UNITED STATES DISTRICT COURT DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOSEPH D'AGOSTIN | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 3:20-cv-01657-OAW |
| | ) | |
| FITNESS INTERNATIONAL, LLC. | ) | |
| D/B/A/ LA FITNESS | ) | |
| Defendant | ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendant, Fitness International, LLC d/b/a/ LA Fitness ("Fitness International"), hereby moves for summary judgment against the plaintiff, Joseph D'Agostin ("Plaintiff"), with respect to all counts and claims set forth in his complaint. As grounds, the defendant states that there is no evidence that it had actual notice of an accumulation of water adjacent to a sauna door that he claims caused him to slip and fall. Likewise, Fitness International did not have sufficient time to find and remedy the alleged accumulation of water on the tile floor adjacent to a sauna door. Given the absence of evidence of any actual or constructive notice of the alleged hazard, summary judgment is warranted in this case.

**I.      UNDISPUTED MATERIAL FACTS**

Plaintiff has been a member of the Norwalk LA Fitness, a sports and fitness club, since 2012. Def.'s Mot. Summ. J. Local Rule 56(a)(1) Statement ¶ 1. Plaintiff alleges that on November 3, 2018, he spent time in a Jacuzzi and then walked to the sauna in the men's locker room. *Id*. ¶¶ 3-6. As he approached and stepped into the sauna, he did not observe any water on

1

the tile floor outside of the sauna door.[2] He entered the sauna without incident. *Id*. ¶¶ 7-8.  He then spent five to seven minutes inside the sauna. *Id*. ¶ 9.

Plaintiff claims that he slipped and then fell while exiting the sauna.  *Id*. ¶ 11. Specifically, he states his foot slipped on an accumulation of water on the tile locker room floor, as he stepped from the sauna.  *Id*. ¶ 12.  At the time of the accident and prior to, the defendant had no knowledge of this particular accumulation of water on the tile floor outside of the sauna door. *Id*. ¶ 16.  There is no evidence in the record that the defendant knew of the presence of the water accumulation outside of the sauna door at the time of the accident.[3]

Likewise, there is no evidence in the record of when, in the 5-7 minute window the plaintiff was inside the sauna, the water accumulated at the spot outside the sauna door, where plaintiff slipped and fell.   There is no evidence of the source of this specific accumulation of water that plaintiff alleges he slipped on.  In fact, plaintiff has no particular information in regard to the liquid accumulation itself, as he did not observe it before and after he fell. *Id*. ¶¶.12-13.

As set forth below, summary judgment is warranted in this case because the defendant had no actual or constructive knowledge of the alleged hazard, the alleged accumulation of water on the tile floor adjacent to the sauna door.

---

[2] Plaintiff testified that that he observed dampness on the floor but he saw "nothing visually" with respect to an accumulation of water prior to stepping into the sauna. *Id.* ¶ 7. He had no problem walking into the sauna at that time.  *Id.* ¶ 8

[3] In addition to structural components to reduce water accumulations, the defendant's staff checked the locker room every half hour to address any walking hazards.  *Id.* ¶ 18.

## II.     LEGAL STANDARDS

### A.  Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient to establish a genuine dispute, and the non-movant must do more than simply show that there is some metaphysical doubt as to the material facts." *Blake v. Conn. Dep't of Developmental Servs*., 750 F. App'x 54, 54-55 (2d Cir. 2019) (quotations, citations, and alterations omitted). "The nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Id*., *quoting Fujitsu Ltd. v. Fed. Exp. Corp*., 247 F.3d 423, 428 (2d Cir. 2001). The nonmovant "must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*., *quoting D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

### B.  Premises Liability Standard

"A business owner owes its invitees a duty to keep its premises in a reasonably safe condition. In addition, the possessor of land must warn an invitee of dangers that the invitee could not reasonably be expected to discover." *DiPietro v. Farmington Sports Arena, LLC*, 306 Conn. 107, 116-17, 49 A.3d 951, 957 (2012), *quoting Baptiste v. Better Val-U Supermarket, Inc.*, 262 Conn. 135, 140 (2002); *Considine v. Waterbury*, 279 Conn. 830, 859 (2006). To recover for the breach of a duty owed to the plaintiff as a business invitee,[4] "it is incumbent upon him to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused his injury or constructive notice of it. The notice, whether actual or

---

[4] Fitness International does not dispute that plaintiff was a business invitee.

constructive, must be **notice of the very defect which occasioned the injury** and not merely of conditions naturally productive of that defect even though subsequently in fact producing it." *DiPietro, supra* at 16-17 (alterations omitted) (emphasis added).

"Relevant case law in Connecticut places a heavy burden on a slip and fall plaintiff to demonstrate that a defendant had actual or constructive notice of the specific defect that led to the accident and not merely of conditions naturally productive of that defect even though subsequently in fact producing it." *Tucker v. United States*, 2017 U.S. Dist. LEXIS 15265, at *7 (D. Conn. Feb. 3, 2017) (Bryant, J.) (quotation and citation omitted); *see also Knox v. United States*, 2016 U.S. Dist. LEXIS 121905, at *12 (D. Conn. Sep. 9, 2016) (Merriam, J.)(same); *Gomes v. United States*, 2012 U.S. Dist. LEXIS 164526, at *11 (D. Conn. Nov. 19, 2012) (Bryant, J.) (same).

"Accordingly, for defendant to be found liable for plaintiff's injuries, "plaintiff must prove (1) the existence of a defect, (2) that the defendant knew or in the exercise of reasonable care should have known about the defect and (3) that such defect had 'existed for such a length of time that the [defendant] should, in the exercise of reasonable care, have discovered it in time to remedy it.'" *Knox*, *supra* at *8-9, *citing Martin v. Stop & Shop Supermarket Cos., Inc.*, 70 Conn. App. 250 (Conn. App. Ct. 2002).

### III. ARGUMENT

In a Connecticut premises liability case, a plaintiff must demonstrate that the defendant had actual or constructive notice of the specific unsafe condition which caused a fall. *LaFaive v. DiLoreto*, 2 Conn. App. 58, 60 (1984).  Either type of notice must be **notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that**

**defect even though subsequently in fact producing it.** *White v. E & F Construction Co.*, 151 Conn. 110, 113, 193 A.2d 716 (1963) (emphasis added.).  In other words, a defendant's "knowledge of the general or overall conditions obtaining on the premises" is insufficient to prove "knowledge and realization of the specific condition causing the injury." *Monahan v. Montgomery*, 153 Conn. 386, 390, 216 A.2d 824, 826 (1966).

The fact that water may exist on different spots on a floor during the course of the day due to incidental water use is not relevant to a determination of the defendant's constructive knowledge of the "very defect which occasioned the injury." *Caviness v. Danbury Mall, LLC*, 2022 Conn. Super. LEXIS 23, *23-24, 2022 WL 225690 (Conn. Super. Ct. January 5, 2022), *citing Monahan v. Montgomery*, *supra*, 153 Conn. 390; *see generally Krause v. Almor Homes*, *Inc*., 149 Conn. 614, 618, 183 A.2d 273, 275, 1962 Conn. LEXIS 223, *5-6 (particular defect at particular location is the only relevant issue on whether the defendant had notice of an alleged danger).

### A. Summary Judgment Is Warranted Because The Plaintiff Cannot Establish Fitness International Had Actual Notice Of The Specific Accumulation Of Water Adjacent To The Sauna Door.

Fitness International did not have actual notice of the alleged water on the tile floor of the locker room in front of the sauna before the plaintiff fell. Id. ¶¶. 16. No evidence in the record demonstrates that the defendant had any actual knowledge of this very defect, which occasioned his injury, an alleged accumulation of water outside of the sauna door. *Monahan v. Montgomery, supra*, 153 Conn. 390. Absent actual knowledge, plaintiff must demonstrate that the defendant had constructive knowledge of this very defect, a heavy burden he fails to meet.in the present case.

**B. Summary Judgment Is Warranted Because The Plaintiff Cannot Establish Fitness International had Constructive Notice Of The Specific Accumulation Of Water That Plaintiff Alleges He Slipped On.**

The Court should dismiss plaintiff's complaint because there is no evidence that the subject accumulation of water outside the sauna door was on the floor long enough for the defendant to find and remedy the alleged hazard. "The mere presence of the water on the floor at the point in time when [plaintiff] fell cannot support an inference of constructive notice because without at least some evidence of how long the water was on the floor, it would be too speculative to infer that the water was on the floor for any more than minutes or even seconds." *Langston v. United States*, 2021 U.S. Dist. LEXIS 189002, at \*17-18 (D. Conn. Sep. 30, 2021) (Shea, J), *quoting Navarro v. Kohl's Dep't Stores, Inc*., 2007 U.S. Dist. LEXIS 21179, \*5, 2007 WL 735787 (D. Conn. Mar. 8, 2007) (Squatrito, J.).

In this case, there is no evidence in the record to suggest that the water that accumulated on the tile floor outside of the sauna was present any longer than a few minutes or even a few seconds. The evidence only suggests that the accumulation was not there at the beginning of the 5-7 minute window when plaintiff entered the sauna. The absence of constructive notice to Fitness International is fatal to plaintiff's case.

As Judge Michael Shea recently noted,

> Courts within this district, applying Connecticut negligence law in slip and fall cases, have repeatedly granted summary judgment against plaintiffs who were unable to present evidence regarding how long a hazard existed before they fell.

*Langston, supra* at \*17-18.   In *Langston*, for example, the plaintiff could not demonstrate how long water had been present on the lobby floor of the defendant Post Office prior to plaintiff's accident. *Id*. Given this factor, Judge Shea awarded summary judgment for the defendant due to

insufficient evidence that the Post Office had constructive knowledge of the accumulation of water.  *Id*.

Similarly, in *Camera v. Target Corp.*, 2020 U.S. Dist. LEXIS 99873, *23, 2020 WL 3051751 (D. Conn. June 8, 2020), Judge Kari Dooley granted defendant's motion for summary judgment in a case where plaintiff claimed he slipped and fell on a soapy liquid in an aisle. Judge Dooley noted that summary judgment was appropriate because the record was "without evidence from which a jury could infer that the alleged soapy substance remained on the floor for an unreasonable length of time."  *Id*.[5]

Further, in *Budd v. United States*, 2009 U.S. Dist. LEXIS 98777, *1, 2009 WL 3538648 (D. Conn. Oct. 23, 2009), Judge Mark Kravitz granted a motion for summary judgment for the defendant where plaintiff alleged injuries incurred from a fall on several drops of water on the defendant's floor.  Judge Kravitz concluded that summary judgment was appropriate due to the absence of any constructive notice to the defendant. *Id*.  Judge Kravitz noted, "the drops could have arrived on the floor a minute and one-half before [plaintiff] slipped. Thus, the record contain[ed] absolutely no evidence from which a jury could infer constructive notice—that is, the wet 'condition existed for a length of time sufficient for the defendant's employees, in the exercise of due care, to discover the defect in time to have remedied it.'" *Id*.

Other Connecticut federal court judges have followed suit in similar cases. See *Tucker v. United States*, 2017 U.S. Dist. LEXIS 15265, at *7 (D. Conn. Feb. 3, 2017) (Judge Vanessa

---

[5] Judge Dooley noted that defendant Target had pointed to the complete lack of evidence supporting the Plaintiff's claim that "the alleged slippery substance remained on the floor long enough to give rise to constructive notice of a hazardous condition. Accordingly, under the Rule 56 analysis, the burden shifts to plaintiff to 'come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.'" *Id*. In Judge Dooley's opinion, the plaintiff failed to do so and thus summary judgment was warranted. *Id*. Here, too, there is a complete absence of evidence of actual or constructive notice, shifting the burden to plaintiff.

Bryant granting defendant's motion for summary judgment, noting in part the absence of any actual or constructive notice of a wet spot); *Knox v. United States*, 2016 U.S. Dist. LEXIS 121905, *1, 2016 WL 4724558 (D. Conn. Sep. 9, 2016) (Judge Sarah Merriam granting defendant's motion for summary judgment given the absence of any evidence that establishes the length of time the alleged defective waxed floor was present.); *Ciullo v. United* States, 2014 U.S. Dist. LEXIS 112657, *19-20, 2014 WL 3973502 (D. Conn. Aug. 14, 2014) (Judge Alvin Thompson granting motion for summary judgment where plaintiff failed to proffer evidence "evidence to show the amount of time that the dowel on which she slipped was present on the exterior stairs of the Post Office.); *Gomes v. United States*, 2012 U.S. Dist. LEXIS 164526, *1, 2012 WL 5869801 (D. Conn. Nov. 19, 2012) (Judge Vanessa Bryant granting defendant's motion for summary judgment where there was no constructive notice of leaves on a defendant's steps that caused plaintiff to fall.); *Chaves v. Exxon Mobil Corp.*, 2008 U.S. Dist. LEXIS 105786, 2009 WL 57119 (D. Conn. Jan. 5, 2009) (Judge Janet Hall dismissing case where plaintiff failed to produce any evidence of where the liquid on which he slipped came from or when it had appeared); *Navarro v. Kohl's Dep't Stores, Inc.*, 2007 U.S. Dist. LEXIS 21179, *2-3, 2007 WL 735787 (2007) (Judge Dominic Squatrito awarding summary judgment to defendant given lack of defendant's constructive notice of spilled liquid on floor).[6]

      Connecticut state court appellate decisions also favor summary judgment in premises liability cases where there is an absence of constructive notice. *See White v. E & F Construction*

---

[6] The defendant is cognizant of Local Rule 56(c)'s admonishment to parties considering motions for summary judgment. However, this instruction is tempered by the proliferation of US District Court decisions granting defendants' motions for summary judgment on the issue of lack of constructive notice. This apparent contradiction makes sense because, while courts are wary of motions for summary judgments that involve questions of material facts, constructive notice summary judgment motions each contend that there is no evidence of constructive notice of a hazard to a defendant. Within this prism, the cited USDC decisions are consistent with the Local Rule's objective.

*Co.*, 151 Conn. 110, 113-14, 193 A.2d 716 (1963) (evidence that established that defective condition existed for only two minutes prior to accident was insufficient to charge defendant with constructive notice of defect); *Bisson v. Wal-Mart Stores, Inc.*, 184 Conn. App. 619, 631-632, 195 A.3d 707, 717, (2018) (upholding motion for summary judgment given absence of evidence that defendant could find and remedy liquid on floor in small amount of time); *Hellamns v. Yale-New Haven Hosp., Inc.*, 147 Conn. App. 405, 413, 82 A.3d 677, 683, 2013 Conn. App. LEXIS 591, *14, 2013 WL 6818146 (2013) (overturning verdict for plaintiff and issuing judgment in favor of defendant due to lack of constructive notice of slippery substance on premises); *James v. Valley-Shore Y.M.C.A., Inc.*, 125 Conn. App. 174, 183, 6 A.3d 1199, 1205, 2010 Conn. App. LEXIS 527, *13 (2010) (affirming summary judgment motion for defendant because there was "no evidence before us that the allegedly defective condition existed for such a length of time that the defendant's employees should, in the exercise of due care, have discovered it in time to have remedied it."); *Colombo v. Stop & Shop Supermarket Co.*, 67 Conn. App. 62, 62, 787 A.2d 5, 6, 2001 Conn. App. LEXIS 584, *1 (2001) (upholding directed verdict for defendant based on lack of evidence of how long spilled milk had been in aisle); *Gulycz v. Stop & Shop Cos.*, 29 Conn. App. 519, 522, 615 A.2d 1087, 1089, 1992 Conn. App. LEXIS 410, *5 (1992) (upholding dismissal of case where plaintiff offered no evidence that defect had existed for any period of time).

In addition, Connecticut Superior Court judges routinely grant summary judgment motions where a plaintiff cannot demonstrate that a defect existed long enough for a defendant to locate and remedy the hazard. For example, in the recent decision of *Caviness v. Danbury Mall, LLC, supra* at 23-24 (Conn. Super. Ct. January 5, 2022), the court granted a premises owner's

motion for summary judgment where the plaintiff could not demonstrate that the mall defendant had actual or constructive notice of a wet spot plaintiff slipped on.  In this case, plaintiff argued that the defendant knew mall customers were tracking in rainwater and creating wet footprints on the mall floor. *Id*.  The plaintiff noted that the defendant had placed a "wet floor sign" near another puddle about 50 feet from the spot where plaintiff fell.  *Id*. Plaintiff argued that the mall thus had constructive notice of an ongoing water hazard problem, and should have taken steps to address the water spot that plaintiff fell on. *Id*. The court rejected this evidence as constructive notice of the subject defect because these facts did not relate to the **actual wet spot** that plaintiff allegedly slipped on. *Id*. Absent any evidence of how long the **actual wet spot** had been on the floor, the plaintiff could not demonstrate constructive notice to the defendant.  Under such circumstances, summary judgment was warranted.  *Id*.

Furthermore, in the case of *Shaw v. Kmart Corp.*, 2007 Conn. Super. LEXIS 1841, *9-1, 2007 WL 2242710, the plaintiff sued the defendant after she slipped and fell on a wet spot in the retail store.  The defendant filed a motion for summary judgment, noting that it did not have any actual or constructive notice of the wet spot plaintiff fell on.  *Id*.  In opposition, plaintiff argued that the retailer's roof often had leaks after snowstorms and such leaks resulted in puddles on the floor below. *Id*. Rusty ceilings and vents ducts underneath the roof provided further evidence of this ongoing problem. Id. After consideration of the plaintiff's arguments, Judge Gerard F. Esposito granted defendant's motion for summary judgment.  Judge Esposito noted that plaintiff's argument had "no merit because it **does not demonstrate that the specific wet spot**

that caused the plaintiff's injury had existed for any length of time and it merely suggests

that general conditions naturally productive of wet spots existed." *Id*. (emphasis added).[7]

Notably, in *Caviness* and *Shaw*, the courts ruled that the plaintiff must demonstrate that

the defendant had constructive notice of the **actual wet spot** that allegedly caused plaintiff to

fall, as opposed to general conditions or ongoing complaints in the general area of the accident.

*See Caviness v. Danbury Mall, LLC, supra* at 23-24; *Shaw v. Kmart Corp*., 2007 Conn. Super.

LEXIS 1841. It was not enough to demonstrate that there was an ongoing problem that should

have led the defendants to expect the creation of the subject water spot that caused an accident.

These holdings are consistent with the long held notion in Connecticut that actual and

constructive notice means "**notice of the very defect which occasioned the injury and not**

**merely of conditions naturally productive of that defect even though subsequently in fact**

**producing it**." *White v. E & F Construction Co*., 151 Conn. at 113.

In the present case, there is no actual or constructive notice of the "very defect which

occasioned the injury," the alleged wet spot adjacent to the sauna door. *Id*. There is no evidence

---

[7] *Accord Perez v. Grade A Shop Rite Commerce Road, LLC*, 2019 Conn. Super. LEXIS 2768 (Conn. Super. Ct. Oct. 4, 2019) (Hernandez, J.), (summary judgment granted where plaintiff slipped in a puddle near a cash register and no constructive noticed was demonstrated given the absence of evidence of how long puddle remained on floor); *Mason v. Wal-Mart Stores*, 2012 Conn. Super. LEXIS 1175, 2012 WL 1959006, at *2 (Conn. Super. Ct. May 1, 2012) (granting summary judgment where the plaintiff could not show that the water on which he slipped and fell existed long enough for the defendant to take corrective action, and holding that "it would be unreasonable for this court to find that the defendant had constructive notice of a hazardous condition that had been in existence for but one minute"); *Shaw v. Kmart Corp.*, No. CV065000627S, 2007 Conn. Super. LEXIS 1841, 2007 WL 2242710, at *3 (Conn. Super. Ct. July 13, 2007) (holding that summary judgment was appropriate where "[t]he plaintiff fail[ed] . . . to offer any evidence, direct or circumstantial, to show that the wet spot [on which plaintiff slipped and fell] had existed for any period of time" and only argued that "because it had stopped snowing the day before, the defendant's employees had a sufficient length of time to anticipate, observe and clean up any wet spots that were likely to accumulate on the floor;" further concluding that plaintiff's argument had no merit because it did not "demonstrate that the specific wet spot that caused the plaintiff's injury had existed for any length of time and it merely suggests that general conditions naturally productive of wet spots existed."); *Deptula v. New Britain Trust Co.*, 19 Conn. Supp. 434, 436-437, 116 A.2d 773 (Conn. C. P. 1955) (entering judgment for defendants where the source of the water on the floor on which plaintiff slipped was known, but there was no evidence as to how long the wetness was present; therefore, without at least some evidence of how long the condition existed, it would be too speculative to infer that the water was on the floor for any more than "minutes or even seconds").

that the defendant had any actual knowledge of this particular wet spot at the time of the accident.  Likewise, the defendant had no constructive knowledge of the alleged hazard because no evidence demonstrates the wet spot was present long enough for the defendant to find and remedy the alleged hazard.[8] The plaintiff may argue that at different times and places there were wet footprints on the locker room floor from patrons using nearby showers, Jacuzzis and the pool but those incidents have no bearing on whether the defendant had actual or constructive notice of the actual water accumulation in this case that arose after plaintiff stepped into the sauna for 5 to 7 minutes.

This court should reject any argument that plaintiff does not have to demonstrate actual or constructive knowledge of the alleged hazard outside of the sauna door at the time of the accident. A standard that held a defendant liable "for the presence of a defect for any length of time" on one's premises constitutes strict liability, an improper standard to apply in premises liability cases. *Hellamns v. Yale-New Haven Hosp., Inc*., 147 Conn. App. 405, 409-410, 82 A.3d 677, 681, 2013 Conn. App. LEXIS 591, *7-9, 2013 WL 6818146 (rejecting a strict liability approach because that is not the standard of care owed by a premises owner in Connecticut).

### Conclusion

Given the absence of any actual or constructive notice attributable to the defendant in this case, the defendant respectfully requests that the Court grant its motion for summary judgment.

---

[8] The outside limit of how long the water remained on the floor outside the sauna was a little bit less than 5-7 minutes.  This "ceiling" does not constitute sufficient time for the defendant to locate and remedy a walking hazard on the premises.  However, the Court need not make any determination of that fact.  Here, we have no knowledge as to how long the water remained on the floor outside of the sauna door.  Thus, the accumulation may have been present only for seconds or minutes before the accident.  The absence of any such evidence leads to impermissible speculation of how long the water spot was on the floor, and it supports the conclusion that there is no affirmative evidence that the defendant had constructive notice of the accumulation of water outside of the sauna door.

Respectfully submitted,
Defendant,
Fitness International, LLC, d/b/a LA Fitness
By its attorneys,

Kevin J. O'Leary, ct30271
Benjamin H. Levites, ct30481
Coughlin Betke LLP
175 Federal Street
Boston, MA 02110
(617) 988-8050
koleary@coughlinbetke.com
blevites@coughlinbetke.com

CERTIFICATION

This is to certify that a copy of the foregoing was filed electronically on March 17, 2022. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Benjamin H. Levites

 Positive

As of: March 17, 2022 2:37 AM Z

## *Baptiste v. Better Val-U Supermarket*

Supreme Court of Connecticut

October 29, 2002, Argued ; December 10, 2002, Officially Released

(SC 16764)

**Reporter**

262 Conn. 135 *; 811 A.2d 687 **; 2002 Conn. LEXIS 461 ***

STERNE BAPTISTE v. BETTER VAL-U
SUPERMARKET, INC., ET AL.

**Prior History: [***1]**  Action to recover damages for the
alleged negligence of the defendants, and for other
relief, brought to the Superior Court in the judicial district
of New London at Norwich, and tried to the court, Hon.
D. Michael Hurley, judge trial referee, who, exercising
the powers of the Superior Court, rendered judgment for
the plaintiff, from which the defendants appealed;
thereafter, the defendant Western Union Financial
Services, Inc., withdrew its appeal.

**Disposition:** Reversed and remanded with directions.

## Core Terms

wire transfer, monetary, trial court, foreseeable, notice

## Case Summary

### Procedural Posture

Plaintiff customer sued defendant grocer, alleging
negligence. The Superior Court in the judicial district of
New London at Norwich (Connecticut) found the
customer contributorily negligent and rendered
judgment for the customer in the amount of $ 2,500. The
grocer appealed.

### Overview

The customer went to the grocer's store to conduct a
money wire transfer. The customer placed an envelope
containing $ 5,000 in cash on the grocer's counter,
which subsequently disappeared. On appeal, the grocer
argued that the trial court erred in holding that the
grocer owed a duty to the customer to protect against
the loss he had sustained, the grocer had breached that
duty, the breach of that duty proximately caused the
customer's injury, and the customer was not
contributorily negligent for the full extent of his loss. In
reversing the trial court's judgment, the supreme court
found that the grocer did not owe the customer a duty.
The supreme court noted that there was no basis upon
which to conclude that the grocer should have
anticipated the type of danger to which the customer
was exposed. In addition, the customer did not allege or
prove that the grocer knew or should have known that
any customer would place cash on the counter without
maintaining visual or physical contact with it.

### Outcome

The trial court's entry of judgment for the customer was
reversed and a direction to render judgment for the
grocer was entered.

## LexisNexis® Headnotes

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 15 of 253

Page 2 of 6

262 Conn. 135, *135; 811 A.2d 687, **687; 2002 Conn. LEXIS 461, ***1

Civil Procedure > Appeals > Standards of Review > De Novo Review

Torts > Negligence > Elements

Civil Procedure > Appeals > Standards of Review > General Overview

Torts > Negligence > General Overview

Torts > ... > Elements > Duty > General Overview

*HN1*[⬇] **Standards of Review, De Novo Review**

The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. Contained within the first element, duty, there are two distinct considerations. First, it is necessary to determine the existence of a duty, and second, if one is found, it is necessary to evaluate the scope of that duty. The issue of whether a duty exists is a question of law which is subject to plenary review. Sometimes the scope of the duty is referred to as the requisite standard of care.

Torts > ... > Elements > Duty > General Overview

*HN2*[⬇] **Elements, Duty**

In determining whether a defendant owed a duty to a plaintiff, the court's threshold inquiry is whether the specific harm alleged by the plaintiff was foreseeable to the defendant. By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary person in the defendant's position, knowing what he knew or should have known, anticipate that

harm of the general nature of that suffered was likely to result? The idea of risk in this context necessarily involves a recognizable danger, based upon some knowledge of the existing facts, and some reasonable belief that harm may possibly follow. Accordingly, the fact finder must consider whether the defendant knew, or should have known, that the situation would obviously and naturally, even though not necessarily, expose the plaintiff to probable injury unless preventive measures were taken. Finally, if a court determines, as a matter of law, that a defendant owes no duty to a plaintiff, the plaintiff cannot recover in negligence from the defendant.

Torts > ... > Duty On Premises > Invitees > Business Invitees

Torts > Premises & Property Liability > General Premises Liability > General Overview

*HN3*[⬇] **Invitees, Business Invitees**

Where a plaintiff is a business invitee of the defendant, the defendant owes the plaintiff a duty to keep its premises in a reasonably safe condition.

Evidence > Burdens of Proof > General Overview

Torts > ... > Duty On Premises > Invitees > Business Invitees

Torts > Premises & Property Liability > General Premises Liability > General Overview

*HN4*[⬇] **Evidence, Burdens of Proof**

For a plaintiff to recover for the breach of a duty owed to him as a business invitee, it is incumbent upon him to allege and prove that the defendant either had actual

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 16 of 253

Page 3 of 6

262 Conn. 135, *135; 811 A.2d 687, **687; 2002 Conn. LEXIS 461, ***1

notice of the presence of the specific unsafe condition which caused his injury or constructive notice of it. The notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it. In the absence of allegations and proof of any facts that would give rise to an enhanced duty, the defendant is held to the duty of protecting its business invitees from known, foreseeable dangers.

**Counsel:** Michael D. Colonese, with whom, on the brief, was Dana M. Horton, for the appellant (named defendant).

Lorenzo J. Cicchiello, for the appellee (plaintiff).

**Judges:** Borden, Norcott, Katz, Palmer and Vertefeuille, Js. In this opinion the other justices concurred.

**Opinion by:** KATZ

# Opinion

 **[\*136] [\*\*689]**   KATZ, J. The dispositive issue in this appeal is whether the trial court properly determined that, under the circumstances of this case, the named defendant, Better Val-U Supermarket, Inc. (defendant), owed a duty to the plaintiff, Sterne Baptiste, who, in the course of completing the forms necessary to conduct a monetary wire transfer through facilities owned by Western Union Financial Services, Inc. (Western Union), which were **[\*\*\*2]** located on the defendant's premises, placed on the defendant's counter an envelope containing $ 5000 in cash, which disappeared. The plaintiff brought an action against the defendant [1]

alleging negligence for its failure to: (1) provide a safe and secure area for the transaction of monetary wire transfers; (2) monitor adequately **[\*137]** the area where monetary transfers took place in order to discourage loss, theft and larceny; (3) use security cameras in the area in which monetary wire transfers took place in order to discourage loss, theft and larceny and to assist in the investigation of loss claims; and (4) train properly its employees in the safe and secure transaction of monetary wire transfers. Following a court trial, the trial court concluded that the area of the defendant's store where the plaintiff had gone to make his transaction was not **[\*\*690]** secure and that it should have been made secure. [2] The court also found that the plaintiff was contributorily negligent, however, less than 50 percent negligent, and rendered judgment awarding him $ 2500 in damages. The defendant appealed [3] from the judgment, claiming that the trial court improperly had determined that: (1) the defendant owed **[\*\*\*3]** a duty to the plaintiff to protect against the loss he had sustained; (2) the defendant had breached that duty; (3) the breach of that duty proximately caused the plaintiff's injury; and (4) the plaintiff was not contributorily negligent for the full extent of his loss. We agree with the defendant's first claim and, accordingly, reverse the judgment of the trial court. [4]

_____

appeal.

[2] The trial court did not state expressly that the defendant was negligent or that it had breached a duty to the plaintiff, merely stating: "The court finds that this is not a secure area, as I think it should be."

[3] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to **Practice Book § 65-1** and _General Statutes § 51-199 (c)_.

[4] We, therefore, do not reach the defendant's remaining claims.

_____

[1] The plaintiff also brought the action against Western Union, which reached a settlement with the plaintiff while this appeal was pending. Western Union subsequently withdrew its

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 17 of 253

Page 4 of 6

262 Conn. 135, *137; 811 A.2d 687, **690; 2002 Conn. LEXIS 461, ***3

[***4] The trial court reasonably could have found the following facts. On March 21, 1999, at approximately 10:30 a.m., the plaintiff entered the defendant's store, located at 469 Hamilton Avenue in Norwich, for the purpose of conducting a monetary wire transfer. A Western Union wire transfer facility was located inside the store. The plaintiff had in his possession a bank envelope containing $ 5000 in United States currency, which he [*138] intended to transfer to his wife in Haiti. He had performed such wire transfers at the defendant's store in the past. Accordingly, he went to the counter that serviced Western Union wire transfers and began to fill out the forms necessary to accomplish the transaction. When the pen he had been using ran out of ink, the plaintiff asked one of the defendant's employees for another pen, at which time he placed the envelope containing the money on the counter to his left. None of the defendant's employees watched the plaintiff fill out the paperwork, but instead waited on other customers. After completing the forms to effect the transfer, the plaintiff notified one of the defendant's employees that he had finished. Another employee, called upon to complete the [***5] transaction, asked the plaintiff for the money, at which time the plaintiff realized that the envelope containing the money was missing. The police were then notified of the incident.

"We begin by setting forth the relevant parameters under our negligence jurisprudence. *HN1*[↑] The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. . . . Contained within the first element, duty, there are two distinct considerations. . . . First, it is necessary to determine the existence of a duty, and [second], if one is found, it is necessary to evaluate the scope of that duty. . . . *Maffucci v. Royal Park Ltd. Partnership, 243 Conn. 552, 566, 707 A.2d 15 (1998)*. The issue of whether a duty exists is a question of law; *Gomes v. Commercial Union Ins. Co., 258 Conn. 603, 614, 783 A.2d 462 (2001)*; *Petriello v. Kalman, 215 Conn. 377, 382, 576 A.2d 474 (1990)*; which is subject to plenary review. We sometimes refer to the scope of that duty as the requisite standard of care. See, e.g., *Santopietro v. New Haven, 239 Conn. 207, 226, 228-29, 682 A.2d 106 (1996)*; [***6] *Shore v. Stonington, 187 Conn. 147, 151, [*139] 444 A.2d 1379 (1982)*; see also *57A Am. Jur. 2d, Negligence § 85* (1989). [**691]

*HN2*[↑]] "Our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. . . . By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result? . . . *Gomes v. Commercial Union Ins. Co., supra, 258 Conn. at 615*; *Jaworski v. Kiernan, 241 Conn. 399, 405, 696 A.2d 332 (1997)*; see also 57A Am. Jur. 2d 216, supra, § 154 (ordinary care has reference to probabilities of danger rather than possibilities of peril). The idea of risk in this context necessarily involves a recognizable danger, based upon some knowledge of the existing facts, and some reasonable belief that harm may possibly follow. W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 31, p. 170; see [***7] also *Schiavone v. Falango, 149 Conn. 293, 298, 179 A.2d 622 (1962)* (reasonable care does not require that one must guard against eventualities which, at best, are too remote to be reasonably foreseeable). Accordingly, the fact finder must consider whether the defendant knew, or should have known, that the situation . . . would obviously and naturally, even though not necessarily, expose [the plaintiff] to probable injury unless preventive measures were taken. *Bonczkiewicz v. Merberg Wrecking Corp., 148 Conn. 573, 579, 172 A.2d 917 (1961)*." (Internal quotation marks omitted.)

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 18 of 253

Page 5 of 6

262 Conn. 135, *139; 811 A.2d 687, **691; 2002 Conn. LEXIS 461, ***7

*LePage v. Horne, 262 Conn. 116, 809 A.2d 505*, ___, ___ A.2d ___ (2002). Finally, "if a court determines, as a matter of law, that a defendant owes no duty to a plaintiff, the plaintiff cannot recover in negligence from the defendant." (Internal quotation marks omitted.) *Gomes v. Commercial Union* **[*140]** *Ins. Co., supra, 258 Conn. at 614-15*; accord *Neal v. Shiels, Inc., 166 Conn. 3, 12, 347 A.2d 102 (1974)*.

It is undisputed that the *HN3*[↑] plaintiff in this case was a business invitee of the defendant and that, consequently, the defendant owed the plaintiff a **[***8]** duty to keep its premises in a reasonably safe condition. *Martin v. Stop & Shop Supermarket Cos., 70 Conn. App. 250, 251, 796 A.2d 1277 (2002)*; *Gulycz v. Stop & Shop Cos., 29 Conn. App. 519, 521, 615 A.2d 1087*, cert. denied, *224 Conn. 923, 618 A.2d 527 (1992)*. Typically, *HN4*[↑] "for the plaintiff to recover for the breach of a duty owed to [him] as [a business] invitee, it [is] incumbent upon [him] to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused [his injury] or constructive notice of it. . . . The notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it." (Citations omitted.) *Monahan v. Montgomery, 153 Conn. 386, 390, 216 A.2d 824 (1966)*; accord *Meek v. Wal-Mart Stores, Inc., 72 Conn. App. 467, 474, 806 A.2d 546 (2002)*. In the absence of allegations and proof of any facts that would give rise to an enhanced duty; cf. *Furstein v. Hill, 218 Conn. 610, 624, 590 A.2d 939 (1991)* **[***9]** (noting that "under certain circumstances a heightened duty to the licensee can arise"); the defendant is held to the duty of protecting its business invitees from known, foreseeable dangers.

On the basis of our review of the record in this case, the plaintiff neither pleaded nor proved that the incident that

occurred on March 21, 1999, was foreseeable. The plaintiff did not offer any evidence to demonstrate that the defendant reasonably should have anticipated and, **[*141]** **[**692]** accordingly, protected against a theft. [5] There was no evidence that the store was located in a high crime area or that any crime ever had occurred in the defendant's store. Cf. *Stewart v. Federated Dept. Stores, Inc., 234 Conn. 597, 601, 662 A.2d 753 (1995)* (noting such evidence in wrongful death action). Consequently, in the absence of any notice or reason to believe that such a crime could occur, there was no basis upon which to conclude that the defendant should have anticipated this particular danger.

**[***10]** Nor was it alleged or proven that the defendant knew or should have known that any customer entering the defendant's store would place cash on the countertop without maintaining visual or physical contact with it or that the customer would lose track of the money. No evidence of any such similar pattern of behavior was offered in the present case. Indeed, had any such evidence been offered, it would not have established the defendant's negligence because the defendant had no duty to protect the plaintiff from his own carelessness. See *Meek v. Wal-Mart Stores, Inc., supra, 72 Conn. App. at 478-79* ("'a store owner is not an insurer of its customers' safety'").

In the present case, the defendant had no reason to know of the likelihood of the type of danger to which the plaintiff was exposed, indeed, a danger that the plaintiff

_____

[5] The plaintiff testified that he had no idea what happened to the money. He made essentially the same statement to the police officer who responded to the call regarding the incident. The record is not definitive as to what actually occurred and the trial court did not make any express findings in this regard, other than to conclude that the area of the defendant's store where the plaintiff attempted to make his wire transfer was not secure.

262 Conn. 135, *141; 811 A.2d 687, **692; 2002 Conn. LEXIS 461, ***10

could not even specifically identify. [6] See footnote [*142] 5 of this opinion. Accordingly, in the absence of any knowledge by the defendant that its arrangement of the wire transfer facility "'would obviously and naturally, even though not necessarily, expose [the plaintiff] to probable injury unless preventive measures were taken'"; [***11] *LePage v. Horne, 262 Conn. 116, 809 A.2d 505*; *Bonczkiewicz v. Merberg Wrecking Corp., supra, 148 Conn. at 579*; the defendant was under no special duty to protect the plaintiff from the loss of his money.

[**693] [***12]   The judgment is reversed and the case is remanded with direction to render judgment for the defendant.

In this opinion the other justices concurred.

---

End of Document

---

[6] The record reflects simply that the defendant knew that customers would bring money to the wire transfer counter and that there were no security guards or cameras in place. Essential to determining whether a legal duty exists, however, is "'the fundamental policy of the law'" that a tortfeasor's responsibility should not extend to the theoretically endless consequences of the wrong. *Perodeau v. Hartford, 259 Conn. 729, 756, 792 A.2d 752 (2002)*; *Jaworski v. Kiernan, supra, 241 Conn. at 406*. Thus, even when harm has been determined to be foreseeable, we have found no duty when the nexus between a defendant's negligence and the particular consequences to the plaintiff was too attenuated. See, e.g., *Waters v. Autuori, 236 Conn. 820, 836, 676 A.2d 357 (1996)* (nexus between accounting standards promulgated by professional regulatory body and investor's economic loss insufficient to create duty of care); *RK Constructors, Inc. v. Fusco Corp., 231 Conn. 381, 387-88, 650 A.2d 153 (1994)* (connection between contractor's negligence and economic loss to injured party's employer owing to increased insurance premiums too attenuated to impose liability). In the present case, even if there were some proof of foreseeability that cash handled during a wire transfer could "disappear," we would have to determine as a matter of policy whether the scope of the defendant's duty should extend to protecting the plaintiff from the loss he suffered. In that instance, we likely would consider whether cameras and security guards should be placed, for example, in jewelry stores, at automatic teller machine locations, and at checkout counters. In light of the evidence in this case, or lack thereof, we need not consider such policy issues.

 Positive

As of: March 17, 2022 2:37 AM Z

# *Bisson v. Wal-Mart Stores, Inc.*

Appellate Court of Connecticut

May 12, 2018, Argued; September 11, 2018, Officially Released

AC 39965

**Reporter**

184 Conn. App. 619 *; 195 A.3d 707 **; 2018 Conn. App. LEXIS 345 ***; 2018 WL 4288647

REBECCA BISSON v. WAL-MART STORES, INC.

**Prior History: [***1]** Action to recover damages for personal injuries sustained as a result of the defendant's alleged negligence, and for other relief, brought to the Superior Court in the judicial district of Ansonia-Milford, where the court, Tyma, J., granted the defendant's motion for summary judgment and rendered judgment thereon; thereafter, the court denied the plaintiff's motion to reargue and for reconsideration, and the plaintiff appealed to this court.

*Bisson v. Wal-Mart Stores, Inc., 2016 Conn. Super. LEXIS 3624 (Conn. Super. Ct., Nov. 21, 2016)*

**Disposition:** Affirmed.

## Core Terms

summary judgment, sweep, constructive notice, genuine issue of material fact, floor, forty second, minute, deposition, notice, length of time, surveillance video, employees, walking, trial court, marks, snow, summary judgment motion, exercise due care, puddle, premises liability, demonstrating, memorandum, quotation, invitees, remedied, janitor, liquid, aisle, deposition testimony, defective condition

## Case Summary

### Overview

HOLDINGS: [1]-In this premises liability action, the grant of summary judgment to the retailer was affirmed because the retailer's evidence, particularly an employee's affidavit, established a forty second maximum time period between the creation of the defect and the customer's fall and a forty second window constituted an insufficient period of time for the retailer to discover and remedy a small puddle of water on the floor in the exercise of due care.

### Outcome

Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

184 Conn. App. 619, *619; 195 A.3d 707, **707; 2018 Conn. App. LEXIS 345, ***1

**HN1[↓]** Summary Judgment, Entitlement as Matter of Law

The standard by which an appellate court reviews a trial court's decision to grant a motion for summary judgment is well established. Summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact a party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. It is not enough for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact, whether contained in a complaint or in a brief, are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court in support of a motion for summary judgment.

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > Judgments > Summary Judgment > Supporting Materials

**HN2[↓]** Summary Judgment, Entitlement as Matter of Law

As a general rule, then, when a motion for summary judgment is filed and supported by affidavits and other documents, an adverse party, by affidavit or as otherwise provided by the rules of practice, must set forth specific facts showing that there is a genuine issue for trial, and if he does not so respond, summary judgment shall be entered against him. Requiring the nonmovant to produce such evidence does not shift the burden of proof. Rather, it ensures that the nonmovant has not raised a specious issue for the sole purpose of forcing the case to trial.

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

Civil Procedure > Judgments > Summary Judgment > Supporting Materials

**HN3[↓]** Summary Judgment, Entitlement as Matter of Law

The party opposing a motion for summary judgment must present evidence that demonstrates the existence of some disputed factual issue. The movant has the burden of showing the nonexistence of such issues but the evidence thus presented, if otherwise sufficient, is not rebutted by the bald statement that an issue of fact does exist. To oppose a motion for summary judgment successfully, the nonmovant must recite specific facts which contradict those stated in the movant's affidavits and documents. The opposing party to a motion for summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 22 of 253

Page 3 of 17

184 Conn. App. 619, *619; 195 A.3d 707, **707; 2018 Conn. App. LEXIS 345, ***1

together with the evidence disclosing the existence of such an issue. The existence of the genuine issue of material fact must be demonstrated by counter-affidavits and concrete evidence. Appellate review of the trial court's decision to grant a motion for summary judgment is plenary.

Torts > Premises & Property Liability > General Premises Liability > Activities & Conditions

Torts > ... > Duties of Care > Duty On Premises > Reasonable Care

*HN4*[🔽]   General Premises Liability, Activities & Conditions

To hold a defendant liable for personal injuries in a premises liability action, the plaintiff must prove (1) the existence of a defect, (2) that the defendant knew or in the exercise of reasonable care should have known about the defect and (3) that such defect had existed for such a length of time that the defendant should, in the exercise of reasonable care, have discovered it in time to remedy it.

Torts > ... > Duty On Premises > Invitees > Business Invitees

*HN5*[🔽]   Invitees, Business Invitees

A business invitee is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land. As a result of this status, a defendant owes the plaintiff the duty to keep its premises in a reasonably safe condition.

Civil Procedure > Judgments > Summary

Judgment > Entitlement as Matter of Law

Torts > ... > Duty On Premises > Invitees > Business Invitees

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

*HN6*[🔽]   Summary Judgment, Entitlement as Matter of Law

For a plaintiff to recover for the breach of a duty owed to him as a business invitee, it is incumbent upon him to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused his injury or constructive notice of it. The notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it. In the absence of allegations and proof of any facts that would give rise to an enhanced duty a defendant is held to the duty of protecting its business invitees from known, foreseeable dangers. Accordingly, business owners do not breach their duty to invitees by failing to remedy a danger unless they had actual or constructive notice of that danger. To defeat a motion for summary judgment in a case based on allegedly defective conditions, the plaintiff has the burden of offering evidence from which a jury reasonably could conclude that the defendant had notice of the condition and failed to take reasonable steps to remedy the condition after such notice.

Torts > ... > Duty On Premises > Invitees > Business Invitees

*HN7*[🔽]   Invitees, Business Invitees

The controlling question in deciding whether the

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 23 of 253

Page 4 of 17

184 Conn. App. 619, *619; 195 A.3d 707, **707; 2018 Conn. App. LEXIS 345, ***1

defendant had constructive notice of the defective condition is whether the condition had existed for such a length of time that the defendants' employees should, in the exercise of due care, have, discovered it in time to have remedied it. What constitutes a reasonable length of time within which the defendant should have learned of the defect, how that knowledge should have been acquired, and the time within which, thereafter, the defect should have been remedied are matters to be determined in light of the particular circumstances of each case. The nature of the business and the location of the defective condition would be factors in this determination. To a considerable degree each case must be decided on its own circumstances. Nevertheless, defect lasting under a minute has been held to be, as a matter of law, insufficient for a defendant to have discovered and remedied it, and thus fatal to a premises liability action.

Torts > ... > Duty On Premises > Invitees > Business Invitees

*HN8*[⬇]  Invitees, Business Invitees

Business owners are not insurers of their customers' safety.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN9*[⬇]  Reviewability of Lower Court Decisions, Preservation for Review

Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. For the appellate court judiciously and efficiently to consider claims of error raised on appeal the parties must clearly and fully set forth their arguments in their briefs. The appellate court does not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.

## Syllabus

The plaintiff, a business invitee of the defendant company, brought this premises liability action against the defendant, seeking to recover damages for personal injuries she sustained when she allegedly slipped and fell on an accumulation of water while walking in the main aisle of the defendant's store. The plaintiff alleged that her fall was caused by, inter alia, the defendant's negligence and carelessness in creating the alleged dangerous and hazardous condition on the floor, and failing to properly inspect its premises to detect and remedy that condition. The defendant filed a motion for summary judgment on the ground that there was no factual basis on which a reasonable jury could find that the defendant had actual or constructive **[***2]** notice of the alleged defect. In support, the defendant attached an excerpt from the plaintiff's deposition and an affidavit of its employee, C. The plaintiff claimed that a genuine issue of material fact existed as to whether the defendant had constructive notice of the alleged defect and, in support of her objection, submitted a copy of C's deposition and a copy of a video recording of the events leading up to, and including, the plaintiff's fall. The trial court granted the defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed to this court. On appeal, the

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 24 of 253

Page 5 of 17

184 Conn. App. 619, *619; 195 A.3d 707, **707; 2018 Conn. App. LEXIS 345, ***2

plaintiff claimed, inter alia, that the trial court improperly concluded that she failed to present evidence demonstrating the existence of a disputed factual issue as to the matter of constructive notice. Specifically, she claimed that C's deposition contained contradictions regarding whether she actually performed a safety sweep of the main aisle prior to the plaintiff's fall and that C's deposition testimony regarding the time that had elapsed from her safety sweep of the main aisle to the plaintiff's fall was inconsistent. *Held*:

1. The trial court properly concluded that the **[***3]** defendant met its initial burden of establishing the absence of a genuine issue of material fact with respect to the constructive notice element of a premises liability action for a business invitee; the defendant's evidence, particularly C's affidavit, established a forty second maximum time period between the creation of the defect and the plaintiff's fall, and that brief period of time in which the defect could have existed did not create a genuine issue of material fact with respect to the constructive notice element, as the defendant, acting through its employees' exercise of due care, did not have sufficient time to discover and remedy the alleged defect, a puddle of water on the floor of its store.

2. The trial court properly concluded that the plaintiff failed to present evidence demonstrating the existence of a disputed factual issue as to the constructive notice element: the plaintiff's attempt to inject a question of untruthfulness into C's deposition regarding whether she had performed a safety sweep was unsupported by the record, as the plaintiff's argument failed to appreciate the distinction between two different types of safety sweeps performed at the defendant's store, **[***4]** the plaintiff's claim that the surveillance video showed that C never looked down or directly in the area of the plaintiff's fall amounted to nothing more than speculation on behalf of the plaintiff because it was not possible to discern where C's gaze was directed when she

performed her safety sweep due to the low quality of the video recording, and although C's deposition testimony regarding the time that had elapsed from her safety sweep of the main aisle to the plaintiff's fall included isolated references to both a five and ten minute time frame, C's deposition, when read as a whole, demonstrated that the plaintiff's fall occurred in the area where, approximately forty seconds prior, C had conducted a safety sweep, and that time period was confirmed by the video recording; moreover, the plaintiff's claim that the presence of snow on the ground on the day of the plaintiff's fall increased the defendant's duty to keep its premises in a reasonably safe condition was inadequately briefed and not reviewable.

**Counsel:** Ryan K. Miller, for the appellant (plaintiff).

Michael P. Kenney, with whom, on the brief, was Kate J. Boucher, for the appellee (defendant).

**Judges:** DiPentima, C. J., and Sheldon and Prescott, **[***5]** Js. In this opinion the other judges concurred.

**Opinion by:** DiPENTIMA

# Opinion

**[**710] [*620]**    DiPENTIMA, C. J. In this premises liability action, the plaintiff, Rebecca Bisson, challenges the summary judgment rendered in favor of the defendant, Wal-Mart **[*621]** Stores, Inc.,[1] **[**711]** in which the trial court determined that (1) the defendant met its burden of establishing that no genuine issue of material fact existed regarding constructive notice of the

---

[1] The plaintiff named "Wal-Mart Stores, Inc." as the defendant in her initial complaint. Thereafter, the plaintiff amended the complaint to include the proper legal name of the defendant, that is, "Wal-Mart Stores East I, L.P."

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 25 of 253

Page 6 of 17

184 Conn. App. 619, *621; 195 A.3d 707, **711; 2018 Conn. App. LEXIS 345, ***5

defect alleged and (2) that the plaintiff's own evidence did not establish the existence of a genuine issue of material fact. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to our consideration of the plaintiff's appeal. The plaintiff commenced this premises liability action on November 13, 2013. In the amended complaint, dated March 4, 2014, the plaintiff alleged that on February 12, 2013, she entered the defendant's store in Naugatuck with her aunt. While walking in the main aisle of the store, the plaintiff slipped and fell on an accumulation of water. The plaintiff suffered immediate pain in her left knee, and an employee of the defendant quickly offered her assistance.

The plaintiff claimed that her fall was caused by the defendant's [***6] negligence and carelessness in creating the dangerous and hazardous condition on the floor, failing to remedy the condition, failing to warn the plaintiff of the condition, failing to properly inspect its premises to detect and correct the condition and failing to exercise reasonable care under the circumstances. The plaintiff also claimed to have suffered a variety of injuries in the fall as a result of the defendant's negligence and carelessness.[2] The defendant filed an answer, denying the allegations of negligence and carelessness, and raised the special defense of comparative negligence.

 [*622] On July 6, 2016, the defendant filed a motion for summary judgment. Specifically, it argued that "[t]he plaintiff's negligence claim against [the defendant] fails as a matter of law because there is no factual basis upon which a reasonable jury could find that [the defendant], through its agents, servants and/or employees, had actual or constructive notice of the alleged defect at issue." Attached to the defendant's memorandum of law in support of the motion for summary judgment were an excerpt of the plaintiff's deposition and an affidavit of Jennifer Card, an employee of the defendant, who had [***7] offered assistance to the plaintiff after her fall. Card's affidavit stated: "[The plaintiff's] fall occurred in the exact area where I had performed a safety sweep less than one minute ([forty] seconds) prior . . . [and] I did not observe any water, or other liquid, on the area of the floor where [the plaintiff] fell during my safety sweep . . . ."

On August 18, 2016, the plaintiff filed an objection to the defendant's motion for summary judgment. She argued that "contradictory pieces of evidence . . . bring about a material fact as to the length of time the water, which caused the [p]laintiff to slip and fall, existed." Specifically, the plaintiff argued that Card's affidavit, which she labeled as "self-serving," was contradicted by Card's deposition. Additionally, the plaintiff contended that a surveillance video, provided by the defendant, disproved Card's statements contained in her affidavit and deposition.[3]

On September 16, 2016, the defendant replied to the plaintiff's objection. The defendant noted in its reply memorandum [**712] that the plaintiff had failed to produce the surveillance video for the trial court's inspection [*623] and, therefore, that video was not part of the record before [***8] the court on the summary judgment proceeding. It did note, however, that if the surveillance video were to be considered, it would support Card's deposition testimony and her

---

[2] Specifically, the plaintiff alleged various injuries to her left knee, heart palpitations, stomach pains and nausea, difficulty sleeping, headaches and physical and emotional pain and suffering.

[3] The plaintiff attached Card's entire deposition and affidavit to her memorandum of law opposing the defendant's motion for summary judgment. The plaintiff did not, however, include a copy of the video with her memorandum of law.

Ben Levites

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 26 of 253

Page 7 of 17

184 Conn. App. 619, *623; 195 A.3d 707, **712; 2018 Conn. App. LEXIS 345, ***8

affidavit.

On September 30, 2016, the plaintiff filed a surreply memorandum, in which she argued that "[t]he surveillance video depicts a different version of what is stated in . . . Card's deposition and affidavit. The [d]efendant's counsel gave this video to the undersigned, without any objection or disagreement, several months ago. It is hereby enclosed for the court's review as an addendum." Attached to the surreply was an affidavit from the plaintiff's counsel stating that he had submitted a USB flash drive to the court containing a true copy of the February 12, 2013 surveillance video from the defendant's Naugatuck store that the defendant's counsel previously had mailed to him on August 28, 2015.

The court, *Tyma, J.*, held a hearing on the motion for summary judgment on November 21, 2016. At the start of the hearing, the court noted that it had watched the surveillance video twice in chambers with both counsel present. The defendant's counsel argued that the video demonstrated that the claimed defect, water **[***9]** on the floor, had existed for no more than one minute, and more likely forty-two seconds. Specifically, the defendant relied on Card's affidavit and the surveillance video to support its contention that she had scanned the area of the plaintiff's fall approximately forty seconds prior to that event and did not see any water on the floor. Such a minimal time period could not constitute a sufficient length of time for constructive notice of the defect, according to the defendant's counsel. Further, the defendant's counsel also directed the trial court to our decision in *Hellamns v. Yale-New Haven Hospital, Inc., 147 Conn. App. 405, 82 A.3d 677 (2013)*, cert. granted, *311 Conn. 918, 85 A.3d 652 (2014)* **[*624]** (appeal withdrawn May 9, 2014), in support of the defendant's argument for summary judgment.

The plaintiff's counsel challenged the defendant's claim

that there was no genuine issue as to the duration of the defect. Specifically, he argued that, given the fact that there was snow on the ground outside on the day of the plaintiff's fall in the store, a genuine issue of material fact existed as to whether the defendant had "taken reasonable steps to make sure that [its] invitees, [its] customers, were safe under the circumstances." The plaintiff's counsel also claimed that inconsistencies between Card's **[***10]** affidavit and her deposition regarding the nature and details of her "safety sweep" precluded the granting of summary judgment in favor of the defendant.

The court iterated that it had watched the surveillance video twice and commented that it showed Card walking down one of the main aisles of the defendant's store.[4] Specifically, it noted that Card traversed **[**713]** the area where the plaintiff's accident would occur. The court then stated: "And approximately forty to forty-two or forty-three seconds later, we see the plaintiff come and slip and fall in the spot where there's allegedly water. So we do know from the surveillance video that you got that it's consistent with [Card's] deposition testimony, that was about forty seconds." The plaintiff's

_____

[4] Specifically, the court stated: "We watched the video and we timed it. So, the video shows that this store employee, Ms. Card, is walking down a Wal-Mart, in one of the main aisles in Wal-Mart, and there's people milling about. And she walks, we watched it twice, she walks by the place where allegedly water is. And approximately forty to forty-two or forty-three seconds later, we see the plaintiff come and slip and fall in the spot where there's allegedly water. So, we do know from the surveillance video that you got that it's consistent with her deposition testimony, that was about forty seconds. . . . It was forty seconds, forty-two, forty-three. It's less than a minute, no doubt about that." Later, the court noted that the video established a time frame of approximately forty seconds from the time that Card walked in the main aisle to the plaintiff's fall at that location.

Ben Levites

Case 3:20-cv-01657-OAW    Document 53    Filed 03/17/22    Page 27 of 253

Page 8 of 17

184 Conn. App. 619, *624; 195 A.3d 707, **713; 2018 Conn. App. LEXIS 345, ***10

 [*625] counsel subsequently claimed that the video supported the claim that a reasonable person could conclude that water had been on the floor for a longer period of time.

The court then rendered an oral decision[5] granting the defendant's motion for summary judgment. It expressly based its decision on Card's affidavit, her deposition testimony and the surveillance video.[6] It concluded that the defendant had met its initial burden of demonstrating that there [***11]  was no genuine issue of material fact that the defendant did not have constructive notice of the water on the floor.[7] It then determined that the plaintiff had failed to meet her burden of offering

───────────────

[5] The court, in lieu of issuing a written memorandum of decision, signed a copy of the transcript on December 5, 2016. See *Practice Book § 64-1 (a)*.

[6] As noted, the court and the parties referred to the surveillance video at the November 21, 2016 hearing regarding the defendant's motion for summary judgment. On appeal, the parties discussed this video in their respective appellate briefs. At oral argument before this court, however, the defendant's counsel commented that the surveillance video was not part of the appellate record.

Subsequent to oral argument, we issued an order, sua sponte, instructing the trial court and counsel for the parties to rectify the record and to provide this court with a copy of the February 12, 2013 surveillance video on a USB flash drive. On May 7, 2018, the parties filed, and the trial court accepted, a stipulation that the attached USB flash drive contained a copy of the requested video. We have reviewed the surveillance video provided by the parties.

[7] Specifically, the court stated: "So based upon the evidence, particularly, the affidavit of . . . Card, and the surveillance video that I've seen . . . the defendant . . . has met its burden, initial burden of proof showing that there's no genuine issue of material fact that [the defendant] did not have constructive notice of this water on the floor. This is not an actual defect, actual notice case."

contrary evidence demonstrating the existence of a genuine issue of material fact.[8] The court subsequently denied  [*626]  the plaintiff's motion for reconsideration or reargument. This appeal followed.

We begin with our standard of review and the relevant legal principles. The fundamental purpose of summary judgment is to prevent unnecessary trials. *Stuart v. Freiberg, 316 Conn. 809, 822, 116 A.3d 1195 (2015)*. *HN1*[↑] ] "The standard by which we review a trial court's decision to grant a motion for summary judgment is well established. Summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the  [**714]  nonmoving party. . . . Although the party seeking summary judgment has the burden of showing the nonexistence of any material fact . . . a party opposing summary judgment must substantiate [***12]  its adverse claim by showing that there is a genuine issue of material fact *together with the evidence disclosing the existence of such an issue*. . . . It is not enough . . . for the opposing party merely to assert the existence of such a disputed issue. . . . Mere assertions of fact, whether contained in a complaint or in a brief, are

───────────────

[8] Specifically, the court stated: "The plaintiff has not met [her] burden to offer contrary evidence from which a jury reasonably can conclude that [the defendant] had notice of the water on the floor and failed to take reasonable steps to remedy it after the notice. The plaintiff's entire argument, in view of the evidence, is based upon the plaintiff, in essence, making [the defendant] an insurer of the safety of all its business invitees on the premises. There's absolutely no evidence as to how long the water existed on the floor prior to the plaintiff's fall. And to find otherwise would be to inject speculation into the case."

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 28 of 253

Page 9 of 17

184 Conn. App. 619, *626; 195 A.3d 707, **714; 2018 Conn. App. LEXIS 345, ***12

insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]. . . .

HN2 ] "As a general rule, then, [w]hen a motion for summary judgment is filed and supported by affidavits and other documents, an adverse party, by affidavit or as otherwise provided by . . . [the rules of practice], must set forth specific facts showing that there is a genuine issue for trial, and if he does not so respond, summary judgment shall be entered against him. . . . Requiring the [*627] nonmovant to produce such evidence does not shift the burden of proof. Rather, it ensures that the nonmovant has not raised a specious issue for the sole purpose of forcing the case to trial. . . .

"More specifically, HN3 ]   [t]he party opposing a motion for summary judgment must present evidence that [***13] demonstrates the existence of some disputed factual issue . . . . The movant has the burden of showing the nonexistence of such issues but the evidence thus presented, if otherwise sufficient, is not rebutted by the bald statement that an issue of fact does exist. . . . To oppose a motion for summary judgment successfully, the nonmovant must recite specific facts . . . which contradict those stated in the movant's affidavits and documents. . . . The opposing party to a motion for summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. . . . The existence of the genuine issue of material fact must be demonstrated by counter-affidavits and concrete evidence. . . . Our review of the trial court's decision to grant a motion for summary judgment is plenary." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Bruno v. Whipple, 162 Conn. App. 186, 213-15, 130 A.3d 899 (2015)*, cert. denied, 321 Conn. 901, 138 A.3d 280 (2016); see also *Practice Book § 17-49.*

The parties do not dispute that the complaint set forth a claim of negligence based upon premises liability, that the plaintiff was a business invitee[9] and that this was [*628] a constructive notice case. Accordingly, [***14] the following relevant legal principles apply to this action. HN4 ] "To hold the defendant liable for her personal injuries . . . the plaintiff must prove (1) the existence of a defect, (2) that the defendant knew or in the exercise of reasonable care should have known about the defect and (3) that such defect had existed for such a length of time that the [defendant] should, in the exercise of reasonable care, have discovered it in time to remedy it." (Internal quotation marks omitted.) *Palmieri v. [**715] Stop & Shop Cos., 103 Conn. App. 121, 123-24, 927 A.2d 371 (2007)*; see also *Martin v. Stop & Shop Supermaket Cos., 70 Conn. App. 250, 251, 796 A.2d 1277 (2002)*.

Our Supreme Court has explained that HN6 ] "[f]or [a] plaintiff to recover for the breach of a duty owed to [him] as [a business] invitee, it [is] incumbent upon [him] to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused [his injury] or constructive notice of it. . . . [T]he notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it. . . .

---

[9] HN5 ] "A business invitee is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land." (Internal quotation marks omitted.) *Gargano v. Azpiri, 110 Conn. App. 502, 506, 955 A.2d 593 (2008)*. As a result of this status, the defendant owed the plaintiff the duty to keep its premises in a reasonably safe condition. *Baptiste v. Better Val-U Supermarket, Inc., 262 Conn. 135, 140, 811 A.2d 687 (2002)*; *Gulycz v. Stop & Shop Cos., 29 Conn. App. 519, 521, 615 A.2d 1087*, cert. denied, 224 Conn. 923, 618 A.2d 527 (1992).

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 29 of 253

Page 10 of 17

184 Conn. App. 619, *628; 195 A.3d 707, **715; 2018 Conn. App. LEXIS 345, ***14

. In the absence of allegations and proof of any facts that would give rise to an enhanced duty . . . [a] defendant is held to the duty of protecting **[***15]** its business invitees from known, foreseeable dangers. . . .

"*Accordingly, business owners do not breach their duty to invitees by failing to remedy a danger unless they had actual or constructive notice of that danger. To defeat a motion for summary judgment in a case based on allegedly defective conditions, the plaintiff has the burden of offering evidence from which a jury reasonably could conclude that the defendant had notice of the condition and failed to take reasonable steps to remedy the condition after such notice.*" (Citation omitted; emphasis added; internal quotation marks **[*629]** omitted.) *DiPietro v. Farmington Sports Arena, LLC, 306 Conn. 107, 116-17, 49 A.3d 951 (2012)*; see also *Kelly v. Stop & Shop, Inc., 281 Conn. 768, 776, 918 A.2d 249 (2007)*; see generally *Colombo v. Stop & Shop Supermarket Co., 67 Conn. App. 62, 64, 787 A.2d 5 (2001)* ("The law concerning notice in this type of case is clear. The plaintiff bore the burden of proffering some evidence, either direct or circumstantial, from which the jury could infer that the defect she allegedly encountered existed for a length of time sufficient to put the defendant on actual or constructive notice of its existence."), cert. denied, *259 Conn. 912, 789 A.2d 993 (2002)*.

*HN7*[↑] "The controlling question in deciding whether the defendant had constructive notice of the defective condition is whether the condition had existed for such a length of time that the defendants' employees should, in **[***16]** the exercise of due care, have, discovered it in time to have remedied it. . . . What constitutes a reasonable length of time within which the defendant should have learned of the defect, how that knowledge should have been acquired, and the time within which, thereafter, the defect should have been remedied are matters to be determined in light of the particular circumstances of each case. The nature of the business and the location of the defective condition would be factors in this determination. To a considerable degree each case must be decided on its own circumstances." (Internal quotation marks omitted.) *Hellamns v. Yale-New Haven Hospital, Inc., supra, 147 Conn. App. 408-409*, see *Considine v. Waterbury, 279 Conn. 830, 870, 905 A.2d 70 (2006)*; see also *Gulycz v. Stop & Shop Cos., 29 Conn. App. 519, 521, 615 A.2d 1087* (whether defendant had constructive notice of condition causing defect turns on whether condition existed for length of time sufficient for defendant's employees, in exercise of due care, to discover defect in time to have remedied it), cert. denied, *224 Conn. 923, 618 A.2d 527 (1992)*. **[*630]** Nevertheless, as we will discuss in greater detail, a defect lasting under a minute has been held to be, as a matter of law, insufficient for a defendant to have discovered and remedied it, and thus fatal to a premises liability action. See, e.g., *James v. Valley-Shore Y.M.C.A., Inc., 125 Conn. App. 174, 183, **[**716]** 6 A.3d 1199 (2010)* (no evidence that allegedly defective condition existed for such **[***17]** length of time that defendant's employees should have discovered it in exercise of due care and remedied it and, therefore, defendant entitled to summary judgment), cert. denied, *300 Conn. 916, 13 A.3d 1103 (2011)*.

First, the plaintiff argues that the court improperly concluded that the defendant met its initial burden of establishing the absence of a genuine issue of material fact. Specifically, she contends that Card's affidavit[10]

---

[10] The plaintiff describes Card's affidavit as "self-serving." We disagree with this description. Card is not a party to this action; she is an employee of the defendant. Additionally, employees of businesses frequently provide such affidavits in preparation for litigation. See, e.g., *Webster Bank v. Flanagan, 51 Conn. App. 733, 749, 725 A.2d 975 (1999)*. Additionally, Card made

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 30 of 253

Page 11 of 17

184 Conn. App. 619, *630; 195 A.3d 707, **716; 2018 Conn. App. LEXIS 345, ***17

was insufficient to demonstrate that no genuine issues of material fact existed.[11] We disagree.

The following additional facts are necessary for our analysis. The defendant moved for summary judgment  [*631] on July 6, 2016. It attached a memorandum of law, a portion of the plaintiff's deposition, dated August 6, 2015, and an affidavit from Card dated August 12, 2015. In her deposition, the plaintiff had stated that there was snow on the ground on February 12, 2013, and that the liquid she had slipped on looked like water, was clear and did not have carriage track marks going through it. She also noted that Card had approached her after the fall and inquired if the plaintiff was okay or wanted to speak with a manager.

Card's affidavit set forth the following: Card was working on February 12, 2013; she [***18] witnessed the plaintiff's slip and fall; the plaintiff's fall occurred in the "exact area" that Card had performed a "safety sweep less than one minute ([forty] seconds) prior"; during the "safety sweep" Card had not observed any liquid, water

---

a sworn statement before a notary public, subjecting her to penalty for giving false information. See id. Finally, we note that Card's affidavit comports with the requirements of *Practice Book § 17-46*, and the plaintiff failed to file a motion to strike her affidavit. See, e.g., *Doe v. West Hartford, 328 Conn. 172, 178, 177 A.3d 1128 (2018)*.

[11] The plaintiff also contends that the court "flipped the burden of proof, [reading] the facts in the light most favorable to the [d]efendant, the moving party, rather than in the light most favorable to [the] [p]laintiff." The plaintiff offers no support for the bald assertion that the court improperly viewed the facts in a light most favorable to the defendant. Absent evidence to the contrary, we presume that the court acted properly. *LeSueur v. LeSueur, 172 Conn. App. 767, 785-86, 162 A.3d 32 (2017)*; see also *Magsig v. Magsig, 183 Conn. App. 182, 196, 191 A.3d 1053 (2018)* (this court will presume trial court acted properly in performance of its duties). Accordingly, we reject this meritless contention.

or otherwise, where the plaintiff's fall occurred; after the plaintiff's fall, Card noticed, for the first time, a small puddle of water at the site of the plaintiff's fall; and Card believed that the water had originated from snow melting off the boots of several children who had been standing in that area. The affidavit emphasized that "[t]he water was not on the floor for more than [forty] seconds before the fall."

We emphasize that the defendant, as the movant for summary judgment, bore the burden of establishing the nonexistence of any genuine issue of material fact and that it was entitled to judgment as a matter of law under the relevant principles of our premises liability law. See *Romprey v. Safeco Ins. Co. of America, 310 Conn. 304, 319-20, 77 A.3d 726 (2013)*; see also *Capasso v. Christmann, 163 Conn. App. 248, 258-59, 135 A.3d 733 (2016)*.

[**717]  The defendant submitted evidence that the liquid on the floor in the main aisle of the store at the site of the plaintiff's fall had been there for no more than forty  [*632] seconds following Card's safety sweep.[12] Specifically, Card's affidavit established [***19] this time frame. She averred that she had performed a safety sweep in the "exact area" of the plaintiff's fall forty seconds later. At the time of her sweep, Card observed no liquid on the floor. Card further posited that the water on the floor had come from snow melting off the boots of four to five children. Additionally, as further support for this sequence of events, the defendant had produced testimony from the plaintiff's deposition that the liquid on the floor was clear and did not have any carriage marks running through it. The unsullied nature of the spill

---

[12] At the hearing before the trial court, defense counsel relied on Card's affidavit, Card's deposition testimony and the video recording from the store, to support the argument that the water had been on the floor for less than one minute.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 31 of 253

Page 12 of 17
184 Conn. App. 619, *632; 195 A.3d 707, **717; 2018 Conn. App. LEXIS 345, ***19

supported the time frame claimed by the defendant.[13]

The trial court then considered whether, under our case law, a genuine issue of material fact existed with respect to the issue of constructive notice. We iterate that "[t]he controlling question in deciding whether the defendants had constructive notice of the defective condition is whether the condition existed for such a length of time that the defendants should, in the exercise of reasonable care, have discovered it in time to remedy it. . . . What constitutes a reasonable length of time is largely a question of fact to be determined in the light of the particular circumstances [***20] of a case." (Citation omitted; internal quotation marks omitted.) *Considine v. Waterbury, supra, 279 Conn. 870*; see also *Hellamns v. Yale-New Haven Hospital, Inc., supra, 147 Conn. App. 408-409*. In the absence of evidence that the claimed defect existed for such a length of time that [*633] the defendant, through exercise of due care by its employees, should have discovered and remedied it, we have affirmed the granting of summary judgment in favor of the defendant. See *James v. Valley-Shore Y.M.C.A., Inc., supra, 125 Conn. App. 179-83*.

We agree with the trial court that the defendant satisfied its initial burden of demonstrating that there was no genuine issue of material fact with respect to the element of constructive notice.[14] The defendant's

evidence, particularly Card's affidavit, established a forty second maximum time period between the creation of the defect and the plaintiff's fall. Under our case law, a forty second window constitutes [**718] an insufficient period of time for a business owner to discover and remedy a small puddle of water on the floor in the exercise of due care.

For example, in *White v. E & F Construction Co., 151 Conn. 110, 111-12, 193 A.2d 716 (1963)*, the plaintiff, an employee of a tenant in the apartment house owned by the defendant, removed laundry from an outdoor clothesline due to rain. After placing the clothes into a basket, the plaintiff proceeded to the basement stairs. *Id., 112*. She slipped on the wet landing and fell [***21] to the basement floor. Id. "About two minutes before the plaintiff fell, her employer had noticed that the steps were wet by reason of rain which was coming through [*634] the open doorway. . . . Therefore, the crucial question is whether the water had been there for such a length of time that the defendant should, in the exercise of due care, have discovered it in time to have removed it." (Citations omitted.) *Id., 112-13*.

The trial court directed a verdict for the defendant following the presentation of evidence. *Id., 111*. In affirming the judgment of the trial court, our Supreme Court stated: "The evidence reveals no more than that

---

[13] But see *Colombo v. Stop & Shop Supermarket Co., supra, 67 Conn. App. 62-65* (trial court properly directed defendant's verdict where plaintiff's only evidence as to length of time that milk was on floor was fact that it was dirty, and this court noted that to conclude otherwise would permit conclusion regarding time of defect's existence solely on conjecture and speculation).

[14] During the hearing on the motion for summary judgment, the plaintiff's counsel argued that the defendant had not provided enough evidence regarding the question of constructive

notice. The trial court disagreed: "[The defendant has] shown plenty of evidence. My question is now the burden shifts to you. You have to come forth with what evidence do you have that the water existed for a sufficient length of time such that the defendant should have been on notice of that and remedied it. What is it? The burden is on you now. [The defendant has] met [its] burden." The plaintiff's counsel disagreed that the defendant had met its initial burden of submitting evidence that there was no genuine issue of material fact as to the element of constructive notice. The court responded: "But assume [the defendant] has because I'm telling you [it] has."

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 32 of 253

Page 13 of 17

184 Conn. App. 619, *634; 195 A.3d 707, **718; 2018 Conn. App. LEXIS 345, ***21

the condition which caused the plaintiff to fall had been present for about two minutes before the time she entered the building. This evidence would not support a finding that the condition had existed for a sufficient length of time to charge the defendant with constructive notice of it." *Id., 113-14*.

More recently, this court considered whether a plaintiff had established that a defendant had constructive notice in *Hellamns v. Yale-New Haven Hospital, Inc., supra, 147 Conn. App. 411-14*.[15] In that case, the plaintiff slipped and fell on a puddle of water while walking in the hallway of a medical building owned by the defendant. *Id., 407*. "A janitor, pushing a cart with **[***22]** cleaning **[*635]** material and a warning sign, walked past the spot where the water had accumulated just prior to the plaintiff falling." Id. Following the trial, the court, acting as the fact finder,

_____

[15] The plaintiff contends that the trial court improperly relied on our decision in *Hellamns* due to the procedural posture of that case. We acknowledge that that appeal stemmed from a judgment for the plaintiff following a court trial. *Hellamns v. Yale-New Haven Hospital, Inc., supra, 147 Conn. App. 407*. In that case, we agreed with the defendant that the trial court had applied a standard of care contrary to law and that the plaintiff had failed to establish that the defendant had notice of the defect. *Id., 407-14*. For these reasons, we reversed the judgment of the trial court and remanded the case with direction to render judgment for the defendant. *Id., 414*.

Despite the procedural differences between *Hellamns* and the present case, we conclude that the guidance that the former provides regarding the matter of constructive notice informs our analysis in the latter. Specifically, the principle that "[e]vidence establishing that the defective condition existed a few seconds before the accident is insufficient to establish that the defendant had constructive notice of that defect" applies whether at the summary judgment stage or a judgment for a party subsequent to trial. *Id., 413*. Accordingly, we disagree with the plaintiff that the court erred in relying on *Hellamns*.

rendered judgment in favor of the plaintiff. Id.

On appeal, we agreed with the defendant that the plaintiff had failed to establish that it had notice of the defect. *Id., 411*. We noted that the only evidence regarding the issue of notice was the plaintiff's testimony that "a janitor walked past the puddle of water just before she fell." *Id., 412*. We concluded that this evidence was insufficient **[**719]** to support the finding that the defendant had notice of the defect and time to remedy it. *Id., 413*. "First, the plaintiff did not present the janitor, or any other employee . . . to establish for the court that the janitor actually saw the puddle of water before the accident. . . . *Second, the plaintiff's testimony established that a janitor passed the puddle of water only seconds before the plaintiff fell. Evidence establishing that the defective condition existed a few seconds before the accident is insufficient to establish that the defendant had constructive notice of that defect.* . . .

"Third, the plaintiff **[***23]** failed to establish that notice could be imputed to the defendant because the plaintiff did not present any evidence to establish that cleaning the specific hallway where the accident occurred was within the janitor's scope of employment." (Citations omitted; emphasis added.) Id.

For these reasons, we concluded in *Hellamns* that the trial court's finding that the defendant had notice of the defect was clearly erroneous and remanded the case with direction to render judgment for the defendant. *Id., 414*; see also *Correa v. Westfield America, Inc., Superior Court, judicial district of Middlesex,* **[*636]** *Docket No. CV-13-6010576-S, 2014 Conn. Super. LEXIS 2507 (October 2, 2014)* (defendant property owner entitled to summary judgment on plaintiff's premises liability action where undisputed evidence demonstrated spill existed for only two minutes prior to fall); *Mason v. Wal-Mart Stores, Inc., Superior Court,*

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 33 of 253

Page 14 of 17

184 Conn. App. 619, *636; 195 A.3d 707, **719; 2018 Conn. App. LEXIS 345, ***23

judicial district of Hartford, Docket No. CV-10-6013281-S (May 1, 2012) (53 Conn. L. Rptr. 882, 883, 2012 Conn. Super. LEXIS 1175 ) (rendering judgment for defendant where plaintiff fell one minute after water had accumulated on floor from mulch bag and noting that "[i]t would be unreasonable . . . to find that the defendant has constructive notice of a hazardous condition that had been in existence for [***24] but one minute . . . [and that] [t]he defendant's store is large, and such minute-to-minute monitoring would be unfeasible").

In summary, the defendant submitted evidence that the defective condition in this case, a puddle of water, existed for, at most, forty seconds prior to the plaintiff's fall. Our Supreme Court has cautioned that "[e]vidence which goes no farther than to show the presence of a slippery foreign substance does not warrant an inference of constructive notice to the defendant." (Internal quotation marks omitted.) Kelly v. Stop & Shop, Inc., supra, 281 Conn. 777. Additionally, we are mindful that, under our law, HN8[⬆] business owners are not insurers of their customers' safety. Id., 790; Hellamns v. Yale-New Haven Hospital, Inc., supra, 147 Conn. App. 410. We disagree with the plaintiff's statement that the defendant must offer "evidence of exactly how long the alleged defect was there . . . ."[16] Rather, to prevail on its

motion for [*637] summary judgment, the defendant had to establish that the [**720] time period in which the defect could have existed was of such a minimal duration that its employees could not have been expected to discover and remedy it in the exercise of due care. James v. Valley-Shore Y.M.C.A., Inc., supra, 125 Conn. App. 183.

Consistent with this case law, the brief period of time in which the defect could have existed here does not create a genuine [***25] issue of material fact with respect to the constructive notice element of a premises liability action for a business invitee. Stated differently, under these facts and circumstances, the defendant, acting through its employee's exercise of due care, did not have enough time to discover and remedy a puddle of water on the floor of its store. Therefore, the defendant met its initial burden of establishing that it was entitled to summary judgment. Romprey v. Safeco Ins. Co. of America, supra, 310 Conn. 320.

Next, the plaintiff argues that the court improperly concluded that she failed to present evidence demonstrating the existence of a disputed factual issue as to the matter of notice. See, e.g., Kurisoo v. Ziegler, 174 Conn. App. 462, 468-69, 166 A.3d 75 (2017). Specifically, she contends that the evidence attached to her objection to the motion for summary judgment and her surreply established the existence of genuine issues of material fact so as to warrant the denial of the motion for summary judgment. We disagree.

The following additional facts will facilitate our discussion. The plaintiff filed her objection to the defendant's motion for summary judgment on August 18, 2016. In addition to her memorandum of law, the plaintiff filed the transcript of Card's deposition, dated August 3, 2016, and Card's August [***26] 12, 2015

---

[16] We have held that if a plaintiff fails to present any evidence as to the duration of the existence of a defect, the court properly may dismiss the action for failing to make out a prima facie case. Gulycz v. Stop & Shop Cos., supra, 29 Conn. App. 521-23; see also McCrorey v. Heilpern, 170 Conn. 220, 221-22, 365 A.2d 1057 (1976) (Supreme Court reversed judgment in favor of plaintiff and remanded with direction to render judgment for defendant where plaintiff produced no evidence regarding length of time hole in floor outside plaintiff's apartment had existed); Drible v. Village Improvement Co., 123 Conn. 20, 23-24, 192 A. 308 (1937) (trial court properly set aside jury verdict and rendered judgment for defendant where plaintiff provided no evidence as to length of time snow

and ice had been on steps of building where plaintiff fell).

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 34 of 253

Page 15 of 17

184 Conn. App. 619, *637; 195 A.3d 707, **720; 2018 Conn. App. LEXIS 345, ***26

affidavit, **[*638]** which had been attached to the defendant's memorandum. In the memorandum of law, the plaintiff referred to the video recording of the events leading up to, and including, her fall on February 12, 2013. The plaintiff included a copy of the video recording as an addendum to her surreply, dated September 30, 2016.

During her deposition, Card stated that employees of the defendant are required to perform safety sweeps any time they walk within the store. This obligation involves "picking up any items . . . picking up anything that is on [the store's] white tiles, putting it . . . back on the shelves." Card explained that, as a result of this requirement, she looked for potential hazards present on the floor any time she walked within the store. In contrast to this type of safety sweep, which was to be done at all times, the defendant's employees also conducted paged safety sweeps. At certain times, an overhead page informed the employees to stop their work, "walk the perimeter of [their] department, and . . . make sure everything is safe for the customers and [employees]." Card noted that she was "observant at all times."

In her deposition, Card stated that on February **[***27]** 12, 2013, although there had been no page, she had performed a safety sweep of the area where the plaintiff fell. Card specifically indicated that she had been looking down at the floor, and that there was "no chance" she was looking in the opposite direction, at her cell phone, or at a customer when she passed that particular spot. Although she initially claimed to have spoken with a customer for ten minutes, she immediately reconsidered her response and stated that it "was only like five minutes." After being reminded of the video recording, Card stated that she had performed the safety sweep forty seconds prior to the plaintiff's fall. After iterating that it was forty seconds, Card noted that it could have been "[m]aybe under a minute." Later,

Card indicated **[*639]** that the water **[**721]** which had caused the plaintiff to fall was not present during her safety sweep. After a further colloquy with the plaintiff's counsel, Card resolutely indicated that the fall occurred forty seconds after her safety sweep.

On appeal, the plaintiff appears to argue that Card's deposition contains contradictions regarding whether she "truly" performed a safety sweep prior to the plaintiff's fall.[17] We do not agree. **[***28]** As noted, Card stated in her deposition that the defendant's employees were required to perform safety sweeps whenever they were walking within the store. In addition, Card described a paged safety sweep, when employees check the perimeters of their assigned departments for any hazards following an overhead page. The plaintiff's argument fails to appreciate the two types of safety sweeps performed at the defendant's store. Although Card stated that she had not performed a paged safety sweep in the main aisle prior to the plaintiff's fall, her statement was consistent with her testimony that safety sweeps are to be done any time an employee walks in the store. The plaintiff's attempt to inject a question of untruthfulness or incredibility into Card's deposition regarding whether she had performed a safety sweep is unsupported by the record.

The plaintiff next argues that the surveillance video shows that Card "never looked down or directly in [the] area" of the plaintiff's fall. She further maintains this "fact" contradicts Card's deposition testimony and affidavit, and, therefore, creates a genuine issue of material fact. We disagree. We have reviewed the

---

[17] Specifically, the plaintiff argues in her brief that "[t]he fact that . . . Card says she was on a safety sweep, because she is always on a safety sweep during her entire shift, but it was not a called safety sweep by WalMart, brings up a big question as to the truthfulness and credibility of those statements, which should be weighed by the trier of fact."

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 35 of 253

Page 16 of 17
184 Conn. App. 619, *639; 195 A.3d 707, **721; 2018 Conn. App. LEXIS 345, ***28

surveillance **[*640]** video recording **[***29]** and disagree with the plaintiff's contention that it depicts precisely where Card was looking at the time of her safety sweep in the main aisle just prior to the plaintiff's fall. Due to the presence of other shoppers, and the quality of the video, it is not possible to discern where Card's gaze was directed. This argument, therefore, amounts to nothing more than speculation on behalf of the plaintiff, which has no place in appellate review. See *Rafalko v. University of New Haven, 129 Conn. App. 44, 54, 19 A.3d 215 (2011)* (speculation and conjecture have no place in appellate review).

The plaintiff also argues that Card's deposition testimony regarding the time that had elapsed from her safety sweep of the main aisle to the plaintiff's fall was inconsistent, varying from forty seconds to five minutes to ten minutes. As a result, the plaintiff contends that a genuine issue of material fact exists.[18] We disagree. Despite her isolated references to a ten minute time frame, and then to a five minute time frame, Card's deposition, read as a whole, demonstrates her view that the plaintiff's fall occurred in the area where, approximately forty seconds prior, she had conducted a safety sweep.

Additionally, this forty second time period is confirmed by the video recording. **[***30]** When a court is presented with such evidence in deciding a motion for summary judgment, it should view the facts in the light depicted by the recording. *Scott v. Harris, 550 U.S. 372, 378-81,* **[**722]** *127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)*;[19] see **[*641]** also *Alvarez v. Building & Land*

---

[18] In its oral decision, the trial court acknowledged that Card's deposition testimony regarding the time between her safety sweep and the plaintiff's fall got "a little bit muddied."

[19] In *Scott v. Harris, supra, 550 U.S. 374-75*, the petitioner, a Georgia county police deputy, employed a certain technique to

*Technology Corp., Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-13-6017699-S, 2018 Conn. Super. LEXIS 284 (February 7, 2018)* (video recording used to determine that there was no material issue of fact); *Carter v. Board of Education, Superior Court, judicial district of New London, Docket No. CV14-*

---

stop the respondent, an individual who had led law enforcement on a high speed pursuit for nearly ten minutes. As a result, the respondent crashed his vehicle and was rendered a quadriplegic. *Id., 375*. The respondent filed an excessive force action, and the petitioner moved for summary judgment on the basis of qualified immunity. *Id., 375-76*. The United States District Court for the Northern District of Georgia denied the petitioner's motion, and the United States Court of Appeals for the Eleventh Circuit affirmed that judgment. *Id., 376*.

In reversing the judgment of the Court of Appeals, the United States Supreme Court first noted that the parties had presented vastly different versions of the events that resulted in the respondent's injuries. *Id., 378-79*. It then stated that, generally, a court was obligated to view the facts in the light most favorable to the nonmoving party, the respondent in this case. *Id., 378*. "There is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question. There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened. The videotape quite clearly contradicts the version of the story told by respondent and adopted by the Court of Appeals." Id.

The United States Supreme Court further noted that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. . . . Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." *Id., 380-81*.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 36 of 253

Page 17 of 17

184 Conn. App. 619, *641; 195 A.3d 707, **722; 2018 Conn. App. LEXIS 345, ***30

*6022709-S, 2015 Conn. Super. LEXIS 2656 (October 20, 2015)* (citing *Scott v. Harris, supra, 380*, and noting that when opposing parties tell two different contradictory stories, one of which is contradicted by record so that no reasonable jury could believe it, court should not adopt that version of facts); *Sipes v. Serrano, Superior Court, judicial district of Tolland, Docket No. CV-07-5001483-S (July 25, 2007) (43 Conn. L. Rptr. 832, 833, 2007 Conn. Super. LEXIS 1951)* (same).

Finally, the plaintiff argues that, due to the presence of snow on the ground on the day of her fall, the defendant "should have taken steps to remedy the fact that the snow caused a heightened dangerous condition to **[\*642]** the floors, where countless numbers of its invitees were walking. If there is snow on the ground, it is foreseeable that the snow would constitute a known **[\*\*\*31]** and foreseeable danger." To the extent that the plaintiff suggests that the presence of snow on the ground increased the defendant's duty to keep its premises in a reasonably safe condition, we conclude that this argument is inadequately briefed. "We consistently have held that *HN9*[↑] [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. . . . It is **[\*\*723]** not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (Internal quotation marks omitted.) *Cadle Co. v. Ogalin, 175 Conn. App. 1, 8, 167 A.3d 402*, cert. denied, *327 Conn. 930, 171 A.3d 454*

*(2017)*.

Having considered and rejected the plaintiff's sundry arguments, we conclude that the **[\*\*\*32]** court properly determined that the defendant met its initial burden of producing evidence that there was no genuine issue of material fact with respect to the constructive notice element of the plaintiff's claim. Additionally, the plaintiff failed to set forth evidence demonstrating a genuine issue of material fact regarding that issue. Accordingly, the court properly granted the defendant's motion for summary judgment.

The judgment is affirmed.

In this opinion the other judges concurred.

---

End of Document

 Neutral

As of: March 17, 2022 2:37 AM Z

# Blake v. Conn. Dep't of Developmental Servs.

United States Court of Appeals for the Second Circuit

February 4, 2019, Decided

17-3439-cv

### Reporter

750 Fed. Appx. 54 *; 2019 U.S. App. LEXIS 3408 **; 2019 WL 422250

NICOLE BLAKE, Plaintiff-Appellant, v. STATE OF CONNECTICUT DEPARTMENT OF DEVELOPMENTAL SERVICES, Defendant-Appellee.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History:** [**1] Appeal from a judgment of the United States District Court for the District of Connecticut (Janet Bond Arterton, Judge).

Blake v. Developmental Servs., 278 F. Supp. 3d 519, 2017 U.S. Dist. LEXIS 163230 (D. Conn., Sept. 29, 2017)

## Core Terms

non-movant, summary judgment, genuine dispute, material fact, de novo, unsubstantiated, disciplined, asserting, employees, color

**Counsel:** FOR PLAINTIFF-APPELLANT: JOHN T. BOCHANIS, Daly, Weihing & Bochanis, Bridgeport, CT.

FOR DEFENDANTS-APPELLEES: JENNIFER P. BENNETT, Assistant Attorney General (Erik T. Lohr, Assistant Attorney General, on the brief), for George Jepsen, Attorney General of the State of Connecticut, Hartford, CT.

**Judges:** PRESENT: GUIDO CALABRESI, JOSÉ A. CABRANES, RICHARD C. WESLEY, Circuit Judges.

## Opinion

**[*54] SUMMARY ORDER**

UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the September 29, 2017 judgment of the District Court be and hereby is **AFFIRMED**.

Plaintiff-Appellant Nicole Blake ("Blake") appeals from a judgment of the District Court granting summary judgment to her former employer, Defendant-Appellee State of Connecticut Department of Developmental Services ("DDS"). On August 4, 2015, Blake commenced this action in Connecticut state court, asserting discrimination and retaliation claims under *Title VII of the Civil Rights Act of 1964*, *42 U.S.C. §§ 2000e-2*, *2000e-3*. DDS removed the case to federal court and, on October 17, 2016, moved for summary judgment. After argument, the District Court granted **[**2]** DDS's motion and dismissed Blake's case in its entirety. *See Blake v. Developmental Servs., 278 F. Supp. 3d 519 (D. Conn. 2017)*. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on

750 Fed. Appx. 54, *54; 2019 U.S. App. LEXIS 3408, **2

appeal.

We review a district court's grant of summary judgment *de novo. See Munoz-Gonzalez v. D.L.C. Limousine Serv., Inc., 904 F.3d 208, 212 (2d Cir. 2018)*. Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to establish a genuine dispute, *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*, and the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). See also Fujitsu Ltd. v. Fed. Exp. Corp., 247 F.3d 423, 428 (2d Cir. 2001)* ("[T]he nonmoving party may not rely on conclusory allegations or unsubstantiated speculation."); **[*55]** *D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)* ("The non-moving party . . . must offer some hard evidence showing that its version of the events is not wholly fanciful.").

After reviewing the record *de novo*, we affirm the District Court's judgment for substantially the reasons stated in its thorough and well-reasoned Ruling. *See Blake, 278 F. Supp. 3d 519*. Put simply, the record contains no evidence—either direct or circumstantial—supporting the conclusion that the adverse actions on which Blake's **[**3]** claims rely were in any way motivated by her race or color, *id. at 534-35*, or by her pursuit of proceedings before the Connecticut Commission on Human Rights and Opportunities ("CHRO"), *id. at 530-33*. Instead, Blake offers only her perceptions—*e.g.*, "I just think [a suspension] was [based on race and/or color]," J.A. 183, "It's possible" that investigation was motivated by filing of CHRO complaint, *id.* at 201—and

vague, unsubstantiated assertions that other DDS employees were not disciplined for similar conduct—*e.g.*, "No other employee was disciplined," *id.* at 45, "Other employees with two unsatisfactory performance evaluations were not discharged," *id.* at 46. These naked declarations are plainly insufficient to establish a genuine dispute of material fact with respect to any of Blake's claims. *See, e.g., Fujitsu Ltd., 247 F.3d at 428*.

## CONCLUSION

We have reviewed all of the arguments raised by Blake on appeal and find them to be without merit. For the foregoing reasons, we **AFFIRM** the September 29, 2017 judgment of the District Court.

---

*End of Document*

Ben Levites

 Positive

As of: March 17, 2022 2:37 AM Z

# *Budd v. United States*

United States District Court for the District of Connecticut

October 23, 2009, Decided; October 23, 2009, Filed

NO. 3:08CV131 (MRK)

**Reporter**

2009 U.S. Dist. LEXIS 98777 *; 2009 WL 3538648

MEGAN BUDD, Plaintiff, v. UNITED STATES OF AMERICA, Defendant.

## Core Terms

summary judgment, constructive notice, length of time, material fact, oral argument, genuine, floor

**Counsel:** [*1] For Megan Budd, Plaintiff: William L. Stevens, LEAD ATTORNEY, Slavin, Stauffacher & Scott, LLC - Watertown, Watertown, CT.

For USA, Defendant: Lauren M. Nash, Ndidi N. Moses, LEAD ATTORNEYS, U.S. Attorney's Office-NH, New Haven, CT.

**Judges:** Mark R. Kravitz, United States District Judge.

**Opinion by:** Mark R. Kravitz

## Opinion

### ORDER

On October 15, 2009, the Court held oral argument on Defendant's Motions for Summary Judgment [docs. # 42 and # 46]. [1] Having carefully considered the parties

briefs and arguments, the Court granted summary judgment for Defendant from the bench and explained its reasons for doing so. *See* Minute Entry [doc. # 57] (granting both motions). The Court also stated that it would issue an Order briefly reiterating its reasoning. This is that Order.

The Court assumes the parties' familiarity with the facts of this case, and therefore recites them here only briefly. The Court notes that these facts are undisputed. On August 15, 2009, Plaintiff Megan Budd went to the Waterbury Post Office to mail a package. While walking through [*2] the lobby she slipped and fell. After falling, she noticed a few drops of liquid on the floor; before falling, she did not see anything on the floor. Witnesses who examined the floor after Ms. Budd's fall recall seeing anywhere from 2-8 drops. The lobby was otherwise very clean. Ms. Budd was treated for a fracture of her right wrist as a result of the fall. She alleges that Defendant's negligence caused her to slip and fall.

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.*

---

[1] The only difference between the two motions is that the first was filed under seal and the second was redacted. Otherwise, the motions are identical, and this Order applies to both.

2009 U.S. Dist. LEXIS 98777, *2

_56(c)_. "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." _Williams v. Utica Coll. of Syracuse Univ., 453 F.3d 112, 116 (2d Cir. 2006)_ (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" _Bouboulis v. Transp. Workers Union of Am., 442 F.3d 55, 59 (2d Cir. 2006)_ **[*3]** (quoting _Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))_.

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, _see Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)_, and the Court must resolve all ambiguities and draw all inferences in favor of the nonmoving party, _see Anderson, 477 U.S. at 255_; _Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008)_. If the moving party carries its burden, the party opposing summary judgment "may not rely merely on allegations or denials." _Fed. R. Civ. P. 56(e)(2)_. Rather, the opposing party must "set out specific facts showing a genuine issue for trial." _Id._ In short, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." _Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)_. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." _Anderson, 477 U.S. at 249-50_ (citations omitted).

In Connecticut, a plaintiff suing for negligence as a result of a slip and fall must prove: "(1) the existence of a defect, and (2) that the defendants knew or should have known, **[*4]** in the exercise of reasonable care, of the defect." _Chaves v. Exxon Mobil Corp., No. 3-06-cv-1589 (JCH), 2008 U.S. Dist. LEXIS 105786, 2009 WL 57119, at *3 (D. Conn. Jan. 5, 2009)_ (citing _Cruz v. Drezek, 175 Conn. 230, 238-39, 397 A.2d 1335 (1978))_. In this case, Defendant does not dispute the existence of a defect, and Ms. Budd concedes in her brief, and her counsel acknowledged at oral argument, that she cannot establish actual notice. _See_ Pl. Mem. in Opp. to Mot. for Summ. J. [doc. # 50] ("Pl. Mem.") at 1.

Thus, the only question is whether Ms. Budd has submitted sufficient evidence from which a reasonable jury could conclude that Defendant had constructive notice of the droplets.

> Whether the defendant had constructive notice of this condition turns on whether the condition existed for a length of time sufficient for the defendant's employees, in the exercise of due care, to discover the defect in time to have remedied it. . . . While an abundance of evidence is not necessary to show a sufficient length of time existed for discovery of the condition . . . some evidence is required. . . . Where some evidence has been submitted, what constituted a reasonable length of time becomes a question of fact to be determined based on the **[*5]** circumstances of the case.

_Gulycz v. Stop & Shop Co., 29 Conn. App. 519, 521, 615 A.2d 1087 (1992)_ (internal citations omitted); _see also Colombo v. Stop & Shop Supermarket Co., 67 Conn. App. 62, 64, 787 A.2d 5 (2001)_ ("The plaintiff [bears] the burden of proffering some evidence, either direct or circumstantial, from which the jury could infer that the defect she allegedly encountered existed for a length of time sufficient to put the defendant on actual or constructive notice of its existence. . . . In the absence of such evidence, we cannot permit a jury to reach such a conclusion on the basis of either speculation or conjecture.") (internal citations omitted).

Ms. Budd's main argument against summary judgment

is that constructive notice is a question of fact. The Court agrees that this is often true. *See Considine v. City of Waterbury, 279 Conn. 830, 870, 905 A.2d 70 (2006)* ("The controlling question in deciding whether the defendants had constructive notice of the defective condition is whether the condition existed for such a length of time that the defendants should, in the exercise of reasonable care, have discovered it in time to remedy it. . . . What constitutes a reasonable length of time is largely a question of [*6] fact to be determined in the light of the particular circumstances of a case.") (internal quotation marks and citations omitted). However, where a plaintiff offers no evidence from which the jury could infer constructive notice, summary judgment is appropriate. *See Colombo, 67 Conn. App. at 64*. This is such a case.

Ms. Budd's counsel conceded at oral argument that Ms. Budd has no evidence regarding how long the drops had been on the floor, how they got there, or even how often the lobby of the post office was inspected or cleaned. As counsel acknowledged at argument, the drops could have arrived on the floor a minute and one-half before Ms. Budd slipped. Thus, the record contains absolutely no evidence from which a jury could infer constructive notice -- that is, the wet "condition existed for a length of time sufficient for the defendant's employees, in the exercise of due care, to discover the defect in time to have remedied it." *See Gulycz, 29 Conn. App. at 521*.

Two cases decided by Connecticut's Appellate Court are instructive. In *Gulycz*, a patron of a Stop & Shop Supermarket sued for negligence after his trousers caught on a protruding hinge and screw in the store, causing him to [*7] injure his leg. *See 29 Conn. App. at 520*. The trial court granted summary judgment to the defendant where there was no evidence in the record to suggest how long the defect had existed; and the Appellate Court affirmed. *See id. at 521-22*. Similarly, in

*Colombo*, the trial court granted summary judgment to the defendant where the plaintiff had slipped on some milk in the defendant's store. The only evidence offered as to how long the defect had been there was the plaintiff's description of the milk as "dirty." *See 67 Conn. App. at 63-64*. According to the Appellate Court, that evidence was insufficient to create a genuine issue of material fact regarding constructive notice, and therefore the Appellate Court affirmed summary judgment for the defendant. *See id.* In the present case, Ms. Budd does not even offer limited evidence of the nature of the defect as was offered by the plaintiff in *Colombo*. Furthermore, at oral argument, Ms. Budd's counsel conceded that he could not distinguish *Gulycz* or *Colombo* from his client's case.

For the reasons stated above and at oral argument on October 15, 2009, the Court grants summary judgment on Defendant's Motions for Summary Judgment [docs. # 42 and [*8] # 46]. **The Clerk is directed to enter judgment in favor of Defendant and close this case.**

IT IS SO ORDERED.

/s/ Mark R. Kravitz

United States District Judge

**Dated at New Haven, Connecticut: October 23, 2009.**

_____

End of Document

 Cited

As of: March 17, 2022 2:37 AM Z

# *Camera v. Target Corp.*

United States District Court for the District of Connecticut

June 8, 2020, Decided; June 8, 2020, Filed

3:18-cv-00095 (KAD)

**Reporter**

2020 U.S. Dist. LEXIS 99873 *; 2020 WL 3051751

VINCENT CAMERA, Plaintiff, v. TARGET CORPORATION, Defendant.

## Core Terms

floor, summary judgment, clean, constructive notice, mop, arrived, inspection, genuine, grandfather, employees, slippery, liquid, notice, guest, material fact, nonmoving, remember, blood, walk, hazardous, quotation, tripped, marks, spill, incident report, length of time, observe, movant, soapy

**Counsel:** [*1] For Vincent Camera, Plaintiff: A. J. Wambolt, LEAD ATTORNEY, Wambolt & Tolomeo LLC, Attorneys & Counsellors at Law, North Haven, CT; Jason G. DeGenaro, Law Offices of Jason G. DeGenaro, Guilford, CT.

For Target Corporation, Defendant: Renee Wocl Dwyer, Tara Frances Racicot, LEAD ATTORNEYS, Conway Stoughton LLC, Hartford, CT.

**Judges:** KARI A. DOOLEY, UNITED STATES DISTRICT JUDGE.

**Opinion by:** KARI A. DOOLEY

## Opinion

**MEMORANDUM OF DECISION**

**RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 42)**

Kari A. Dooley, United States District Judge:

Plaintiff Vincent Camera ("Mr. Camera," or the "Plaintiff") filed this action against Target Corporation ("Target," or the "Defendant") alleging that he sustained serious injuries from a fall in a Target store in North Haven, CT, which the Plaintiff alleges was due to Target's negligence in, *inter alia*, failing to maintain the safety of its premises. Pending before the Court is Target's motion for summary judgment (ECF No. 42), to which Mr. Camera has objected (ECF No. 58), and to which Target has filed a reply. (ECF No. 61.) For the reasons set forth below, the Defendant's motion for summary judgment is GRANTED.

**Standard of Review**

The standard under which the Court reviews motions for summary [*2] judgment is well-established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. "A genuine issue of material fact is one that 'might affect the outcome of the suit under the

governing law' and as to which 'a reasonable jury could return a verdict for the nonmoving party.'" *Noll v. Int'l Bus. Machines Corp., 787 F.3d 89, 94 (2d Cir. 2015)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*).

The inquiry conducted by the Court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson, 477 U.S. at 250*. Accordingly, the moving party satisfies its burden under *Rule 56* "by showing . . . that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002)* (*per curiam*) (quotation marks and citations omitted). Once the movant meets its burden, "[t]he nonmoving party must set forth specific facts showing that there is a genuine issue for trial." *Irizarry v. Catsimatidis, 722 F.3d 99, 103 n.2 (2d Cir. 2013)* (quoting *Rubens v. Mason, 527 F.3d 252, 254 (2d Cir. 2008)*). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish **[*3]** a disputed fact. *Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009)*. "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010)* (citation omitted). The standard thus requires "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson, 477 U.S. at 249*. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id. at 249-50* (citations omitted).

In assessing the presence or absence of a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012)* (*per curiam*) (quoting *Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir 2003)*). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp., 310 F.3d 243, 254 (2d Cir. 2002)*.

### Material Facts

The following facts are drawn from the parties' *Local Rule 56(a)* Statements of Undisputed Material Facts and exhibits in the record.

On September 10, 2016, the Plaintiff was shopping in the Target store in North Haven, CT with his grandson, Christopher Ciarleglio ("Chris"), when he slipped and fell sometime around 11:45 A.M. **[*4]** in the vicinity of what is known as the "soft lines" department, leading him to hit his head and develop a cut over his eye. Two different Target employees claim to have responded to the scene—Luis Silva ("Lou") and Francisco Alvarez ("Frank"),[1] although Chris remembers only one Target employee attending to his grandfather's fall. Outside of Chris and these two employees, there are no other identified witnesses to the events surrounding the accident.[2] The witnesses' three accounts differ as

---

[1] The Court refers to the witnesses by their first names because many of the parties' submissions, including the attached exhibits and deposition transcripts, refer to the witnesses by their first names.

[2] Chris testified that a family that was shopping nearby also witnessed his grandfather's fall and provided some assistance, but the family left before any Target employee arrived at the scene and therefore did not speak with any employee about

described below.


## Chris Ciarleglio

Chris was sixteen years old at the time of the accident. (Ciarleglio Dep. Tr. at 41:19.) He and his grandfather used to go to the Target store in North Haven together all of the time and would walk the same route. (*Id.* at 8:2-8.) In his deposition he described the incident as follows:

> He just—all of a sudden I saw—he was probably saying something to me and then all of a sudden I just saw him fall and I saw his head bounce right off the floor. And that's when I went over to the spot and I was like wiping my foot and it seemed like it was bubbly. It didn't seem like it was water. Probably like a soap. It seemed weird.

> Then I looked at him and I thought—I knew he fell really [*5] hard and I was trying to get him up and I knew he was out of it and there was a family next to us and they were like, "What happened?" Like they were all concerned. And we like moved him towards like a mannequin, whatever, something he could just lean up against, away from where he fell. And he was like, "I'm fine, I'm fine," but I knew he wasn't. He was all out of it. And I don't know if the family—I don't know if somebody saw—and then the guy came over and mopped the area where he fell.

> And then my grandpa was still like down at the time, he was like leaned up, and that's when they like had him sign that paper, whatever. And I asked him, I said, "What's that?" And then he was just like, "It's just precautionary. That's what we usually do when there's falls or whatever."

And then we like got my grandpa—me and that family got my grandpa up and we went towards like the doors where like the guest services are, like where the bathrooms are, and that's where we were just waiting. And nobody ended up coming and we just left and I had to drive home.

(*Id.* at 15:6-25; 16:1-12.) Chris testified that there was only one Target employee who attended to his grandfather, and that the employee who had [*6] him sign the accident report form was the same employee who mopped up the area where his grandfather had fallen. (*Id.* at 16:20-25; 22:23-25.) He estimated that the employee arrived about fifteen minutes after the fall with the mop, which he described as a long janitor mop. (*Id.* at 17:19-20; 36:1-6.) Chris could not remember much about what the employee looked like, other than that he was a white male, whom he described as tall and skinny and somewhere around his mid-twenties to early-thirties. (*Id.* at 17:1-16.) He testified that the employee cleaned up the "wet and bubbly" substance from the floor after Chris pointed it out, before asking his grandfather to sign the accident report. (*Id.* at 18:14-17; 22:4-14.)

When asked if he knew how long the soapy substance was on the floor, Chris responded that "[i]t looked like relatively new, newer. It didn't look like anybody stepped on it or anything like that." (*Id.* at 25:17-21.) He estimated that the slippery area was about the size of counsel's Redweld folder (*id.* at 29:5-8) and also described it as "clear, kind of like white colored." (*Id.* at 35:8-9.) He did not recall any of the soapy substance being on his grandfather's clothes and he [*7] did not take any pictures of what he saw on the floor. (*Id.* at 27:8-16.) He testified that he put his foot over it, however, and it appeared to be very slippery. (*Id.* at 35:13-16.) According to Chris, the Target employee apologized when Chris pointed out the substance on the floor; he also described the employee as carrying a

---

what they observed. (Ciarleglio Dep. Tr. at 29:20-25; 30:10-15, Pl.'s Ex. A, ECF No. 58-3.) These individuals remain unidentified.

clipboard and moving very fast. (*Id.* at 27:19-21.) Later in his deposition he also recalled the employee having a spray bottle with him and spraying the area before mopping. (*Id.* at 37:11-12; 38:20-23.) Chris testified that the employee also cleaned up blood on the floor using the spray bottle and paper towels without the mop while on his hands and knees, and that the blood was at least five feet away from the area of the soapy substance. (*Id.* at 39:22-25; 40:7-12.)

Chris further testified that the Target employee did not ask his grandfather about the cause of the fall and "just literally gave him the paper to sign." (*Id.* at 20:14-17.) He estimated that the entire interaction lasted two to five minutes at most. (*Id.* at 42:8-9.) He did not have any recollection of his grandfather saying "that he just tripped over his own feet." (*Id.* at 20:21-25; 21:1-5.) Chris testified [*8] that he did not speak with any other Target employee on the day of the accident. (*Id.* at 41:6-8.)

**Lou Silva**

Lou testified that he was serving as the store's leader on duty ("LOD") on the day in question when Frank Alvarez alerted him to the Plaintiff's fall via walkie talkie. (Silva Dep. Tr. at 21:15-20, Pl.'s Ex. B, ECF No. 58-4.) Lou went immediately to the accident site, where he came upon the Plaintiff sitting near a mannequin with a paper towel over his eye. (*Id.* at 25:3-6.) According to Lou, Frank was already there, speaking with the Plaintiff at the time he arrived. (*Id.* at 25:20-21.) Lou spoke with the Plaintiff and his grandson and reviewed the questions on Target's accident report list. (*Id.* at 26:14-23.) While Target policy usually dictates that two separate incident reports be filled out—one that tracks the LOD's impressions and another that relays the guest's narrative—Lou did not have the proper LOD form and so he used the guest incident report twice—one time for

each purpose. (*Id.* at 34:24-25; 35:1-11.)

In the guest version of the report, which the Plaintiff signed, Lou wrote "Tripped on floor" as the cause of the accident. (Guest Incident Report, Def.'s Ex. B, ECF No. [*9] 42-4.) In the LOD version of the report, he wrote "Nothing tripped walking" as the accident cause. (LOD Report, Def.'s Ex. C, ECF No. 42-5.) In both versions of the report, Lou checked the boxes indicating that Mr. Camera's clothes were not wet or damaged, that the floor/ground was clean and dry, and that there was no object involved. Lou testified that he did not observe any liquid on the ground near where the Plaintiff fell and was not aware of another store employee having cleaned up anything on the floor before he arrived at the accident scene. (Silva Dep. Tr. at 27:7-11.) Nor did he recall seeing any blood on the ground. (*Id.* at 29:17-20.) Lou testified that he did not carry a mop or any cleaning materials when he came to speak with the Plaintiff (*id.* at 25:22-25; 26:1-4) and he did not see Frank with a mop or broom, either. (*Id.* at 26:5-9.)

In an affidavit submitted after his deposition, Lou repeated that the floor was clean and dry when he arrived at the scene of the accident and that he did not observe any liquid or bubbly substance on the floor. (Silva Aff. ¶¶ 6-8, Def.'s Ex. E, ECF No. 42-7.) He also stated that "[o]n the Guest Incident Report signed by the plaintiff I noted [*10] 'tripped on floor' as those were the plaintiff's words." (*Id.* ¶ 11.) According to Lou, neither Mr. Camera nor his grandson pointed out any liquid or bubbly substance on the floor near the site of the fall. (*Id.* ¶¶ 12-13.) He maintains that he did not respond to the accident with a mop, broom, or any cleaning supplies or observe any other Target employee doing so, that he did not instruct any other Target employee to arrive with a mop or other cleaning supplies, and that there was no indication that the area was cleaned before he arrived. (*Id.* at ¶¶ 14-17.)

## Frank Alvarez

Frank served as an executive team leader of asset protection for Target at the time of the event, which meant he was in charge of protecting both store merchandise and the safety of team members and guests. (Alvarez Dep. Tr. at 8:3-10, Pl.'s Ex. C, ECF No. 58-5.) Frank could not remember who specifically informed him of the Plaintiff's fall but he noted that it was Target policy for a team member to remain with an injured guest and so he believed another employee may have been there (other than Lou) when he arrived at the scene. (*Id.* at 24:6-15; 44:9-19.) He testified that he did not observe any liquid on the floor near **[*11]** the site of the accident other than blood. (*Id.* at 26:7-9.) Frank testified that he believed he cleaned up the blood in connection with the Plaintiff's fall and that he likely used a disinfectant spray bottle or can in doing so. (*Id.* at 22:5-10; 23:12-17.) He did not observe any other employee with a mop or otherwise performing any cleanup and testified that it would have been unusual for someone else to have come and cleaned the floor but left the blood before he arrived. (*Id.* at 26:10-14; 25:23-25.) He acknowledged on cross-examination, however, that in light of his testimony that another Target employee was with Mr. Camera and his grandson before he arrived, he did not know whether that employee could have cleaned the floor before he arrived. (*Id.* at 45:4-17.) He also acknowledged that not all Target employees are permitted to clean up blood due to the special training the task requires. (*Id.* at 62:20-23.) When asked whether he knew whether someone else had used a mop prior to his arrival to clean the area where the Plaintiff fell, Frank acknowledged that it was possible but "they would have to have moved very quickly to get a mop, clean it up and run back without me seeing them" **[*12]** given the

timing.[3] (*Id.* at 47:5-20.)

Frank recalled the Plaintiff being very apologetic and attributing the fall to his having tripped over his own feet. (*Id.* at 26:22-24.) He believed Lou assisted the Plaintiff in completing the incident report. (*Id.* at 30:5-8.) Frank testified that the description in the incident reports completed by Lou was consistent with what he remembers Mr. Camera telling him about the cause of the fall. (*Id.* at 34:9-14; 35:14-21.)

## Other Relevant Evidence

In a medical record dated September 14, 2016, Mr. Camera reported that his left side was "hurting due to fall at Target." (Def.'s Ex. I, ECF No. 42-11.) The medical record further reflects that "pt states his foot got caught and fell." (*Id.*) A medical record from a neurology visit dated September 29, 2016 states that on September 10, the Plaintiff "was walking through the department store when he tripped over a lip in the floor."[4] (Def.'s Ex. J, ECF No. 42-12.) During his

--------

[3] It is undisputed that video surveillance footage from the time of the Plaintiff's fall did not depict any Target employees carrying a mop or broom to the accident site. (*See* Def.'s *Local Rule 56(a)* Statement ¶ 12, ECF No. 42-2; Pl.'s *Local Rule 56(a)* Statement ¶ 12, ECF No. 58-2.) However, the specific area where the Plaintiff fell was not one covered by the store's video security system and so there is no footage depicting the accident scene itself. (*See* Alvarez Dep. Tr. at 49:8-18.) According to Target, the video footage does show, however, that only 2 minutes and 42 seconds elapsed between the time that the Plaintiff was last seen in the footage and the time that Frank was seen responding to the scene of the accident. (*See* Def.'s Mem. at 11.) The Court notes that Target did not cite to the evidence of record in support of this assertion. However, nor did the Plaintiff challenge its accuracy.

[4] In his *Local Rule 56(a)* Statement, although the Plaintiff denies the Defendant's statement that he "told Dr. Mednick

deposition the Plaintiff testified that he did not remember seeing anything on the ground, including a liquid, that may have caused his fall. (Pl.'s Dep. Excerpt at 22:2-10, Def.'s Ex. D, ECF No. 42-6.) He stated: "All I know is I hit **[*13]** something, and that was the last thing I remember. I don't know if it was liquid or whatever it was. I went down hard." (*Id.* at 22:19-21.) The Plaintiff also did not remember having a conversation about the cause of the fall with a Target employee or agreeing with a Target employee that the floor was clean and dry. (*Id.* at 22:11-14; 51:2-4.) The Plaintiff testified that about a month after the incident, he went back to the Target store with his family to take photos and did not see anything in the area where he fell. (*Id.* at 62:4-12; 63:18-20.) Instead he opined:

> I think somebody might have spilled something. That's the only thing I can think of. Maybe somebody spilled something, soap or something, and nobody saw it and I hit it. That's the only conclusion I came up with. I don't know. I can't tell you.
>
> . . .
>
> Chris said he saw some foamy stuff on the floor. I thought maybe somebody spilled a little soap and they didn't realize it. I don't know.

(*Id.* at 63:21-25; 64:1, 4-6.)

## Discussion

The parties do not dispute that as a business invitee, Target owed Mr. Camera "a duty to 'keep its premises in a reasonably safe condition.'" *DiPietro v. Farmington Sports Arena, LLC, 306 Conn. 107, 116, 49 A.3d 951 (2012)* (quoting *Baptiste v. Better Val-U Supermarket,*

*Inc., 262 Conn. 135, 140, 811 A.2d 687 (2002)*). "[F]or a plaintiff to recover for the breach of a **[*14]** duty owed to him as a business invitee," he must "prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused his injury or constructive notice of it." *Id. at 116-17* (quoting *Baptiste, 262 Conn. at 140*) (alterations omitted). In addition:

> [t]he notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it. . . . In the absence of allegations and proof of any facts that would give rise to an enhanced duty . . . a defendant is held to the duty of protecting its business invitees from known, foreseeable dangers.

*Id. at 117* (quoting *Baptiste, 262 Conn. at 140*) (alterations omitted).

Target first asserts that summary judgment should be awarded in its favor because the Plaintiff has put forth insufficient evidence to establish any defect—specifically that there was a liquid substance on the floor at the time that he fell. However, on this issue, the testimony is conflicting. As discussed above, Chris testified that he saw a soap-like substance, that he pointed it out to the Target employee who came to the site of the accident, that the Target employee **[*15]** used a mop to clean the floor, and that the substance was very slippery. This testimony stands in stark contrast to the evidence submitted by Target, but it is not for the Court "to weigh the evidence or resolve issues of fact." *Lucente, 310 F.3d at 254*. Indeed, on the narrow issue of whether there was, in fact, a defect, if a jury credited Chris's testimony, it could find in the Plaintiff's favor on this issue. *See Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005)* ("Assessments of credibility and choices between conflicting versions of

---

that he tripped over a lip in the floor" (*see* Def.'s **Local Rule 56(a)** Statement ¶ 9), he does not, as required by **Local Rule 56(a)**, support the denial with a citation to the evidence of record. Accordingly, this statement is deemed admitted.

the events are matters for the jury, not for the court on summary judgment") (quotation marks and citation omitted).

This is not the end of the inquiry, however. The Plaintiff must also establish that Target had either actual or constructive notice of the alleged defect. On this issue, Target is entitled to summary judgment because the Plaintiff has not identified any evidence from which the fact-finder could conclude that Target had such notice.

Mr. Camera has not put forth any evidence indicating that Target had actual notice of the alleged slippery substance that caused his fall, and the parties dispute whether he has carried his burden of creating a genuine issue of material fact as to whether Target had constructive notice **[*16]** of this allegedly hazardous condition. "Business owners are chargeable with constructive notice of a dangerous condition when, had they exercised reasonable care, they would have discovered the condition." *DiPietro, 306 Conn. at 117-18.* "Constructive notice is triggered by a general duty of inspection or, when the dangerous condition is not apparent to the human eye, some other factor that would alert a reasonable person to the hazard." *Id. at 118.* In this context the question is whether the alleged soapy substance on the floor "had existed for such a length of time that [Target's] employees should, in the exercise of due care, have discovered it in time to have remedied it." *Kelly v. Stop & Shop, Inc., 281 Conn. 768, 777, 918 A.2d 249 (2007)* (quotation marks and citation omitted). The Connecticut Supreme Court has stated:

> What constitutes a reasonable length of time is largely a question of fact to be determined in the light of the particular circumstances of a case. The nature of the business and the location of the foreign substance would be factors in this determination . . . To a considerable degree each case must be decided on its own circumstances.

> *Evidence which goes no farther than to show the presence of a slippery foreign substance does not warrant an inference of constructive* **[*17]** *notice to the defendant.*

*Id.* (emphasis added) (quotation marks and citations omitted).

Even drawing all inferences in the Plaintiff's favor, the evidence "goes no farther than to show the presence of a slippery foreign substance" and otherwise fails to identify any factor, including the passage of a sufficient length of time, which would permit a reasonable fact finder to conclude that a Target employee should have discovered the substance in time to clean it before the Plaintiff fell. In fact, Plaintiff's entire case as to both the existence of the slippery substance and constructive notice begins and ends with Chris's testimony. And the only potentially probative evidence on the notice issue undermines any finding that the substance remained on the floor for an unreasonably long time. Chris testified that "[i]t looked like relatively new, newer. It didn't look like anybody stepped on it or anything like that." (Ciarleglio Dep. Tr. at 25:19-21.) Target also submitted evidence indicating that it had received no complaints about falls involving "an accumulation of liquid near the Soft Lines department in the two years prior." (Def.'s Resp. to Pl.'s Interrogs. No. 9, Def.'s Ex. H, ECF **[*18]** No. 42-10.)

Citing only Connecticut cases applying Connecticut's rules of procedure, the Plaintiff argues that Target is not entitled to summary judgment on this issue because it has not put forth sufficient evidence demonstrating the absence of constructive notice. (*See* Pl.'s Mem. at 3.) It is well established that "[a] federal court sitting in diversity must apply state substantive law and federal procedural law." *All Am. Tel. Co., Inc. v. AT & T Corp., 328 F. Supp. 3d 342, 354 (S.D.N.Y. 2018).* "As courts in this Circuit have held, the summary judgment standard

2020 U.S. Dist. LEXIS 99873, *18

is procedural, and there is a federal procedural rule on point—i.e., *Rule 56*." *Id.* It is not the Defendant's obligation, under the Federal Rules of Civil Procedure, to proffer affirmative evidence on an issue on which the Plaintiff carries the burden of proof, and therefore the cases cited by the Plaintiff are inapposite. *See, e.g., CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013)* (explaining that "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim" to satisfy the movant's initial burden on a motion for summary judgment under *Fed. R. Civ. P. 56*); *see also Doona v. OneSource Holdings, Inc., 680 F. Supp. 2d 394, 400-01 (E.D.N.Y. 2010)* (declining to apply "more plaintiff-friendly New York **[*19]** summary judgment standard" in slip and fall case, which would require the defendant to put forward affirmative evidence that it lacked constructive notice of the hazard, and explaining that "[t]he defendant in federal court is thus able to rely to a much greater extent on showing an absence of evidence or 'gaps' in the plaintiff's case than would be his state counterpart").

Here, Target has pointed to the complete lack of evidence supporting the Plaintiff's claim that the alleged slippery substance remained on the floor long enough to give rise to constructive notice of a hazardous condition. Accordingly, under the *Rule 56* analysis, the burden shifts to Mr. Camera to "come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., 735 F.3d at 123* (quotation marks and citation omitted). This he has failed to do. Instead, he argues without citation that "M[r]. Alvarez's testimony makes clear that the defendant had no inspection policy in place nor did it conduct any inspections of the area where the plaintiff fell, despite the aisle being an area

that customers, like the plaintiff, would likely walk through during their visits to the defendant's **[*20]** store." (Pl.'s Opp. at 15.) He simultaneously, and contradictorily, asserts that Target has specific maintenance and inspection policies from which one can infer constructive notice, citing *Chaves v. Exxon Mobile Corp., No. 3:06-CV-1589 (JCH), 2008 U.S. Dist. LEXIS 5465, 2008 WL 220748 (D. Conn. Jan. 25, 2008)*. (Pl.'s Mem. at 12-13.)

Neither of these arguments is supported by the record or the law. Although Lou testified that Target did not conduct regularly-scheduled floor inspections (*see* Silva Dep. Tr. at 17:22-25), both Lou and Frank testified that it was standard for employees in management positions to conduct a "brand walk" in which they would assess the condition of the store at the beginning of their shift before the store opened. (Silva Dep. Tr. 16:10-20; 20:1-4; Alvarez Dep. Tr. at 15:8-23.) Lou testified that he did not recall noticing anything out of the ordinary in the soft lines department during his brand walk on the day of the Plaintiff's accident. (Silva Dep. Tr. at 20:19-21.) He also stated in his affidavit that all Target employees "are trained and instructed to continually be on the lookout for any dangerous or defective condition on the premises." (Silva Aff. ¶ 18.) Frank likewise testified that despite the lack of a formal inspection **[*21]** schedule, Target employees "were expected to go out constantly and be a presence on the floor during th[e] day . . . at multiple points in time." (Alvarez Dep. Tr. at 42:6-11.) The Plaintiff's contention that Target failed to inspect the area where Plaintiff fell is "mere speculation or conjecture as to the true nature of the facts," *Hicks, 593 F.3d at 166*, and accordingly does not suffice to create a genuine issue of material fact. *See Dominguez v. United States, 963 F. Supp. 2d 107, 122 (D. Conn. 2013)* ("[A]n inference of constructive notice must have some definite basis in the facts . . . and the conclusion based on it must not be the result of speculation and conjecture.")

(quotation marks, alterations, and citation omitted); *see also* *Navarro v. Kohl's Dep't Stores, Inc., No. 3:05-CV-00843 (DJS), 2007 U.S. Dist. LEXIS 21179, 2007 WL 735787, at *5 (D. Conn. Mar. 8, 2007)* ("In the present case, the only evidence that the defect existed prior to Navarro's fall is that she fell. Neither Navarro nor any of the deposed store employees testified to seeing the spill or having notice of it prior to the accident. Without at least some evidence, direct or circumstantial . . . as to how long the spill existed prior to Navarro's fall, it would be too speculative for a jury to infer the length of time the spill was in place so as to establish constructive notice."). **[*22]**

Plaintiff's reliance on *Chaves* is also misplaced. There, the court denied summary judgment on the issue of constructive notice where the evidence showed that the defendants had a "policy on 'Snow and Ice Removal,' which directs employees to 'walk the lot regularly reporting and removing ice and snow hazards promptly' and 'acting to control changing conditions that are the recipe for ice . . . [i.e.] the temperature is dropping (i.e.overnight) or colder weather is in the forecast." *2008 U.S. Dist. LEXIS 5465, 2008 WL 220748, at *5*. The plaintiff there had put forth evidence concerning the weather forecast during the hours before her fall, and the District Court found that the defendant's policy regarding snow and ice removal could lead a reasonable fact finder to conclude that the defendant had constructive notice of the ice that allegedly caused the plaintiff's fall by virtue of its policy obligating it to perform inspections "whenever icing was a possibility." *Id.* Here, by contrast, while the Plaintiff refers to three documents allegedly setting forth Target's maintenance and inspection policy without citation to the record (Pl.'s Opp. at 13-14), the Plaintiff does not identify any specific evidence concerning conditions in the store **[*23]** on the day of his fall, outside of the fall itself, from which constructive notice could be inferred. And as

previously noted, as Chris himself described the substance—"[i]t looked like relatively new, newer. It didn't look like anybody stepped on it or anything like that." (Ciarleglio Dep. Tr. at 25:19-21.)

In sum, because the record is without evidence from which a jury could infer that the alleged soapy substance remained on the floor for an unreasonable length of time, or any other evidence suggesting that Target failed to exercise reasonable care in discovering the hazardous condition, the Plaintiff has failed to identify a genuine issue of fact on the issue of constructive notice and Target is entitled to summary judgment.

## Conclusion

For the foregoing reasons, the Defendant's motion for summary judgment is granted. The Clerk of Court is directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 8th day of June 2020.

*/s/ Kari A. Dooley*

KARI A. DOOLEY

UNITED STATES DISTRICT JUDGE

End of Document

No *Shepard's* Signal™
As of: March 17, 2022 2:37 AM Z

## *Caviness v. Danbury Mall, LLC*

Superior Court of Connecticut, Judicial District of Danbury At Danbury

January 5, 2022, Decided; January 5, 2022, Filed

DBDCV196033893S

**Reporter**

2022 Conn. Super. LEXIS 23 *; 2022 WL 225690

Joanne Caviness v. Danbury Mall, LLC et al.

**Notice:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

## Core Terms

wet, spot, mode of operation, mall, constructive notice, wet floor, notice, floor, exit, defendants', slipped, genuine issue of material fact, quotation, marks, summary judgment motion, foreseeable, conditions, hazardous, entrance, walking, signs, zone, actual notice, alleges, cases, requirement of notice, dangerous condition, feet, deposition testimony, premises liability

**Judges:** [*1] Dan Shaban, J.

**Opinion by:** Shaban

## Opinion

MEMORANDUM OF DECISION RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT #133

PROCEDURAL HISTORY

The plaintiff, Joanne Caviness, alleges she was injured in a slip and fall that occurred at the Danbury Fair Mall owned and operated by the defendants, Danbury Mall, LLC and MACW Property Management, LLC. The plaintiff's complaint consists of three counts, all of which are for premises liability alleging the same facts against three different defendants.[1] In the operative complaint (#113), the plaintiff alleges that while walking towards the exit of the Danbury Fair Mall on January 9, 2018, she was injured when she slipped on a wet spot and fell. She further alleges that the wet spot was the result of the defendants' negligence because they failed to keep the interior flooring of the mall in a reasonably safe condition. According to the plaintiff, the defendants knew, or in the exercise of reasonable care should have known, about the wet spot and failed either to remedy the defect or warn persons of it. Alternatively, the plaintiff alleges that the mode of operation in which the defendants conducted their business made it inherently foreseeable that such recurrent defects would [*2] be created.

On May 5, 2021, the defendants filed a motion for summary judgment (#133). In their supporting

---

[1] In count one, the defendant is Danbury Mall, LLC. In count two, the defendant was originally Macerich Management Company, but MACW Property Management, LLC was later substituted as the proper defendant on August 17, 2020. In count three, the defendant was Macerich Solar, LLC, but count three was withdrawn by the plaintiff on August 27, 2020. Therefore, only counts one and two are at issue in this case.

memorandum of law, the defendants argue that there is no genuine issue of material fact that they did not have actual or constructive notice of the alleged wet spot that caused the plaintiff's fall and resulting injuries.[2] On May 28, 2021, the plaintiff filed a memorandum of law in opposition to the defendants' motion for summary judgment (#137) and noted that the defendants did not address the plaintiff's allegations in the complaint regarding the mode of operation rule.[3] On July 22, 2021, the defendants filed a reply memorandum (#142) to the plaintiff's opposition arguing, among other things, that the mode of operation rule does not apply in this case because that rule is a narrow exception to the traditional notice requirement and that the plaintiff's allegations do not fall under it. The plaintiff filed a surreply (#144) on September 10, 2021.[4] The court heard oral argument on the motion for summary judgment by remote means on September 13, 2021.

FACTS

The following facts are undisputed. On the evening of January 9, 2018, the plaintiff was visiting the Danbury Fair Mall in Danbury, **[*3]** Connecticut. Pl. Compl. ¶5. The walkway outside the mall was wet and snow covered parts of the ground other than the walkway. Pl. Ex. D to plaintiff's objection #137. A wet floor sign was placed at the entrance/exit door. Pl. Ex. C to plaintiff's

---

[2] The defendants attach excerpts from the deposition of the plaintiff, an affidavit from Danbury Mall Security Director, Richard Lee, and the incident report from the alleged fall in support of their motion for summary judgment. Def. Exhibits 1, 2, A.

[3] The plaintiff attaches her own affidavit and two photographs of the outside of the Danbury Fair Mall from the day of the incident in support of her opposition to the motion for summary judgment. Pl. Ex. C, D.

[4] The plaintiff attaches excerpts of the deposition of Richard Lee in support of her surreply. Pl. Ex. A.

objection #137 ¶¶11-12. After being in the mall for about three hours, the plaintiff walked through the common interior area of the mall, towards the exit. Pl. Ex. C to defendants' objection #137 ¶14. Def. Ex. 1, pp. 115:11-23; 117:11-13; 122:11-18; 124:4-10. While doing so, the plaintiff slipped and fell on a wet substance on the floor approximately fifty feet from the exit. Pl. Ex. C to defendants' objection #137 ¶¶4, 13. At the time she had entered the mall earlier (through the same doors she intended to exit through), she did not notice any issue with the flooring that might cause her to slip or fall. Def. Ex. 1, p. 119:3-5. Just prior to her fall, on her way to the exit, she "did not see anything on the floor" that might cause her to slip or fall. Def. Ex. 1, p. 124:22-25. While walking, her leg slipped on a wet substance that caused her to fall. Def. Ex. 1, pp. 126:24-25; 127:1-20. After falling, she noticed wet spots on her clothes, **[*4]** but did not see anything on the floor. Pl. Ex. C to plaintiff's objection #137 ¶7. Def. Ex. 1, p. 125:14-20. The liquid on her clothing was clear and did not stain her clothing. Pl. Ex. C to plaintiff's objection #137 ¶¶8-9. After her fall, she was helped up by others, then continued on toward the exit and left the mall. Def. Ex. 1, p. 125:20-25. The plaintiff did not report the fall until she returned to her car and called the mall. Def. Ex. 1, p. 131:19-23. She later went to Danbury Hospital on her own to be examined. Def. Ex. 1, p. 131:21-24. The next day she called the mall again and spoke to Richard Lee (Lee), the mall's security director. Def. Ex. 2, ¶8; exhibit A appended thereto. An incident report was then prepared which reflects that the plaintiff reported she "never saw the wet spot." *Id.* In her deposition testimony, the plaintiff stated that she did not know what substance had caused her to slip, what caused any wet spot on the ground, or how long the wet spot had been there. Def. Ex. 1; pp. 127:5-8; 131:12-18.

In Lee's affidavit submitted by the defendants, he averred that at the time of plaintiff's fall, mall employees

would actively walk and patrol the common areas to **[*5]** identify wet spots or other hazardous conditions. Def. Ex. 2, ¶¶5-6. Prior to the plaintiff's fall, no wet spot had been found or noticed by any mall employee at the location where plaintiff alleges she was injured. Def. Ex. 2, ¶6. Nor was any wet spot found after the time of plaintiff's fall. Def. Ex. 2, ¶7. The defendants had no knowledge how the wet spot had gotten on the floor or how long it had been there. Def. Ex. 2, ¶¶9-10. Wet floor signs were only put down after a wet spot had been located. Pl. Ex. A to pleading #144; p. 42; 2-12.

Other facts will be recited as necessary.

DISCUSSION

"*Practice Book § [17-49]* requires that judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A material fact is a fact that will make a difference in the result of the case . . . The facts at issue are those alleged in the pleadings." (Internal quotation marks omitted.) *Russell v. Mitchell Properties, Inc., 148 Conn.App. 635, 638, 87 A.3d 591*, cert. denied, *314 Conn. 912, 100 A.3d 404 (2014)*. "In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact . . . but rather to determine whether any such issues exist." **[*6]** (Internal quotation marks omitted.) *Episcopal Church in the Diocese of Connecticut v. Gauss, 302 Conn. 408, 421-22, 28 A.3d 302 (2011)*, cert. denied, *567 U.S. 924, 132 S.Ct. 2773, 183 L.Ed.2d 653 (2012)*.

"In seeking summary judgment, it is the movant who has the burden of showing the nonexistence of any issue of fact. The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle[s] him to a judgment as a matter of law. The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue . . . Once the moving party has met its burden, however, the opposing party must present evidence that demonstrates the existence of some disputed factual issue . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions **[*7]** of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under Practice Book § 380 [now § 17-45]." (Internal quotation marks omitted.) *Fiano v. Old Saybrook Fire Co. No. 1, Inc., 332 Conn. 93, 101, 209 A.3d 629 (2019)*.

A

Mode of Operation Rule

Although offered as an alternative theory of liability, the court will address the mode of operation theory first. The defendants argue that the mode of operation theory is a limited and narrow exception to the traditional notice requirement for premises liability cases and that it does not apply in the present matter. According to the defendants, the rule is not applicable here because the plaintiff has not shown that the defendants' mode of operation was considerably different from that of similarly operated businesses and she has failed to establish that her injury occurred within a "limited zone of risk." The plaintiff counters, that because the mode of operation rule does apply, it obviates the need for the plaintiff to prove actual or constructive notice. Specifically, the plaintiff contends that the wet spot she

Ben Levites

allegedly slipped on was a reasonably foreseeable and recurrent risk that the defendants' mode of operation gave rise to.

Connecticut officially adopted [*8] the mode of operation rule in the case of *Kelly v. Stop & Shop, Inc., 281 Conn. 768, 918 A.2d 249 (2007)*. "The mode of operation rule . . . allows a customer injured due to a condition inherent in the way [a] store is operated to recover without establishing that the proprietor had actual or constructive knowledge of the dangerous condition." (Internal quotation marks omitted.) *Id., 777*. For the mode of operation rule to apply, the plaintiff must establish "a prima facie case of negligence upon presentation of evidence that the mode of operation of the defendant's business gives rise to a foreseeable risk of injury to customers and that the plaintiff's injury was proximately caused by an accident within the zone of risk." *Id., 791*.

In *Fisher v. Big Y Foods, Inc., 298 Conn. 414, 3 A.3d 919 (2010)*, the Supreme Court revisited the mode of operation rule to address its scope and application. The court acknowledged that the language and cases cited in *Kelly* could be interpreted to apply the mode of operation rule generally throughout the self-service retail industry and to cases outside of the rule's intended scope. *Id., 426-27*. The *Fisher* court went to great lengths, however, to clarify that the mode of operation rule is meant to be a "narrow" exception to the traditional notice requirement and "does not apply generally to all accidents caused [*9] by transitory hazards in self-service retail establishments, but rather, only to those accidents that result from particular hazards that occur regularly, or are inherently foreseeable, due to some specific method of operation employed on the premises." *Id., 423*. "Consequently, when a plaintiff injured by a transitory hazardous condition on the premises of a self-service retail

establishment fails to show that a particular mode of operation made the condition occur regularly or rendered it inherently foreseeable, the plaintiff must proceed under traditional premises liability doctrine, i.e., he must show that the defendant had actual or constructive notice of the particular hazard at issue." *Id., 439*.

Following the reasoning of *Kelly* and *Fisher*, the Appellate Court has distilled three requirements for the mode of operation rule to apply: "(1) the defendant must have a particular mode of operation distinct from the ordinary operation of a related business; (2) that mode of operation must create a regularly occurring or inherently foreseeable hazard; and (3) the injury must happen within a limited zone of risk." *Porto v. Petco Animal Supplies Stores, Inc., 167 Conn.App. 573, 581, 145 A.3d 283 (2016)*; *Hill v. OSJ of Bloomfield, LLC., 200 Conn.App. 149, 157, 239 A.3d 345 (2020)*.

Under the first requirement, the mode of operation rule does not "impose liability on a business [*10] if the businesses' mode of operation was not appreciably different from that of similar businesses." *Porto v. Petco Animal Supplies Stores, Inc., supra, 167 Conn. App. 573, 145 A.3d 283.*[5] "[T]he mode of operation rule is

_____

[5] The reasoning for this requirement stems for Connecticut Supreme Court's analysis in *Fisher v. Big Y Foods, Inc., supra, 298 Conn. 414, 3 A.3d 919*. In *Fisher*, the Connecticut Supreme Court noted that "a rule that presumptively established a storekeeper's negligence simply for having placed packaged items on shelves for customer selection and removal, without requiring any evidence that they were displayed in a particularly dangerous manner, would require us to ignore the modern day reality that all retail establishments operate in this manner and, given competitive considerations and customer demands, they have no other choice. The North Carolina Court of Appeals, in rejecting a plaintiff's claim that a movie theater's darkened state was a

2022 Conn. Super. LEXIS 23, *10

applied appropriately only when a business employs a more specific method of operation within the general business environment that is distinct from the ordinary, inevitable way of conducting the sort of commerce in which the business is engaged . . . Thus, a supermarket that sells groceries in the usual self-service fashion is not engaged in a specific mode of operation; it is simply in the business of selling groceries . . . Merely describing the customary way of conducting a particular kind of business is not enough." (Citations omitted; internal quotation marks omitted.) *Konesky v. Post Rd. Entm't, 144 Conn. App. 128, 139-40, 72 A.3d 1152*, cert. denied, *310 Conn. 915, 76 A.3d 630 (2013)*.

Under the second and third requirements, "[t]he rule applies only to specific areas of an establishment where the risk of injury is continuous or foreseeably inherent by virtue of the nature of the business or mode of operation . . . Notably, our Supreme Court included the requirement that a plaintiff's injury occur within a zone of risk." (Citation omitted; internal quotation marks omitted.) *Hill v. OSJ of Bloomfield, LLC., supra, 200 Conn.App. 156*. Our Appellate Courts have rejected the mode of operation theory in **[*11]** cases without an identifiable zone of risk or where the zone of risk would encompass the entirety of the establishment, as such an

'mode of operation' that had made his trip and fall reasonably foreseeable, made the following salient observation: '[The] plaintiff's argument must fail—for the simple reasoning that, movie theatres could not do business at all if they could not be darkened . . .' Consequently, the claimed mode of operation is a theatre's only method of operation and as such, the theatre cannot be considered negligent [for employing it] but instead, its patrons must be considered to have assumed the risk in order to take part in the activity provided.' . . . Similarly, a modern supermarket's only method of operation is to place items on shelves for customer selection and removal. Accordingly, a defendant cannot be considered negligent solely on the ground that it has employed that method." (Citations omitted; emphasis omitted.) *Id., 438-39*.

interpretation of the zone of risk requirement would render it "superfluous."[6] See *Porto v. Petco Animal Supplies Stores, Inc., supra, 167 Conn.App. 584-85*; see also *Konesky v. Post Road Entertainment, supra, 144 Conn.App. 143-44*. In other words, the zone of risk must be *limited*, as "an expansive zone of risk would be inconsistent with the Supreme Court's admonition that the mode of operation rule is meant to be a narrow exception to the notice requirements under traditional premises liability." (Internal quotation marks omitted.) *Porto v. Petco Animal Supplies Stores, Inc., supra, 167 Conn.App. 581*.

In the present case, the plaintiff argues that the defendants' policy for handling wet floors and wet weather outside constitutes a mode of operation that creates a reasonably foreseeable and recurrent risk of wet spots being created by patrons tracking in water or snow. To support her argument, the plaintiff submitted her affidavit and the deposition testimony of Lee. Pl. Ex. C; Pl. Ex. A to #144. In his deposition, Lee describes the mall's customary procedure for dealing with wet spots

---

[6] In *Porto v. Petco Animal Supplies Stores, Inc., supra, 167 Conn.App. 573, 145 A.3d 283*, the court rejected the application of the mode of operation theory. It found that wet spots caused by pet urine in a pet store did not create an identifiable zone of risk and that the "moving target" theory asserted by the plaintiffs must fail because if applied the zone of danger would encompass the entire store. *Id., 584-85*.

In *Konesky v. Post Road Entertainment, supra, 144 Conn.App. 128*, the court rejected the application of the mode of operation theory where the plaintiff slipped and fell on a wet spot created by beer tubs used to serve cold drinks. The court reasoned that if it applied the zone of risk to any location in which a patron could carry a cold, wet beer, the zone of risk would encompass the entire premises "simply because drinks do sometimes spill or otherwise produce slippery surfaces." *Id., 143*.

on floors and wet weather outside. Specifically, he stated that housekeeping would put down floor mats at the entrances of the mall as a general precaution when it got wet outside **[\*12]** from inclement weather. According to Lee, however, wet floor signs are not put out automatically on days where it is wet outside, and as a policy were not put out until a wet spot was located. Lee also stated, in his affidavit submitted by the defendants, that mall employees "actively walk and patrol the premises in all common areas to identify wet spots or other hazardous conditions that need to be addressed." Def. Ex. 2, ¶5.

This evidence regarding the defendants' customary procedure for dealing with wet spots and wet weather, however, does not satisfy the first requirement of the mode of operation rule in Connecticut because "[m]erely describing the customary way of conducting a particular kind of business is not enough." *Porto v. Petco Animal Supplies Stores, Inc., supra, 167 Conn.App. 582*. Instead, the first requirement can only be satisfied if there is evidence that shows the defendants' mode of operation is "appreciably different from that of similar businesses." *Id., 581-82*. While evidence of the defendants' mode of operation has been presented to the court by both parties, there has been no evidence submitted that shows the defendants' mode of operation was distinct or appreciably different from the mode of operation of *other malls or similar businesses* **[\*13]**. Notably, the plaintiff's allegations are not addressed to a specific retail store or tenant within the mall and their specific mode of operation for retail sales. The plaintiff has not submitted evidence to raise a genuine issue of material fact that the defendants were not simply acting as any other operators/owners of a commercial mall would on a wet day by allowing patrons into the premises and putting down wet floor signs when wet spots were found. Without this evidence, the plaintiff cannot satisfy the first requirement of Connecticut's

mode of operation rule. Further, there is no evidence presented by the plaintiff to rebut that offered by the defendant to create a genuine issue of material fact that the condition of the floor at the location identified by the plaintiff occurred regularly or was inherently foreseeable by the defendant.

The plaintiff's reliance on the out-of-state cases of *Buttrey Food Stores Division v. Coulson, 620 P.2d 549 (Wyo. 1980)* and *F.W. Woolworth Co. v. Stokes, 191 So.2d 411 (Miss. 1966)* is misguided. While it is true that the Connecticut Supreme Court included these two cases in a string citation in *Kelly*, the context of that string citation is important. *Kelly v. Stop & Shop, Inc., supra, 281 Conn. 782*. Contrary to the plaintiff's assertion, the string citation was not included to look favorably upon or support each of **[\*14]** the cases' individual holdings or to use their holdings to clarify examples of when the rule should apply. Rather, it was used as an illustration of the "distinct modern trend favoring the rule." *Id., 783*. The Supreme Court in *Fisher* explicitly noted that the *Kelly* court never elaborated on the breadth of the rule's application in those cases and that "the vast majority of those jurisdictions applied [the mode of operation rule] narrowly." *Fisher v. Big Y Foods, Inc., supra, 298 Conn. 426-30 n.21*.

The plaintiff's reliance on *Buttrey* and *Stokes* also fails to account for the fact that since the Supreme Court cited them in *Kelly*, the mode of operation rule's scope and application in Connecticut has been distinguished from some of the other states that have adopted it. *Fisher v. Big Y Foods, Inc., supra, 298 Conn. 427 n.21*. The Supreme Court in *Fisher* took great care to clarify that in Connecticut the mode of operation rule is to be a "narrow" exception to the traditional notice requirements and our Appellate Courts have created a test that reflects the adopted rule's limited scope and application. *Porto v. Petco Animal Supplies Stores, Inc., supra, 167*

*Conn.App. 581*. In light of the fact that *Buttrey* and *Stokes* do not represent the law governing the mode of operation rule as it has been applied in Connecticut, the court does not find them to be persuasive authority.

In sum, for the mode of operation theory to apply in **[*15]** the state of Connecticut, the plaintiff must satisfy the first requirement of the Appellate Court's test by making a showing that the defendants' mode of operation was appreciably different from that of similar businesses. In this motion for summary judgment, however, the plaintiff has failed to raise a genuine issue of material fact that would satisfy this requirement. Accordingly, whether based on an issue of fact or as a matter of law, the mode of operation theory is inapplicable and the plaintiff must instead comport with the traditional notice requirements of a premises liability case.[7]

B

Notice

In the present case, it is undisputed that the plaintiff allegedly slipped on a wet spot while walking in an interior common area of the mall. The only issue to be resolved then is whether there is a genuine issue of material fact that the defendants had actual or constructive notice of the wet spot. The plaintiff contends the defendants had actual or constructive notice of the defect prior to her fall in that: (1) the defendants had a policy that required wet floor signs to be put up after wet spots were located; (2) that both prior to and after the fall the plaintiff saw wet floor signs **[*16]** at the exit/entrance to the mall approximately fifty feet from where she fell. Based on this, plaintiff argues whether fifty feet is close enough in proximity to the wet floor signs to establish actual or constructive notice is an issue of fact that should be left to the trier of fact to determine.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury . . . Duty is a legal conclusion about relationships between individuals, made after the fact, and is imperative to a negligence cause of action." (Internal quotation marks omitted.) *Doe v. Saint Francis Hospital & Medical Center, 309 Conn. 146, 174, 72 A.3d 929 (2013)*. Under the theory of premises liability, "[t]he law is clear that a possessor of land has a duty to an invitee to reasonably inspect and maintain the premises in order to render them reasonably safe . . . In addition, the possessor of land must warn an invitee of dangers that the invitee could not reasonably be expected to discover." (Internal quotation marks omitted.) *Gargano v. Azpiri, 110 Conn.App. 502, 508, 955 A.2d 593 (2008)*.

"[B]usiness owners do not breach their duty to invitees by failing to remedy a danger unless they had actual or constructive notice of that danger." *DiPietro v. Farmington Sports Arena, LLC, 306 Conn. 107, 117, 49 A.3d 951 (2012)*. This "notice, whether actual or constructive, must be notice **[*17]** of the very defect

---

[7] As the plaintiff has failed to satisfy the first requirement of the Appellate Courts test, this court need not discuss the second or third requirements. The court does note that the plaintiff essentially alleges that patrons of the mall created the wet spot she slipped on by tracking water in from the outside on either their shoes or clothing. The plaintiff has not presented evidence to establish as a material fact that the wet spot on the floor where she claims to have slipped was caused by other patrons tracking in water from the wet surface outside the mall to that spot. The source of the water was unknown to the plaintiff. To accept the plaintiff's argument that the tracking in of water for an unspecified distance creates the kind of limited and "identifiable zone of risk" our Supreme and Appellate Courts intended would essentially render the entirety of the mall's common area a zone of risk. *Porto v. Pelco Animal Supplies Stores, Inc., supra, 167 Conn.App. 581*.

which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it." *Monahan v. Montgomery, 153 Conn. 386, 390, 216 A.2d 824 (1966)*. Accordingly, in order to "defeat a motion for summary judgment in a case based on allegedly defective conditions, the plaintiff has the burden of offering evidence from which a jury reasonably could conclude that the defendant had notice of the condition and failed to take reasonable steps to remedy the condition after such notice." *DiPietro v. Farmington Sports Arena, LLC, supra, 117*.

1

Actual Notice

"To establish actual notice the plaintiff must prove that [a defendant], through its agents and/or employees, actually knew of the dangerous condition long enough before the plaintiff was injured to have taken corrective action." *Brye v. State, Superior Court, judicial district of Waterbury, Docket No. CV-06-5000745, 2012 Conn. Super. LEXIS 521 (February 17, 2012, Trombley, J.)*. Further, while it is true that "actual knowledge of the precise defect constituting the dangerous condition had to be proven as distinguished from actual knowledge of conditions naturally productive of the dangerous condition and subsequently in fact producing it . . . [T]his does not mean that circumstantial evidence is not available, **[*18]** and cannot be sufficient, to prove the actual notice of the precise defect . . . In many cases, . . . circumstantial evidence is the only evidence available to a party to prove a fact material or essential to his cause of action or defense." (Citations omitted.) *Hennessey v. Hennessey, 145 Conn 211, 214-15, 140 A.2d 473 (1958)*.

Beginning with the issue of actual notice, the question before this court is whether the plaintiff has submitted evidence that establishes a genuine issue of material fact that the defendants knew of the alleged wet spot the plaintiff slipped on long enough for them to have had the opportunity to remedy the defect. The plaintiff has provided the court with no direct evidence that establishes the defendants knew of the alleged wet spot before her fall nor of how long the wet spot was on the floor. The only direct evidence that has been provided to the court on this matter is the plaintiff's own deposition testimony that concedes that she herself does not know how long the wet spot was on the floor, what it was, or how it got there. Def. Ex. 1, p. 131.

Although the plaintiff has not submitted any direct evidence of actual notice to the court, she has submitted circumstantial evidence in an attempt to support her claim. This evidence **[*19]** comes in the form of the plaintiff's affidavit, the deposition testimony of Lee, and photographs of surveillance footage from the outside of the mall on the day of the incident. The plaintiff also cites portions of her deposition submitted by the defendants. Pl. Ex. C, D; Ex. A to reply #144; Def. Ex. 1.

The photographs submitted by the plaintiff establish that the weather outside the mall on the day of the incident was wet with some light snow cover on the grounds other than the exterior walkways. In her deposition testimony, the plaintiff explained that that this snow and wetness would get in through the entrance/exit door of the mall as it is inevitably brought in on people's feet. Additionally, as discussed above, Lee stated that the mall's housekeeping puts out floor mats at the entrances of the mall under wet weather conditions, similar to the day of the plaintiff's accident. Nevertheless, as a policy, the wet floor signs and mats are never put out until a wet spot is first located. According to Lee, mall employees "actively walk and patrol the premises in all common areas to identify wet spots or other hazardous conditions that need to be addressed," and that once a wet spot **[*20]** was located it was stationed and controlled by a security officer who would set up caution

barriers (which in the context of the deposition excerpts appears to be synonymous with wet floor signs) and notify housekeeping for cleanup. These barriers would then remain up until the area was clean and dry.

According to the plaintiff, when she arrived at the mall on the day of the incident she saw a wet floor sign in the area near the entrance doors as she walked into the mall. After about three hours of shopping, the plaintiff was heading towards the exit of the mall to leave. As she got within about fifty feet of the exit, her leg slipped on a wet substance that caused her to fall. In her affidavit, the plaintiff stated the liquid she slipped on was clear and that after her fall, although she found wet spots on her clothes, they did not stain her shirt indicating to her that the liquid she fell on was clear. After being helped up, the plaintiff continued on and proceeded to exit the mall. It was at this time that the plaintiff again saw the wet floor sign in the area near the entrance/exit door.

The plaintiff argues that reading the testimony of the plaintiff in conjunction with Lee's testimony **[\*21]** under these facts, establishes a genuine issue of material fact that should be left to the jury to consider at trial. The defendants disagree, arguing first that the mere presence of a wet floor sign does not establish the existence of a wet spot let alone notice of a wet spot in any location. Second, the defendants argue in the alternative that even if it is established that they did have notice of a wet spot near the entrance of the mall that the plaintiff has not presented any evidence that could establish they had notice of a wet spot approximately fifty feet away from the wet floor sign. Although the plaintiff was able to establish actual notice for a wet spot near the wet floor sign, the "notice, whether actual or constructive, must be notice of the *very defect* which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it." (Emphasis

added.) *Monahan v. Montgomery, supra, 153 Conn. 390*. Further, there has simply been no evidence provided by the plaintiff that shows the defendants "*actually knew* of the dangerous condition [at the spot of her fall] long enough before the plaintiff was injured to have taken corrective action." (Emphasis added.) **[\*22]** *Brye v. State, Superior Court, judicial district of Waterbury, Docket No. CV-06-5000745, 2012 Conn. Super. LEXIS 521 (February 17, 2012, Trombley, J.)*.

The plaintiff argues that the defendants had actual notice of the spot the plaintiff slipped on because it was in the "vicinity" of a wet area that the defendants had notice of. The problem with this argument, however, is that the evidence of the wet spot being in the "vicinity" is speculative because there has been no evidence presented as to how extensive either of the two spots were. The plaintiff could only offer a guess of them being fifty feet apart. Further, the plaintiff has presented no evidence of when the wet spot appeared at the location where she fell or how it got there. Therefore, determining whether the defendants knew of the very condition that existed and was there long enough for them to remedy it can only be based on conjecture and speculation. The plaintiff has failed to raise a genuine issue of material fact that the defendants had actual notice of the wet spot that caused her fall.

2

Constructive Notice

"Business owners are chargeable with constructive notice of a dangerous condition when, had they exercised reasonable care, they would have discovered **[\*23]** the condition . . . Constructive notice is triggered by a general duty of inspection or, when the dangerous condition is not apparent to the human eye, some other factor that would alert a reasonable person to the hazard." (Citation omitted.) *DiPietro v. Farmington Sports Arena, LLC, supra, 306 Conn. 117-18*. "The

2022 Conn. Super. LEXIS 23, *23

controlling question in deciding whether the defendants had constructive notice of the defective condition is whether the condition existed for such a length of time that the defendants should, in the exercise of reasonable care, have discovered it in time to remedy it." (Internal quotation marks omitted.) *Riccio v. Harbour Vill. Condo. Ass'n, 281 Conn. 160, 163, 914 A.2d 529 (2007)*. "Evidence which goes no farther than to show the presence of a slippery foreign substance does not warrant an inference of constructive notice to the defendant." (Internal quotation marks omitted.) *Kelly v. Stop & Shop, Inc., supra, 281 Conn. 777*.

In the present case, the plaintiff argues that the defendants had constructive notice of the wet spot because they knew that it was a wet day outside and that patrons could be tracking in water as they come and go, thus creating a recurrent and foreseeable risk. In support of her argument, the plaintiff relies on her affidavit in which she attests that it was wet and slushy on the day of the accident. She argues that the defendants knew **[*24]** for hours the danger of water being tracked into the mall, so much so that they put up wet floor signs near the entrance/exit. The plaintiff also relies on the photographs of the video camera footage that shows the wet and snow covered ground *outside* of the mall on the day of the incident. The plaintiff's argument is fatally flawed because her testimony does not establish notice of "the very defect which occasioned the injury," but rather evidence of "conditions naturally productive of that defect even though subsequently in fact producing it." *Monahan v. Montgomery, supra, 153 Conn. 390*.

The only testimony from the plaintiff that goes directly to notice of the actual defect is her deposition testimony submitted by the defendants. In this testimony, the plaintiff states that she did not see anything on the floor prior to her fall, that she does not know what substance caused her to fall, and most importantly for this analysis

that she does not know how long the wet spot had been on the floor prior to her fall. Def. Ex. 1. Several Superior Court decisions and the Appellate Court have held that failing to establish how long the defect existed is fatal to establishing constructive notice.

In **[*25]** *Lane v. Shop Rite of Waterbury, LLC, Superior Court, judicial district of Waterbury, Docket No. CV-03-0182136-S, 2006 Conn. Super. LEXIS 1518 (May 24, 2006, Gallagher, J.)*, the court took up a motion for summary judgment in which the plaintiff slipped on a substance while walking down a store aisle. Similar to the present case, the plaintiff also admitted that he did not know how long the substance was on the ground for, along with several other admissions that failed to establish how long the substance existed for or how it got there. *Id.* The plaintiff in *Lane* made a similar argument to the present plaintiff, arguing that because it was raining all day that someone may have tracked water into the store. *Id.* The *Lane* court held that: "The evidence that it was pouring rain that day is not evidence of the nature and duration of specific defect alleged (assuming that the alleged defect is a puddle of rain water) rather, it is evidence merely of the condition naturally productive of the defect. Such evidence does not warrant an inference of constructive knowledge." *Id.*

In *Perez v. Grade A Shop Rite Commerce Road, LLC, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-18-6034996-S, 2019 Conn. Super. LEXIS 2768 (October 4, 2019, Hernandez, J.)*, the court took up a **[*26]** motion for summary judgment where the plaintiff slipped in a puddle near a cash register and alleged that the defendant had constructive knowledge of the puddle. Similar to *Lane*, the court honed in on the fact that the plaintiff did not know for how long the puddle had existed and that she did not offer any other evidence to establish how long it had been there. *Id.* In finding that the plaintiff did not meet the notice requirement, the court stated that the plaintiff was

Ben Levites

essentially asking "the court to infer constructive notice from the claimed size and location of the water. The plaintiff's assertion about the location and size of the claimed puddle shows only the presence of water, it does not constitute evidence that would permit the court to infer how long it was present before the plaintiff slipped." *Id.*[8]

Accordingly, even if this court views the evidence in the light most favorable to the plaintiff, she is unable to establish constructive notice because she does not know how long the defect existed for and has presented no other evidence to establish the origin, nature, and age of the defect. Therefore, without this key temporal evidence, the court finds that **[*27]** the trier of fact would not be able to determine how long the defect had existed in order to impute constructive notice on the defendants.

CONCLUSION

Reading the allegations of the complaint and considering the evidence in the light most favorably to the non-movant plaintiff, the court finds that as to the causes of actions brought by the plaintiff, the mode of operation theory is inapplicable in this case as a matter of law. Further, there is no genuine issue of material fact that there was no actual or constructive notice to the defendants of the very defect which caused the plaintiff's injuries. Therefore, as a matter of law, the plaintiff cannot establish negligence on the part of the defendants. The motion for summary judgment is granted.

BY THE COURT

Shaban, J.

_____

End of Document

_____

[8] Other Connecticut courts have ruled similarly. See *James v. Valley-Shore Y.M.C.A., Inc., 125 Conn.App. 174, 6 A.3d 1199 (2010)*, cert. denied, **300 Conn. 916. 13 A.3d 1103 (2011)** (on an appeal from summary judgment, court found that the plaintiff failed to establish constructive notice in case where the plaintiff failed to submit evidence of the length of time the defect existed for); *Colombo v. Stop & Shop Supermarket Co., Inc., 67 Conn.App. 62, 787 A.2d 5 (2001)*, cert. denied, **259 Conn. 912, 789 A.2d 993 (2002)** (court held that the plaintiff failed to establish constructive notice by failing to provide any evidence from which the jury could infer that the defect existed for a length of time that put the defendant on notice); *Viera v. K Mart Corp., Superior Court, judicial district of Hartford-New Britain, at Hartford, Docket No. CV-87-0338782-S (April 8, 1992, Aurigemma, J.) (6 Conn. L. Rptr. 719, 1992 Conn. Super. LEXIS 986)* (court held that the plaintiff failed to establish constructive notice in case where the plaintiff slipped on water allegedly tracked into the store in part because there was no evidence presented to establish how long the water was on the floor).

 Positive

As of: March 17, 2022 2:37 AM Z

## *Chaves v. Exxon Mobil Corp.*

United States District Court for the District of Connecticut

December 31, 2008, Decided; January 5, 2009, Filed

CIVIL ACTION NO. 3-06-cv-1589 (JCH)

**Reporter**

2008 U.S. Dist. LEXIS 105786 *; 2009 WL 57119

JOANN CHAVES, Plaintiff, v. EXXON MOBIL CORPORATION d/b/a PLAINFIELD MOBIL-SOUTHBOUND, and MOBIL CORPORATION, Defendants.

**Prior History:** *Chaves v. Exxon Mobile Corp., 2008 U.S. Dist. LEXIS 5465 (D. Conn., Jan. 25, 2008)*

## Core Terms

Station, sidewalk, constructive notice, wet, no evidence, daughter, slimy, temperatures, freezing, pain, snow, defective condition, precipitation, inspection, employees, premises, removal, incident report, minutes, walking, weather, exited, front, trash, pull, arm

## Case Summary

**Procedural Posture**

Plaintiff sued defendants, related owners of a gasoline service station, seeking recovery for personal injuries sustained when she slipped and fell on the sidewalk outside of the service station. Defendants denied any wrongdoing.

**Overview**

Plaintiff and her daughter stopped at the service station to use the restroom. Plaintiff took three or four steps on the sidewalk before she slipped and fell; she did not observe any defect on the sidewalk. Her daughter, who did not witness the fall, described the area where plaintiff fell as crystally, slimy, and wet; she did not see any salt or sand in the area. The weather was cold and clear, with no precipitation. Defendants had a policy to remove snow and ice from the premises to ensure patron safety. The court found that plaintiff established a defective condition on the station's sidewalk, which caused her to fall, but concluded that defendants were not liable to plaintiff because they had no actual or constructive knowledge of the defect. In particular, there was no constructive notice because the temperature was above freezing, and there was no precipitation that morning or the prior day. In any event, under Connecticut law, the presence of snow or ice would not have been enough to render defendants liable. Further, a reasonable inspection would not have revealed the defect as there was no evidence of how long the slimy/wet area on the sidewalk was present.

**Outcome**

The court entered judgment in favor of defendants.

## LexisNexis® Headnotes

Torts > ... > Duty On

Premises > Invitees > Business Invitees

*HN1*[ ]  **Invitees, Business Invitees**

A business invitee is owed the duty to maintain its premises in a reasonably safe condition.

Torts > ... > Duties of Care > Duty On Premises > Reasonable Care

*HN2*[ ]  **Duty On Premises, Reasonable Care**

To hold a defendant liable for personal injuries sustained as a business invitee, a plaintiff must prove (1) the existence of a defect, and (2) that the defendants knew or should have known, in the exercise of reasonable care, of the defect.

Torts > ... > General Premises Liability > Dangerous Conditions > General Overview

*HN3*[ ]  **General Premises Liability, Dangerous Conditions**

A condition is not a defect unless it renders the premises unreasonably dangerous.

Evidence > Admissibility > Circumstantial & Direct Evidence

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

Torts > ... > Duties of Care > Duty On Premises > Reasonable Care

*HN4*[ ]  **Admissibility, Circumstantial & Direct Evidence**

The controlling question in deciding whether a defendant had constructive notice of a defective condition is whether the condition existed for such a length of time that the defendant should, in the exercise of reasonable care, have discovered it in time to remedy it. A reasonable length of time is a question of fact to be determined in light of the specific facts of a case. Circumstantial evidence can establish constructive notice. Notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it. Evidence which goes no farther than to show the presence of a slippery foreign substance does not warrant an inference of constructive notice to a defendant. However, the condition of a substance can evidence constructive notice.

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

Torts > ... > General Premises Liability > Dangerous Conditions > Natural Conditions

Torts > ... > Duties of Care > Duty On Premises > Reasonable Care

*HN5*[ ]  **Dangerous Conditions, Known Dangers**

The law in Connecticut is clear: the mere presence of snow or ice is not enough to render a defendant liable. The presence of black ice without more, for instance, evidence that the ice was caused by the melting and freezing of snow rather than a spill or some other intervening factor, is not enough to prove liability. Under Connecticut common law, a court looks to all the circumstances.

**Counsel:** [*1] For JoAnn Chaves, Plaintiff: Jennifer Hack Collins, LEAD ATTORNEY, Guendelsberger & Taylor, New Milford, CT; Ryan M. Henry,

Guendelsberger, Collins, Henry & Guendelsberger, LLP, New Milford, CT.

For Exxon Mobil Corp, doing business as Plainfield Mobil - Southbound, Mobil Corp, Defendants: Cristina M. Lopez-Grenet, Robert Reginald Simpson, LEAD ATTORNEYS, Ami Vinod Gadhia, Shipman & Goodwin, Hartford, CT.

**Judges:** Janet C. Hall, United States District Judge.

**Opinion by:** Janet C. Hall

# Opinion

BENCH TRIAL RULING

## I. INTRODUCTION

The plaintiff, Joann Chaves, brings this action against defendants Exxon Mobil Corporation doing business as the Plainfield Mobil-Southbound and Mobil Corporation (collectively "defendants") for negligence arising out of a fall she took on the sidewalk outside the Mobil Service Station. The defendants deny any wrongdoing.

## II. FINDINGS OF FACT

A. The Incident

Joann Chaves ("Chaves") and her daughter, Melissa Chaves, left their home in Marlboro Massachusetts at around 6:30 a.m. on December 14, 2004. They were driving to the Foxwoods Casino in Connecticut to meet two friends to play bingo. Chaves had made this trip many times, about once every four to six weeks. The drive took approximately **[*2]** one hour and twenty minutes.

En route to Foxwoods, at around 7:30 a.m., the

Chaveses stopped at the defendants' service station ("the Station") on the southbound side of Interstate 395 in Plainville, Connecticut. Chaves testified that she always stopped at this station to use the restroom when she traveled to Foxwoods. The Station runs parallel to Interstate 395. Cars can pull off I-395 and can either pull along side the gas pumps directly in front of them or they can take a right before the pumps and park in the parking areas located adjacent to, and in back of, the Station. The Station is east of the gas pumps. Directly in front of the Station there is a sidewalk, and in front of that is a fire lane where cars often park before entering the store. In the front of the Station is a handicap ramp leading up to the entrance; it runs parallel to the curb and sidewalk. There is also a set of stairs that lead directly to the entrance, running perpendicular to the sidewalk.

Upon entering the station plaza, Chaves pulled her car up to the sidewalk adjacent to the Station, in the same spot where she usually parked. Melissa Chaves asked her mother to move the car forward slightly because there **[*3]** was a large puddle preventing her from exiting the car. Chaves pulled the car forward slightly so that her daughter could exit without stepping in the puddle. Melissa Chaves left the car first and began walking on the sidewalk into the Station. Chaves exited her car and walked around the back of the car, and up onto the sidewalk. Once on the sidewalk, Chaves took three to four steps in the direction of the stairs when her feet came out from under her, and she fell. Chaves testified that she did not have time to brace herself before she fell. Before she fell, Chaves did not observe any defect on the sidewalk. She fell landing on the left side of her body with her left shoulder making contact with the ground. When she fell, Chaves was in immediate pain, mostly in her left shoulder and arm. She was wet from her left shoulder to knee. She was wearing jeans, a sweatshirt, and sneakers. Chaves

remained on the ground "dazed" for about thirty to forty-five seconds.

Because she was walking in front of her mother, Melissa Chaves did not witness the fall, but turned around and saw her mother on the ground. Melissa Chaves then helped her mother into a sitting position. At this time, Chaves looked [*4] around the area in which she was sitting. She described the area as "crystally," "slimy," and "wet" (hereinafter collectively referred to as "slimy/wet"). [1] This slimy/wet area where she fell was not large. Chaves described it as "about the size of her rear end." She did not see any salt or sand in the area. Chaves does not know exactly what caused her to fall. When her daughter helped her to her feet, Chaves testified that she had trouble getting up because her bottom was sliding back and forth. Melissa Chaves also testified that she had trouble helping her mom up because her feet were sliding back and forth.

After her daughter helped her up, they both walked into the Station. Chaves was [*5] holding her left arm as she was in pain. Once inside, she went directly to the restroom to check herself. The restroom is located to the right of the cashier booth inside the station. The cashier booth is enclosed in glass.

Chaves said that Melissa came into the restroom to check on her. Chaves says she was in the bathroom for a couple of minutes. When asked what her level of pain was, from 1 to 10 (with 1 being little pain) Chaves stated that when she was in the bathroom her level of pain was

a 12. She said the pain was worse than childbirth.

When they exited the bathroom, Chaves and her daughter stood off to the side of the cashier booth. Chaves was hoping that someone would ask her about the fall and to fill out an incident report. She says she did not report her fall to anyone because she did not want to be rude. Chaves and her daughter waited there a few minutes, but no one came up to her. There were a couple of people waiting in line, but neither Chaves nor Melissa ever got in line. Melissa Chaves said she made eye contact with one of the cashiers, but no one approached them. She also testified that her mother got frustrated because no one approached them. After waiting a few minutes, [*6] the two women exited the store the same way they had entered.

Though Chaves was still in great pain, she drove the rest of the way to Foxwoods because her daughter was an inexperienced driver. Chaves and her daughter arrived at Foxwoods around 8 a.m. and met their two friends. Chaves' clothes were still wet. Chaves did not seek medical treatment at Foxwoods. The foursome played Bingo from about 10 a.m. until 2 p.m. Chaves says the pain in her arm got worse as time went on.

When they left at 2 p.m. Chaves was in such great pain that she allowed her daughter to drive home to Massachusetts. She held her arm the entire ride home. When she got home, she called her primary care physician at Southboro Medical Group. She then went to Southboro Medical Urgent Care where they took an x-ray and told her she fractured her arm and would need orthopedic surgery.

B. Weather

On the morning of December 14, 2004, it was a cold and clear day. There was no precipitation. The weather report indicates that it was 32 degrees at 6 a.m., 33 degrees at 7 a.m, and 31 degrees at 8 a.m. *See* Pl.'s

---

[1] Chaves indicates that the substance she fell on was slippery, and she believed it to be ice. However, in her deposition she stated that she did not know if it was ice. Melissa Chaves also never described the substance as ice. Instead, she said she slid back and forth on the substance when attempting to help her mother up after her fall. The court finds the substance was pre- or post-ice. In other words, it was not ice, but a substance that has some semi-solid nature to it, but is not hard like ice.

2008 U.S. Dist. LEXIS 105786, *6

Exh. 7. During all of these times, the weather report indicates that "frozen precipitation," " standing water," and "snow [*7] melt" were "unlikely." *Id.* According to Chaves, it did not rain or precipitate during her drive from her home in Massachusetts to Foxwoods. She testified that the sky was clear.

C. Exxon Policy

Michelle Roberts, a sales associate at Exxon since 1996, was working at the Station on December 14, 2004. Two people were on duty that day from 7 a.m. until 9 a.m. She has no recollection of an incident occurring that day.

According to Roberts, the policy for customer complaints is for the employee to take down the name of the customer, the area where they fell, and any other pertinent information. At the time of the incident, the Station did not have pre-printed incident report forms so the employee was required to take the information on a blank sheet of paper. Once the information was taken, the employee would forward the complaint along to the Station manager. Roberts testified she would go outside and assess the situation after receiving a complaint regarding the conditions outside of the Station. Often times, but not always, when incident reports are filed, the video tapes taken of the inside and outside of the Station are preserved. If no incident report is filed, the tapes are recorded [*8] over. Additionally, employees have access to a Polaroid camera to document any incidents. No incident reports nor Polaroid photos are on file from the day at issue.

At the time of the incident, defendants had a policy for snow and ice removal. *See* Def.'s Exh. 106. The general policy consisted of a system in which the goal was safety so no one, including both employees and patrons, got hurt. For every task the employees were charged to assess, analyze, and act safely ("AAA"). The policy specifically addressed snow and ice removal.

Even though there was no snow, ice, or inclement weather at the time and day at issue, employees were always required to keep the inside and outside of the Station safe and free from debris. As with snow removal, there were no set times to perform inspections of the premises. Roberts stated that the frequency often depended on the conditions.

Employees were also required to take out the trash during their shift. This required removing trash from the six trash cans throughout the Station and bringing it to the dumpster in the back. The frequency of trash removal depended on how busy the Station was but could be up to two times per eight hour shift. The process, [*9] according to Roberts, takes about fifteen to twenty minutes on average.

All of the supplies for trash and snow removal are kept in the back room of the Station. The supplies included an ice pick, a bag of rock salt, a bucket for the salt, a shovel, and safety cones.

III. CONCLUSIONS OF LAW

A. Duty

It is undisputed that Chaves was *HN1*[↑] a business invitee of the defendants and therefore, the defendants owed her the duty to maintain its premises in a reasonably safe condition. *Martin v. Stop & Shop Supermarket Co., Inc., 70 Conn. App. 250, 251, 796 A.2d 1277 (Conn. App. 2002). HN2*[↑] To hold the defendant liable for her personal injuries, Chaves must prove (1) the existence of a defect, and (2) that the defendants knew or should have known, in the exercise of reasonable care, of the defect. *Cruz v. Drezek, 175 Conn. 230, 238-9, 397 A.2d 1335 (1978).*

1. *Existence of a Defect*

Chaves argues that she slipped and fell on a slimy/wet

2008 U.S. Dist. LEXIS 105786, *9

area on the sidewalk belonging to the Station. *HN3*[↑] A condition is not a defect unless it renders the premises unreasonably dangerous. *Martin v. Stop & Shop Supermarket Co., 2000 Conn. Super. LEXIS 2522, *2 (Conn. Super. 2000)*, aff'd, *70 Conn. App. 250, 251, 796 A.2d 1277 (Conn. App. 2002)*.

The court [*10] finds that Chaves did slip and fall on the sidewalk on December 14, 2004. There is no evidence that Chaves caused her own fall. She was wearing sneakers, walking at a reasonable pace, and did not seem to be distracted by anything at the time. Both Chaves and her daughter, Melissa, described the area where she fell as slippery as evidenced by them both sliding around on the substance. Further, the fact that Chaves' clothes were wet indicates there was a defect on the sidewalk. While defendants argue that it was too wet to be ice, they do not contest that it could have been a combination of water and ice. The court thus finds that there is enough evidence, though it is weak, that there was a defective condition on the Station sidewalk which caused Chaves to fall.

2. *Knowledge of the Defect*

Finding that a defect existed that caused Chaves to slip, the question of liability comes down to whether the defendants knew of the defective condition. In this case, Chaves concedes that there was no evidence of actual notice. Thus, her case rests on whether the defendants had constructive notice of the defective condition. *HN4*[↑] "The controlling question in deciding whether the defendants had constructive [*11] notice of the defective condition is whether the condition existed for such a length of time that the defendants should, in the exercise of reasonable care, have discovered it in time to remedy it." *Considine v. City of Waterbury, 279 Conn. 830, 870, 905 A.2d 70 (Conn. 2006)*. A reasonable length of time is a question of fact to be determined in light of the specific facts of the case. *Id.* "It is settled that circumstantial evidence can establish constructive notice." *Kurti v. Becker, 54 Conn. App. 335, 339, 733 A.2d 916 (Conn. App. 1999)*. "The notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it." *Kelly v. Stop & Shop, Inc., 281 Conn. 768, 776, 918 A.2d 249 (Conn. 2007)*. Evidence which goes no farther than to show the presence of a slippery foreign substance does not warrant an inference of constructive notice to the defendant." *Id. at 777* (quoting *Morris v. King Cole Stores, Inc., 132 Conn. 489, 494, 45 A.2d 710 (Conn. 1946))*. However, the condition of the substance can evidence constructive notice. *Morris, 132 Conn. at 493* [*12] (stating that a jury could reasonably find constructive notice upon hearing evidence that the lettuce the plaintiff slipped on was dirty and "looked as though several people stepped on it before.").

Chaves asserts that defendants had constructive notice of the slimy/wet mixture on the sidewalk because the temperatures were below freezing, and a reasonable inspection of the perimeter of the premises would have revealed the defect. Further, Chaves argues that an inference can be drawn that the defect had been there long enough for an employee to notice it because the substance that Chaves fell on was crystally and thus, indicates ice had formed over time.

Defendants assert that there is insufficient evidence to prove constructive notice. They argue that there is no evidence of precipitation on or before the morning of the incident that would cause the sidewalk to be wet. Moreover, they contend that there is no evidence that something spilled or leaked onto the area where she fell. Defendants contend that there is no evidence to support an inference that it was there long enough to provide the defendants with constructive notice.

After reviewing the evidence, the court concludes that the **[*13]** defendants did not have constructive notice of the defective condition. First, contrary to Chaves contention, the condition of the defect does not provide enough evidence to indicate how long the defect had been there. The temperature over night was freezing but just barely. By 7 a.m., the temperature had risen to 33 degrees. Further, there was no evidence of precipitation that morning or the day before. The only evidence of water was Melissa Chaves' statements that she had to ask her mother to pull up the car to avoid a puddle of water that had formed in the fire lane. However, Roberts testified that water often formed in this area as there was a dip in the pavement. This does not explain the substance on the sidewalk, however.

*HN5* ] The law in Connecticut is clear: the mere presence of snow or ice is not enough to render the defendant liable. *Riccio v. Harbour Village Condominium Association, Inc., 281 Conn. 160, 164, 914 A.2d 529 (Conn. 2007)*(finding that the presence of black ice without more, for instance, evidence that the ice was caused by the melting and freezing of snow rather than a spill or some other intervening factor, was not enough to prove liability). Under Connecticut common **[*14]** law, the court looks to all the circumstances. For example, in *Kurti v. Becker*, evidence that the warm air on the day before plaintiff's fall could have caused the snow that had accumulated near the driveway to melt and then freeze again when the air temperature dropped below freezing "at least three hours before" plaintiff's fall was sufficient to prove constructive notice. *54 Conn. App. at 339*. Similarly, in *Morris v. King Cole Stores, Inc.*, the court found the defendant liable for plaintiff's injuries from slipping on a piece of lettuce and strawberries on the ground near the produce stand. *132 Conn. 489, 45 A.2d 710*. The *Morris* court determined that there was enough evidence to prove constructive evidence because of the appearance

of the defective condition. *Id. at 494*. The substance was "dirty," "stuck to the floor," and "looked as though several people stepped on it before" *Id. at 493*. The court determined that, even though the evidence was weak, it was enough for a jury to find the defendant had constructive notice of the defect. *Id. at 494*.

The present case is unlike *Kurti* or *Morris* because there is no more than the presence of a slimy/wet substance to prove that the defect occurred for **[*15]** enough time to provide constructive notice to the defendants. While the court is aware that it takes time for ice to form, or to melt, there is no evidence in this record to indicate how much time it takes at 32 degrees [2] and whether it was enough time to provide the defendants with constructive notice. It is undisputed that no one knows exactly how long the substance was on the sidewalk. The temperatures were in fact freezing the morning of the fall and in the evening preceding it; however, the temperatures were never less than 30 degrees, and from about 4 a.m until 7 a.m. the temperature increased from 31 degrees to 33 degrees, which is above freezing. Pl.'s. Exh. 7. Perhaps if the temperatures were well below freezing it would have been enough to provide constructive notice to the defendants that ice could have potentially formed on the premises, but the defendants are not required to know when the temperatures are exactly freezing. This is especially true when there has been no precipitation in the last 24 hours.

Chaves also argues that a reasonable inspection would have revealed the defect. While the defendants' policy provides for inspection **[*16]** of the premise at all times, not just when there is inclement weather, the staff is not required to be out there at any specific times (*e.g.*, every hour, every two hours, *etc.*). Instead, they are required to keep the premises free from debris and safe for the

_____

[2] It was 32 degrees at 5 a.m. and 6 a.m.

patrons and employees alike. There is no evidence that the defendants should have been aware of this defect and should have remedied it. In other words, there was no precipitation that would have caused an inspection; nor was there evidence of any complaint from a customer that something had spilled on the sidewalk.

Even if Chaves presented enough evidence to prove that a reasonable inspection would have revealed the defect, there is still no evidence of how long the defect was there. Unlike the condition of the lettuce in *Morris*, there is no evidence about this small, slimy/wet area which tends to suggest it had been there for any period of time.

Plaintiffs also failed to produce any evidence of where the liquid came from or what exactly caused the slimy/wet area on the sidewalk. While it is true that water could have been there long enough to produce a pre-icy substance, there is no evidence of where the water came from. It is **[*17]** possible that a customer could have spilled some of a cold drink with ice in the area shortly before Chaves fell. On the record before the court, it would be pure speculation for the court to try to conclude how or when that small area of slimy/wet liquid first appeared on the sidewalk.

Because there is no evidence of what caused the slimy/wet area on the sidewalk, and no evidence of how long it was there, the court finds that Chaves has failed to prove that the defendants had constructive notice of the defective condition. Therefore, the court finds that the defendants are not liable for Chaves' injuries.

## IV. CONCLUSION

The court enters judgment in favor of defendants. Accordingly, the court denies the defendants oral Motion for Judgment as a Matter of law (Doc. No. 100) as moot and orders the clerk to close the case.

**SO ORDERED**.

Dated at Bridgeport, Connecticut this 31 st day of December, 2008.

/s/ Janet C. Hall

Janet C. Hall

United States District Judge

---

End of Document

Ben Levites

 Cited

As of: March 17, 2022 2:37 AM Z

# *Ciullo v. United States*

United States District Court for the District of Connecticut

August 14, 2014, Decided; August 14, 2014, Filed

Civ. No. 03:12CV1772 (AWT)

**Reporter**

2014 U.S. Dist. LEXIS 112657 *; 2014 WL 3973502

VITA CIULLO, Plaintiff, v. UNITED STATES OF AMERICA, Defendant.

## Core Terms

dowel, stairs, parade, summary judgment, slipped, constructive notice, actual notice, nonmovant, exterior, length of time, second step, entrance, trash, marks, genuine issue of material fact, deposition, quotation, morning, front, steps, toy, summary judgment motion, amount of time, speculation, genuine, argues, debris, route

**Counsel:** **[*1]** For Vita Ciullo, Plaintiff: Daniel K. Algilani, LEAD ATTORNEY, Grady & Riley, LLP, Waterbury, CT.

For USA, Defendant: Michelle Lynn McConaghy, LEAD ATTORNEY, U.S. Attorney's Office-NH, New Haven, CT.

**Judges:** Alvin W. Thompson, United States District Judge.

**Opinion by:** Alvin W. Thompson

## Opinion

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Vita Ciullo ("Ciullo") brings this negligence action grounded in premises liability against defendant United States of America ("United States") pursuant to the Federal Tort Claims Act ("FTCA"), *28 U.S.C. § 1346(b)*. The defendant has moved for summary judgment. For the reasons set forth below, the defendant's motion for summary judgment is being granted.

### I. FACTUAL BACKGROUND

On June 1, 2010, Robert Boroczky ("Boroczky"), the Supervisor of the Oakville Post Office (the "Post Office") in Oakville, Connecticut, arrived at work at 8:00 a.m. Boroczky entered the Post Office through the employee entrance in the back of the building. He was the second employee to arrive, and was preceded by Lee Vinca ("Vinca"), a letter carrier at the Post Office, who also entered through the employee entrance. Vinca was responsible for opening the Post Office in the morning, which included unlocking the front **[*2]** entrance to the Post Office. On June 1, 2010, Vinca checked the Post Office lobby for debris and then "looked outside the front entrance checking the entrance area and steps for trash." (Vinca Aff. (Doc. No. 18-5) ¶ 5). Vinca did not see any debris or trash and was not notified by anyone that there was any debris or trash in either area.

2014 U.S. Dist. LEXIS 112657, *2

On that same morning, the plaintiff arrived at the Post Office at 8:50 a.m. The plaintiff parked in a small parking lot directly across from the Post Pffice, and as she approached the Post Office, she did not notice anything on the exterior stairs leading into the Post Office. While the garbage pail in front of the Post Office had some trash hanging out of it, there was no trash on the ground, and the plaintiff did not have to step over any trash to enter the Post Office.

The plaintiff proceeded up the right side of the stairs and did not see anything out of the ordinary about the stairs. When she entered the Post Office, the plaintiff saw that although the lobby was open, the customer counter was closed and would not open until 9:00 a.m. The plaintiff turned around and left the Post Office.

The plaintiff began descending the stairs on the side opposite **[*3]** which she had entered the Post Office, but when she reached the second step from the top, she slipped on a dowel that was on the step and fell backwards. The plaintiff had not seen the dowel when she walked into the Post Office. The plaintiff picked up the dowel, which she described as ten inches long and the width of a pencil, and went back into the Post Office lobby. She banged on the metal door at the closed customer service window, and Boroczky exited from the back room. The plaintiff told Boroczky that she had fallen, and Boroczky wrote down the plaintiff's name and phone number. Prior to the plaintiff informing him of her fall, Boroczky was not aware that there was a dowel on the front stairs.

The plaintiff left the Post Office and called her husband to tell him that she had fallen. Her husband told her that she should go back to the Post Office and fill out an incident report. After running an errand, the plaintiff returned to the Post Office to file an incident report, but she was told that she would have to go to the Watertown Post Office instead to file the report. She did

so.

The plaintiff went to work the night of June 1, 2010, at 5:30 p.m. and worked until 11:30 p.m. She **[*4]** did not seek medical attention related to her fall until two weeks after the accident.

The day prior to the plaintiff's fall at the Post Office, there was a Memorial Day parade held in Oakville, Connecticut. According to a flyer describing the parade, the parade route began at the Watertown Plaza, proceeded on Route 63 South to Route 73, and ended at the Oakville Green, where a ceremony was conducted. While the parade route was in the vicinity of the Post Office, it did not pass in front of the Post Office.

## II. LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. See *Fed. R. Civ. P. 56(a)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994)*. *Rule 56(a)* "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp., 477 U.S. at 322*.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. See, e.g., *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987)*; *Heyman v. Commerce & Indus. Ins. Co., 524*

2014 U.S. Dist. LEXIS 112657, *4

F.2d 1317, 1319-20 (2d Cir. 1975). It is well-established [*5] that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Anderson, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Id. As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. Thus, only those facts that must be decided [*6] in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." Stern v. Trs. of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (internal quotation marks omitted) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find for the [nonmovant]." Anderson, 477 U.S. at 252.

Finally, the nonmoving [*7] party cannot simply rest on the allegations in her pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. See Celotex Corp., 477 U.S. at 324. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted.

2014 U.S. Dist. LEXIS 112657, *7

## III. DISCUSSION

"Under the FTCA the government's liability is determined by the application of the law of the place where the act or omission occurred." *Davis v. U.S., 430 F. Supp. 2d 67, 73 (D. Conn. 2006)* (citing *28 U.S.C. § 1346(b)*). Thus, Connecticut law applies in the present case.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *Baptiste v. Better Val-U Supermarket, Inc., 262 Conn. 135, 138, 811 A.2d 687 (2002)*. In this case, the parties do **[*8]** not dispute that the plaintiff was a business invitee, and therefore the duty owed to the plaintiff by the defendant was a duty to maintain its premises in a reasonably safe condition. See *Kelly v. Stop & Shop, Inc., 281 Conn. 768, 776, 918 A.2d 249 (2007)* ("It is undisputed that the owner of a retail store has a duty to keep the premises in a reasonably safe condition for the benefit of its customers."). Thus, to hold the defendant liable for her injuries, the plaintiff must prove "(1) the existence of a defect, (2) that the defendant knew or in the exercise of reasonable care should have known about the defect and (3) that such defect had existed for such a length of time that the defendant should, in the exercise of reasonable care, have discovered it in time to remedy it." *Martin v. Stop & Shop Supermarket Cos., Inc., 70 Conn. App. 250, 251, 796 A.2d 1277 (2002)* (internal quotation marks omitted). The defendant has moved for summary judgment on the ground that it did not have notice, actual or constructive, that the dowel was present on the Post Office stairs, and therefore it cannot be liable for the plaintiff's injuries.

### A. Actual Notice

Actual notice is "[n]otice given directly to, or received

personally by, a party." Black's Law Dictionary 1164 (9th ed. 2009). Thus, to show actual notice in the present case, the plaintiff has to show that **[*9]** the defendant actually knew that the dowel was on the second step of the Post Office stairs.

In support of its motion for summary judgment, the defendant submits as evidence the statements of Boroczky and Vinca regarding their lack of knowledge that the dowel was on the second step. At his deposition, Boroczky testified that prior to the plaintiff informing him that she had fallen, he did not know that there was a dowel on the stairs. (Boroczky Dep. (Doc. No. 18-4) at 39:25-40:3). He further testified that if he had known that there was something on the stairs prior to the plaintiff's fall, he would have removed it. (Boroczky Dep. at 39:17-24). Vinca submitted an affidavit in which he stated that when he unlocked the front entrance to the Oakville Post Office on June 1, 2010, he "did not see any debris or trash on the steps or at the entrance of the Post Office" and that he "was not notified by anyone that there was a dowel[], debris or any trash on the steps or at the entrance of the Post Office." (Vinca Aff. ¶ 6).

The plaintiff argues that there is a genuine issue of material fact as to whether the defendant had actual notice that the dowel was on the second step. However, she presents **[*10]** no evidence that anyone at the Post Office knew about the dowel. Instead, she argues that the court should not credit the statements of either Boroczky or Vinca and that a jury should evaluate their credibility.

As to Vinca's affidavit, the plaintiff argues that "Mr. Vinca's claim that he properly policed the exterior stairway but did not see the round dowel[] flies in the face of the testimony of Mr. Boroczky who specifically stated that no postal employee is tasked with inspecting the exterior premises before the Post Office opens for

2014 U.S. Dist. LEXIS 112657, *10

business in the morning." (Pl.'s Mem. Opp. Mot. Summ. J. (Doc. No. 19) at 9). It appears that the plaintiff is asking the court to conclude that Vinca lied about "polic[ing]" the exterior stairway." While the plaintiff has proffered no evidence in support of such an assertion, even if the court were to conclude that Vinca did not actually police the exterior stairs of the Post Office on the morning of June 1, 2010, such a fact would mean that Vinca did not have actual notice that the dowel was on the second step, because he would not have seen it. Thus, there is no genuine issue of material fact as to whether Vinca had actual notice that the dowel was on the Post [*11] Office stairs.

As to Boroczky's deposition testimony, the plaintiff argues that Boroczky's testimony that he was not aware of the presence of the dowel on the stairs is "not sufficient evidence to warrant summary judgment because Mr. Boroczky acknowledged that he did not inspect the premises that day . . . ." (Pl.'s Mem. Opp. Mot. Summ. J. at 9). However, the fact that Boroczky did not inspect the stairs, and therefore did not see the dowel, shows that he did not have actual notice that the dowel was on the stairs. Therefore, there is no genuine issue as to the fact that Boroczky did not have actual notice that the dowel was located on the second step of the Post Office stairs.

The plaintiff has not proffered any evidence to show that Vinca, Boroczky, or any other employee of the Post Office actually knew that the dowel was located on the second step of the Post Office stairs. At her deposition, the plaintiff testified that she does not know if anyone at the Post Office knew that there was a dowel on the stairs before she fell. Thus, in the absence of any evidence that anyone at the Post Office knew that there was a dowel on the exterior stairs before the plaintiff fell, there is no **[*12]** genuine dispute as to the fact that the

defendant did not have actual notice of the defect.[1]

## B. Constructive Notice

"The controlling question in deciding whether the defendant[] had constructive notice of the defective condition is whether the condition existed for such a length of time that the defendant[] should, in the exercise of reasonable care, have discovered it in time to remedy it. What constitutes a reasonable length of time is largely a question of fact to be determined in the light of the particular circumstances of a case." *Riccio v. Harbour Vill. Condo. Ass'n, Inc., 281 Conn. 160, 163-64, 914 A.2d 529 (2007)* (internal quotations marks and citation omitted). "To establish constructive notice, [the plaintiff] must adduce some evidence, either direct or circumstantial, that establishes the length of time the defect was present." *Navarro v. Kohl's Dep't Stores,*

─────────────────────────

[1] Throughout the actual notice section of the plaintiff's memorandum in opposition to the motion for summary judgment, the plaintiff refers to the defendant's burden on a motion for summary judgment. She appears to argue that the plaintiff's failure to come forward with evidence showing actual notice is not grounds for granting summary judgment because the defendant has the initial burden on a motion for summary judgment of showing that there is no genuine issue of material fact. (See Pl.'s Mem. Opp. Mot. Summ. J. at 8 ("The Defendant's argument that Ms. Ciullo has not produced evidence to prove actual notice is misguided because the initial burden is on the Defendant and the Defendant has failed to meet its burden.")). However, here the defendant met its initial burden, which means the burden shifts to the plaintiff to proffer evidence establishing the existence of a genuine issue of material fact. *Rule 56(a)* "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party **[*13]** will bear the burden of proof at trial." *Celotex Corp., 477 U.S. at 322*. The plaintiff has failed to do so.

2014 U.S. Dist. LEXIS 112657, *13

*Inc., No. 3:05CV00843(DJS), 2007 U.S. Dist. LEXIS 21179, 2007 WL 735787, at *4 (D. Conn. Mar. 8, 2007)*. However, "[a]n inference [of constructive notice] must have some definite basis in the facts and the conclusion based on it must not be the result of speculation and conjecture." *Gulycz v. Stop & Shop Cos., Inc., 29 Conn. App. 519, 522, 615 A.2d 1087 (1992)* (internal quotation marks and citation omitted). The defendant argues that summary judgment should be granted because the plaintiff has offered no evidence establishing how long the dowel had been on the Post Office stairs [*14] before she slipped on it.

The plaintiff contends that the dowel came from the parade, and therefore the defect existed from the time of the parade until the plaintiff slipped on the dowel. In support of her contention, the plaintiff repeatedly states that she has "adduced evidence that establishes the length of time the dowel was present on the Post Office's exterior stairway, specifically, from Memorial Day, May 31, 2010, until the morning of the subject incident, June 1, 2010." (Pl.'s Mem. Opp. Mot. Summ. J. at 18). However, the evidence to which the plaintiff cites shows that the plaintiff's theory that the dowel was present from the time of the parade to the time that she slipped on it is based only on speculation.

The plaintiff has submitted evidence that the parade took place in the vicinity of the Oakville Post Office on May 31, 2010.[2] However, that is the only evidence she

has adduced that the dowel came from the parade. While the plaintiff testified at her deposition that it "was a dowel from the parade" (Ciullo Dep. (Doc. No. 18-3) at 69:25), the undisputed evidence shows that her conclusion was based only on her own speculation.[3] In describing the dowel, the plaintiff testified [*15] that "It was a dowel that at the parade children can buy them. There's an elastic band with a toy hanging off of the dowel, and that's what that was." (Ciullo Dep. at 26:13-16). However, when she was asked whether the dowel she slipped on had a toy on it, she stated, "No. It did not. I'm assuming. . . . It did not have a toy on it." (Ciullo Dep. at 26:23-25). The plaintiff additionally testified that she did not attend the May 31, 2010 Oakville Memorial Day Parade and that she had "never" attended the Oakville Memorial Day Parade. (Ciullo Dep. at 37:9). The plaintiff has not presented any evidence that the dowel toys she referred to were sold or present at the parade. However, even if she had, the plaintiff has also failed to present any evidence showing that the dowel on which she slipped was of the same size and color as the dowels attached to the toys and that there were markings on the dowel showing that a toy had previously been attached to it.

Additionally, the plaintiff does not provide any evidence as to how or when a dowel from the parade would have ended up on the second step from the top of the exterior stairs of the Post Office. The evidence presented by the parties shows that the parade route did not go past the Post Office. Thus, for the dowel to end up where the

---

[2] In her opposition to the motion for summary judgment, the plaintiff appears to suggest that the parade route went past the Post Office. She cites to Boroczky's deposition in which, when first asked about the parade, he testified that he [*16] believed that the path of the parade went by the Post Office and that while he "ha[d] no idea exactly," people most likely stood on Post Office grounds to watch the parade. (Boroczky Dep. at 28:1). However, after consulting a flyer containing the parade route, Boroczky was asked "[D]o you believe that the parade

went in front of the Oakville Post Office on May 31st, 2010?" (Boroczky Dep. at 42:23-25). Boroczky replied, "No. No, I don't." (Boroczky Dep. at 43:1).

[3] When asked at her deposition whether she knew for sure that the dowel came from the parade, the plaintiff answered "No." (Ciullo Dep. at 70:3). Additionally, the plaintiff has admitted that she does not know when the dowel was left on the stairs. (56(a)(1) Stmt. ¶ 33).

Ben Levites

plaintiff slipped on it, someone would have had to either climb the stairs and drop the dowel there or throw the dowel onto the stairs. The plaintiff [*17] has presented no evidence of when between the time of the parade and her fall this would have happened. At her deposition, the plaintiff testified that the dowel could have been left on the stairs on May 31, 2010. When asked if it could have been left there on the morning of June 1, 2010, the plaintiff answered, "Perhaps." (Ciullo Dep. at 70:12). Furthermore, when asked whether the dowel could have been left on the Post Office steps while she was in the Post Office lobby on June 1, 2010, the plaintiff responded that it was "possible."[4] (Ciullo Dep. at 71:6). Even if the plaintiff thought that it was unlikely--as her deposition responses seem to suggest-- that the dowel would have been left on the steps while she was inside, "[s]peculation as to the probability or improbability of the timing of an occurrence is not . . . evidence of when the occurrence took place." *Navarro, 2007 U.S. Dist. LEXIS 21179, 2007 WL 735787 at *5*.

Because the plaintiff's theory that the dowel came from the parade, and thus was on the stairs from that time until she fell is based on speculation and conjecture

─────────────────────

[4] The plaintiff originally testified that the dowel could not have been left on the steps while she was in the Post Office lobby. However, after testifying that she was not looking out at the stairs while she was in the lobby and that when she was banging on the window in the lobby she could not see the stairs, the plaintiff testified that [*18] it was possible that the dowel could have been left on the stairs while she was inside the Post Office. In her affidavit, the plaintiff states "I dispute that it is possible the dowel was left on the stairs while I was in the Oakville Post Office lobby on June 1, 2010." (Ciullo Aff. (Doc. No. 19-7) ¶ 12). However, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony." *Bickerstaff v. Vassar Coll., 196 F.3d 435, 455 (2d Cir. 1999)*.

rather than a definite basis in the facts, the only evidence the plaintiff has as to the amount of time the dowel was on the stairs is that it was there just before she fell. The mere fact that the dowel was present and that the plaintiff slipped on it, however, is not sufficient to establish the amount of time that the defect existed. See *Gomes v. U.S., No. 3:11-CV-01825(VLB), 2012 U.S. Dist. LEXIS 164526, 2012 WL 5869801, at *7 (D. Conn. Nov. 19, 2012)* ("[T]he Court finds that [the plaintiff] has failed to establish constructive notice because he has not presented any evidence to prove how long the leaves were present on the [*19] steps. . . . [T]he only evidence that the wet leaves on which Plaintiff fell existed *prior* to his fall is Plaintiff's assertion that he fell and noticed the leaves falling."); *Navarro, 2007 U.S. Dist. LEXIS 21179, 2007 WL 735787, at *6* (stating that where a plaintiff slipped on a puddle in the defendant's store and the plaintiff had not presented any evidence as to the amount of time the puddle had been there, "[t]he sole fact that the liquid was in a puddle approximately one to three feet in diameter fails, as a matter of law, to demonstrate that the spill was in place for a length of time sufficient to put [the defendant] on constructive notice of the spill."); *Gulycz, 29 Conn. App. at 521-22* (holding that the plaintiff had not presented any evidence establishing the amount of time that a protruding hinge and screw on which he was injured had existed in that condition where the plaintiff's only argument as to the length of time was that he was injured by it and "the defect was structural in nature and therefore must have existed for a sufficient length of time so as to enable an inference of constructive notice.").

Because the plaintiff has not proffered evidence to show the amount of time that the dowel on which she slipped was present on the exterior stairs of the Post Office, [*20] the plaintiff cannot establish that the defendant had constructive notice of the defective

condition. Therefore, because the plaintiff cannot show that the defendant had actual or constructive notice, the defendant is entitled to judgment on the plaintiff's claim as a matter of law.

## IV. CONCLUSION

For the reasons set forth above, the defendant's Motion for Summary Judgment (Doc. No. 18) is hereby GRANTED. Judgment shall enter in favor of defendant United States of America.

The Clerk shall close this case.

It is so ordered.

Dated this 14th day of August, 2014, at Hartford, Connecticut.

/s/ Alvin W. Thompson

United States District Judge

---

End of Document

 Positive

As of: March 17, 2022 2:37 AM Z

## *Colombo v. Stop & Shop Supermarket Co.*

Appellate Court of Connecticut

September 12, 2001, Submitted on Briefs ; November 20, 2001, Officially Released

(AC 21390)

**Reporter**

67 Conn. App. 62 *; 787 A.2d 5 **; 2001 Conn. App. LEXIS 584 ***

SANDRA COLOMBO v. STOP AND SHOP SUPERMARKET COMPANY, INC.

**Prior History: [***1]** Action to recover damages for personal injuries sustained by the plaintiff as a result of the defendant's alleged negligence, and for other relief, brought to the Superior Court in the judicial district of Tolland and tried to the jury before Sferrazza, J.; thereafter, the court granted the defendant's motion for a directed verdict; verdict for the defendant; subsequently, the court denied the plaintiff's motion to set aside the verdict and rendered judgment for the defendant, from which the plaintiff appealed to this court.

**Disposition:** Affirmed.

## Core Terms

milk, directed verdict, notice, dirty, judgment of the trial court, extended period of time, reasonable inspection, light most favorable, constructive notice, length of time, no evidence, circumstantial, Supermarket, inspection, premises, Viewing, slipped, walking, juror

## Case Summary

### Procedural Posture

Plaintiff customer sued defendant supermarket to recover damages for personal injuries she sustained when she slipped and fell on spilled milk while walking away from a bank in the supermarket. The Superior Court, Judicial District of Tolland, Connecticut, granted the supermarket's motion for a directed verdict, denied the customer's motion to set aside the verdict, and rendered judgment for the supermarket. The customer appealed.

### Overview

The customer alleged that the spill existed for such a period of time that the supermarket knew or should have known about it; that the supermarket was negligent in failing to maintain the premises adequately, in permitting the condition to remain for an extended period of time, in failing to warn of the dangerous condition, or in failing to conduct timely inspections of the premises; and that such negligence caused her to damages. The customer testified that immediately after she slipped and fell she noticed that the milk, her clothing, and her hands were dirty. At trial, the supermarket argued that the only issue was whether the supermarket had actual or constructive notice and a reasonable opportunity to take some kind of curative step. The trial court ruled that no reasonable juror could have found that the supermarket had notice of the condition or that it existed for a length of time that reasonable inspection would have discovered it. The appellate court agreed that the jury could not reasonably have concluded from the evidence that the supermarket

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 79 of 253

Page 2 of 4

67 Conn. App. 62, *62; 787 A.2d 5, **5; 2001 Conn. App. LEXIS 584, ***1

breached a duty to the customer. Therefore, a directed verdict was correctly entered in the supermarket's favor.

## Outcome

The appellate court affirmed the judgment.

# LexisNexis® Headnotes

Civil Procedure > Trials > Judgment as Matter of Law > Directed Verdicts

Evidence > Types of Evidence > Circumstantial Evidence

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

Civil Procedure > Appeals > Standards of Review > General Overview

*HN1*[⬇] Judgment as Matter of Law, Directed Verdicts

The appellate court's standard of review of a directed verdict is well settled. A trial court should direct a verdict for a defendant if, viewing the evidence in the light most favorable to the plaintiff, a jury could not reasonably and legally reach any other conclusion than that the defendant is entitled to prevail. In assessing the evidence, the court should weigh both direct and circumstantial evidence, including all reasonable inferences to be drawn therefrom.

Evidence > Inferences & Presumptions > General Overview

Torts > ... > Activities & Conditions > Slip & Fall Injuries > General Overview

Torts > Premises & Property Liability > General Premises Liability > General Overview

*HN2*[⬇] Evidence, Inferences & Presumptions

The law concerning notice in a case where a business invitee slips and falls on a substance is clear. The plaintiff bears the burden of proffering some evidence, either direct or circumstantial, from which the jury could infer that the defect she allegedly encountered existed for a length of time sufficient to put the defendant on actual or constructive notice of its existence. In the absence of such evidence, a court cannot permit a jury to reach such a conclusion on the basis of either speculation or conjecture.

**Counsel:** Brian W. Prucker filed a brief for the appellant (plaintiff).

Kirby G. Huget filed a brief for appellee (defendant).

**Judges:** Lavery, C. J., and Flynn and Dupont, Js.

# Opinion

 [*62]   [**6]   PER CURIAM. The plaintiff in this negligence action, Sandra Colombo, appeals from the judgment of the trial court rendered on a directed verdict in favor of the defendant, Stop and Shop Supermarket Company, Inc. We affirm the judgment of the trial court.

 [*63]   The plaintiff alleged in her complaint that she slipped and fell on spilled milk while walking away from a People's Bank branch office located within the defendant's supermarket. She alleged that the condition existed for [***2] such a period of time that the defendant knew or should have known about it. She further alleged that the defendant was negligent in failing to maintain the premises adequately, in permitting the condition to remain for an extended period of time,

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 80 of 253

Page 3 of 4

67 Conn. App. 62, *63; 787 A.2d 5, **6; 2001 Conn. App. LEXIS 584, ***2

in failing to warn the plaintiff of the dangerous condition or in failing to conduct timely inspections of the premises. She also alleged that such negligence caused her to suffer personal injuries and to incur medical expenses.

The substance of the plaintiff's testimony was that while walking in the defendant's store, she slipped and fell on milk, and that she noticed immediately thereafter that the milk, her clothing and her hands were "dirty."

At the close of the plaintiff's case, the court granted the defendant's motion for a directed verdict and, at the court's direction, the jury found the issues in the defendant's favor. The court denied the plaintiff's subsequent motion to set aside the verdict. The plaintiff then brought the present appeal.

At trial, the defendant did not dispute that the plaintiff fell or that the defendant controlled and maintained the store where the incident occurred. As the defendant's attorney argued, there **[***3]** was only a "question of actual or constructive notice, and **[**7]** the question as to whether the store had a reasonable opportunity to take some kind of curative step." The court, mindful of the duty that the defendant owed to the plaintiff as an invitee, reasoned that, as a preliminary matter, it had to ascertain simply whether the defendant, in the exercise of due care and inspection, should have discovered the milk on the floor.

**[*64]** The court concluded that "no reasonable juror could find that [the defendant] had notice of this condition [or] that [it] existed for a length of time that reasonable inspection would have discovered it. . . . We have no evidence as to how it got there, no evidence as to when it got there." The court refused to permit the issue to go to the jury simply because the plaintiff had characterized the milk as being "dirty." The court added: "The fact that the plaintiff got up and she was dirty is not

evidence [from which] a rational juror could make an inference that that milk was there for such an extended period of time that the store reasonably should have found it if [the store] were conducting reasonable inspections or for any other duty of care . . . ."

**[***4]** "*HN1*[⬆]] Our standard of review of a directed verdict is well settled. A trial court should direct a verdict for a defendant if, viewing the evidence in the light most favorable to the plaintiff, a jury could not reasonably and legally reach any other conclusion than that the defendant is entitled to prevail. . . . In assessing the evidence, the court should weigh both direct and circumstantial evidence, including all reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) *Abramczyk v. Abbey, 64 Conn. App. 442, 447, 780 A.2d 957*, cert. denied, *258 Conn. 933, 785 A.2d 229 (2001).*

*HN2*[⬆]] The law concerning notice in this type of case is clear. The plaintiff bore the burden of proffering some evidence, either direct or circumstantial, from which the jury could infer that the defect she allegedly encountered existed for a length of time sufficient to put the defendant on actual or constructive notice of its existence. See *Warren v. Stancliff, 157 Conn. 216, 218-19, 251 A.2d 74 (1968)*; *Tuite v. Stop & Shop Cos., 45 Conn. App. 305, 308-309, 696 A.2d 363 (1997)*. In the absence of such evidence, we **[***5]** cannot permit a jury to reach such a conclusion on the basis of either speculation or conjecture. See, e.g., *Gulycz v. Stop & Shop Cos., 29 Conn. App. 519, 522,* **[*65]** *615 A.2d 1087*, cert. denied, *224 Conn. 923, 618 A.2d 527 (1992).* Viewing the facts presented in the light most favorable to the plaintiff, we conclude that, as a matter of law, the jury could not reasonably have concluded that the defendant breached a duty to the plaintiff under the circumstances of this case, and, therefore, the court properly directed a verdict in favor of the defendant.

67 Conn. App. 62, *65; 787 A.2d 5, **7; 2001 Conn. App. LEXIS 584, ***5

The judgment is affirmed.

---

End of Document

Q Questioned

As of: March 17, 2022 2:37 AM Z

# *Considine v. City of Waterbury*

Supreme Court of Connecticut

February 16, 2006, Argued ; September 12, 2006, Officially Released

SC 17551

**Reporter**

279 Conn. 830 *; 905 A.2d 70 **; 2006 Conn. LEXIS 323 ***

EDWARD CONSIDINE v. CITY OF WATERBURY

**Prior History: [***1]** Action to recover damages for personal injuries sustained as a result of the defendant's alleged negligence, and for other relief, brought to the Superior Court in the judicial district of Waterbury, where the defendant filed an answer and special defenses; thereafter, the matter was tried to the court, Hon. Howard J. Moraghan, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment for the plaintiff, from which the defendant appealed.

*Considine v. City of Waterbury, 2005 Conn. Super. LEXIS 562 (Conn. Super. Ct., Feb. 23, 2005)*

**Disposition:** Affirmed.

# Core Terms

municipality, glass, building code, clubhouse, sidelite, restaurant, standard of care, trial court, lease, premises, entryway, immunity, regulation, annealed, present case, golf course, state building, hazard, proprietary function, pecuniary benefit, marks, door, constructive notice, replace, rent, governmental function, reasonably safe, quotation, corporate profits, injuries

# Case Summary

## Procedural Posture

Defendant city challenged a trial court judgment entered in favor of plaintiff restaurant patron after a trial to the court in the patron's personal injury action. The trial court found that the city could be held liable under *Conn. Gen. Stat. § 52-557n(a)(1)(B)* and that the patron had presented sufficient evidence to establish the city's negligence in maintaining its property. The appeal was transferred from the Appellate Court (Connecticut).

## Overview

The city leased part of a clubhouse on its municipal golf course to a restaurant. The patron fell into a window panel beside the exit door and was injured by broken glass. The appellate court affirmed the trial court judgment. The phrase "special corporate benefit or pecuniary profit" in *§ 52-557n(a)(1)(B)* codified municipal common-law liability for acts performed in a proprietary capacity. The lease was proprietary because it was like private enterprise and the city derived a pecuniary benefit. There was an inextricable link and close connection between the city's alleged negligence and the lease. The restaurant's location on a city golf course did not transform an otherwise commercial

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 83 of 253

Page 2 of 37

279 Conn. 830, *830; 905 A.2d 70, **70; 2006 Conn. LEXIS 323, ***1

function into a governmental one, and the distinction between discretionary and ministerial acts did not apply. The evidence was sufficient to support the finding that the city was negligent. The Connecticut building code, which regulated the use of glass in entryways but was inapplicable, was properly admitted as some evidence of a standard of care. The patron offered an expert's opinion that the city failed to properly maintain the entryway, and the city had constructive notice of the hazard.

## Outcome

The appellate court affirmed the trial court judgment.

# LexisNexis® Headnotes

Governments > Local Governments > Claims By & Against

Torts > ... > Liability > State Tort Claims Acts > Exclusions From Liability

Torts > ... > Liability > State Tort Claims Acts > General Overview

*HN1*[⬇] **Local Governments, Claims By & Against**

See *Conn. Gen. Stat. § 52-557n(a)*.

Governments > Legislation > Interpretation

*HN2*[⬇] **Legislation, Interpretation**

When construing a statute, the fundamental objective of the Supreme Court of Connecticut is to ascertain and give effect to the apparent intent of the legislature. In other words, it seeks to determine, in a reasoned

manner, the meaning of the statutory language as applied to the facts of the case, including the question of whether the language actually does apply. In seeking to determine that meaning, *Conn. Gen. Stat. § 1-2z* directs the court first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. When a statute is not plain and unambiguous, the court also looks for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter.

Governments > Legislation > Interpretation

*HN3*[⬇] **Legislation, Interpretation**

See *Conn. Gen. Stat. § 1-2z*.

Governments > Legislation > Interpretation

*HN4*[⬇] **Legislation, Interpretation**

In the absence of a statutory definition, words and phrases in a particular statute are to be construed according to their common usage. To ascertain that usage, the Supreme Court of Connecticut looks to the dictionary definition of the term.

Governments > Local Governments > Claims By & Against

Torts > Public Entity Liability > Immunities > Sovereign Immunity

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 84 of 253

Page 3 of 37

279 Conn. 830, *830; 905 A.2d 70, **70; 2006 Conn. LEXIS 323, ***1

HN5[↓] Local Governments, Claims By & Against

The common law recognizes that a municipality is not just restricted to acting as the agent of the state, but may engage in acts for its own corporate benefit or for the benefit of its inhabitants. Functions of a municipal corporation fall into two classes, those of a governmental nature, where it acts merely as the agent or representative of the state in carrying out its public purposes, and those of a proprietary nature, where it carries on activities for the particular benefit of its inhabitants. In this latter situation, the municipality is not clothed with the state's immunities and is liable to be sued for injuries inflicted through its negligence in the performance of such an act. Sovereign immunity protects sovereign governments, such as states and municipalities, when acting as agents of the state, but not municipal corporations acting on their own behalf. Thus, a municipality's immunity from liability for injuries applies only when it is engaged in the performance of a public duty for the public benefit, and not for its own corporate profit. Accordingly, the distinction between whether the municipality is acting in its governmental capacity, or in its corporate or proprietary capacity, is, under the common law, the litmus test for whether the municipality will be held liable for its negligence.

Governments > Local Governments > Claims By & Against

Torts > Public Entity
Liability > Immunities > Sovereign Immunity

HN6[↓] Local Governments, Claims By & Against

In determining whether a municipality's activity is proprietary in nature, the Supreme Court of Connecticut, along with those of other jurisdictions, examines whether the activity generates a special corporate benefit or pecuniary profit inuring to the municipality. The test to apply is to ascertain whether the act or function has within it the special corporate benefit or pecuniary profit of the municipality affected. A municipality is liable for a negligent act committed while engaged in the performance of acts done in the management of its property or rights for its own corporate benefit or profit and that of its inhabitants. A municipality may be liable for acts done in the management of property or rights voluntarily held by them for their own immediate profit or advantage as a corporation, although inuring, of course, ultimately to the benefit of the public.

Governments > Local Governments > Claims By & Against

Torts > Public Entity
Liability > Immunities > Sovereign Immunity

HN7[↓] Local Governments, Claims By & Against

Where a municipality's officers or servants are in the exercise of power conferred upon the municipality for its private benefit or pecuniary profit, and damage results from their negligence or misfeasance, the municipality is liable to the same extent as in the case of private corporations or individuals. One of the most often invoked criteria for determining if a municipality is operating in a proprietary or governmental capacity is whether the function is allocated to the municipality for its profit or special advantage or whether it is for the purpose of carrying out the public functions of the state without special advantage to the city.

Governments > Local Governments > Claims By & Against

279 Conn. 830, *830; 905 A.2d 70, **70; 2006 Conn. LEXIS 323, ***1

Torts > ... > Liability > State Tort Claims
Acts > Exclusions From Liability

Governments > Legislation > Interpretation

Torts > Public Entity
Liability > Immunities > Sovereign Immunity

*HN8*[↵]  Local Governments, Claims By & Against

The imposition of liability under *Conn. Gen. Stat. § 52-557n* on municipalities when they are engaged in a function from which they derive a special corporate profit or pecuniary benefit is nearly identical to municipalities' common-law liability for acts for their own special corporate benefit or pecuniary profit.  Because the legislature is presumed to be aware of prior judicial decisions involving common-law rules, and *Conn. Gen. Stat. § 1-1(a)* directs that words or phrases that have acquired a peculiar and appropriate meaning in the law shall be construed and understood accordingly, the Supreme Court of Connecticut concludes that the use of these phrases was an attempt to codify municipal common-law liability for acts performed in a proprietary capacity.

Governments > Local Governments > Claims By & Against

Torts > ... > Liability > State Tort Claims
Acts > Exclusions From Liability

Torts > Public Entity
Liability > Immunities > Sovereign Immunity

*HN9*[↵]  Local Governments, Claims By & Against

*Conn. Gen. Stat. § 52-557n(a)(1)(B)* codifies the common-law rule that municipalities are liable for their negligent acts committed in their proprietary capacity.

Governments > Local Governments > Claims By & Against

Torts > ... > Liability > State Tort Claims
Acts > Exclusions From Liability

Torts > Public Entity
Liability > Immunities > Sovereign Immunity

*HN10*[↵]  Local Governments, Claims By & Against

The distinction between a municipality's governmental and proprietary functions is criticized as being illusory, elusive, arbitrary, unworkable, and a quagmire. The governmental-proprietary distinction is a quagmire that has long plagued the law of municipal corporations. The distinction between governmental and proprietary functions is sometimes illusory in practice. The application of the distinction may lead to arbitrary results. The modern distinction between a municipality's dual functions is elusive and the distinction is basically unworkable. Despite this criticism, Connecticut, like a minority of other jurisdictions, has not disavowed the application of this distinction.

Governments > Local Governments > Claims By & Against

Torts > ... > Liability > State Tort Claims
Acts > Exclusions From Liability

Torts > Public Entity
Liability > Immunities > Sovereign Immunity

*HN11*[↵]  Local Governments, Claims By & Against

A municipality generally is determined to be acting for its own special corporate benefit or pecuniary profit where it engages in an activity for the particular benefit of its

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 86 of 253

Page 5 of 37

279 Conn. 830, *830; 905 A.2d 70, **70; 2006 Conn. LEXIS 323, ***1

inhabitants, or if it derives revenue in excess of its costs from the activity.

Governments > Local Governments > Claims By & Against

Torts > ... > Liability > State Tort Claims Acts > Exclusions From Liability

Torts > Public Entity Liability > Immunities > Sovereign Immunity

HN12[↓]  Local Governments, Claims By & Against

When a municipality derives substantial revenue from its commercial use of municipal property, it is considered nonetheless to be engaged in a proprietary function even if it reinvests that revenue back into the property's maintenance expenses or to pay down debt related to the property. If a municipality is deriving revenue or profit from renting its property, the fact that it is applied to the maintenance of the property and the reduction of the debt incurred in its construction or acquirement, or otherwise ultimately to the benefit of the public, is not sufficient to create the immunity. A municipality uses works constructed for the public benefit for its corporate profit, when the profits are to be applied to the maintenance of the works and the reduction of the debt incurred by the corporation in their construction.

Governments > Local Governments > Claims By & Against

Torts > ... > Liability > State Tort Claims Acts > Exclusions From Liability

Torts > Public Entity Liability > Immunities > Sovereign Immunity

HN13[↓]  Local Governments, Claims By & Against

A municipality is engaged in a proprietary function when it acts very much like private enterprise.

Governments > Local Governments > Claims By & Against

Torts > ... > Liability > State Tort Claims Acts > Exclusions From Liability

Torts > Public Entity Liability > Immunities > Sovereign Immunity

HN14[↓]  Local Governments, Claims By & Against

The existence of an actual pecuniary profit is a factor in deciding whether a municipal function is proprietary, but reliance on it alone would create problematic incentives and arbitrary results.

Governments > Local Governments > Claims By & Against

Torts > ... > Liability > State Tort Claims Acts > Exclusions From Liability

Torts > ... > Liabilities of Lessors > Negligence > General Overview

Torts > Public Entity Liability > Immunities > Sovereign Immunity

HN15[↓]  Local Governments, Claims By & Against

A municipality acts in its proprietary capacity when it leases municipal property to private individuals. Accordingly, a municipality may be held liable if there is an inextricable link or inherently close connection between its negligent act or omission and the rental of

279 Conn. 830, *830; 905 A.2d 70, **70; 2006 Conn. LEXIS 323, ***1

its property. The municipality is responsible for its negligent acts or omissions in connection with the property rented.

Governments > Local Governments > Claims By & Against

Torts > ... > Liability > State Tort Claims Acts > Exclusions From Liability

Torts > ... > Liabilities of Lessors > Negligence > General Overview

Torts > Public Entity Liability > Immunities > Sovereign Immunity

*HN16*[ ] Local Governments, Claims By & Against

The leasing of a portion of a municipal building for a substantial rent to a private party to operate a business is an act that very much resembles private enterprise, and, accordingly, is consistently determined to be a proprietary function.

Governments > Local Governments > Claims By & Against

Torts > ... > Liability > State Tort Claims Acts > Exclusions From Liability

Torts > Public Entity Liability > Immunities > Sovereign Immunity

*HN17*[ ] Local Governments, Claims By & Against

The inquiry of whether the state's sovereign immunity extends to shield a municipality turns on the nature and character of the act and not its location. Whether a function is governmental is determined from a consideration of the nature of the duty imposed or the

privilege conferred, and of the character of the act done or the function performed. It is the nature of the activity, not its location that determines its proprietary character.

Governments > Local Governments > Claims By & Against

Torts > ... > Liability > State Tort Claims Acts > Exclusions From Liability

Torts > Public Entity Liability > Immunities > Sovereign Immunity

*HN18*[ ] Local Governments, Claims By & Against

In cases where questioned municipal conduct has little or no purely governmental content but instead resembles decisions or activities carried on by people generally, there is an objective standard for judgment by the courts and the doctrine of discretionary immunity does not bar the action. There is generally no immunity for discretionary acts where governmental concerns are minimally involved and ordinary standards of safety can be applied.

Civil Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

*HN19*[ ] Substantial Evidence, Sufficiency of Evidence

The standards governing review by the Supreme Court of Connecticut of a sufficiency of evidence claim are well established and rigorous. The court must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the trier's verdict. In making this determination, the evidence must be given the most favorable construction in support of

279 Conn. 830, *830; 905 A.2d 70, **70; 2006 Conn. LEXIS 323, ***1

the verdict of which it is reasonably capable. In other words, if the trier could reasonably have reached its conclusion, the verdict must stand, even if the court disagrees with it.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

*HN20*[↓]   **Standards of Review, Clearly Erroneous Review**

To the extent that a defendant challenges a trial court's factual findings, the Supreme Court of Connecticut reviews such claims under the clearly erroneous standard of review. A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made.

Torts > Negligence > Elements

*HN21*[↓]   **Negligence, Elements**

The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Torts > Negligence > Elements

Torts > ... > Elements > Duty > General Overview

*HN22*[↓]   **Jury Trials, Province of Court & Jury**

Contained within duty, the first element of a cause of action in negligence, there are two distinct considerations. First, it is necessary to determine the existence of a duty, and then, if one is found, it is necessary to evaluate the scope of that duty. The existence of a duty is a question of law, and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand. Put another way, the question of what a reasonable person would have done under the circumstances is a question to be determined by the trier of fact, except where the individual's conduct clearly has or has not conformed to what the community requires, and that no reasonable trier of fact could reach a contrary conclusion.

Torts > ... > Duties of Care > Duty On Premises > General Overview

*HN23*[↓]   **Duties of Care, Duty On Premises**

In general, there is an ascending degree of duty owed by the possessor of land to persons on the land based on their entrant status, i.e., trespasser, licensee or invitee.

Torts > ... > Duty On Premises > Invitees > General Overview

*HN24*[↓]   **Duty On Premises, Invitees**

A possessor of land has a duty to an invitee to reasonably inspect and maintain the premises in order to render them reasonably safe. In addition, the possessor of land must warn an invitee of dangers that the invitee could not reasonably be expected to discover.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 89 of 253

Page 8 of 37

279 Conn. 830, *830; 905 A.2d 70, **70; 2006 Conn. LEXIS 323, ***1

Torts > ... > Proof > Violations of Law > Safety Codes

Torts > ... > Proof > Violations of Law > Standards of Care

### *HN25*[⤓] Violations of Law, Safety Codes

Even though a building code has not been violated, it may be evidence of a standard which a jury can consider in determining whether a defendant has exercised due care.

Torts > ... > Proof > Violations of Law > Safety Codes

Torts > ... > Proof > Violations of Law > Standards of Care

### *HN26*[⤓] Violations of Law, Safety Codes

The safety provisions of a building code may appropriately be held competent, not in and of themselves as evidence of negligence, but as evidence of a standard by which the jury must measure the conduct of the defendants in determining whether they exercised that due care the law required in the situation.

Torts > ... > Proof > Violations of Law > General Overview

Torts > ... > Proof > Violations of Law > Standards of Care

### *HN27*[⤓] Proof, Violations of Law

Later-enacted standards may be admitted as evidence of the proper standard of care when the facts and circumstances indicate such an admission will be helpful.

Evidence > Relevance > Relevant Evidence

### *HN28*[⤓] Relevance, Relevant Evidence

See *Conn. Code Evid. R. 4-1.*

Evidence > Relevance > General Overview

### *HN29*[⤓] Evidence, Relevance

Evidence is material when it is offered to prove a fact directly in issue or a fact probative of a matter in issue.

Torts > ... > Proof > Violations of Law > General Overview

Torts > ... > Proof > Violations of Law > Standards of Care

### *HN30*[⤓] Proof, Violations of Law

Statutes, regulations, ordinances, and other safety codes can be considered as some evidence of the standard of care in analogous situations.

Torts > ... > Proof > Violations of Law > General Overview

Torts > ... > Proof > Violations of Law > Standards of Care

### *HN31*[⤓] Proof, Violations of Law

Where a statute, ordinance, or regulation prescribes standard precautions for a purpose other than the protection of the person who is injured, the fact that such precautions have been prescribed for another purpose may be a relevant fact for the consideration of

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 90 of 253

Page 9 of 37

279 Conn. 830, *830; 905 A.2d 70, **70; 2006 Conn. LEXIS 323, ***1

the triers of fact, as indicating that a reasonable man would have taken the same precautions in the particular case. Such statutes, ordinances, or regulations are statutory custom, which is entitled to admission as evidence of standard of care.

Torts > ... > Proof > Violations of Law > Safety Codes

Torts > ... > Proof > Violations of Law > Standards of Care

### HN32[⬇] Violations of Law, Safety Codes

Courts generally allow voluntary safety codes to be considered as evidence of the standard of care.

Governments > State & Territorial Governments > Employees & Officials

### HN33[⬇] State & Territorial Governments, Employees & Officials

The Connecticut building code is jointly adopted and administered by the state building inspector and the codes and standards committee. *Conn. Gen. Stat. § 29-252(a)*. The state building inspector is required to be a licensed architect or professional engineer with at least 10 years of experience. *Conn. Gen. Stat. § 29-252(b)*. Additionally, 13 of the 17 members of the codes and standards committee must include: two architects, three engineers, two builders or superintendents, one public health official, two building officials, two fire marshals, and one member of a national building trades labor organization. *Conn. Gen. Stat. § 29-251*. Each of these members must also have 10 years of experience in their respective fields. *Conn. Gen. Stat. § 29-251*. The other four members are public members. *Conn. Gen. Stat. § 29-251*.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Torts > ... > General Premises Liability > Dangerous Conditions > Duty to Inspect

Torts > ... > Duties of Care > Duty On Premises > Reasonable Care

### HN34[⬇] Jury Trials, Province of Court & Jury

A defendant who owns premises has a duty to reasonably inspect and maintain the premises in order to render them reasonably safe. The question of what constitutes reasonable maintenance is generally a fact-intensive inquiry that will vary with the circumstances.

Torts > ... > Standards of Care > Reasonable Care > Balancing Test

### HN35[⬇] Reasonable Care, Balancing Test

Three factors determine the standard of care owed in any given circumstance: the likelihood that a person's conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest which he must sacrifice to avoid the risk.

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

Torts > ... > Standards of Care > Reasonable Care > Recognition of Risk

### HN36[⬇] Dangerous Conditions, Known Dangers

In the context of a negligence action based on a defective condition on a defendant's premises, there can

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 91 of 253

Page 10 of 37

279 Conn. 830, *830; 905 A.2d 70, **70; 2006 Conn. LEXIS 323, ***1

be no breach of the duty resting upon the defendant unless he or she knew of the defective condition or was chargeable with notice of it.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

Torts > ... > Standards of Care > Reasonable Care > Recognition of Risk

*HN37*[↓]  Jury Trials, Province of Court & Jury

The controlling question in deciding whether a defendant had constructive notice of a defective condition is whether the condition existed for such a length of time that the defendant should, in the exercise of reasonable care, have discovered it in time to remedy it. What constitutes a reasonable length of time is largely a question of fact to be determined in the light of the particular circumstances of a case.

**Counsel:** Paula N. Anthony, for the appellant (defendant).

James P. Brennan, for the appellee (plaintiff).

**Judges:** Norcott, Katz, Palmer, Vertefeuille and Zarella, Js. In this opinion NORCOTT, KATZ and PALMER, Js., concurred. ZARELLA, J., concurring in part and dissenting in part.

**Opinion by:** VERTEFEUILLE

# Opinion

**[**74] [*832]**   VERTEFEUILLE, J. The defendant, the city of Waterbury, appeals from the judgment of the trial court rendered in favor of the plaintiff, Edward Considine. The defendant contends that the trial court improperly determined that governmental immunity as set forth in *General Statutes § 52-557n* [1] did **[**75]** not shield it from liability and that the plaintiff had proffered sufficient evidence to establish **[***2]** that the defendant was negligent in maintaining its property. We disagree, and, accordingly, we affirm the judgment of the trial court.

**[*833]**  The trial court found the following pertinent facts. For many years, the defendant has owned and operated a public municipal golf course known as Western Hills Golf Course. A clubhouse building **[***3]** located on the course property contains a pro shop, locker rooms, restrooms and a restaurant called The Hills Restaurant (restaurant). On or about March 1, 2002, the plaintiff and two friends went to the restaurant to listen to guitarists who were performing there that night. The restaurant is a private establishment that serves meals and alcohol and provides entertainment for its customers. The defendant leases a portion of the clubhouse to the restaurant and under the terms of the lease, the defendant is responsible for maintaining the common areas of the clubhouse that permit access to the restaurant. In 2002, the restaurant paid the defendant $ 29,060.16 in annual rent. The lease contains a clause that increases the restaurant's rent

---

[1] *General Statutes § 52-557n (a)* provides in relevant part: *HN1*[↑] "(1) Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by . . . (B) negligence in the performance of functions from which the political subdivision derives a special corporate profit or pecuniary benefit . . . (2) Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by . . . (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law."

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 92 of 253

Page 11 of 37

279 Conn. 830, *833; 905 A.2d 70, **75; 2006 Conn. LEXIS 323, ***3

each year, and by the time of the trial, the restaurant was paying the defendant rent of $ 30,852 per year. In addition to the restaurant, a second private entity leases a portion of the clubhouse and operates it as a pro shop. The rent required under this lease is $ 1 per year. The golf course is open, weather permitting, from April 15 until December 15 each year. Accordingly, on March 1, 2002, the golf course was closed and the clubhouse was being **[***4]** used only for the restaurant.

After listening to the musical performance, the plaintiff and his two companions left the restaurant. Before exiting the clubhouse, however, one of the plaintiff's companions stopped to use the restroom while the plaintiff waited in the clubhouse's common entryway. The plaintiff stood near the exit door, adjacent to which was a glass window panel, sometimes called a "lite" or sidelite, which was approximately eighteen to twenty-four inches wide and extended from the floor to the top of the door. While the plaintiff was waiting, his leg collapsed or, in his words, "gave out," and he fell against **[*834]** the window panel, which shattered as he fell into it and onto the floor. As a result, he received multiple cuts and abrasions from glass shards and slivers as well as some general soreness and emotional distress.

The plaintiff thereafter brought the present action against the defendant to recover for the injuries he sustained from his fall into the sidelite. In his one count amended complaint, he alleged that the defendant was negligent in one or more of the following ways: improperly installing or maintaining the window panel; failing to install shatterproof **[***5]** glass; failing to install the proper glass in an area of ingress and egress as required by the state building code; and failing to warn the plaintiff that the glass was installed improperly and could shatter. In addition, the plaintiff alleged that the defendant was liable for its negligence under *§ 52-557n*. In its answer, the defendant denied it was negligent and

alleged a special defense that it was not liable for the plaintiff's injuries under the doctrine of governmental immunity. [2]

**[**76]** After a trial to the court, the defendant was found liable for the plaintiff's injuries suffered as a result of the defendant's negligence. In rejecting the special defense of governmental immunity, the trial court determined that the defendant could be held liable under *§ 52-557n (a) (1) (B)* **[***6]** because the defendant derives a special corporate profit or pecuniary benefit from renting a portion of the clubhouse to the restaurant. Specifically, the trial court concluded that the defendant received a pecuniary benefit from the receipt of more than $ 29,000 in annual rent from the restaurant. [3]

**[*835]** Turning to the issue of the defendant's alleged negligence, the trial court found that, although the building code did not require the defendant to replace the type of glass used in the sidelite because construction of the clubhouse predated the applicable building code provisions, the defendant nevertheless was negligent in failing to replace it. The trial court credited the testimony of the plaintiff's expert engineer, who opined that the defendant failed to maintain the building properly **[***7]** and in a safe condition by not replacing the existing glass with a safer type of glass. This appeal followed. [4]

---

[2] The defendant also asserted contributory negligence as a special defense. The trial court found that the plaintiff's injuries were in no way caused by his own negligence. The defendant does not challenge this determination on appeal.

[3] In contrast, the trial court determined that the $ 1 in annual rent the defendant charged the pro shop was such a small fee that it would not abrogate the defendant's governmental immunity with regard to pro shop patrons.

[4] The defendant appealed from the judgment of the trial court to the Appellate Court, and we thereafter transferred the

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 93 of 253

Page 12 of 37

279 Conn. 830, *835; 905 A.2d 70, **76; 2006 Conn. LEXIS 323, ***7

I

The defendant first contends that the trial court improperly determined that it was not immune from liability for its allegedly tortious conduct. Specifically, the defendant contends that its maintenance of the golf course and clubhouse is a governmental function. In addition, the defendant claims that it is not deriving a special corporate profit or pecuniary benefit from the rental of a portion of its clubhouse building to the restaurant because the rental income is applied to maintenance expenses for the property. The defendant particularly takes issue with the trial court's focus on the rental income from the restaurant without [***8] viewing it as part of the defendant's overall operation of the golf course. Finally, the defendant contends that the trial court improperly failed to find that the maintenance of the clubhouse building was a discretionary function, which precludes its liability for the plaintiff's injuries under *§ 52-557n (a) (2) (B)*.

In response, the plaintiff claims that the trial court properly determined that the defendant was liable under *§ 52-557n (a) (1) (B)*. The plaintiff claims that a [*836] considerable portion of the clubhouse was used as a source of revenue for the defendant, and, thus, the defendant should be liable for its negligent acts that are inextricably linked to this rental property. The plaintiff further argues that the defendant should be held liable in the present case because its negligence was related to the condition of the common entryway to the leased property. In addition, the plaintiff claims that the trial court correctly determined that this court's decision in *Carta v. Norwalk, 108 Conn. 697, 702, 145 A. 158 (1929)*, precludes the defendant from arguing that it does not receive a pecuniary benefit because it reinvests the rental income into the maintenance [***9]

of the clubhouse and golf course. Moreover, the plaintiff contends that the trial court properly determined that it need not consider the expenses related to the operation of [**77] the golf course because it was the defendant's failure to maintain in a reasonably safe manner the entryway to the clubhouse that caused the plaintiff's injuries. We affirm the judgment of the trial court.

The issue of whether the defendant is immune under *§ 52-557n* from the injuries caused by its negligent maintenance of the entryway of the clubhouse presents a question of statutory interpretation, and, thus, our review is plenary. See, e.g., *Kinsey v. Pacific Employers Ins. Co., 277 Conn. 398, 404, 891 A.2d 959 (2006)*. HN2[⬆]] "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, *General Statutes § 1-2z* [5] directs us first to consider the text [***10] [*837] of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the

_____

appeal to this court pursuant to *General Statutes § 51-199 (c)* and **Practice Book § 65-1**.

_____

[5] *General Statutes § 1-2z* provides: HN3[⬆]] "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 94 of 253

Page 13 of 37

279 Conn. 830, *837; 905 A.2d 70, **77; 2006 Conn. LEXIS 323, ***10

legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Id., 405*.

 **[***11]** In accordance with *§ 1-2z*, we turn first to the text of *§ 52-557n (a) (1)*, which provides in relevant part that "[e]xcept as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by . . . (B) negligence in the performance of functions from which the political subdivision derives a *special corporate profit* or *pecuniary benefit* . . . ." (Emphasis added.) The statute does not define the phrases "special corporate profit" and "pecuniary benefit." *HN4*[⬆] "In the absence of a statutory definition, words and phrases in a particular statute are to be construed according to their common usage. . . . To ascertain that usage, we look to the dictionary definition of the term." (Internal quotation marks omitted.) *Chatterjee v. Commissioner of Revenue Services, 277 Conn. 681, 690, 894 A.2d 919 (2006)*; *General Statutes § 1-1 (a)*. Construing these two phrases according to their common usage, nevertheless, results in ambiguity. Even if we put aside the modifier "special corporate" in the phrase, "special corporate profit," the term profit itself is susceptible to multiple common meanings. **[***12]** For example, profit commonly can mean either revenue in **[*838]** excess of expenses or more generally an advantage, benefit, gain or valuable return. Webster's Third New International Dictionary (1993). The second phrase is also susceptible to multiple meanings because "pecuniary benefit" commonly means a "benefit capable of monetary valuation"; Black's Law Dictionary (7th Ed. 1999); and a benefit commonly means an advantage, privilege, profit, or gain. Id. Accordingly, we conclude that the text of *§ 52-557n (a) (1)* fails to yield a plain and unambiguous answer to the **[**78]** question of whether the defendant derives either a special

corporate profit or pecuniary benefit from the lease of a portion of the clubhouse to the restaurant.

Resort to the statute's legislative history is somewhat helpful, but not definitive, in resolving the meaning of "special corporate profit" and "pecuniary benefit." *Section 52-557n* was enacted as § 13 of the Tort Reform Act of 1986, Public Acts 1986, No. 86-338 (act). This court has described the act as being "drafted in response to rapidly rising insurance rates, which, some believed, would be curtailed if tort liability could be limited and systematized. As finally **[***13]** enacted, the act represents a complex web of interdependent concessions and bargains struck by hostile interest groups and individuals of opposing philosophical positions." *Sanzone v. Board of Police Commissioners, 219 Conn. 179, 185, 592 A.2d 912 (1991)*.

Although the legislative history of § 13 of the act provides no definition of "special corporate profit" or "pecuniary benefit," it does suggest that these terms were drawn from the common law of municipal liability. Senator Richard B. Johnston, the proponent of the legislation in the Senate and chairman of the judiciary committee, described § 13 (a) of the act as "codify[ing] certain elements of common law liability as they apply to political subdivisions, by identifying three areas where liability exists. First, the negligent act within **[*839]** the [s]cope of employment or official duties. Second, negligence in the course of conduct involving profit or pecuniary benefit to that political subdivision. Third, the creation of a nuisance, except in those instances where a defective road or bridge case can only be brought under other existing statutes." [6] 29 S. Proc., Pt. 10,

---

[6] The proponent of the act in the House of Representatives, Representative Robert G. Jaekle, did not comment on whether *§ 52-557n (a) (1) (B)* was meant to codify the common law. He did, however, state that under this subsection a municipality

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 95 of 253

Page 14 of 37

279 Conn. 830, *839; 905 A.2d 70, **78; 2006 Conn. LEXIS 323, ***13

1986 Sess., p. 3445. In contrast, subsection **[\*\*\*14]** (b), which enumerated specific instances in which a municipality is immune from liability, was described as creating "brand new immunities to municipalities that were never there before . . . ." 29 H.R. Proc., Pt. 22, 1986 Sess., p. 8088, remarks of Representative Robert F. Frankel. Although Senator Johnston's statement indicates that *§ 52-557n (a) (1) (B)* was meant to codify municipal common-law liability, we cannot conclude that his interpretation was definitive because a number of other legislators generally viewed the municipal liability section of the act as either altering individuals' existing right to bring an action against a municipality, or, at the very least, as having an unclear impact on individuals' right to sue a municipality. [7] See 29 H.R. **[\*840]** Proc.,

---

can be held liable for "[n]egligence in the performance of functions from which basically the town derives any sort of benefit." 29 H.R. Proc., Pt. 16, 1986 Sess., p. 5929, remarks of Representative Jaekle.

[7] This conclusion is consistent with this court's prior examination of the legislative history of § 13 of the act, in which we described it as "worse than murky; it is contradictory. . . . The transcripts of legislative hearings on the bill are full of heated debate over § 13 [of the act], dealing with municipal liability, but the legislators seemed not to agree as to its meaning. The record of legislative debate does indicate that § 13 was intended, in a general sense, both to codify and to limit municipal liability, but it also reflects confusion with respect to precisely what part of the preexisting law was being codified, and what part was being limited." *Sanzone v. Board of Police Commissioners, supra, 219 Conn. 188.*

Moreover, the legislature's confusion over the extent that the act was codifying or altering Connecticut tort law is further demonstrated by the fact that, in the midst of the debate over the act, the cochairmen and ranking members of the judiciary committee asked the law revision commission to prepare an analysis comparing the act with the state's preexisting tort law. See Report of the Law Revision Commission to the Judiciary Committee Comparing Public Act 86-338 and Prior

Pt. 16, 1986 Sess., p. 5891, **[\*\*79]** remarks of Representative Irving J. Stolberg (commenting, in support of amendment to strike out municipal liability sections, that "sacrifice of individual rights in [the sections of the bill dealing with municipal liability] is extremely extensive"); 29 H.R. Proc., Pt. 22, 1986 Sess., p. 8108, remarks of Representative Michael D. Rybak (describing section on municipal liability as "an absolute **[\*\*\*15]** mine field, an attempt to codify [200] years of municipal law and statute in probably two weeks"); 29 H.R. Proc., Pt. 16, 1986 Sess., p. 5902, remarks of Representative David Lavine (Commenting, in support of the amendment to strike out municipal liability sections, that "it may be that all this works the way the majority leader suggests that it might. And the word is might. It may be that it won't. But for sure tonight at five minutes after one, we don't know that answer."); 29 S. Proc., Pt. 10, 1986 Sess., p. 3482, remarks of Senator Anthony V. Avallone (Describing § 13 of the act as "a section on municipal liability that I defy anybody in here to explain to me. . . . I've been trying for two weeks to find municipal lawyers who understand it. And they can't."). These remarks may have been directed at the enumerated situations barring liability in § 13 (b) of the act, but this too is unclear from the context and substance of these remarks. We turn next to the common-law backdrop against which this section was enacted in an effort to determine whether the phrases "special corporate profit" and "pecuniary benefit" were meant to draw **[\*841]** their meaning from and to codify

---

Connecticut Law (1987) p. 1. With regard to the municipal liability section of the act, it should be noted that the law revision commission concluded that the act "codifie[d] municipal liability in terms of the same negligence and nuisance principles that governed under common law . . . ." Id., p. 23. The report speculated that the act may have departed from the common law in subsection (b) wherein it enumerated specific instances in which the municipality would not be liable. Id., pp. 22-23.

Ben Levites

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 96 of 253

Page 15 of 37
279 Conn. 830, *841; 905 A.2d 70, **79; 2006 Conn. LEXIS 323, ***15

the preexisting **[\*\*\*16]** common law.

**[\*\*\*17]** At common law, a municipality was, under certain circumstances, immune from liability for the torts it committed. See, e.g., *Abbott v. Bristol, 167 Conn. 143, 150, 355 A.2d 68* and n.2, *167 Conn. 143, 355 A.2d 68 (1974)*; *Carta v. Norwalk, supra, 108 Conn. 701-702*; *Hourigan v. Norwich, 77 Conn. 358, 364-65, 59 A. 487 (1904)*. The source of this municipal immunity was the state's sovereign immunity. *Hourigan v. Norwich, supra, 364-65*; see also 18 E. McQuillin, Municipal Corporations (3d Ed. Rev. 2003) § 53.23, p. 380 ("rule of immunity for governmental acts and liability for corporate or proprietary acts is grounded in common-law sovereign immunity"); 5 F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 29.6, p. 624 (municipal immunity "was commonly rationalized by saying that the municipality is the agent or representative of the state in performing governmental functions and so shares the state's immunity, but that it has no sovereignty or immunity of its own"). This court explained in *Hourigan v. Norwich, supra, 364*, that when the state performs its governmental function through an agent, **[\*\*\*18]** "the agent cannot be sued for injuries resulting from a strict performance of the agency. In such case the act is regarded as the act of the [s]tate and not that of the agent, who is the mere instrument of the [s]tate and nothing more . . . ." Similarly, a municipality is the agent of the state "in the exercise of certain governmental powers . . . [and when] the [s]tate imposes upon an incorporated city the absolute duty of performing some **[\*\*80]** act which the [s]tate may lawfully perform and pertaining to the administration of government, the city in the performance of that duty may be clothed with the immunities belonging to the mere agent of the [s]tate . . . ." Id.

*HN5*[↑] The common law also recognized that a municipality is not just restricted to acting as the agent of the state, **[\*842]** but may engage in acts for its own

corporate benefit or for the benefit of its inhabitants. Id.; see also *Winchester v. Cox, 129 Conn. 106, 109, 26 A.2d 592 (1942)* ("functions of a municipal corporation fall into two classes, those of a governmental nature, where it acts merely as the agent or representative of the state in carrying out its public purposes, and those of a proprietary **[\*\*\*19]** nature, where it carries on activities for the particular benefit of its inhabitants"). In this latter situation, the municipality "is not clothed with [the state's] immunities and is liable to be sued for injuries inflicted through its negligence in the performance of such an act." *Hourigan v. Norwich, supra, 77 Conn. 364*; see also 18 E. McQuillin, supra, § 53.23, p. 381 ("[s]overeign immunity protects sovereign governments, such as states, and municipalities when acting as agents of the state, but not municipal corporations acting on their own behalf"); see generally W. Williams, Liability of Municipal Corporations for Tort (1901) pp. 8-9. Thus, this court has stated that a municipality's immunity from liability for injuries applies only when it "is engaged in the performance of a public duty for the public benefit, and not for its own corporate profit . . . ." *Richmond v. Norwich, 96 Conn. 582, 588, 115 A. 11 (1921)*. Accordingly, the distinction between whether the municipality was acting in its governmental capacity, or in its corporate or proprietary capacity, was, under the common law, the litmus test for whether the **[\*\*\*20]** municipality would be held liable for its negligence.

*HN6*[↑] In determining whether a municipality's activity was proprietary in nature, this court, along with those of other jurisdictions, has examined whether the activity generated a "*special corporate benefit* or *pecuniary profit* inuring to the municipality." (Emphasis added.) *Carta v. Norwalk, supra, 108 Conn. 702*; accord *Hannon v. Waterbury, 106 Conn. 13, 17, 136 A. 876 (1927)* ("test to apply is to ascertain whether the act or function has **[\*843]** within it the *special corporate benefit or*

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 97 of 253

Page 16 of 37

279 Conn. 830, *843; 905 A.2d 70, **80; 2006 Conn. LEXIS 323, ***20

*pecuniary profit* of the municipality affected" [emphasis added; internal quotation marks omitted]); *Richmond v. Norwich, supra, 96 Conn. 588* (municipality liable for negligent act committed while "engaged in the performance of acts done in the management of its property or rights for its own *corporate benefit or profit* and that of its inhabitants" [emphasis added]); *Hourigan v. Norwich, supra, 77 Conn. 365* (municipality may be liable for acts done "in the management of property or rights voluntarily held by them for their own *immediate profit or advantage* [***21] *as a corporation*, although inuring, of course, ultimately to the benefit of the public" [emphasis added; internal quotation marks omitted]); 18 E. McQuillin, supra, § 53.23, p. 383 (*HN7* 🔼) "[w]here the municipality's officers or servants are in the exercise of power conferred upon the municipality for its *private benefit or pecuniary profit*, and damage results from their negligence or misfeasance, the municipality is liable to the same extent as in the case of private corporations or individuals" [emphasis added]); 5 F. Harper, F. James & O. Gray, supra, § 29.6, p. 627 (one of most often invoked criteria for determining if municipality is operating in proprietary or governmental capacity is "whether the [**81] function is allocated to the municipality for *its profit or special advantage* or whether [it is] for the purpose of carrying out the public functions of the state without special advantage to the city" [emphasis added]). *HN8* 🔼] The imposition of liability under *§ 52-557n* on municipalities when they are engaged in a function from which they derive a "special corporate profit" or "pecuniary benefit" is nearly identical to municipalities' common-law liability [***22] for acts for their own "special corporate benefit [*844] or pecuniary profit." [8] Because "the legislature is presumed to be

_____

[8] We note that the phrases used in *§ 52-557n (a) (1) (B)* transpose the terms "profit" and "benefit" from the common-law test. Nevertheless, as discussed previously herein, the

aware of prior judicial decisions involving common-law rules"; *Chadha v. Charlotte Hungerford Hospital, 272 Conn. 776, 793-94 n.21, 865 A.2d 1163 (2005)*; see also 2B J. Sutherland, Statutory Construction (6th Ed. Singer) § 50:01, p. 140 ("legislature is presumed to know the common law before statute was enacted"); and *General Statutes § 1-1 (a)* directs that words or phrases that "have acquired a peculiar and appropriate meaning in the law . . . shall be construed and understood accordingly," we conclude that the use of these phrases was an attempt to codify municipal common-law liability for acts performed in a proprietary capacity. [9] Cf. *Yale Diagnostic Radiology v. Estate of Fountain, 267 Conn. 351, 361, 838 A.2d 179 (2004)* (concluding that *General Statutes § 46b-37 [b] [2]* codifies common-law rule that "both parents are primarily responsible for providing necessary goods and services to their children"); *Gerrity v. R.J. Reynolds Tobacco Co., 263 Conn. 120, 127, 818 A.2d 769 (2003)* [***23] (observing that product liability act was designed in part to codify common law of product liability).

Having [***24] decided that *HN9* 🔼] *§ 52-557n (a) (1) (B)* codifies the common-law rule that municipalities are liable for their negligent acts committed in their proprietary capacity, we must examine what the

_____

legislative history does not provide any explanation for the particular phrasing employed by the legislature. Accordingly, we are left to conclude that this difference from the common-law test was incidental.

[9] We twice before have assumed, without deciding, that *§ 52-557n (a) (1) (B)* codified the common law. See *Martel v. Metropolitan District Commission, 275 Conn. 38, 53, 881 A.2d 194 (2005)*; *Elliott v. Waterbury, 245 Conn. 385, 410-11, 715 A.2d 27 (1998)*. Although we conclude that *§ 52-557n (a) (1) (B)* codifies the common law with regard to municipal liability for proprietary functions, we express no opinion on the other grounds for municipal liability in *§ 52-557n (a) (1)*.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 98 of 253

Page 17 of 37

279 Conn. 830, *844; 905 A.2d 70, **81; 2006 Conn. LEXIS 323, ***24

common law meant by the **[\*845]** phrases "special corporate benefit" and "pecuniary profit." At the outset, we recognize that _HN10_[↑] the distinction between a municipality's governmental and proprietary functions has been criticized as being illusory, elusive, arbitrary, unworkable and a quagmire. _Indian Towing Co. v. United States, 350 U.S. 61, 65, 76 S. Ct. 122, 100 L. Ed. 48 (1955)_ (calling governmental-proprietary distinction "quagmire that has long plagued the law of municipal corporations"); _Tadjer v. Montgomery County, 300 Md. 539, 546, 479 A.2d 1321 (1984)_ (remarking that "distinction between governmental and proprietary functions is sometimes illusory in practice"); _Hudson v. East Montpelier, 161 Vt. 168, 177 n.3, 638 A.2d 561 (1993)_ (noting that its application of distinction has led to arbitrary results); 18 E. McQuillin, supra, § 53.02.10, p. 148 (calling modern distinction between municipality's dual functions elusive); W. Prosser **[\*\*\*25]** & W. Keeton, Torts (5th Ed. 1984) § 131, p. 1054 (observing that distinction "is basically unworkable"). Despite this criticism, Connecticut, like a minority of other jurisdictions, [10] has **[\*\*82]** not disavowed the application of this distinction.

---

[10] Due to the dissatisfaction with the distinction between proprietary and governmental acts, many courts and legislatures have moved away from it. See 4 _Restatement (Second), Torts, § 895C_, pp. 408-409 (1979); 5 F. Harper, F. James & O. Gray, supra, § 29.6, p. 639. Nevertheless, this distinction has survived in one form or another in a handful of jurisdictions. See, e.g., _Mich. Comp. Laws § 691.1413_ (2006) ("[I]mmunity of the governmental agency shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as defined in this section. Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the governmental agency, excluding, however, any activity normally supported by taxes or fees."); _Tadjer v. Montgomery County, supra, 300 Md. 539_, _Hillerby v. Colchester, 167 Vt. 270, 706 A.2d 446 (1998)_.

**[\*\*\*26]** We begin with municipal activities that are _not_ for a municipality's special corporate benefit or pecuniary profit. If a municipality is acting only as the "agent or representative of the state in carrying out its public **[\*846]** purposes"; _Winchester v. Cox, supra, 129 Conn. 109_; then it clearly is not deriving a special corporate benefit or pecuniary profit. Two classes of activities fall within the broader category of acting as the agent of the state: "[1] those imposed by the [s]tate for the benefit of the general public, and [2] those which arise out of legislation imposed in pursuance of a general policy, manifested by legislation affecting similar corporations, for the particular advantage of the inhabitants of the municipality, and only through this, and indirectly, for the benefit of the people at large. . . . For example, the maintenance of the public peace or prevention of disease would fall within the first class; _Keefe v. Union, 76 Conn. 160, 166, 56 A. 571 [1903]_; while the maintenance of a park system would fall within the second class." (Citations omitted; internal quotation marks omitted.) _Hannon v. Waterbury, supra, 106 Conn. 16_; **[\*\*\*27]** see also _Spitzer v. Waterbury, 113 Conn. 84, 87-88, 154 A. 157 (1931)_ (construction of storm water sewers is governmental function because it is part of duty imposed by state on municipality to maintain highways within its limits); _Epstein v. New Haven, 104 Conn. 283, 284, 132 A. 467 (1926)_ (use of municipal property as public park is governmental function because "control of public parks belongs primarily to the [s]tate and municipalities in operating and managing them act as governmental agencies exercising an authority delegated to them by the [s]tate"). While the distinction remains clear with regard to the first class of activities, it becomes more difficult to discern in the second class of activities. For example, the second class of activities encompasses functions that appear to be for the sole benefit of a municipality's inhabitants, but nevertheless provide indirect benefits to the general public because the activities were meant to improve the

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 99 of 253

Page 18 of 37

279 Conn. 830, *846; 905 A.2d 70, **82; 2006 Conn. LEXIS 323, ***27

general health, welfare or education of the municipality's inhabitants. See *Hannon v. Waterbury, supra, 18* (operating swimming **[*847]** pool was governmental function because **[***28]** it was for "education of the people of the city in teaching them to swim and thus guarding their lives against the accident of drowning, promoting a most useful and beneficial form of exercise, and teaching cleanliness of habits of living and thus preserving their health"); *Pope v. New Haven, 91 Conn. 79, 81, 99 A. 51 (1916)* (celebration of Independence Day was governmental function because its aim was to "instruct the people generally and to arouse and stimulate patriotic sentiments and love of country"). The municipality may even charge a nominal fee for participation in a governmental activity and it will not lose its governmental nature as long as the fee is insufficient to meet the activity's expenses. See *Hannon v. Waterbury,supra, 17-18* **[**83]** (charged small fee to use municipal pool, but fee did not cover maintenance expenses); see also *Couture v. Board of Education, 6 Conn. App. 309, 312-13, 505 A.2d 432 (1986)* (sponsoring high school football game, at which small charge was paid to be spectator, was governmental act because part of delegated duty from state to provide education).

On the other side of the distinction, **[***29]** *HN11*[↑] a municipality generally has been determined to be acting for its own special corporate benefit or pecuniary profit where it engages in an activity "for the particular benefit of its inhabitants"; *Winchester v. Cox, supra, 129 Conn. 109;* or if it derives revenue in excess of its costs from the activity. [11] *Martel v. Metropolitan District*

---

[11] *HN14*[↑] The existence of an actual pecuniary profit is a factor in deciding whether the function is proprietary, but reliance on it alone would create problematic incentives and arbitrary results. For example, the Michigan Supreme Court in *Hyde v. University of Michigan Regents, 426 Mich. 223, 258,*

*Commission, [*848] 275 Conn. 38, 53, 881 A.2d 194 (2005)* (operation of water utility for profit is proprietary function); *Elliott v. Waterbury, 245 Conn. 385, 412-14, 715 A.2d 27 (1998)* (same); *Richmond v. Norwich, supra, 96 Conn. 584, 588* (same); see also *Tadjer v. Montgomery County, supra, 300 Md. 549-50* (if income derived from activity substantially exceeds expenses, such as rent and operational costs, then it is proprietary in nature). *HN12*[↑] When a municipality derives substantial revenue from its commercial use of municipal property, it has been considered nonetheless to be engaged in a proprietary function even if it reinvests that revenue back into the property's maintenance expenses or to pay down debt related to the property. See *Carta v. Norwalk, supra, 108 Conn. 702* **[***30]** (if municipality is deriving revenue or profit from renting its property, fact that it is "applied to the maintenance of the property and the reduction of the debt incurred in its construction or acquirement, or otherwise ultimately to the benefit of the public, is not sufficient to create the immunity"); *Hourigan v. Norwich, supra, 77 Conn. 365* (municipality "uses works constructed for the public benefit for its corporate profit, when the profits are to be applied to the maintenance of the works and the reduction of the debt incurred by the corporation in their construction"); but cf. *Coleman v. Kootsillas, 456 Mich. 615, 621, 575 N.W.2d 527 (1998)* (if revenue generated from activity "is used only to pay

---

*393 N.W.2d 847 (1986),* observed: "If the availability of immunity turned solely upon an examination of the ledgers and budgets of a particular activity, a fiscally responsible governmental agency would be 'rewarded' with tort liability for its sound management decisions. Such a rule could discourage implementation of cost-efficient measures and encourage deficit spending. Moreover, the rule would be difficult to implement and inconsistent in its results. If an activity operates at a loss one year, but makes a profit the next year, does the availability of immunity from tort liability also change?"

Case 3:20-cv-01657-OAW Document 53 Filed 03/17/22 Page 100 of 253

Page 19 of 37

279 Conn. 830, *848; 905 A.2d 70, **83; 2006 Conn. LEXIS 323, ***30

current and long-range expenses involved in operating the activity, this could indicate that the primary purpose of the activity was not to produce a pecuniary profit"). Accordingly, it has been stated that *HN13*[↑] a municipality is engaged in a proprietary function when it acts "very much like private enterprise . . . ." W. Prosser & W. Keeton, supra, § 131, p. 1053.

[***31] [*849] In the specific context of leasing municipal property, this court and courts of other jurisdictions generally have concluded that *HN15*[↑] a municipality acts in its proprietary capacity when it leases municipal property to private individuals. See *Carta v. Norwalk, supra, 108 Conn. 699-702* (lease of concession [**84] facilities at municipal beach for $ 2500 was prima facie evidence that municipality was engaged in proprietary function); see also *District of Columbia v. Richards, 75 U.S. App. D.C. 349, 128 F.2d 297, 299 (D.C. Cir. 1942)* (municipality liable for negligence as owner and operator of building in which it leased market stands to merchants); *Chafor v. Long Beach, 174 Cal. 478, 489-90, 163 P. 670 (1917)* (municipality's maintenance of auditorium that it leased to private individuals was proprietary function regardless of whether it charged rent); *Madisonville v. Poole, 249 S.W.2d 133, 134 (Ky. 1952)* (municipality concedes that leasing clubhouse to private individuals was proprietary function); *Wood v. Oxford, 290 Mass. 388, 388-91, 195 N.E. 321 (1935)* (municipality liable for injuries [***32] caused by negligent maintenance of town hall because rooms in town hall were rented out to private parties); *Oliver v. Worcester, 102 Mass. 489, 502 (1869)* (no municipal immunity when it rented substantial portion of municipal building to private persons); *Stephenson v. Garner, 136 N.C. App. 444, 454, 524 S.E.2d 608* (lease of municipal property for construction of cellular telephone tower was proprietary function), appeal denied, *352 N.C. 156, 544 S.E.2d 243 (2000)*; *Chupek v. Akron, 89 Ohio App. 266, 269, 101 N.E.2d 245 (1951)*

(lease of municipal stadium to private individual to hold automobile race was proprietary function); *Dean v. Board of Trustees of Soldiers & Sailors Memorial Building, 65 Ohio App. 362, 364-65, 29 N.E.2d 910 (1940)* (no governmental immunity when portions of building are leased to private entities and operated as movie theater, storerooms and office space); *Richmond v. Grizzard, 205 Va. 298, 301, [*850] 136 S.E.2d 827 (1964)* (lease of portion of municipal building to church was not governmental function); 18A E. McQuillin, supra, § 53.91.10, [***33] p. 129 ("liability applies where a municipality deals with property, bought or used in connection with a governmental activity, for a corporate activity, as by renting it"); but cf. *Hartness v. Allegheny County, 349 Pa. 248, 252-53, 37 A.2d 18 (1944)* (immunity applied for negligent maintenance of county courthouse where only proprietary uses of building were few pay telephones, bootblack stand, and some clerks, part of whose job was to order supplies for county's restaurants and amusement enterprises). Accordingly, a municipality may be held liable if there is an "inextricable link or inherently close connection" between its negligent act or omission and the rental of its property. *Martel v. Metropolitan District Commission, supra, 275 Conn. 56* (municipality liable only if there is "inextricable link or inherently close connection" between alleged negligence and municipality's operation of proprietary function); *Carta v. Norwalk, supra, 108 Conn. 702* (municipality "is responsible for its negligent acts or omissions in connection with the property rented").

Turning to the present case, we conclude that the defendant can [***34] be held liable for the plaintiff's injuries because it was acting in its proprietary capacity when it leased a portion of the clubhouse to the restaurant and there is an "inextricable link or inherently close connection"; *Martel v. Metropolitan District Commission, supra, 275 Conn. 56*; between the

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 101 of 253

Page 20 of 37

279 Conn. 830, *850; 905 A.2d 70, **84; 2006 Conn. LEXIS 323, ***34

defendant's allegedly negligent maintenance of the sidelite in the clubhouse's entryway and the rental of the restaurant. By examining the character of the activity at issue, it is apparent that leasing a portion of a municipal building as a restaurant stands in stark contrast from those activities in which this court has determined that the municipality was acting as the state's agent for the direct or **[*851]** indirect benefit of the general public. See, e.g., _Spitzer v. Waterbury, supra, 113 Conn. 87-88_ (storm water **[**85]** sewers); _Vezina v. Hartford, 106 Conn. 378, 379-81, 138 A. 145 (1927)_ (fire department); _Hannon v. Waterbury, supra, 106 Conn. 17-18_ (municipal swimming pool); _Epstein v. New Haven, supra, 104 Conn. 283_ (public park); see also _Schmidt v. Breeden, 134 N.C. App. 248, 253, 517 S.E.2d 171 (1999)_ **[***35]** (recounting other traditional governmental functions as including "operation of jails, public libraries . . . and city garbage services"). Rather, **HN16**⬆ the leasing of a portion of a municipal building for a substantial rent to a private party to operate a business is an act that very much resembles private enterprise, and, accordingly, consistently has been determined to be a proprietary function. See _District of Columbia v. Richards, supra, 128 F.2d 299_; _Oliver v. Worcester, supra, 102 Mass. 502_; _Stephenson v. Garner, supra, 136 N.C. App. 454_; _Chupek v. Akron, supra, 89 Ohio App. 266, 269_; _Dean v. Board of Trustees of Soldiers & Sailors Memorial Building, supra, 65 Ohio App. 364-65_; _Richmond v. Grizzard, supra, 205 Va. 301_.

In addition to the fact that the defendant's leasing of the restaurant is of a similar nature and character as private enterprise, it appears that the defendant was, _in fact,_ deriving a pecuniary benefit from the lease. The defendant's acting deputy director of public works, Joseph A. Geary, testified that the proceeds of the lease were **[***36]** reinvested into a fund that is used to operate the golf course. Thus, the defendant received a

pecuniary benefit from the lease because it was able to use the proceeds from the lease to offset its costs in maintaining the golf course. [12] Moreover, even if we were to assume **[*852]** that the golf course is such an interrelated function to the restaurant that we must view its revenues and expenses in the aggregate, the fact that the revenue or profit derived from the commercial use of municipal property "is applied to the maintenance of the property and the reduction of the debt incurred in its construction or acquirement, or otherwise ultimately to the benefit of the public, is not sufficient to create [governmental] immunity." _Carta v. Norwalk, supra, 108 Conn. 702_. We therefore conclude that the defendant's leasing of a portion of the clubhouse to the restaurant is a proprietary function.

**[***37]** Having concluded that leasing a portion of the clubhouse to be operated as a restaurant is a proprietary function, we next must consider whether there is an "inextricable link or inherently close connection"; _Martel v. Metropolitan District Commission, supra 275 Conn. 56_; between this function and the alleged negligent act-failing to maintain properly the window panel. The entryway where the plaintiff was injured was the main entrance to the clubhouse and one of two entrances by which a patron could access the restaurant. Further, the lease obligates the defendant to maintain the common areas of the building that provide access to the restaurant. Therefore, we conclude that there was an inextricable link and close connection between the defendant's negligent maintenance of the glass sidelite in the common entryway and the leasing

---

[12] In addition to its receipt of lease income, the defendant also was benefited by the improvements that the lease required the restaurant to make to the clubhouse, such as "providing cooling for the main clubhouse, adding a full liquor sit-down bar . . . [and] refurbishing the exterior and interior walls of the building . . . ."

Ben Levites

Case 3:20-cv-01657-OAW Document 53 Filed 03/17/22 Page 102 of 253

Page 21 of 37

279 Conn. 830, *852; 905 A.2d 70, **85; 2006 Conn. LEXIS 323, ***37

of the restaurant portion of the clubhouse.

The defendant claims nonetheless that the maintenance of the clubhouse was a [**86] governmental function because this building was located on a municipal golf course, and a golf course, like a park or swimming pool, is a recreational facility that falls within the scope of a municipality's governmental [***38] functions. Even if we were to assume that the operation of a municipal golf [*853] course is a governmental function, [13] we cannot conclude that the fact that the restaurant is in a building located on a municipal golf course transforms an otherwise commercial function into a governmental one. First, the present case does not present a situation in which two municipal functions are so interrelated that the nature of each function cannot be analyzed independently. Indeed, the restaurant, in the present case, was operated independently of the golf course because it was open to the public even when the golf course was closed and its patrons, like the plaintiff, came there for reasons other than golf. Although many golfers likely patronized the restaurant before and after playing golf, it hardly can be said that the existence of a restaurant is essential to a functioning golf course. Second, *HN17*[↑] the inquiry of whether the state's sovereign immunity extends to shield a municipality turns on the nature and character of the act and not its location. See *Hannon v. Waterbury, supra, 106 Conn. 17* (whether function is governmental "is determined from a consideration of the nature of [***39] the duty imposed or the privilege conferred, and of the character of the act done or the function performed"); see also *Rhodes v. Palo Alto, 100 Cal. App. 2d 336, 341, 223 P.2d 639 (1950)* (determining that operation of community theater was proprietary function despite its location within public park because "[i]t is the nature of

the activity, not its location . . . that determines its proprietary character").

The defendant also argues that it should not be held liable for its negligence because it is immune under *§ 52-557n (a) (2) (B)* for negligent acts or omissions that require the exercise of judgment or discretion and that the maintenance of the common areas of the clubhouse [*854] was such a discretionary function. [14] We disagree. When a municipality is engaged in a governmental function, its immunity is restricted to discretionary acts and not ministerial acts. See *Heigl v. Board of Education, 218 Conn. 1, 4-5, 587 A.2d 423 (1991)*[***40] ("[A] municipality is immune from liability for the performance of *governmental acts* as distinguished from ministerial acts. . . . *Governmental acts* are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature. . . . [M]inisterial acts are performed in a prescribed manner without the exercise of judgment or discretion . . . ." [Citations omitted; emphasis added; internal quotation marks omitted.]); accord *Elliott v. Waterbury, supra, 245 Conn. 411* ("under the common law . . . both municipalities and their employees or agents have immunity from negligence liability *for governmental acts* involving the exercise of judgment or discretion" [emphasis added]). Because we concluded that the defendant was engaged in a proprietary act and not a governmental act, the distinction between discretionary and ministerial acts does not apply. See *Adriance v. Standish, 687 A.2d 238, 241 (Me. 1996)* (*HN18*[↑] "[i]n cases where the questioned conduct has little or no purely governmental content but instead [**87] resembles decisions or activities carried on by people generally, there is an objective standard for [***41]

---

[13] This court never has decided whether a municipal golf course is a proprietary or governmental function.

[14] The defendant does not claim that *§ 52-557n (a) (2) (B)* altered the common law. Accordingly, we will assume, without deciding, that *§ 52-557n (a) (2) (B)* codifies the common law.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 103 of 253

Page 22 of 37

279 Conn. 830, *854; 905 A.2d 70, **87; 2006 Conn. LEXIS 323, ***41

judgment by the courts and the doctrine of discretionary immunity does not bar the action" [internal quotation marks omitted]); see also W. Prosser & W. Keeton, supra, § 132, p. 1065 (generally no immunity for discretionary acts "where governmental concerns are minimally involved and ordinary standards of safety can be applied").

II

The defendant next claims that the trial court improperly determined that it negligently had maintained the **[*855]** clubhouse because the plaintiff proffered insufficient evidence to support this finding. The defendant concedes that it had a duty to the plaintiff, as an invitee, to inspect reasonably and maintain the clubhouse in order to render it reasonably safe. The defendant claims, however, that the plaintiff failed to proffer sufficient evidence to establish that the standard of care under the circumstances **[***42]** of the present case required it to replace the glass in the sidelite with a safer type of glass. In particular, the defendant asserts that the only evidence proffered by the plaintiff on this point consisted of references to federal regulations and the state building code, both of which did not apply to the clubhouse because they were adopted after it was built. In addition, the defendant claims that the plaintiff failed to introduce any evidence that the defendant had actual or constructive notice that the window panel was unsafe or hazardous. Rather, the defendant contends that it had no notice of the window's dangerous condition as supported by Geary's testimony that, in his twenty-six years of employment with the defendant's bureau of parks and recreation, he knew of no person that had been injured by coming into contact with the sidelite. In response, the plaintiff claims that it proffered sufficient evidence that the defendant had breached its duty because the building code was some evidence of the standard of care to which the defendant was required to conform its conduct. In addition, the plaintiff

contends that the length of time that the sidelite existed in its defective **[***43]** condition was a sufficient basis from which the trial court could have found that the defendant had constructive notice. We agree with the plaintiff.

The following testimony is relevant to the resolution of these claims. The plaintiff's expert witness, Michael E. Shanok, a consulting engineer specializing in forensics and safety, testified that, based on the circumstances **[*856]** relating to the plaintiff's injury, the glass installed in the sidelite next to the door was very likely annealed glass. Shanok further testified that, because this type of glass is not toughened in any way, it "is by far the most easy to break among the various types of glass . . . ." In addition, Shanok testified that there is a substantial risk of injury if one were to fall into annealed glass because it has a tendency to break into large, sharp shards of glass. He also explained in his testimony that placing a glass window panel next to an entryway door is recognized as an "extremely hazardous location because people are constantly going one way or another through that set of doors, and the possibility of someone coming into contact with the [sidelite] is relatively high." He remarked that the use of annealed **[***44]** glass in a sidelite next to a door is more dangerous than using it in a window on a wall because there is greater likelihood that someone may come into contact with the sidelite as "a person might mistake [it] for a door and push their hand against it thinking they're going to open a door . . . ." Highlighting the risk of placing a glass sidelite next to an entryway door, Shanok testified that, although **[**88]** not applicable to the clubhouse, [15] the building code,

_____

[15] On cross-examination, Shanok testified that, if a building had been built before 1970, the building code and regulations did not require that the windows be replaced as long as they were in a serviceable condition. Geary testified that the

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 104 of 253

Page 23 of 37

279 Conn. 830, *856; 905 A.2d 70, **88; 2006 Conn. LEXIS 323, ***44

enacted by the office of the state building inspector in approximately 1970, and the regulations of the United States Consumer Product Safety Commission, promulgated in approximately 1980, both regard the entryway as a highly hazardous location and regulate the type of glass that can be used in this area. Shanok additionally testified that to reduce the risk of injury from such a hazardous condition, a building manager or landlord should engage in the process of risk management, "which is simply the inspection of [its] premises [*857] to locate hazards and deal with them so that you lessen the possibility of liability or accidents [on its] premises." Under the facts of the present case, Shanok testified that the risk posed by the [***45] sidelite could have been lessened by replacing the annealed glass in the panel with tempered, thermally toughened, or laminated glass because these types of glass are more difficult to break and, if they do break, they are less likely to cause lacerations because they break into small cubes. Accordingly, Shanok concluded that the sidelite next to the entryway door was not maintained properly by the defendant because the risk it posed should have been identified and mitigated by replacing the annealed glass with tempered, thermally toughened, or laminated glass.

Geary next testified that, as acting deputy director of public works and before that as acting director of the defendant's [***46] parks department, he was responsible for overseeing the clubhouse. He testified that he did not know the technical name for the type of glass that was used in the sidelite, but described it as "regular" glass. In addition, Geary testified that he had observed the shattered window on the night of the plaintiff's injuries and that the shards of glass appeared to be sharp and "in smaller pieces than when safety glass would break." Geary further testified that an

---

clubhouse was built in approximately 1962 and the sidelite remained in an undamaged condition.

employee of the defendant's parks department visually inspected the clubhouse on a weekly basis, but that neither he nor any of his subordinates checked the building code regarding the type of glass to be used in an entryway. Geary also testified that, prior to the plaintiff's injury, the parks department's records did not indicate that anyone had injured themselves on the window panel and he did not recall in his twenty-six years of employment with the parks department that anyone had injured themselves on this sidelite. Finally, Geary testified that he had no knowledge that there was anything defective [*858] with regard to this sidelite or that it was in any kind of damaged condition.

As an initial matter, we note that _HN19_↑] "[t]he standards [***47] governing our review of a sufficiency of evidence claim are well established and rigorous. . . . [W]e must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the [trier's] verdict . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable. . . . In other words, [i]f the [trier] could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it." (Citations omitted; internal quotation marks omitted.) _Carrol v. Allstate Ins. Co., 262 Conn. 433, 442, 815 A.2d 119 (2003)._ _HN20_↑] To the extent that the defendant challenges the trial [**89] court's factual findings, we review such claims under our clearly erroneous standard of review. See _Edmands v. Cuno, Inc., 277 Conn. 425, 438, 892 A.2d 938 (2006)._ "A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm [***48] conviction that a mistake has been made." (Internal quotation marks omitted.) _Id., 438-39._

279 Conn. 830, *858; 905 A.2d 70, **89; 2006 Conn. LEXIS 323, ***48

A

We turn first to the defendant's claim that the plaintiff failed to proffer sufficient evidence that the failure to replace the glass in the sidelite was a breach of the standard of care owed to the plaintiff. HN21[↑] "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. . . . HN22[↑] Contained within the first element, duty, there are two distinct considerations. . . . First, it is necessary to determine the existence of a duty, [*859] and then, if one is found, it is necessary to evaluate the scope of that duty. . . . The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand." (Citations omitted; internal quotation marks omitted.) Maffucci v. Royal Park Ltd. Partnership, 243 Conn. 552, 566, 707 A.2d 15 (1998). Put another way, the question of what a reasonable person would have done under the circumstances is a question to be determined by the trier of [***49] fact, except where the individual's conduct "clearly has or has not conformed to what the community requires, and that no reasonable [trier of fact] could reach a contrary conclusion." W. Prosser & W. Keeton, supra, § 37, p. 237; accord 2 Restatement (Second) Torts, Standard of Conduct, § 285, comment (g), p. 23 (1965) ("jury must itself define the standard of the reasonable man with such particularity as is necessary to make it applicable to the facts of the case before it").

"HN23[↑] In general, there is an ascending degree of duty owed by the possessor of land to persons on the land based on their entrant status, i.e., trespasser, licensee or invitee. . . . HN24[↑] A possessor of land has a duty to an invitee to reasonably inspect and maintain the premises in order to render them reasonably safe. . . . In addition, the possessor of land must warn an invitee of dangers that the invitee could not reasonably be expected to discover." (Citations omitted.) Morin v. Bell Court Condominium Assn., Inc., 223 Conn. 323, 327, 612 A.2d 1197 (1992). There is no dispute that the plaintiff, in the present case, was an invitee of the defendant, and, accordingly, the defendant had a duty [***50] to reasonably inspect and maintain the clubhouse in order to render it reasonably safe and to warn the plaintiff of dangers that he could not reasonably be expected to discover. Thus, to determine that the defendant breached this [*860] duty, the trial court had to find that the reasonable maintenance of the clubhouse to keep it reasonably safe required the defendant to replace the glass in the sidelite with a safer type of glass or to post a warning of the danger that the glass posed.

This court previously has not had the opportunity to consider directly whether a building code, which technically does not apply to the defendant's premises, can nonetheless be considered as some evidence of the appropriate standard of care. The closest this court has come to considering this question was in the case of Dinnan v. Jozwiakowski, 156 Conn. 432, 242 A.2d 747 (1968). In that case, the defendant claimed on appeal that the trial [**90] court improperly "instructed the jury with respect to [its] duty to the tenant 'when it refused to consider the standards established by the building code . . . .'" Id., 434. Specifically, the defendant claimed that, the provisions of the [***51] New Haven building code, which were used in evidence during the examination of expert witnesses, "must be considered with respect to the standards of safety it sets up." (Internal quotation marks omitted.) Id., 436. This court determined that the trial court's instruction to the jury was not improper because the building code was not violated as it had been enacted after the building was erected. Id. Accordingly, we concluded that "the defendant certainly has no ground to complain of the court's charge that the

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 106 of 253

Page 25 of 37

279 Conn. 830, *860; 905 A.2d 70, **90; 2006 Conn. LEXIS 323, ***51

evidence as introduced in this connection 'was for the purpose of testing the soundness of the opinions given' by the experts." Id. Thus, this court's decision in *Dinnan* precludes a jury instruction that a technically inapplicable building code must be considered as *the* standard of care, or, stated another way, a violation of this building code would not have constituted negligence per se. [16] See also *Baldwin v. Jablecki, 52 Conn. App. 379, 382-83,  [*861]  726 A.2d 1164 (1999)* (concluding that trial court properly directed verdict for defendant on plaintiff's negligence per se count based on building code violation because code did not apply [***52] to building that was erected prior to code's enactment). Although the question was not before this court, we did not reject the trial court's instruction that the building code could be considered in evaluating expert testimony regarding the standard of care. [17]

_____

[16] "Negligence per se operates to engraft a particular legislative standard onto the general standard of care imposed by traditional tort law principles, i.e., that standard of care to which an ordinarily prudent person would conform his conduct. To establish negligence, the jury in a negligence per se case need not decide whether the defendant acted as an ordinarily prudent person would have acted under the circumstances. They merely decide whether the relevant statute or regulation has been violated. If it has, the defendant was negligent as a matter of law." (Internal quotation marks omitted.) *Gore v. People's Savings Bank, 235 Conn. 360, 376, 665 A.2d 1341 (1995)*.

[17]

The dissent argues that this court's decision in *Dinnan* supports its position that evidence of an inapplicable building code cannot be used as some evidence of the standard of care. We disagree that *Dinnan* can be read this broadly; rather, we conclude that *Dinnan* is not controlling of today's decision. It must be borne in mind that the defendant in *Dinnan* was challenging the trial court's jury instructions. *Dinnan v. Jozwiakowski, supra, 156 Conn. 434*. In evaluating

 [***53]  [*862]  [**91]  Although this court has not dealt directly with this question, the District of Columbia Circuit Court of Appeals in *Curtis v. District of Columbia, 124 U.S. App. D.C. 241, 363 F.2d 973 (D.C. Cir. 1966)*, has considered whether such a building code could be used as some evidence of the standard of care. In that case, the plaintiff sought to recover for the injuries he sustained when he fell while walking over a vault, the covering of which was a part of the sidewalk. Id. The

_____

that claim, this court concluded, in cursory fashion, that, because there was no claim that the building code was violated, the "defendant certainly has no ground to complain of the court's charge that the evidence as introduced in this connection 'was for the purpose of testing the soundness of the opinions given' by the experts." *Id., 436*. This conclusion must be read in light of our standard of review to challenges of jury instructions in which this court "must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law." (Emphasis added; internal quotation marks omitted.) *Vertex v. Waterbury, 278 Conn. 557, 572, 898 A.2d 178 (2006)*. Accordingly, we conclude that this court's decision in *Dinnan* is limited to the determination that the jury instruction fairly presented the case to the jury because it allowed them to consider the inapplicable building code to test the soundness of the expert's opinions regarding the applicable standard of care. As instructed, the jury was then able to view the standard of care as testified to by the plaintiff's expert in light of the standards set forth in the applicable provisions of the building code. Thus, while the *Dinnan* decision makes clear that the conformance or nonconformance with the inapplicable building code was not dispositive of the plaintiff's negligence claim, the decision cannot be stretched to control the question of whether the trier of fact is prohibited from considering such a building code, in light of expert testimony, to arrive at the standard of care.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 107 of 253

Page 26 of 37

279 Conn. 830, *862; 905 A.2d 70, **91; 2006 Conn. LEXIS 323, ***53

plaintiff alleged that he had tripped over a hinge of the covering that protruded approximately one inch above the sidewalk. Id. To establish the standard of care, the plaintiff attempted to introduce into evidence a pertinent section of the District of Columbia building code, which required that vault coverings be flush with the sidewalk. *Id., 974*. The trial court excluded this evidence because the vault was constructed prior to the adoption of the building code and it was not retroactive in its application. Id. On appeal, the court concluded that, *HN25*[↑] even though the building code had not been violated, it "was evidence of a standard which the jury could consider in determining whether the defendants **[***54]** had exercised due care . . . ." *Id., 975*. The court reasoned that "the officials with expertise and duty in the matter, decided that in the interest of safety such protrusions [from the vault coverings] should at least be prohibited in future construction. From this it follows that *HN26*[↑] these safety provisions may appropriately be held competent, not in and of themselves as evidence of negligence, but as evidence of a standard by which the jury must measure the conduct of the defendants in determining whether they exercised that due care the law required in the situation." *Id., 976*; see also *Hammond v. International Harvester [*863] Co., 691 F.2d 646, 651 (3d Cir. 1982)* (concluding that, in products liability action, Occupational Safety and Health Administration regulation relating to tractor safety equipment, although not applicable because it was enacted after tractor was manufactured, supported finding that tractor was defective because it was missing this equipment); *Klein v. District of Columbia, 133 U.S. App. D.C. 129, 409 F.2d 164, 166-67 (D.C. Cir. 1969)* (concluding that municipal building code should have been admitted as evidence of standard **[***55]** of care even though it was enacted after structure was installed); *Martin v. Louisiana Power & Light Co., 546 F. Supp. 780, 783 (E.D. La. 1982)* (noting, in dicta, that *HN27*[↑] "later-enacted standards may be admitted as

evidence of the proper standard of care when the facts and circumstances indicate such an admission will be helpful"), aff'd, *719 F.2d 403 (5th Cir. 1983)*; *Polk v. Los Angeles, 26 Cal.2d 519, 540-41, 159 P.2d 931 (1945)* (regulations regarding maintenance of power lines even if applicable only to public utilities were admissible to establish standard of care of municipality in maintaining its power lines).

We are in agreement with the court in *Curtis* that the building code is both relevant and material to the question of the standard of care, in the present case, because it reflects the experience and expertise of what authorities believe to be the safe use of glass in an entryway, albeit for future construction. [18] See *Conn.*

_____

[18] The dissent argues that evidence of the inapplicable building code was not relevant to the inquiry into whether the defendant was required to replace the glass in the sidelite in order to render the clubhouse "reasonably safe." The dissent reasons that the building code's prohibition of the use of annealed glass in only new construction reflects a determination that preexisting uses of such glass in entryways were not dangerous enough to warrant remediation. Accordingly, the dissent contends that the fact that the building code does prohibit the use of annealed glass in new construction "does not reflect any definitive judgment of what is, and what is not, 'reasonably safe.'"

We agree with the dissent that the building code in the context of the clubhouse does not pronounce a *definitive judgment* as to what is, and is not, "reasonably safe," because, as we discussed previously herein, an inapplicable building code provision cannot be used to establish negligence per se. We do, however, believe that the building code does provide some relevant evidence of what is the reasonably safe use of glass in the clubhouse's entryway. *HN33*[↑] The building code is jointly adopted and administered by the state building inspector and the codes and standards committee. *General Statutes § 29-252 (a)*. The state building inspector is required to be a licensed architect or professional engineer with at least ten years of experience. *General Statutes § 29-252 (b)*.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 108 of 253

Page 27 of 37

279 Conn. 830, *863; 905 A.2d 70, **91; 2006 Conn. LEXIS 323, ***55

*Code Evid. § 4-1* **[\*\*92]** **[\*864]** (*HN28*⬆️) evidence is relevant if it has "any tendency to make the existence of any fact that is material to the determination of the proceeding more probable **[\*\*\*56]** or less probable than it would be without the evidence"); *State v. Estrella, 277 Conn. 458, 484 n.17, 893 A.2d 348 (2006)* (*HN29*⬆️) "[e]vidence is material when it is offered to prove a fact directly in issue or a fact probative of a matter in issue"). This determination is buttressed by the similar conclusion of this court and courts of other jurisdictions that *HN30*⬆️] statutes, regulations, ordinances, and other safety codes can be considered as some evidence of the standard of care in analogous **[\*865]** situations.

_____

Additionally, thirteen of the seventeen members of the codes and standards committee must include: two architects, three engineers, two builders or superintendents, one public health official, two building officials, two fire marshals, and one member of a national building trades labor organization. *General Statutes § 29-251*. Each of these members must also have ten years of experience in their respective fields. *General Statutes § 29-251*. The other four members are public members. *General Statutes § 29-251*. Thus, the building code reflects the reasoned judgment of numerous professionals with extensive relevant experience that in the interests of safety the use of annealed glass in the entryway of buildings should be prohibited in future construction. From this fact, a trier of fact reasonably could infer that the use of annealed glass in the entryway of a building constructed before the effective date of the code also poses a safety hazard. Indeed, it strains logic to interpret the inapplicability of this prohibition to prior construction as a determination that the use of annealed glass in the entryway of older buildings does not pose similar safety concerns. Such an interpretation is made even more doubtful in light of Shanok's testimony that if the glass in the clubhouse was not in a serviceable condition, it would need to be replaced in accordance with the building code. Accordingly, we conclude that Shanok's reference to the building code was relevant because it has a tendency to make it more probable than it would without this evidence that maintaining the clubhouse in a reasonably safe condition required replacing the annealed glass in the entryway.

For example, violations of regulations of the Occupational Safety and Health Administration cannot be used as the grounds for a negligence per se instruction, but these regulations can be admitted into evidence as evidence of the standard of care because they will provide helpful guidance to the trier of fact. See *Wendland v. Ridgefield Construction Services, Inc., 184 Conn. 173, 181, 439 A.2d 954 (1981)*. Further, courts of other jurisdictions have allowed the trier of fact to consider regulations that prescribe safety standards as evidence of the standard of care even when the plaintiff was not within the class of individuals that the regulation was **[\*\*\*57]** meant to protect. See *Koll v. Manatt's Transportation Co., 253 N.W.2d 265, 270 (Iowa 1977)* (evidence of violation of Occupational Safety and Health Administration regulation **[\*\*93]** is admissible evidence of negligence in action brought by plaintiff not covered by regulation); *Manchack v. Willamette Industries, Inc., 621 So. 2d 649, 652-53 (La. App.)* (same), cert. denied, *629 So. 2d 1170 (La. 1993)*; accord 2 Restatement (Second), supra, § 288B, comment (d), p. 38 (*HN31*⬆️] where statute, ordinance, or regulation "prescribes standard precautions for a purpose other than the protection of the person who is injured . . . [t]he fact that such precautions have been prescribed for another purpose may be a relevant fact for the consideration of the triers of fact, as indicating that a reasonable man would have taken the same precautions in the particular case"); W. Prosser & W. Keeton, supra, § 36, p. 231 (referring to use of such statutes, ordinances, or regulations as "statutory custom, which is entitled to admission as evidence" of standard of care). Finally, *HN32*⬆️] courts generally have allowed voluntary safety codes to be considered as evidence of the **[\*\*\*58]** standard of care. See, e.g., *Miller v. Yazoo Mfg. Co., 26 F.3d 81, 82-84 (8th Cir. 1994)* (concluding that it was proper to admit into evidence, in personal injury action, American National Standards **[\*866]** Institute lawnmower safety standards to establish whether

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 109 of 253

Page 28 of 37

279 Conn. 830, *866; 905 A.2d 70, **93; 2006 Conn. LEXIS 323, ***58

lawnmower's condition was unreasonably dangerous); _Brown v. Cedar Rapids & Iowa City Railways Co., 650 F.2d 159, 163 (8th Cir. 1981)_ (noting trend in federal and state court to admit advisory safety codes promulgated by government agencies, as well as industry, voluntary, or private safety codes as evidence of standard of care); _Boston & Maine Railroad v. Talbert, 360 F.2d 286, 290 (1st Cir. 1966)_ (evidence of nonauthoritative, nationally recognized standards concerning highway and railroad crossing design properly was admissible because it was "one more piece of evidence upon which the jury could decide whether the defendant acted as a reasonably prudent person in the circumstances of this case"); cf. _Landsiedel v. Buffalo Properties, LLC, 2005 WY 61, 112 P.3d 610, 616-17 (Wyo. 2005)_ (trial court did not abuse its discretion in refusing to instruct **[***59]** that nonapplicable building code or industry standards constituted minimum standard of care, but trial court did allow plaintiff to present evidence of code and standards); but see _Wise v. Tidal Construction Co., 270 Ga. App. 725, 729, 608 S.E.2d 11 (2004)_ (trial court did not improperly exclude evidence of inapplicable, national building codes to illustrate standard of care).

 **[***60]** Some authorities take the contrary view to _Curtis_ and do not allow such building codes to be considered as some evidence of the standard of care because they generally are concerned that a jury would likely misuse this evidence by treating any violation of such a code as negligence per se. See _Curtis v. District of Columbia, supra, 363 F.2d 977-78_ (Prettyman, J., dissenting) (concluding that evidence of regulation, which was inapplicable due to its adoption after construction of defendant's premises, should not be considered by jury because it would likely treat any violation of regulation as negligence per se, despite court's instruction to contrary); see also _Coleman v. Hall, 161 N.W.2d 329, 330-31_ **[*867]** _(Iowa 1968)_

(determining that building code, which was not made retroactive, cannot be considered as standard of care with regard to building constructed before code's enactment because probative value of code was outweighed by risk that jury would be prejudiced by its admission); _Trimarco v. Klein, 56 N.Y.2d 98, 108, 436 N.E.2d 502, 451 N.Y.S.2d 52 (1982)_ (concluding that it was improper to admit statute, which required **[***61]** landlords to use certain type of glass in showers, because it risked prejudicing defendant and typical discretion to balance prejudice against relevancy was not applicable where other evidence of industry **[**94]** custom was available); _Ellis v. Caprice, 96 N.J. Super. 539, 550-54, 233 A.2d 654 (App. Div.)_ (tenement statute regarding air shafts not admissible when prospective application only, thus not applicable to defendants' building; probative value outweighed by possibility of prejudice), cert. denied, _50 N.J. 409, 235 A.2d 901 (1967)_; cf. _Gubalke v. Estate of Anthes, 189 Neb. 385, 389, 202 N.W.2d 836 (1972)_ (concluding that ordinance regulating construction of fences was not relevant evidence of standard of care because it was enacted after defendant's fence was constructed and not made retroactive). Nevertheless, this concern is not implicated in the present case because the trial court, sitting as the trier of fact, explicitly stated, in its memorandum of decision, that there was no supportable claim of negligence per se because the clubhouse was built after the effective date of the building code. [19] **[***63]** We

---

[19] We note that a trial court presiding over a jury trial has wide discretion to exclude relevant evidence "if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury . . . ." **Conn. Code Evid. § 4-3**; see also _State v. Paulino, 223 Conn. 461, 477, 613 A.2d 720 (1992)_ ("determination of whether the prejudicial impact of evidence outweighs its probative value is left to the sound discretion of the trial court judge" [internal quotation marks omitted]). In addition, if the trial court admits

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 110 of 253

Page 29 of 37

279 Conn. 830, *867; 905 A.2d 70, **94; 2006 Conn. LEXIS 323, ***63

therefore conclude that [***62] the trial court properly considered the building code and the [*868] federal regulations as *some* evidence of the standard of care because they reflected the collective experience and expertise of both the office of the state building inspector and the federal Consumer Product Safety Commission and what they believe to be the safe use of glass in entryways. [20]

---

such evidence, it can mitigate the concern that the jury will misuse such evidence by issuing a proper limiting jury instruction.

[20] The dissent argues that, by permitting the inapplicable building code to be admitted as evidence of the standard of care, we are usurping the role of the drafters of the building code by requiring the owners of otherwise exempt premises to meet the standards set forth in the building code. We believe that the dissent misconstrues the reach of today's decision.

First, our conclusion that the inapplicable building code properly was considered as some evidence of the standard of care does not make owners of exempt premises subject to the building code's provisions. For example, the defendant, as the owner of the clubhouse, would not on the basis of today's decision become subject to any fines or other sanction as a result of using annealed glass in the clubhouse's entryway. See *General Statutes § 29-254a* ("[a]ny person who violates any provision of the State Building Code shall be fined not less than two hundred nor more than one thousand dollars or imprisoned not more than six months or both").

Second, we disagree with the dissent's view that our decision today signals that an owner of exempt property will be held negligent for failing to remodel his or her building to conform with otherwise inapplicable building code standards. As we have stated previously herein, *HN34* ] the defendant had a duty "to reasonably inspect and maintain the premises in order to render them reasonably safe." *Morin v. Bell Court Condominium Ass'n., Inc., supra, 223 Conn. 327*. The question of what constitutes reasonable maintenance is generally a fact intensive inquiry that will vary with the circumstances. Accordingly, it certainly could be the case that

[***64] [*869] [**95]   We note moreover that the plaintiff did not rely solely on references to the building code and federal regulations in establishing the standard of care. Rather, the plaintiff also offered Shanok's expert opinion that the defendant failed to maintain properly the entryway to the clubhouse. His opinion was based on the following factors. First, the use of annealed glass in an entryway area was hazardous because it breaks easily and is likely to

---

it would be unreasonable to require an exempt building owner to retrofit his or her building at great expense to comply with the present building code where the risk of injury from the existence of such a condition is proportionally not that great. See *Conway v. O'Brien, 111 F.2d 611, 612 (2d Cir. 1940)* (Judge Learned Hand noted *HN35* ] three factors which determine standard of care owed in any given circumstance: "the likelihood that [the person's] conduct will injure others, taken with the seriousness of the injury if it happens, and *balanced against the interest which he must sacrifice to avoid the risk*" [emphasis added]), rev'd on other grounds by *312 U.S. 492, 61 S. Ct. 634, 85 L. Ed. 969 (1941)*; *Congdon v. Norwich, 37 Conn. 414, 419-20 (1870)* (noting that trier of fact should consider, in determining whether road was maintained in reasonably safe condition, costs and feasibility of preventing hazardous condition, which in this case was accumulation of snow and ice); *Washington v. Louisiana Power & Light Co., 555 So. 2d 1350, 1351 (La. 1990)* (affirming judgment setting aside jury verdict because burden of taking necessary precautions clearly outweighed magnitude of risk); *Williams v. New York Rapid Transit Corp., 272 N.Y. 366, 369, 6 N.E.2d 58 (1936)* (rejecting claim of negligence based on defendant's maintenance of train platform, in which only six feet of space allowed between newsstands and edge of platform, because "[i]f this form of construction is negligent, then hundreds, perhaps thousands, of railway stations must be rebuilt"); see also 3 F. Harper, F. James & O. Gray, supra, § 16.9, p. 478 ("if the risk is deemed reasonable in light of the disproportion of the cost to prevent it, it is thereby privileged in negligence law"). Thus, today's decision cannot be read as establishing a negligence per se rule for nonconformance with inapplicable building code provisions.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 111 of 253

Page 30 of 37

279 Conn. 830, *869; 905 A.2d 70, **95; 2006 Conn. LEXIS 323, ***64

cause serious injury when it does break. Second, the window panel's size, extending from the floor to the top of the adjoining door, its location in an entryway, a high traffic area, and its position next to a door, where it could be mistaken for part of the door, increased the risk of someone being seriously injured. Third, the defendant could have identified the hazard posed by this condition by inspecting its property. Finally, the defendant could have mitigated this hazard by installing tempered, thermally toughened, or laminated glass. We therefore conclude that the plaintiff proffered sufficient evidence to establish that the defendant, by failing to replace the glass in the sidelite, did not reasonably maintain the clubhouse in a reasonably **[\*\*\*65]** safe condition.

B

We turn next to the defendant's claim that the trial court improperly found that it was negligent because the plaintiff failed to present any evidence that it had actual or constructive notice of the sidelite's unsafe or **[\*870]** hazardous condition. [21] This court previously has stated that, *HN36*[↑]] in the context of a negligence action based on a defective condition on the defendant's premises, "[t]here could be no breach of the duty resting upon the defendants unless they knew of the defective condition or were chargeable with notice of it . . . ." *Cruz v. Drezek, 175 Conn. 230, 235, 397 A.2d 1335 (1978)*.

─────────────────────

[21] The trial court did not make an explicit finding in its memorandum of decision that the defendant had actual or constructive notice of the defect that caused the plaintiff's injuries. Nevertheless, a finding of notice was implicit in the trial court's ultimate finding that the defendant was negligent in the maintenance of the sidelite. See *Giametti v. Inspections, Inc., 76 Conn. App. 352, 364, 824 A.2d 1 (2003)* (despite lack of express finding of fact, implying from trial court's finding for plaintiff on merits of negligent misrepresentation claim that trial court found that plaintiff relied on misrepresentation because reliance is element of negligent misrepresentation).

In the present case, the plaintiff does not claim that the defendant had actual notice of the defective condition, but contends instead that the defendant had constructive notice. [22] *HN37*[↑]] "The controlling question in deciding whether **[\*\*96]** the defendants had constructive notice of the defective condition is whether the condition existed for such a length of time that the defendants should, in the exercise of reasonable care, have discovered it in time to remedy it." *Id., 238-39*. "What constitutes a reasonable length of time is largely a question of **[\*\*\*66]** fact to be determined in the light of the particular circumstances of a case." *Morris v. King Cole Stores, Inc., 132 Conn. 489, 494, 45 A.2d 710 (1946)*.

**[\*\*\*67]**

In the present case, Shanok testified, and the defendant did not contest, that the hazard posed by the use of nontoughened glass in the sidelite could have been identified if the defendant had engaged in the process of risk management, "which is simply the inspection of [its] premises to locate hazards and deal with them so **[\*871]** that you lessen the possibility of liability or accidents [on its] premises." [23] In addition, there was

─────────────────────

[22] The defendant claims that it lacked notice because it had no knowledge of any problems with the sidelite and that no one had been injured by the sidelite in the previous twenty-six years. This claim addresses solely the question of whether the defendant had actual notice-an issue the plaintiff concedes to the defendant.

[23] The dissent contends that the plaintiff failed to establish constructive notice because he did not proffer evidence of how a reasonable inspection would have discovered that the glass in the sidelite was annealed glass. In particular, the dissent argues that because a visual inspection would not have revealed whether the glass was annealed glass or toughened glass and Geary testified that his review of the records and

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 112 of 253

Page 31 of 37

279 Conn. 830, *871; 905 A.2d 70, **96; 2006 Conn. LEXIS 323, ***67

documents related to the clubhouse did not contain any information regarding the type of glass used in the sidelite, the plaintiff has failed to substantiate how a reasonable inspection would have discovered this defective condition.

We disagree with the conclusion reached by the dissent because it fails to consider the evidence in light of the standard of review that is applicable to the defendant's claim. As we have stated previously herein, "[w]e must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the [trier's] verdict . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable. . . . In other words, [i]f the [trier] could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it." (Internal quotation marks omitted.) _Carrol v. Allstate Ins. Co., supra, 262 Conn. 442._ As we noted herein, Shanok testified that a landlord or building manager could have identified the defective condition posed by the sidelite through an inspection of the premises. Construing his testimony in the light most favorable to supporting the verdict, we believe that it supports a reasonable inference that a landlord or building manager could have identified the glass in the sidelite to not have been one of the toughened varieties of glass. Such an inference is further supported by the fact that the building was built before the building code and consumer product safety commission regulations required that toughened glass be used in entryways.

Further, the record contains no evidence to support the dissent's assertion that a visual inspection cannot distinguish between annealed and toughened glass. Nor do we believe that such a fact bears the hallmarks of accuracy and accessibility as to make it amenable to judicial notice. See _State v. Griffin, 251 Conn. 671, 702-703, 741 A.2d 913 (1999)_ ("[f]acts may be judicially noticed which are so notorious that the production of evidence would be unnecessary, or which the judicial function supposes the judge to be familiar with, in theory at least, or which, although they are neither notorious nor bound to be judicially known, are capable of such instant and unquestionable demonstration, if desired, that no party

testimony **[*872]** that the clubhouse was built in approximately **[**97]** 1962, and that the state building code and the Consumer Product Safety Commission regulations were enacted in 1970 and 1980, respectively. Thus, the defendant had at least twenty-two years from the time when various authorities recognized that nontoughened glass should not be used in an entryway to inspect its property to identify the hazard posed by the sidelite and remedy it or warn its invitees of that hazard. Compare _McCrorey v. Heilpern, 170 Conn. 220, 222, 365 A.2d 1057 (1976)_ (concluding that there was no reasonable basis for jury's finding of constructive notice because plaintiff proffered no evidence that defective condition existed for any period of time before plaintiff's **[***68]** injury), _White v. E & F Construction Co., 151 Conn. 110, 113-14, 193 A.2d 716 (1963)_ (evidence that defective condition existed for two minutes before accident was insufficient to charge defendant with constructive notice), and _Gulycz v. Stop & Shop Cos., 29 Conn. App. 519, 522, 615 A.2d 1087_ (concluding that trier of fact could not find constructive

_____

would think of imposing a falsity on the tribunal in the face of an intelligent adversary" [internal quotation marks omitted]); _State v. Zayas, 195 Conn. 611, 614, 490 A.2d 68 (1985)_ (judicial notice may be taken of "facts which are capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy"). Indeed, the record would support an inference that visual inspection would reveal the distinction between these types of glass. Geary testified that, although he did not know the technical name for the glass, he described the glass in the sidelite as "regular" glass. Because Geary conceded that his review of the clubhouse's records did not reveal the type of glass used in the sidelite, his description of the glass as "regular" could only have been made on the basis of a visual inspection. Geary's testimony that the glass in the sidelite was "regular" glass, viewed in the light most favorable to supporting the verdict, reasonably would support an inference that he meant that the glass in the sidelite was not one of the varieties of toughened glass.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 113 of 253

Page 32 of 37

279 Conn. 830, *872; 905 A.2d 70, **97; 2006 Conn. LEXIS 323, ***68

notice because plaintiff offered no evidence that defect existed for any period of time), cert. denied, *224 Conn. 923, 618 A.2d 527 (1992)*, with *Kirby v. Zlotnick, 160 Conn. 341, 345, 278 A.2d 822 (1971)* (concluding that there was sufficient evidence of constructive notice where defective condition of porch railing, which caused plaintiff's injuries, existed for at least two weeks), and *Kurti v. Becker, 54 Conn. App. 335, 339, 733 A.2d 916* (concluding that defendant had constructive notice of defect because three hours was sufficient **[*873]** period of time for defendant to have discovered that ice formed on driveway and to have warned invitee or remedied situation), cert. denied, *251 Conn. 909, 739 A.2d 1248 (1999)* . Accordingly, we conclude **[***69]** that the plaintiff proffered sufficient evidence from which the trial court properly could have found that the defendant had constructive notice of the hazard posed by the use of annealed glass in the entryway of the clubhouse.

**[***70]** The judgment is affirmed.

In this opinion NORCOTT, KATZ and PALMER, Js., concurred.

**Concur by:** ZARELLA (In Part)

**Dissent by:** ZARELLA (In Part)

# Dissent

ZARELLA, J., concurring in part and dissenting in part. Although I agree with the conclusion of the majority in part I of its opinion that governmental immunity does not shield the defendant, the city of Waterbury, from liability, two reasons compel me to dissent from the majority's conclusion in part II of its opinion that the plaintiff, Edward Considine, offered sufficient evidence to make out a prima facie case of negligence. First, the majority inappropriately affirms the use of an inapplicable

building code as evidence of the standard of care owed by the defendant to the plaintiff. Second, even if it assumed that the use of the inapplicable building code as evidence of the standard of care was appropriate, the plaintiff failed to offer any evidence that the defendant had actual or constructive notice of any defect in the premises.

I

I generally agree with the facts set forth in the majority opinion and will not repeat them in this opinion. I disagree, however, with the majority's holding that the state building code is relevant evidence of the **[***71]** standard of care owed by the defendant to the plaintiff. I instead believe that a nonretroactive provision of a building code is **[**98]** not relevant evidence of the standard of care **[*874]** owed to an invitee by the owner of exempted, preexisting premises.

Evidence is relevant if it has "any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." *Conn. Code Evid. § 4-1*; see also *Jewett v. Jewett, 265 Conn. 669, 679, 830 A.2d 193 (2003)* ("[r]elevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue" [internal quotation marks omitted]). In the present case, the defendant owed the plaintiff "a duty . . . to reasonably inspect and maintain the premises in order to render them reasonably safe" and to "warn [the plaintiff] of dangers that [he] could not reasonably [have been] expected to discover." *Morin v. Bell Court Condominium Ass'n., Inc., 223 Conn. 323, 327, 612 A.2d 1197 (1992)*. The primary issue is whether "maintain[ing] the premises in order to render **[***72]** them reasonably safe"; id.; required the defendant to replace the annealed glass of the sidelite with a safer type of glass.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 114 of 253

Page 33 of 37

279 Conn. 830, *874; 905 A.2d 70, **98; 2006 Conn. LEXIS 323, ***72

The plaintiff introduced evidence that the state building code forbids the use of annealed glass in entryway sidelites in new construction. A necessary premise for deeming this evidence relevant to the issue of whether the defendant had a duty to replace the glass is that the state building code represents an official declaration of what is, and what is not, reasonably safe. Cf. *Curtis v. District of Columbia, 124 U.S. App. D.C. 241, 363 F.2d 973, 977-78 (D.C. Cir. 1966)* (Prettyman, J., dissenting). This premise, however, does not exist in the present case. As the plaintiff's expert, Michael E. Shanok, testified at trial, the state building code sets forth two distinct safety standards, one that is applicable to regulated premises and one that is applicable to exempted premises, such as the **[*875]** premises at issue in this case. [1] By holding that the state building code's prohibition on the use of annealed glass in new construction is relevant evidence of what is, and what is not, "reasonably safe," the majority unwarrantedly cherry-picks the **[***73]** standard that *does not* apply to the defendant's premises to the exclusion of the standard that *does* apply to the defendant's premises. It seems that it is more likely that the drafters of the state building code determined that preexisting uses of annealed glass in entryways were *not* so dangerous as to necessitate remediation and, accordingly, approved those uses of annealed glass by exempting them from regulation. [2] **[***74]** The fact that the state building code

prohibits the use of annealed glass in entryway sidelites in new construction does not reflect any definitive judgment as to what is, and what is not, reasonably safe. Evidence of the state building code therefore does not make it more or less probable that the **[**99]** defendant was required to replace the glass to render its premises reasonably safe, and is thus irrelevant. [3]

Moreover, even if the building code's prohibition on the use of annealed glass in an entryway were relevant, **[*876]** any probative value it may have is outweighed by the danger of unfair prejudice or confusion, or of misleading the jury. See *Conn. Code Evid. § 4-3* ("[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury"). The admission of evidence of an inapplicable statutory standard of care creates a virtual certainty of jury confusion in light of the nebulous distinction between supposedly permissible use of the statute as evidence of the standard of care and supposedly impermissible use of the statute as evidence of negligence. As Judge Prettyman opined in his dissent in *Curtis v. District of Columbia, supra, 363 F.2d 973*, "[o]nce the regulation is **[***75]** in evidence, a jury would almost inevitably give it effect. Indeed I am not

---

prohibited in future construction." Footnote 18 of the majority opinion.

I agree with the majority that those persons responsible for adopting and administering the state building code are experts. The majority, however, fails to appreciate that the building code also reflects the reasoned judgment of numerous professionals with extensive relevant experience that the use of annealed glass in preexisting building entryways is *not so unsafe* as to necessitate remediation.

[3] If anything, evidence of the inapplicable state building code is relevant to show that the defendant did not act unreasonably in failing to replace the entryway's annealed glass.

---

[1] The former standard requires owners of regulated premises to refrain from using annealed glass in entryway sidelites whereas the latter standard does not require any particular improvement to exempted premises.

[2] The majority, after reciting the qualifications of the professionals responsible for adopting and administering the state building code, asserts that "the building code reflects the reasoned judgment of numerous professionals with extensive relevant experience that in the interests of safety the use of annealed glass in the entryway of buildings should be

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 115 of 253

Page 34 of 37

279 Conn. 830, *876; 905 A.2d 70, **99; 2006 Conn. LEXIS 323, ***75

quite sure myself what the line is between giving effect to the regulation and considering it as evidence of negligence." *Id., 978* (Prettyman, J., dissenting); see also *Ellis v. Caprice, 96 N.J. Super. 539, 553, 233 A.2d 654 (App. Div.)* (any probative value of evidence of statute purportedly establishing standard of conduct was outweighed by possibility of prejudice), cert. denied, *50 N.J. 409, 235 A.2d 901 (1967)*; *Trimarco v. Klein, 56 N.Y.2d 98, 108, 436 N.E.2d 502, 451 N.Y.S.2d 52 (1982)* ("it cannot be said that [nonretroactive] statutes, once injected into the adversarial conflict, did not prejudice the defendants"). This likelihood of confusion underlies Professor Wigmore's opposition to the use of statutory standards in any context other than those involving the rule of negligence per se. 2 J. Wigmore, Evidence (Chadbourn Rev. Ed. 1979) § 461, pp. 606-607. For this additional reason, the trial court's consideration of evidence of the state building code was improper.

Finally, policy considerations militate against the admission of this evidence. [***76] The drafters of the state building code expressly exempted certain premises, [*877] including the premises at issue in the present case, from regulation. The law, however, requires a person not to do that which is negligent-including, apparently, failing to replace exempted uses of annealed glass in entryway sidelites. See *Curtis v. District of Columbia, supra, 363 F.2d 978* (Prettyman, J., dissenting). Thus, in permitting the state building code to inform a property owner's standard of care, the majority effectively expands the regulatory force of the code far beyond what its drafters intended. [4] The

majority makes much of its distinction between using the building code as a substantive standard and using it as evidence of the standard of care. This distinction, however, is cold comfort to the owner of an exempted premises who nonetheless will be required either "to reconstruct and remodel his building to meet changing safety standards" [**100] on an ongoing basis or to take his chances with a jury. [5] *Coleman v. Hall, 161 N.W.2d 329, 331 (Iowa 1968)*; see also *Curtis v. District of Columbia, supra, 977-78* (Prettyman, J., dissenting). The majority's [***77] usurpation of the function of the drafters of the state building code to promulgate rules for the construction and use of buildings is another reason to preclude evidence of an inapplicable building code from informing an exempted property owner's standard of care.

[***78] My position is supported by this court's decision in *Dinnan v. Jozwiakowski, 156 Conn. 432, 242 A.2d 747 [*878] (1968)*. The majority states that, in that case, this court "did not reject the trial court's instruction that [an inapplicable] building code could be considered in evaluating expert testimony regarding the standard of care" and that "*Dinnan* precludes a jury instruction that a technically inapplicable building code must be considered as *the* standard of care, or, stated another way, a violation of this building code would not have constituted negligence per se." (Emphasis in original.)

_____

evidence of the standard of care will be offered beyond the inapplicable building code, it is unclear whether the majority would *require* evidence of the standard of care in addition to the evidence of the inapplicable building code.

[5] The majority disagrees that its decision "signals that an owner of exempt property will be held negligent for failing to remodel his or her building to conform with otherwise inapplicable building code standards." Footnote 20 of the majority opinion. This, however, is precisely what has happened in the present case as a consequence of the majority's decision.

_____

[4] This rationale is particularly persuasive when an inapplicable building code is the *only* evidence of the standard of care. Although the majority, in stating that "the trial court properly considered the building code and the federal regulations as some evidence of the standard of care," implies that additional

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 116 of 253

Page 35 of 37

279 Conn. 830, *878; 905 A.2d 70, **100; 2006 Conn. LEXIS 323, ***78

These statements, although accurate, are nonetheless misleading because the issues of whether an inapplicable building code may be considered in impeaching expert testimony and whether an inapplicable building code can support a negligence per se instruction were not contested in *Dinnan* and are not contested in the present case. I interpret *Dinnan* to stand for the more pertinent proposition that, although evidence of an inapplicable building code may be used to impeach a witness, it may not be used for the substantive standards that the code establishes. This **[\*\*\*79]** *was* the issue that this court decided in *Dinnan*.

In *Dinnan*, a tenant was injured when she fell down the staircase of a building owned by the defendant, Stanislawa Jozwiakowski. *Id., 433*. The staircase appeared to be in compliance with the local building code. See *Dinnan* v. *Jozwiakowski*, Conn. Supreme Court Records & Briefs, April Term, 1968, Pt. A-479, Record pp. 15, 17. The staircase nevertheless was exempt from the code because it had been constructed prior to the code's enactment. See *Dinnan v. Jozwiakowski, supra, 156 Conn. 436*. At trial, Henry J. Falsey, a former local building inspector, testified for the tenant that the staircase was not reasonably safe. *Dinnan v. Jozwiakowski, Conn. Supreme Court Records & Briefs, supra*, Appendix to Plaintiff's Brief p. 6a. On cross-examination, the building owner introduced testimony regarding the local building code-which Falsey himself **[\*879]** had been "primarily responsible for preparing"-in an apparent attempt to impeach Falsey's testimony that the staircase was not reasonably safe. Id., Appendix to Defendant's Brief p. 4a. The trial court instructed the jury that the testimony regarding **[\*\*\*80]** the local building code was admitted "for the purpose of testing the soundness of the opinions given by [Falsey]." Id., Record p. 29. The trial court made it clear, however, that no party was claiming "that

there [was] any violation of the building code in [the] case because it seem[ed] to be undisputed that the code was enacted sometime after [the] building was erected." Id.

On appeal, the building owner argued that the jury should have been instructed to consider the inapplicable local building **[\*\*101]** code not only for impeachment purposes but also for the standards it established, presumably because the building owner believed that her compliance with the code, at least with respect to the staircase at issue, would support her case. Id., Defendant's Brief pp. 6-7 ("[T]he [c]ode must be considered with respect to the standards of safety it sets up. . . . [T]he jury should have been charged on its consideration of the standards established in the [c]ode."). This court rejected the building owner's argument, however, reasoning that "[t]here was no claim of any violation of the building code since it was enacted after the building was erected. Under the circumstances, **[\*\*\*81]** the [building owner] certainly ha[d] no ground to complain of the court's charge that the evidence as introduced in this connection was for the purpose of testing the soundness of the opinions given by the experts." (Internal quotation marks omitted.) *Dinnan v. Jozwiakowski, supra, 156 Conn. 436*. The rule established in *Dinnan* is both clear and directly pertinent to the present case: Although an inapplicable building code may be used to impeach a witness, it may not be used for the substantive standards it establishes, even when the **[\*880]** proponent seeks to establish that his or her premises are in compliance with the inapplicable code.

II

Even if an inapplicable building code is admissible as evidence of the defendant's standard of care, the plaintiff still failed to meet his burden of demonstrating the defendant's negligence insofar as he failed to offer

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 117 of 253

Page 36 of 37

279 Conn. 830, *880; 905 A.2d 70, **101; 2006 Conn. LEXIS 323, ***81

any evidence that the defendant had notice of any defect in the premises. [6]

[***82] A plaintiff bears the burden of proving the allegations in his or her complaint. E.g., *Rivera v. Meriden, 72 Conn. App. 766, 769, 806 A.2d 585 (2002)*. In the present case, the plaintiff's burden includes making out a prima facie case of the defendant's negligence. A prima facie case of negligence consists of four elements: duty; breach; causation; and injury. E.g., *Jagger v. Mohawk Mountain Ski Area, Inc., 269 Conn. 672, 687 n.13, 849 A.2d 813 (2004)*. There can be no breach, however, unless the defendant "had actual knowledge of the defect [in the premises] or . . . [was] chargeable with constructive notice of it, because, had [the defendant] exercised a reasonable inspection of the premises, [it] would have discovered [the defect]." *Pollack v. Gampel, 163 Conn. 462, 468, 313 A.2d 73 (1972)*.

The majority opinion rests on the premise that the mere presence of annealed glass in the entryway sidelite was an unsafe defect requiring replacement or warning. The plaintiff, however, has failed to demonstrate the defendant's constructive notice that the sidelite was composed of annealed glass insofar as he has failed [***83] to offer evidence "from which the jury reasonably could have concluded that a reasonable inspection would [*881] have disclosed the [fact that the sidelite was composed of annealed glass]." *Id., 470*.

Shanok testified-and the majority apparently agrees-that the hazard posed by the use of annealed glass in the sidelite could have been discovered if the defendant had engaged in the process of risk management, "which is simply the inspection of premises to locate hazards and

deal with them so that you lessen the possibility of liability or accidents . . . ." The logic of this position under the circumstances of [**102] the present case is untenable. Annealed glass is indistinguishable from safety glass in appearance, and the plaintiff offered no evidence that the pane through which he fell was etched or otherwise marked as annealed glass. [7] [***86] See,

---

[7] The majority states that "the record contains no evidence to support [my] assertion that a visual inspection cannot distinguish between annealed and toughened glass." Footnote 23 of the majority opinion. The majority, however, fails to appreciate that the record contains no evidence to support the assertion that a visual inspection-or, indeed, any reasonable inspection-*can distinguish* between annealed and toughened glass. In so doing, the majority misplaces the burden of proof. It was incumbent on the plaintiff to demonstrate that reasonable inspection of the defendant's premises would have put the defendant on notice of the presence of annealed glass in the entryway. The plaintiff has not met this burden.

Moreover, even though the standard of review requires us to view the evidence in the light most favorable to sustaining the verdict, drawing reasonable inferences therefrom, it can hardly be said that any reasonable inference can be drawn from Shanok's conclusory opinion testimony, which was not grounded in facts and did not contain any reasons in support of his opinion.

Finally, the majority's assertion that "the record would support an inference that visual inspection would reveal the distinction between [annealed and safety] glass" is disingenuous. Id. Although it is true that Joseph A. Geary, the defendant's deputy director of public works, testified that the glass appeared to be "regular" glass, he also testified that he "[did not] know, you know, the technical version of what type of glass was in that door . . . ." Moreover, Geary testified that the pieces of glass he observed upon arriving at the scene the night of the accident were "smaller pieces of glass" and that the broken glass "appeared to be in smaller pieces than when safety glass would break." Geary testified after Shanok had testified that annealed glass "has a [tendency] to break in large shards," while safety glass "would break into small cubes

---

[6] The plaintiff does not claim that the defendant had actual notice that the sidelite was composed of annealed glass. He only claims that the defendant had constructive notice thereof.

279 Conn. 830, *881; 905 A.2d 70, **102; 2006 Conn. LEXIS 323, ***86

[*882] e.g., *Becker v. IRM Corp., 38 Cal.3d 454, 469, 698 P.2d 116, 213 Cal.Rptr. 213 (1985)* ("the undisputed affidavits are to the effect that there was 'no visible difference between the tempered and untempered glass in terms of visible appearance'"); *Trimarco v. Klein, supra, 56 N.Y.2d 102* ("the [glass] [***84] door [of a bathtub that shattered], which turned out to have been made of ordinary glass variously estimated as one sixteenth to one quarter of an inch in thickness, *concededly would have presented no different appearance to the plaintiff . . . than did tempered safety glass*" [emphasis added]). Indeed, the plaintiff himself testified that "[i]t didn't appear that there was anything wrong with the glass" of the sidelite before he fell into it. Moreover, Joseph A. Geary, the defendant's deputy director of public works, testified that the documents and records available to him did not indicate what type of glass was used in the entryway sidelite. [8] In the absence of any indication of the type of glass used in the pane, an inspector would have had to shatter the pane in order to determine whether it was composed of annealed glass. This simply is not a reasonable inspection to require a property owner to perform. See *Fitzgerald v. Cestari, 569 So. 2d 1258, 1260 (Fla. 1990)* ("the dangerous condition, in this case a lack of safety glass [in a sliding door], was not discoverable through a reasonable inspection by the owners"). But cf. *Becker v. IRM Corp., supra, 469* [***85] (reversing judgment in favor of defendant because jury could have found that reasonable visual inspection by defendant would have disclosed [**103] that injury causing glass was marked "untempered"). Because the plaintiff has offered no evidence to demonstrate how a reasonable inspection would have put the defendant on notice of the presence of annealed glass on its premises, I [*883] must conclude that the plaintiff has failed to meet his burden of proving the allegations contained in his complaint.

I respectfully dissent and would reverse the judgment of the trial court.

_____

End of Document

_____

. . . ." The majority, in attempting to use Geary's testimony to support an inference regarding the type of glass in the entryway, once again cherry-picks isolated fragments of Geary's testimony without regard to the full extent of his testimony.

[8] Geary also testified that the glass had not been broken, repaired or replaced since the clubhouse's construction in 1962.

Ben Levites

 Caution

As of: March 17, 2022 2:37 AM Z

# *D'Amico v. City of New York*

United States Court of Appeals for the Second Circuit

November 18, 1997, Argued ; January 7, 1998, Decided

Docket No. 97-7273

**Reporter**

132 F.3d 145 *; 1998 U.S. App. LEXIS 113 **

VITO D'AMICO, Firefighter, Plaintiff-Appellant, v. THE CITY OF NEW YORK; JOSEPH F. BRUNO, Former Fire Commissioner; CARLOS RIVERA, Current Fire Commissioner, The City of New York; THOMAS DUNPHY, Lieut.; MATTHEW MURTAGH, Deputy Asst. Chief; PATRICIA BARTELS, Asst. Fire Commissioner, Defendants-Appellees.

**Subsequent History:** Certiorari Denied June 1, 1998, Reported at: *1998 U.S. LEXIS 3690*.

**Prior History: [**1]** Appeal from a judgment of the United States District Court for the Southern District of New York, Thomas P. Griesa, Chief Judge, granting defendants' motion for summary judgment and dismissing complaint alleging that the defendants violated the Rehabilitation Act of 1973 when they dismissed plaintiff from his position with the Fire Department of the City of New York.

**Disposition:** District court's grant of defendants' motion for summary judgment AFFIRMED.

## Core Terms

cocaine, Rehabilitation, disability, firefighter, prima facie case, accommodation, handicap, terminated, substance abuser, summary judgment

## Case Summary

**Procedural Posture**

Appellant firefighter sought review of a decision by the United States District Court for the Southern District of New York, which granted summary judgment to appellees, a city and its officials, in appellant's complaint alleging that defendants violated the Rehabilitation Act of 1973 when they dismissed him from his position with the city fire department.

**Overview**

Appellant was fired for using cocaine. Appellant sought review of the dismissal, claiming appellees violated the Rehabilitation Act of 1973. The trial court granted appellees' request for summary judgment, and appellant sought review of that decision. The court affirmed the dismissal, holding that an issue of material fact existed as to whether appellant was a current substance abuser at the time of the dismissal within the meaning of the Rehabilitation Act and therefore whether appellant satisfied the prong showing that appellant was a disabled individual. The court held that appellant's history of cocaine addiction, together with appellees' judgment as to the possibility of, and the risks inherent in, a relapse, justified appellees' decision to terminate appellant's employment. The court held that appellant offered no evidence to indicate that he was otherwise

qualified to serve as an active firefighter, had not sought any accommodation from appellees for his disability, nor did he seek to be placed in any other job with appellees. The court held that appellant did not establish a prima facie case of discrimination.

## Outcome

The court affirmed the grant of summary judgment to appellees, city and officials, because although appellant firefighter proved a disability, appellant failed to show he was otherwise qualified to be a firefighter and that he had sought accommodation from appellees for his disability.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > Appeals > Summary Judgment Review > General Overview

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

*HN1*[⬇] Summary Judgment, Entitlement as Matter of Law

The appellate court reviews a district court's grant of summary judgment de novo. The court utilizes the same standard as the district court: summary judgment is

appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful. The court must draw all inferences in favor of the non-moving party. A court may grant summary judgment only when no rational jury could find in favor of the non-moving party.

Evidence > Burdens of Proof > Allocation

Evidence > Burdens of Proof > Initial Burden of Persuasion

Evidence > Burdens of Proof > Ultimate Burden of Persuasion

Business & Corporate Compliance > ... > Discrimination > Disability Discrimination > Rehabilitation Act

*HN2*[⬇] Burdens of Proof, Allocation

The plaintiff in a suit brought under the Rehabilitation Act of 1973 bears the initial burden of establishing a prima facie case under the Act. The burden then shifts to the employer. In a case where the employer relies on the plaintiff's handicap as the reason for the adverse employment decision, the employer must rebut the inference that the handicap was improperly taken into account by going forward with evidence that the handicap is relevant to qualifications for the position. The plaintiff bears the ultimate burden of proving by a preponderance of the evidence that he is qualified for the position despite his disability.

Business & Corporate

Compliance > ... > Discrimination > Disability Discrimination > Rehabilitation Act

*HN3*[ ] Disability Discrimination, Rehabilitation Act

The Rehabilitation Act of 1973 provided that no otherwise qualified individual with handicaps shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. *29 U.S.C.S. § 794(a)*. To establish a prima facie case of employment discrimination under the Rehabilitation Act of 1973, a plaintiff must prove that: (1) he is an "individual with a disability," (2) he was "otherwise qualified" for a position, (3) he was denied that position on the basis of his disability, and (4) the employer receives federal funds.

Business & Corporate
Compliance > ... > Discrimination > Disability Discrimination > Rehabilitation Act

*HN4*[ ] Disability Discrimination, Rehabilitation Act

Substance abuse is a recognized disability for purposes of the Rehabilitation Act of 1973, and an employer may violate the Act by taking an adverse employment action against an employee who has overcome past substance abuse problems.

Business & Corporate
Compliance > ... > Discrimination > Disability Discrimination > Rehabilitation Act

*HN5*[ ] Disability Discrimination, Rehabilitation Act

See *29 U.S.C.S. § 706(8)(C)*.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > General Overview

*HN6*[ ] Disability Discrimination, Scope & Definitions

An individual is otherwise qualified for a position if he is able to perform the essential functions of the position, with or without a reasonable accommodation.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > General Overview

*HN7*[ ] Disability Discrimination, Scope & Definitions

The determination of whether the employee is otherwise qualified as of the date of termination is based on a prospective comparison of the employee's ability to perform and the abilities of non-disabled individuals to perform. The likelihood of relapse is relevant to the determination of whether an individual is otherwise qualified, even if he is not a "current" substance abuser. To evaluate whether an employee with a disability is otherwise qualified, there are a number of factors to consider. But, the inquiry essentially boils down to examining what conduct is symptomatic of the handicap, what conduct the job in question requires, and how these two interact. A court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position.

**Counsel:** F.W. MEEKER, JR., Richard A. Glovin, Of Counsel, New York, NY, for Plaintiff-Appellant.

PAUL A. CROTTY, Corporation Counsel of the City of New York, Deborah R. Douglas, Kristen M. Helmers, Of Counsel, New York, NY, for Defendants-Appellees.

**Judges:** Before: KEARSE, CARDAMONE, Circuit Judges, and LEISURE, District Judge. [*]

**Opinion by:** PETER K. LEISURE

# Opinion

 [*148]  LEISURE, District Judge:

Vito D'Amico, plaintiff in the underlying action, appeals from a judgment of the United States District Court for the Southern District of New York (Griesa, C.J.), granting defendants' motion for summary judgment and dismissing [**2]  D'Amico's Complaint alleging that the defendants violated the Rehabilitation Act of 1973 when they dismissed him from his position with the Fire Department of the City of New York ("FDNY"). For the reasons stated below, the judgment of the district court is affirmed.

## BACKGROUND

D'Amico joined the FDNY in 1982. In 1987, he began to use cocaine. He started by using cocaine once per week, but by 1988, he either snorted or smoked cocaine almost daily. In April 1988, D'Amico was arrested for assault, possession of a controlled substance, and resisting arrest. Following this arrest, the FDNY referred D'Amico to counseling within the FDNY, but D'Amico did not at that time reveal the extent of his cocaine habit to his counselor. [1]

In September 1988, the FDNY received an anonymous letter accusing D'Amico of using and selling cocaine. The FDNY ordered D'Amico to submit to a urine test on

---

[*] Hon. Peter K. Leisure, United States District Judge for the Southern District of New York, sitting by designation.

[1] The charges stemming from this arrest were dropped on or about July 26, 1988.

or about December 13, 1988. D'Amico [**3]  tested positive for cocaine and the FDNY suspended him without pay. The FDNY lifted D'Amico's suspension in January, 1989, pending the outcome of disciplinary proceedings, reassigned him to light duty in February 1989, referred D'Amico to FDNY counseling, and arranged for him to enter an intensive outpatient drug treatment program at Smithers Alcoholism Treatment and Training Center ("Smithers").

Smithers informed the FDNY on April 7, 1989, that the facility had discharged D'Amico for failure to comply with his treatment agreement. Smithers's letter to the FDNY noted that D'Amico had engaged in "inappropriate behavior," and was absent from treatment for over a week. Smithers's internal record states that D'Amico admitted using alcohol on one occasion and cocaine on another occasion, during the course of the program. D'Amico vehemently denies using alcohol or cocaine during this period, and claims that he was drug-free from December 14, 1988, to the time of his discharge from the FDNY.

During this period, the FDNY charged D'Amico with four violations of FDNY Regulations. Charge 1 alleged that D'Amico was "absent without leave" on September 21, 1988, when he failed to report to the [**4]  Bureau of Health Services. Charge 2 alleged that this absence violated his oath of office. Charge 3 alleged that on or about December 13, 1988, D'Amico used a controlled substance prohibited by New York Penal Law, in violation of the FDNY Regulations. Charge 4 alleged that the use of cocaine on or about December 13, 1988, violated an All Units Circular of the FDNY.

On March 14, 1989, the FDNY notified D'Amico that a pre-trial conference would be held on March 30 regarding the disciplinary charges. At the conference, D'Amico allegedly  [*149]  knowingly and falsely stated that he had not been discharged from Smithers. This

Ben Levites

statement formed the basis of the fifth charge brought against him in June 1989.

D'Amico returned to Smithers and entered an inpatient drug treatment program on April 17, 1989. D'Amico successfully completed the program on May 15, 1989. Smithers then informed the FDNY of D'Amico's completion.

Administrative Law Judge Ray Fleischhacker presided over a hearing on the disciplinary charges on June 23, 1989. [2] Judge Fleischhacker found D'Amico guilty of Charges 1-4, and not guilty of Charge 5. Judge Fleischhacker recommended that the FDNY terminate D'Amico because of his cocaine **[\*\*5]** use. On September 8, 1989, Fire Commissioner Joseph Bruno terminated D'Amico, effective September 5, 1989. Commissioner Bruno stated:

> In light of the grave responsibilities entrusted to a firefighter, the Respondent's continued employment with the Fire Department presents a significant risk, both to the general public and to his fellow firefighters.

D'Amico commenced this action on August 28, 1992, alleging that the FDNY violated the Rehabilitation Act of 1973 and Title 42, United States Code ("U.S.C."), Section 1983. Following discovery, Chief Judge Thomas P. Griesa granted the defendants' motion for summary judgment on all of the plaintiff's claims. See *D'Amico v. City of New York, 955 F. Supp. 294 (S.D.N.Y. 1997)*. D'Amico appeals the court's determinations regarding his claims under the Rehabilitation **[\*\*6]** Act.

## DISCUSSION

---

[2] Pursuant to Section 15-113 of the New York City Administrative Code, hearings to determine if a firefighter has violated the FDNY Regulations are conducted by an Administrative Law Judge.

## I. Standard for Appellate Review

*HN1*[⬆] ] The Court of Appeals reviews a district court's grant of summary judgment *de novo*. See *Iacobelli Constr., Inc. v. County of Monroe, 32 F.3d 19, 23 (2d Cir. 1994)*; see also *Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 721 (2d Cir. 1994)*; *Taggart v. Time Inc., 924 F.2d 43, 45-46 (2d Cir. 1991)*. The Court utilizes the same standard as the district court: summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful. See, e.g., *Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir. 1997)*; *Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996)*; *Lipton v. Nature Co., 71 F.3d 464, 469 (2d Cir. 1995)*. The Court must draw all inferences in favor of the non-moving party. See *Heilweil, 32 F.3d at 721*; see also *Taggart, 924 F.2d at 46*. A court may grant summary judgment only **[\*\*7]** when no rational jury could find in favor of the non-moving party. See *Heilweil, 32 F.3d at 721*; see also *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)*.

## II. Burden of Proof Under the Rehabilitation Act

*HN2*[⬆] ] The plaintiff in a suit brought under the Rehabilitation Act bears the initial burden of establishing a *prima facie* case under the Act. See *Heilweil, 32 F.3d at 722*. The burden then shifts to the employer. In a case where the employer relies on the plaintiff's handicap as the reason for the adverse employment decision, the employer must "rebut the inference that

the handicap was improperly taken into account by going forward with evidence that the handicap is relevant to qualifications for the position." *Doe v. New York Univ., 666 F.2d 761, 776 (2d Cir. 1981)*; see also *Heilweil, 32 F.3d at 722* (quoting *Doe*). The plaintiff bears the ultimate burden of proving by a preponderance of the evidence that he is qualified for the position despite his disability. See *Teahan v. Metro-North Commuter R.R. Co., 951 F.2d 511, 515 (2d Cir. 1991)*; see also *Heilweil, 32 F.3d at 722*.

### III. Plaintiff's *Prima Facie*  [**8]  Case

*HN3*[⬆] The Rehabilitation Act, at the time of the events at issue here, provided that "no [*150] otherwise qualified individual with handicaps . . . shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." *29 U.S.C. § 794(a) (1988)*. To establish a *prima facie* case of employment discrimination under the Rehabilitation Act, a plaintiff must prove that: (1) he is an "individual with a disability," (2) he was "otherwise qualified" for a position, (3) he was denied that position on the basis of his disability, and (4) the employer receives federal funds. See *Borkowski v. Valley Centr. Sch. Dist., 63 F.3d 131, 135 (2d Cir. 1995)*; see also *Heilweil, 32 F.3d at 722*; *Doe, 666 F.2d at 774-75*.

The parties agree that D'Amico satisfies prongs (3) and (4) of the *prima facie* case; the FDNY receives federal funding and terminated D'Amico based upon his cocaine use. The parties disagree about whether D'Amico is an "individual with a disability," and whether he is "otherwise qualified" to be a firefighter.

### A.  [**9]  "Individual with a Disability"

*HN4*[⬆] Substance abuse is a recognized disability for purposes of the Rehabilitation Act, and an employer may violate the Act by taking an adverse employment action against an employee who has overcome past substance abuse problems. See *Teahan, 951 F.2d at 517, 518*. *HN5*[⬆] The Act provides:

(i) For purposes of subchapter V of this chapter, the term "individual with a disability" does not include an individual who is currently engaging in the illegal use of drugs, when a covered entity acts on the basis of such use.

(ii) Nothing in clause (i) shall be construed to exclude as an individual with a disability an individual who -

(I) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use[.]

*29 U.S.C. § 706(8)(C) (1994)*.

The relevant time for assessing whether a plaintiff is a "current substance abuser" is the time of discharge. See *Teahan, 951 F.2d at 518*. In the instant case, plaintiff was discharged on September 8, 1989. However, the Court does not utilize that date as a [**10] fixed snapshot, but rather as a guidepost from which to determine whether the employer acted with justification. A current substance abuser is an individual whose "substance abuse problem is severe and recent enough so that the employer is justified in believing that the employee is unable to perform the essential duties of his job." *Id. at 520*. The resolution of whether an individual's problem is severe and recent enough to classify him as a current substance abuser turns on the consideration of several factors, including: (1) the level of responsibility entrusted to the employee, (2) the

employer's applicable job and performance requirements, (3) the level of competence ordinarily required to perform the task in question, and (4) the employee's past performance record. See id.

The parties disagree as to the existence of D'Amico's drug use during the period between December 13, 1988, when he tested positive for cocaine, and September 8, 1989, when the FDNY terminated his employment. The FDNY claims that D'Amico admitted using alcohol and cocaine during D'Amico's first stay at Smithers, in early 1989. [3] D'Amico vehemently denies making any such statement and claims that he [**11] did not use any drugs during the time in question. Drawing all inferences in favor of D'Amico, the Court finds that an issue of material fact exists as to whether D'Amico was a current substance abuser at the time of his dismissal within the meaning of the Rehabilitation Act. As D'Amico has satisfied the prong requiring him to show that he is a disabled individual, he will have established a *prima facie* case if he also shows he is "otherwise qualified" for a position as an active firefighter.

[*151] B. "Otherwise Qualified"

As D'Amico makes a *prima facie* case that he is a disabled individual, the Court must determine if he is "otherwise qualified" for a position as an active firefighter. *HN6*[↑] An individual is otherwise qualified for a position if he is able to perform the essential functions of the position, with or without a reasonable accommodation. See *Borkowski, 63 F.3d at 135*. The Supreme Court defines an individual as "otherwise qualified" if he "is [**12] able to meet all of a [position's] requirements in spite of his handicap." *School Bd. of Nassau County v. Arline, 480 U.S. 273, 287 n.17, 94 L. Ed. 2d 307, 107 S. Ct. 1123 (1987)* (internal quotation

*HN7*[↑] ] The determination of whether the employee is otherwise qualified as of the date of termination is based on a prospective comparison of the employee's ability to perform and the abilities of non-disabled individuals to perform. See *Teahan, 951 F.2d at 521*; see also *Doe, 666 F.2d at 776*. The likelihood of relapse is relevant to the determination of whether an individual is otherwise qualified, even if he is not a "current" substance abuser. See *Teahan, 951 F.2d at 520*. To evaluate whether an employee with a disability is otherwise qualified, there are a number of factors to consider. But, the inquiry essentially boils down to examining what conduct is symptomatic of the handicap, what conduct the job in question requires, and how these two interact. See *id. at 521* ("In other words, whether conduct is job-related depends as much on the job as on the conduct."). A court must give considerable deference to an employer's judgment regarding what functions [**13] are essential for service in a particular position. See *Doe, 666 F.2d at 776*; see also *Taub v. Frank, 957 F.2d 8, 10 (1st Cir. 1992)*.

A court necessarily must consider both the type of position for which the plaintiff claims to be otherwise qualified, and the consequences of a potential mishap. In *DiPompo v. West Point Military Academy, 770 F. Supp. 887, 894 (S.D.N.Y. 1991)*, aff'd *960 F.2d 326 (2d Cir. 1992)*, Judge Michael B. Mukasey cogently observed, "What may be a reasonable risk for a postal worker . . . whose job generally does not pose great hazards to those who perform it or to the public they serve, is not necessarily a reasonable risk for a firefighter, whose job is defined at almost every turn by the potential for disaster to himself and others." The demands placed upon a firefighter are unique and extreme, and the job of firefighter is dangerous and difficult, even without outside variables such as cocaine

---

[3] Smithers discharged D'Amico on March 27, 1989.

132 F.3d 145, *151; 1998 U.S. App. LEXIS 113, **13

use. Any lapse in judgment or alertness easily could result in injury or death to the victims of the fire, to other firefighters, and to the firefighter himself.

D'Amico's history of cocaine addiction, together with the FDNY's judgment as to the possibility [**14] of, and the risks inherent in, a relapse, justified the FDNY's decision to terminate his employment. By his own admission, D'Amico engaged in drug usage following his dismissal, which is the precise problem the FDNY feared. [4] "Where the issue to be decided is the likelihood that an event will occur, the fact that it did occur is perhaps the most probative evidence possible." *Hogarth v. Thornburgh, 833 F. Supp. 1077, 1087 (S.D.N.Y. 1993)*. D'Amico has offered no evidence to indicate that he was otherwise qualified to serve as an active firefighter, he has not sought any accommodation from the FDNY for his disability, nor does he seek to be placed in any other job within the FDNY. A plaintiff bears the initial burden of showing that he can perform the essential functions of the job with a reasonable accommodation or no accommodation. See *Borkowski, 63 F.3d at 138*; see also *Gilbert v. Frank, 949 F.2d 637, 642 (2d Cir. 1991)*. "It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits. Once the plaintiff has done this [he] has made out a *prima facie* showing that a reasonable accommodation [**15] is available, and the risk of nonpersuasion falls on the defendant." *Borkowski, 63 F.3d at 138*; [*152] see also *Gilbert, 949 F.2d at 642*. As D'Amico has not suggested any accommodation, he fails to make a *prima facie* showing that one exists. D'Amico thus has not established a *prima facie* case of discrimination under the Rehabilitation Act. His claim must fail; the judgment of

the district court was correct.

## CONCLUSION

For the reasons stated above, the district court's grant of the defendants' motion for summary judgment is AFFIRMED.

---

End of Document

---

[4] D'Amico admits using cocaine in December 1989, following his completion of the Smithers program and his termination from the FDNY.

Ben Levites

 Positive

As of: March 17, 2022 2:37 AM Z

## *DiPietro v. Farmington Sports Arena, LLC*

Supreme Court of Connecticut

April 19, 2012, Argued; August 28, 2012, Officially Released

SC 18726

**Reporter**

306 Conn. 107 *; 49 A.3d 951 **; 2012 Conn. LEXIS 323 ***; 2012 WL 3568483

KAREN DIPIETRO v. FARMINGTON SPORTS ARENA, LLC, ET AL. KAREN DIPIETRO v. DIMENSIONAL TECHNOLOGY GROUP, LLC, ET AL.

**Prior History: [***1]** Actions, in two cases, to recover damages for personal injuries sustained as a result of the defendants' alleged negligence, and for other relief, brought to the Superior Court in the judicial district of Hartford and transferred to the Complex Litigation Docket; thereafter, the action in the second case was withdrawn as against the defendant Farmington Sports, Inc.; subsequently, the court, Berger, J., consolidated the cases, granted the defendants' motions for summary judgment and rendered judgment thereon in each case; thereafter, the court denied the plaintiff's motion for reargument and for reconsideration, and the plaintiff appealed to the Appellate Court, Bishop, Beach and Borden, Js., which affirmed in part and reversed in part the trial court's judgments and remanded the case for further proceedings, and the defendants, on the granting of certification, appealed to this court.

*DiPietro v. Farmington Sports Arena, LLC, 123 Conn. App. 583, 2 A.3d 963, 2010 Conn. App. LEXIS 414 (2010)*

**Disposition:** Reversed; judgment directed.

## Core Terms

surface, carpet, notice, indoor soccer, playing, testing, summary judgment, constructive notice, defendants', dangerous condition, inspection, installed, soccer, Arena, genuine issue of material fact, hazardous condition, affirmative act, no evidence, facilities, regulation, scientific, invitee, Sports, safe, inherently dangerous, premises liability, industry standard, unsafe condition, business owner, floor

## Case Summary

### Procedural Posture

Defendants, owner, manager, and controlling member, appealed a judgment by the Appellate Division (Connecticut) that reversed the trial court's grant of summary judgment in their favor in plaintiff mother's action for injuries to her child at their indoor soccer arena.

### Overview

The mother sought to recover damages for personal injuries sustained by her child when she fell after her foot stuck to the carpeted playing surface during a soccer game at the defendants' facility. The state supreme court found, inter alia, that the mother did not produce any evidence from which a jury could

306 Conn. 107, *107; 49 A.3d 951, **951; 2012 Conn. LEXIS 323, ***1

reasonably conclude that the defendants had notice of the allegedly dangerous condition and failed to take reasonable steps to remedy it. There was no evidence of previous complaints about the carpet, or any history of soccer injuries due to that type of playing surface. A visual inspection would not have revealed the alleged dangerousness. No government or industry standards prohibited the use of the carpet for indoor soccer. Although plaintiff's expert witness testimony was relevant to the cause of the injury, it did not provide a basis for charging the defendants with constructive notice of the inherent dangerousness of the surface. The defendants' choice of the carpet was not an affirmative act of negligence from which knowledge of its inherent dangerousness could be inferred without extensive scientific testing. Therefore, the defendants were entitled to summary judgment.

**Outcome**

The judgment was reversed, and the case was remanded for further proceedings.

# LexisNexis® Headnotes

Civil Procedure > Appeals > Appellate Jurisdiction > Certified Questions

*HN1*[ ] **Appellate Jurisdiction, Certified Questions**

The Supreme Court of Connecticut may modify certified questions to render them more accurate in framing issues presented.

Evidence > ... > Testimony > Expert Witnesses > General Overview

Torts > ... > General Premises Liability > Dangerous Conditions > Duty to Maintain

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

Torts > ... > Duties of Care > Duty On Premises > Reasonable Care

*HN2*[ ] **Testimony, Expert Witnesses**

The standard of care in any premises liability action is defined generally by law as the duty to keep the premises in a reasonably safe condition; therefore, expert testimony is not required to establish it. This duty is bounded, however, by the traditional requirement that a defendant must have actual or constructive notice of a dangerous condition on its premises before being required to remedy it. Notice can be proven in a number of ways, including by expert testimony as to what the defendant ought to have known.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN3*[ ] **Entitlement as Matter of Law, Genuine Disputes**

*Conn. Gen. Prac. Book, R. Super. Ct. § 17-49* provides that summary judgment shall be rendered forthwith if the pleadings, affidavits, and any other proof submitted

306 Conn. 107, *107; 49 A.3d 951, **951; 2012 Conn. LEXIS 323, ***1

show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

*HN4*[↓] **Entitlement as Matter of Law, Appropriateness**

In deciding a motion for summary judgment, a trial court must view the evidence in a light most favorable to the nonmoving party.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

*HN5*[↓] **Burdens of Proof, Movant Persuasion & Proof**

A party seeking summary judgment has the burden of showing the absence of any genuine issue of material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law, and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. A material fact is a fact which will make a difference in the result of the case.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

*HN6*[↓] **Standards of Review, De Novo Review**

The scope of review of the trial court's decision to grant a motion for summary judgment is plenary.

Torts > ... > Duty On Premises > Invitees > Business Invitees

Torts > ... > General Premises Liability > Dangerous Conditions > Duty to Maintain

Torts > ... > Duties of Care > Duty On Premises > Reasonable Care

*HN7*[↓] **Invitees, Business Invitees**

A business owner owes its invitees a duty to keep its premises in a reasonably safe condition.

Torts > ... > General Premises Liability > Dangerous Conditions > Duty to Warn

Torts > ... > Duty On Premises > Invitees > General Overview

*HN8*[↓] **Dangerous Conditions, Duty to Warn**

A possessor of land must warn an invitee of dangers that the invitee could not reasonably be expected to discover.

Torts > ... > Duty On Premises > Invitees > Business Invitees

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

*HN9*[↓] **Invitees, Business Invitees**

For a plaintiff to recover for the breach of a duty owed to

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 130 of 253

Page 4 of 17

306 Conn. 107, *107; 49 A.3d 951, **951; 2012 Conn. LEXIS 323, ***1

him as a business invitee, it is incumbent upon him to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused his injury or constructive notice of it. The notice, whether actual or constructive, must be notice of the very defect that occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it.

Torts > ... > Duty On
Premises > Invitees > Business Invitees

Torts > ... > General Premises Liability > Dangerous
Conditions > Known Dangers

*HN10*[⬇] Invitees, Business Invitees

In the absence of allegations and proof of any facts that would give rise to an enhanced duty, a defendant is held to the duty of protecting its business invitees from known, foreseeable dangers.

Torts > ... > Duty On
Premises > Invitees > Business Invitees

Torts > ... > General Premises Liability > Dangerous
Conditions > Known Dangers

*HN11*[⬇] Invitees, Business Invitees

Business owners do not breach their duty to invitees by failing to remedy a danger unless they had actual or constructive notice of that danger.

Civil Procedure > ... > Summary
Judgment > Burdens of Proof > Nonmovant
Persuasion & Proof

Torts > ... > General Premises Liability > Dangerous
Conditions > Known Dangers

Torts > ... > Duties of Care > Duty On
Premises > Reasonable Care

*HN12*[⬇] Burdens of Proof, Nonmovant Persuasion & Proof

To defeat a motion for summary judgment in a case based on allegedly defective conditions, a plaintiff has the burden of offering evidence from which a jury reasonably could conclude that the defendant had notice of the condition and failed to take reasonable steps to remedy the condition after such notice.

Torts > ... > General Premises Liability > Dangerous
Conditions > Duty to Inspect

Torts > ... > General Premises Liability > Dangerous
Conditions > Known Dangers

Torts > ... > Duties of Care > Duty On
Premises > Reasonable Care

*HN13*[⬇] Dangerous Conditions, Duty to Inspect

Business owners are chargeable with constructive notice of a dangerous condition when, had they exercised reasonable care, they would have discovered the condition. Constructive notice is triggered by a general duty of inspection or, when the dangerous condition is not apparent to the human eye, some other factor that would alert a reasonable person to the hazard.

Torts > ... > General Premises Liability > Dangerous
Conditions > Known Dangers

*HN14*[⬇] Dangerous Conditions, Known Dangers

306 Conn. 107, *107; 49 A.3d 951, **951; 2012 Conn. LEXIS 323, ***1

In a premises liability context, the words "reason to know" denote the fact that the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists.

Evidence > Inferences & Presumptions > Inferences

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

Torts > ... > Duties of Care > Duty On Premises > Reasonable Care

*HN15*[⤓]  **Inferences & Presumptions, Inferences**

In a premises liability context, longer periods of time create an inference of constructive knowledge only when the defect is discoverable by reasonable care.

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

*HN16*[⤓]  **Dangerous Conditions, Known Dangers**

In a premises liability context, in addition to obvious or discoverable dangers, constructive notice may arise from the existence of industry standards or government regulations.

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

*HN17*[⤓]  **Dangerous Conditions, Known Dangers**

In a premises liability context, industry standards provide a basis against which to measure conditions and impute constructive notice of an unreasonably unsafe condition.

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

Torts > ... > Types of Premises > Recreational Facilities > Sports Facilities

*HN18*[⤓]  **Dangerous Conditions, Known Dangers**

In a premises liability context, safety standards for sports facilities will include consideration of the available alternatives and the level of risk tolerance inherent in any sports activity. This balance mirrors the public policy of encouraging continued vigorous participation in recreational sporting activities while weighing the safety of the participants.

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

*HN19*[⤓]  **Dangerous Conditions, Known Dangers**

Because constructive notice is premised on the policy determination that under certain circumstances a person should be treated as if he had actual knowledge so that one should not be permitted to deny knowledge when he is acting so as to keep himself ignorant, the Supreme Court of Connecticut declines to impute constructive knowledge to a purchaser of a product based on a purported duty to perform scientific testing where there are no industry standards against which test results may be assessed.

Torts > ... > Duty On Premises > Invitees > Business Invitees

*HN20*[⤓]  **Invitees, Business Invitees**

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 132 of 253

Page 6 of 17

306 Conn. 107, *107; 49 A.3d 951, **951; 2012 Conn. LEXIS 323, ***1

In a premises liability context, business owners are not insurers of their customers' safety.

Torts > ... > Duty > Affirmative Duty to Act > Creators of Foreseeable Peril

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

## *HN21*[⬇] Affirmative Duty to Act, Creators of Foreseeable Peril

Under an affirmative act theory of negligence, if a plaintiff alleges that the defendant's conduct created an unsafe condition on the premises, proof of notice is not necessary.

Torts > ... > Duty > Affirmative Duty to Act > Creators of Foreseeable Peril

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

## *HN22*[⬇] Affirmative Duty to Act, Creators of Foreseeable Peril

In a premises liability context, when a defendant itself has created a hazardous condition, it safely may be inferred that the defendant had knowledge thereof.

Torts > ... > Duty > Affirmative Duty to Act > Creators of Foreseeable Peril

Torts > ... > General Premises Liability > Dangerous Conditions > General Overview

## *HN23*[⬇] Affirmative Duty to Act, Creators of Foreseeable Peril

In a premises liability context, there is no logical distinction between a situation in which a store owner directly creates a condition or defect, and where the owner's method of operation creates a situation in which it is reasonably foreseeable that the expectable acts of third parties will create a dangerous condition or defect.

Torts > ... > Duty > Affirmative Duty to Act > Creators of Foreseeable Peril

## *HN24*[⬇] Affirmative Duty to Act, Creators of Foreseeable Peril

In a premises liability context, affirmative act cases for injuries from negligently displayed merchandise differ from mode of operations cases chiefly in that the injury is not triggered by an intervening customer's act.

Torts > ... > Duty > Affirmative Duty to Act > Creators of Foreseeable Peril

Torts > ... > Elements > Duty > Foreseeability of Harm

## *HN25*[⬇] Affirmative Duty to Act, Creators of Foreseeable Peril

In a premises liability context, the mode of operation analysis is applicable only to those accidents that result from particular hazards that occur regularly, or are inherently foreseeable, due to some specific method of operation employed on the premises.

Torts > ... > Duty > Affirmative Duty to Act > Creators of Foreseeable Peril

## *HN26*[⬇] Affirmative Duty to Act, Creators of Foreseeable Peril

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 133 of 253

Page 7 of 17

306 Conn. 107, *107; 49 A.3d 951, **951; 2012 Conn. LEXIS 323, ***1

In a premises liability context, like the affirmative act rule, an action brought under the mode of operation rule includes an element of notice in its prima facie case.

Evidence > Inferences & Presumptions > Inferences

Torts > ... > Duty > Affirmative Duty to Act > Creators of Foreseeable Peril

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

*HN27*[⬇] Inferences & Presumptions, Inferences

In a premises liability context, the affirmative act rule creates the inference of knowledge when defendants are responsible for creating the allegedly dangerous condition.

Evidence > Inferences & Presumptions > Inferences

Torts > ... > Duty > Affirmative Duty to Act > Creators of Foreseeable Peril

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

*HN28*[⬇] Inferences & Presumptions, Inferences

In a premises liability context, the affirmative act rule permits the inference of actual notice only when the defendant or its employees created an obviously hazardous condition.

Evidence > Inferences & Presumptions > Inferences

Torts > ... > Duty > Affirmative Duty to Act > Creators of Foreseeable Peril

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

*HN29*[⬇] Inferences & Presumptions, Inferences

In a premises liability context, when a defendant itself has created a hazardous condition, it safely may be inferred that it had knowledge thereof.

Evidence > Types of Evidence > Circumstantial Evidence

Torts > ... > Duty > Affirmative Duty to Act > Creators of Foreseeable Peril

Evidence > Inferences & Presumptions > Inferences

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

*HN30*[⬇] Types of Evidence, Circumstantial Evidence

In a premises liability context, rather than acting as an alternative to notice, the affirmative act rule allows an inference of notice when circumstantial evidence shows that the defendant knew or should have known of the dangerous condition because it was a foreseeably hazardous one that the defendant itself created.

## Syllabus

The plaintiff, in two separate actions, sought to recover damages for personal injuries sustained by her minor daughter, M, while she was playing soccer at an indoor soccer arena that was managed and operated by the defendant, A Co., owned by the defendant D Co., and controlled **[***2]** by the defendant P. The plaintiff had alleged that M's injury resulted from an inherently dangerous and defective playing surface that had been

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 134 of 253

Page 8 of 17
306 Conn. 107, *107; 49 A.3d 951, **951; 2012 Conn. LEXIS 323, ***2

installed at the arena. The playing surface was a commercial grade carpet selected by P, based on his years of experience with indoor soccer, his knowledge that other indoor facilities used similar playing surfaces, and the recommendation of the carpet manufacturer's representative. At the time of M's injury in 2002, there were no industry or government standards that regulated the use of playing surfaces for indoor soccer, and the national indoor soccer association of which A Co. was a member did not prohibit the use of carpeting for indoor soccer. The carpet had been installed in 2001, and the arena was inspected and approved soon thereafter by the sanctioning authority for indoor soccer facilities in the state. A site inspection did not reveal any visible defects in the playing surface, and the coach of M's soccer team, who had prior experience with similar playing surfaces at other indoor soccer facilities, attested in an affidavit that the surface appeared to be normal and in good condition at the time of M's injury. The plaintiff did **[\*\*\*3]** not dispute that the carpet was not defective by means of installation or maintenance. The defendants moved for summary judgment, claiming that there was a lack of evidence regarding the applicable standard of care and of notice to the defendants of any defect in the playing surface. In support of her opposition to the motions, the plaintiff submitted deposition and affidavit testimony of an expert, who concluded that the carpet surface was unreasonably dangerous and unfit for use at an indoor soccer arena and that it was a substantial factor in causing M's injuries. The trial court granted the defendants' motions, concluding that the plaintiff had failed to establish genuine issues of material fact on essential elements of her premises liability actions, and rendered summary judgments in the defendants' favor. Specifically, the court held that expert testimony was required to establish the standard of care applicable to an indoor soccer arena and that the plaintiff had not produced evidence that the defendants had notice of the

alleged hazardous condition of the playing surface. On the plaintiff's appeal, the Appellate Court reversed the trial court's judgments and remanded the case **[\*\*\*4]** for further proceedings, concluding that the law applicable to premises liability claims imposed the standard of care, namely, the duty to provide and to maintain premises in a reasonably safe condition, and therefore, that expert testimony was not necessary on that issue. The Appellate Court also concluded that there was no need to prove that the defendants had notice of the unsafe condition because they were responsible for creating the condition. From the Appellate Court's judgment, the defendants, on the granting of certification, appealed to this court. Held that the Appellate Court improperly reversed the summary judgments rendered in the defendants' favor, the plaintiff having failed to produce any evidence demonstrating a genuine issue of material fact as to the essential element of notice: in order to recover on a premises liability claim, a plaintiff must allege and prove that the defendant business owner had either actual notice of the presence of the specific unsafe condition that caused the injury or constructive knowledge of it, to defeat a motion for summary judgment in an action based on allegedly defective conditions, a plaintiff has the burden of showing that the **[\*\*\*5]** defendant had notice of the condition and failed to take reasonable steps to remedy the condition after such notice, and it was undisputed that the defendants here did not have actual knowledge of the carpet's allegedly dangerous characteristics, nor did they have constructive notice of the alleged condition, as the uncontested facts of the case made it clear that a visual inspection would not have revealed the carpet's inherent dangerousness for indoor soccer; furthermore, the defendants' choice of the carpet was not an affirmative act of negligence from which knowledge of the carpet's inherent dangerousness could be inferred, there was no evidence from which a reasonable fact finder could

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 135 of 253

Page 9 of 17

306 Conn. 107, *107; 49 A.3d 951, **951; 2012 Conn. LEXIS 323, ***5

conclude that industry standards or government regulations put the defendants on constructive notice of the allegedly dangerous nature of the playing surface, and there was no evidence that the dangerous condition was or could have been foreseeable to the defendants without extensive scientific testing, or that the scope of the defendants' duties to maintain and inspect the indoor soccer arena in a reasonably safe manner extended to such testing.

**Counsel:** Kenneth J. Bartschi, with whom were Brendon P. Levesque **[***6]** and, on the brief, Karen L. Dowd, Jeffrey G. Schwartz, Christopher M. Vossler and Kevin M. Tighe, for the appellants (defendants in each case).

David G. Hill, for the appellee (plaintiff in both cases).

Robert C.E. Laney and Peter E. DeMartini filed a brief for the Connecticut Defense Lawyers Association as amicus curiae.

**Judges:** Rogers, C. J., and Norcott, Palmer, Zarella, McLachlan, Eveleigh and Harper, Js.[*] ROGERS, C. J. In this opinion the other justices concurred.

**Opinion by:** ROGERS

# Opinion

 **[**953]** **[*110]** ROGERS, C. J. The dispositive issue presented by this premises liability appeal is whether the Appellate Court correctly concluded that the plaintiff, Karen DiPietro, had established the existence of a genuine issue of material fact concerning the defendants' actual or constructive knowledge of a dangerous condition. The defendants, Farmington Sports Arena, LLC (Arena), Dimensional Technology

Group, LLC (Dimensional Technology), and Paul DiTommaso, Jr.,[1] appeal, upon our grant of certification, from the judgment of the Appellate Court reversing the trial court's rendering of summary judgments in their favor. *DiPietro v. Farmington Sports Arena, LLC, 123 Conn. App. 583, 619, 2 A.3d 963 (2010)*. **[***7]** The plaintiff brought these actions on behalf of her minor daughter, Michelle DiPietro (Michelle), alleging that Michelle had injured her ankle while playing soccer at the defendants' indoor soccer facility because the defendants negligently had installed **[*111]** a playing surface inherently dangerous **[**954]** for indoor soccer. The defendants claim that the Appellate Court improperly reversed the trial court's summary judgments because the plaintiff produced no evidence that the defendants knew of or should have known of the hazardous condition.[2] We agree with the defendants

_____

[1] Arena managed and operated the Farmington Indoor Sports Arena, the facility at issue in this appeal. Dimensional Technology owned the property. DiTommaso, along with other family members, controlled these entities.

The plaintiff also named DiTommaso Associates, LLC (Associates), as a defendant in the second case. The Appellate Court held that the trial court properly had dismissed the action against Associates on the alternate ground of res judicata. *DiPietro v. Farmington Sports Arena, LLC, 123 Conn. App. 583, 591, 2 A.3d 963 (2010)*. The Appellate Court's holding as **[***8]** to Associates is not a subject of this appeal, and Associates is not a party to the appeal.

[2] We granted the defendants' petition for certification to appeal, limited to the following questions: "(1) Did the Appellate Court properly rule that expert testimony was not required in a negligence case wherein the plaintiff claimed that the defendants had installed an inherently dangerous carpet in its indoor soccer arena, and where there was no evidence that the defendants had notice of the danger?

"(2) Did the Appellate Court properly rule that plenary review applied to the trial court's decision concerning the admissibility

_____

[*] The listing of justices reflects their seniority status on this court as of the date of oral argument.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 136 of 253

Page 10 of 17

306 Conn. 107, *111; 49 A.3d 951, **954; 2012 Conn. LEXIS 323, ***8

and, accordingly, reverse the judgment of the Appellate Court.

The pleadings and documents submitted in connection with the defendants' motions for summary judgment, and with the plaintiff's objection thereto, reveal the following undisputed facts and procedural history. On March 9, 2002, Michelle, then eleven years old, was injured while playing soccer at the defendants' facility, the Farmington Indoor Sports Arena. Michelle fell to the ground after her foot had stuck to the carpet as she was running. In her complaint, the plaintiff alleged that Michelle's fall resulted from a "dangerous and defective condition with the playing surface" and further that, as [*112] a result of the fall, Michelle had suffered a serious ankle injury that led to "difficulty walking . . . an [intermittent] inability to walk . . . severe pain and suffering . . . and accompanying mental distress and emotional anxiety."

The allegedly [***10] dangerous and defective playing surface was a commercial grade carpet selected and purchased by DiTommaso. He had selected the carpet

_____

of expert testimony in a summary judgment motion?" *DiPietro v. Farmington Sports Arena, LLC, 299 Conn. 920, 921, 10 A.3d 1053 (2010)*.

Upon closer review of the briefs and the record, we have reformulated the first certified question to reflect more accurately the issue presented. See *Rosado v. Bridgeport Roman Catholic Diocesan Corp., 276 Conn. 168, 191-92, 884 A.2d 981 (2005)* (*HN1* 🔼) "this court may modify certified questions to render them more accurate in framing issues presented"), citing *Stamford Hospital v. Vega, 236 Conn. 646, 648 n.1, 674 A.2d 821 (1996)*. Furthermore, [***9] we do not reach the second certified question because, upon review of the trial court's memorandum of decision, we conclude that, despite the trial court's stated concerns as to the admissibility of the expert's opinion, the court did consider it in ruling on the defendants' motions for summary judgment but found it to be substantively insufficient.

based on his two decades of experience with indoor soccer, his knowledge that similar playing surfaces were used in other facilities in Connecticut and the recommendation of the carpet manufacturer's representative. At that time, there were two choices for indoor soccer surfaces, the carpet at issue and synthetic Astroturf. DiTommaso preferred the carpet to Astroturf because he believed that Astroturf caused rug burn injuries and soccer balls moved more slowly over the carpet. He did not inquire with the manufacturer's representative about the safety of the carpet, compare other playing surfaces or perform any safety testing.

At the time of Michelle's injury, there were no industry or government standards regulating the use of playing surfaces for indoor soccer. The United States Indoor Soccer Association, of which Arena is a member, did not prohibit the use of carpeting for indoor soccer, and carpet commonly was used in indoor soccer facilities in Connecticut. The defendants offered testimony that the major indoor soccer league [**955] in the United States used [***11] similar carpeting.

A contractor installed the carpet over a flat concrete floor in November, 2001, and the facility was inspected and approved shortly thereafter by the Connecticut Junior Soccer Association, which sanctions commercial indoor soccer facilities. A site inspection found the playing surface to be flat and even, firmly secured to the underlying concrete surface and free of visible defects. [*113] Mike J. Brown, Michelle's soccer coach, who had prior experience with similar playing surfaces at other indoor soccer facilities, attested in an uncontroverted affidavit that the carpet was "'normal,'" "in good condition," and without "damaged areas, lumps, rolls, cuts, tears, or any other foreign objects" at the time of Michelle's injury. DiTommaso testified in his deposition that he had not received any complaints about the carpet other than the one from the plaintiff. The plaintiff does not dispute that the carpet was not

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 137 of 253

Page 11 of 17

306 Conn. 107, *113; 49 A.3d 951, **955; 2012 Conn. LEXIS 323, ***11

defective in the sense of improper installation or maintenance.

The defendants filed motions for summary judgment in both actions, claiming that they were entitled to judgment because, inter alia, there was no evidence as to the applicable standard of care and of notice [***12] to the defendants of any defect in the playing surface. In support of her opposition to summary judgment, the plaintiff submitted the deposition and affidavit of Benno M. Nigg, a professor of biomechanics and the director of the human performance laboratory in the faculty of kinesiology at the University of Calgary. Nigg's testimony concerned a report he had prepared after conducting scientific tests on the playing surface. Nigg had conducted a series of experiments using the actual shoe worn by Michelle at the time of her injury and samples of the carpet at the defendants' facility, as well as other synthetic sports surfaces, that were intended to measure the resistance between the shoe sole and the surface in the performance of various common athletic movements. The tests showed higher resistance on the carpeted surface than the synthetic surface. Nigg concluded that "[t]he flooring surface provided by the defendants was unreasonably dangerous and unfit for use at an indoor soccer arena . . . (a) [because] it produced excessive translational and rotational traction forces, which typically result in high injury frequencies, (b) because it showed significantly higher loading than [*114] synthetic [***13] sports surfaces found more frequently in sports arenas, and (c) because it created excessive forces on the foot, which can lead to ankle injuries such as the one sustained by [Michelle]. Based on the mechanism of injury described by the plaintiff, my results indicate that the surface was a substantial factor in causing [Michelle's] injuries."

When deposed by the defendants' counsel, Nigg conceded that he knew of no industry or government standards governing indoor soccer playing surfaces. He also stated that he never had managed or administered a youth indoor soccer program or indoor soccer facility. Nigg confirmed further that he had not contacted or worked with any groups or organizations that promoted indoor soccer, such as the United States Indoor Soccer Association. Despite the lack of industry standards, Nigg testified that, in his view, "what one should do when one puts a surface in is do some testing, including material testing, including subjects, and based on that testing decide on the appropriate surface." He acknowledged, however, that "[t]hat is not done typically."

The trial court granted the defendants' motions for summary judgment on two principal bases. First, the court [***14] held that expert testimony was required to establish [**956] the standard of care applicable to an indoor soccer facility, and second, that the plaintiff had not produced evidence that the defendants had notice of the alleged hazardous condition. Noting that "only the defendants have provided evidence of the standard of care and the lack of notice about the alleged, dangerous defect," the court concluded that the plaintiff had failed to establish genuine issues of material fact on essential elements of her premises liability claims. The plaintiff thereafter appealed to the Appellate Court.

The Appellate Court reversed the trial court's summary judgments rendered in favor of the defendants. [*115] Reasoning that the plaintiff's claims "[rest] on the rules of law applicable to premises liability in which the law itself imposes the standard of care, namely, the duty to provide and to maintain premises in a reasonably safe condition," the Appellate Court concluded that expert testimony was not necessary on that issue. *DiPietro v. Farmington Sports Arena, LLC, supra, 123 Conn. App. 619*. In regard to notice, the Appellate Court reasoned that "there was no need for the plaintiff to prove notice of the unsafe [***15] condition because the defendants were responsible for creating the unsafe condition." *Id., 621*. This appeal followed.

306 Conn. 107, *115; 49 A.3d 951, **956; 2012 Conn. LEXIS 323, ***15

The defendants claim on appeal that the Appellate Court improperly reversed the trial court's summary judgments in their favor. They contend that the Appellate Court improperly concluded that the plaintiff was not required to produce evidence that they were on notice of the dangerous condition. We agree that the plaintiff failed to produce evidence demonstrating a genuine issue of material fact as to the essential element of notice.[3]

We begin by setting forth the applicable standard of review. "The standards governing our review of a trial [*116] court's decision to grant a motion for summary judgment are well established. *HN3*[↑] *Practice Book [§ 17-49]* provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . *HN4*[↑] In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving [***17] party. . . . *HN5*[↑] The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an [**957] evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . . A material fact . . . [is] a fact which will make a difference in the result of the case. . . . Finally, *HN6*[↑] the scope of our review of the trial court's decision to grant the plaintiff's motion for summary judgment is plenary." (Citations omitted; internal quotation marks omitted.) *H.O.R.S.E. of Connecticut, Inc. v. Washington, 258 Conn. 553, 558-60, 783 A.2d 993 (2001).*

The relevant principles of premises liability are well established. *HN7*[↑] A business owner owes its invitees a duty to "keep its premises in a reasonably safe condition." *Baptiste v. Better Val-U Supermarket, Inc., 262 Conn. 135, 140, 811 A.2d 687 (2002).* "In addition, *HN8*[↑] the possessor of land must warn an invitee of dangers that the invitee could not reasonably be expected to discover." (Internal quotation marks omitted.) *Considine v. Waterbury, 279 Conn. 830, 859, 905 A.2d 70 (2006).* [***18] Nevertheless, *HN9*[↑] "[f]or [a] plaintiff to recover for the breach of a duty owed to [him] as [a business] invitee, it [is] incumbent upon [him] to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused [his injury] or constructive [*117] notice of it. . . . [T]he notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it. . . . *HN10*[↑] In the absence of allegations

---

[3] Intertwined with the defendants' argument that notice is lacking is a claim that the Appellate Court improperly reversed the trial court's summary judgments because the case required expert testimony on the standard of care as to indoor soccer surfaces, and the plaintiff's expert could offer no opinion in this regard, but only as to the cause of Michelle's injury. We agree with the Appellate Court that *HN2*[↑] the standard of care in any premises liability action is defined generally by law as the duty "to keep [the] premises in a reasonably safe condition"; *Baptiste v. Better Val-U Supermarket, Inc., 262 Conn. 135, 140, 811 A.2d 687 (2002)*; and, [***16] therefore, that expert testimony is not required to establish it. This duty is bounded, however, by the traditional requirement that a defendant must have actual or constructive notice of a dangerous condition on its premises before being required to remedy it. Notice can be proven in a number of ways, including by expert testimony as to what the defendant ought to have known. As we explain hereinafter, because the plaintiff did not produce *any* evidence on the essential element of notice, expert testimony or otherwise, her premises liability actions cannot survive summary judgment in the defendants' favor.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 139 of 253

Page 13 of 17

306 Conn. 107, *117; 49 A.3d 951, **957; 2012 Conn. LEXIS 323, ***18

and proof of any facts that would give rise to an enhanced duty . . . [a] defendant is held to the duty of protecting its business invitees from known, foreseeable dangers." (Citations omitted; internal quotation marks omitted.) *Baptiste v. Better Val-U Supermarket, Inc., supra, 140*.

Accordingly, *HN11*[↑] business owners do not breach their duty to invitees by failing to remedy a danger unless they had actual or constructive notice of that danger. *HN12*[↑] To defeat a motion for summary judgment in a case based on allegedly defective conditions, the plaintiff has the burden of offering evidence from which a jury reasonably could conclude that [***19] the defendant had notice of the condition and failed to take reasonable steps to remedy the condition after such notice. See *Riccio v. Harbour Village Condominium Assn., Inc., 281 Conn. 160, 164, 914 A.2d 529 (2007)* (standard on directed verdict).

In this case, it is undisputed that the defendants did not have actual notice of the carpet's allegedly dangerous characteristics. Rather, the plaintiff claims, the defendants had constructive notice of the dangerous condition of the carpet because it had been installed for approximately four months at the time of Michelle's injury. As further evidence of constructive notice, the plaintiff cites Nigg's testimony that an owner or operator of an indoor soccer arena should perform testing before installing a playing surface and claims that the defendants, had they done so, would have discovered the hazardous condition. We are not persuaded.

*HN13*[↑] Business owners are chargeable with constructive notice of a dangerous condition when, had they exercised [*118] reasonable care, they would have discovered the condition. 2 *Restatement (Second), Torts § 343* (1965). Constructive notice is triggered by a general duty of inspection or, when the dangerous condition is [***20] not apparent to the human eye,

some other factor that would alert a reasonable person to the hazard.[4] In the present case, the [**958] plaintiff produced no evidence "from which [a] jury could reasonably conclude that the defendant[s] had notice of [the allegedly dangerous] condition and failed to take reasonable steps to remedy it after such notice"; *Riccio v. Harbour Village Condominium Assn., Inc., supra, 281 Conn. 164*; and the defendants produced substantial evidence to the contrary. Although, at the time of Michelle's injury, the carpet had been installed for four months, the plaintiff does not allege that the carpet was defectively installed, or that it had lumps, tears, holes, or cuts, or that it lay unevenly at the time of the injury.[5] Brown, Michelle's soccer coach, testified that the carpet "appeared to be in good condition" at the time of Michelle's injury and was a normal surface for indoor soccer. There was no evidence of previous complaints about the surface, or any history of soccer injuries due

---

[4] The Restatement (Second) provides the following definition relevant to constructive notice: *HN14*[↑] "The words 'reason to know' . . . denote the fact that the actor has information from which a person of reasonable intelligence or of the superior intelligence of the actor would infer that the fact in question exists, or that such person would govern his conduct upon the assumption that such fact exists." 1 *Restatement (Second), supra, § 12 (1)*.

[5] Because the plaintiff claims that the carpet was inherently dangerous for use as a playing surface, the usual constructive notice inquiry, "whether the condition had existed for such a length of time that the [defendant's] employees should, in the exercise of due care, have discovered it in time to have remedied it"; (internal quotation marks omitted) *Kelly v. Stop & Shop, Inc., 281 Conn. 768, 777, 918 A.2d 249 (2007)*; does not apply. *HN15*[↑] Longer periods of time create the inference of constructive knowledge only when the defect is discoverable by reasonable care. In the present case, the allegedly negligent act occurred in the process of selecting and installing [***22] the flooring.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 140 of 253

Page 14 of 17

306 Conn. 107, *118; 49 A.3d 951, **958; 2012 Conn. LEXIS 323, ***22

to the playing surface at the Farmington Indoor Sports Arena or similar surfaces [*119] installed at other indoor soccer facilities in Connecticut. See *Claveloux v. Downtown Raquet Club Associates, 246 Conn. 626, 630-31, 717 A.2d 1205 (1998)* [***21] (substantially similar accident admissible for purposes of proving notice of danger or defect).[6]

Under the uncontested facts of this case, a visual inspection would not have revealed the carpet's inherent dangerousness for indoor soccer. Unlike visible conditions such as floor debris; *Morris v. King Cole Stores, Inc., 132 Conn. 489, 492, 45 A.2d 710 (1946)*; or deteriorated railings; *Kirby v. Zlotnick, 160 Conn. 341, 345, 278 A.2d 822 (1971)*; which put a premises owner with enough time to discover and remedy the condition on constructive notice of that condition, the alleged defect in the carpet here could not have been detected by a reasonable inspection.

*HN16*[↑] In addition to obvious or discoverable [***23] dangers, constructive notice may arise from the existence of industry standards or government regulations. For example, a building code and a federal regulation prohibiting the use of annealed glass in new construction was sufficient to charge a business owner with constructive notice that such glass was dangerous, even though the preexisting structure at issue was exempted from the code and the regulation, when the

code and the regulation had been in place for thirty-two and twenty-two [**959] years, respectively, and, further, there was evidence that an inspection would have identified the danger. *Considine v. Waterbury, supra, 279 Conn. 870-72*. In the present [*120] case, however, no government or industry standards prohibited the use of the carpet for indoor soccer. The defendants introduced uncontested evidence that the United States Soccer Association had no standards prohibiting the use of similar carpet, and that other indoor soccer facilities used a similar surface at the time of Michelle's injury. Indeed, the defendants' facility had passed an inspection performed by the Connecticut Junior Soccer Association months before the injury. Thus, there was no evidence from which a reasonable fact [***24] finder could conclude that industry standards or government regulations put the defendants on constructive notice of the carpet's allegedly dangerous nature.

The opinion of the plaintiff's expert witness does not contradict this conclusion. Nigg's testimony was based on his expertise in the fields of biomechanics, engineering, medicine, and kinesiology.[7] Utilizing his experience in the these fields, and the results of scientific tests he conducted on samples of the carpet and the shoe Michelle was wearing at the time of her injury, Nigg concluded that "[t]he flooring surface provided by the defendants was unreasonably dangerous and unfit for use at an indoor soccer arena." Although this testimony is relevant to the cause of the injury, it does not provide a basis for charging the defendants with constructive notice of the inherent dangerousness of the surface. Because Nigg had no

---

[6] In *Claveloux v. Downtown Racquet Club Associates, supra, 246 Conn. 626*, we noted the argument for relaxed admissibility requirements "for cases in which evidence of other accidents is offered only to prove notice of a defect or danger"; *id., 630-31*; under which "for the purpose of establishing notice of a defect or danger, prior accidents need only be such as [would] call [the] defendant's attention to the dangerous situation that resulted in the litigated accident . . . ." (Internal quotation marks omitted.) *Id., 631*. We, however, declined to decide the issue on that record.

[7] For the purposes of summary judgment, we assume that both Nigg's deposition testimony and his affidavit properly were considered by the trial court. See footnote 2 of this opinion.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 141 of 253

Page 15 of 17

306 Conn. 107, *120; 49 A.3d 951, **959; 2012 Conn. LEXIS 323, ***24

experience or expertise in operating an indoor soccer facility, his belief that playing surfaces should be scientifically tested is not a reason to impute knowledge of a latent defect, which purportedly would be uncovered by such testing, to the defendants. Indeed, Nigg conceded that such testing was not typically [***25] done. Moreover, it is difficult to discern a reason to conduct tests when, in the absence of any industry standards, the results would not trigger a [*121] particular course of action.[8] Construing Nigg's testimony in the light most favorable to the plaintiff, the evidence fails to provide a basis from which a jury could conclude that a "reasonable inspection" would have alerted defendants to the inherent dangerousness of the carpet. *Considine v. Waterbury, supra, 279 Conn. 871 n.23*;

---

[8] *HN17*[⬆] Industry standards provide a basis against which to measure conditions and impute constructive notice of an unreasonably unsafe condition. *Considine v. Waterbury, supra, 279 Conn. 864-65*. Standards reflect the "collective experience and expertise" of the regulating body. *Id., 868*. *HN18*[⬆] Safety standards for sports facilities will include consideration of the available alternatives and the level of risk tolerance inherent in any sports activity. This balance mirrors "the public policy of encouraging [***26] continued vigorous participation in recreational sporting activities while weighing the safety of the participants . . . ." *Jaworski v. Kiernan, 241 Conn. 399, 407, 696 A.2d 332 (1997)*.

In the absence of industry standards, experts can be expected to disagree about the appropriate playing surface for indoor soccer. *HN19*[⬆] Because "[c]onstructive notice is premised on the policy determination that under certain circumstances a person should be treated as if he had actual knowledge so that one should not be permitted to deny knowledge when he is acting so as to keep himself ignorant"; *Hall v. Burns, 213 Conn. 446, 479, 569 A.2d 10 (1990)*; we decline to impute constructive knowledge to a purchaser of a product based on a purported duty to perform scientific testing where there are no industry standards against which test results may be assessed.

*Kirby v. Zlotnick, supra, 160 Conn. 344*.

The plaintiff's constructive notice claim amounts to the assertion that the defendants' duty to "use reasonable care to maintain [their] premises in a reasonably safe condition"; *Warren v. Stancliff, 157 Conn. 216, 218, 251 A.2d 74 (1968)*; included submitting the playing surface to empirical safety testing. *HN20*[⬆] Business owners, however, are not insurers of [***27] their customers' safety. *Kelly v. Stop & Shop, Inc., 281 Conn. 768, 790, 918 A.2d 249 (2007)*. In the absence of visually discoverable hazards, previous indications of danger, or industry and government standards, the defendants' duty did not extend to the type of scientific testing required to uncover the carpet's alleged inherent defects.[9] Because [*122] the plaintiff failed to establish a genuine issue of material fact as to the defendants' actual or constructive notice of the dangerousness of the carpet, the defendants were entitled to summary judgment unless some exception to the notice requirement applied.

The plaintiff contends alternatively that her premises liability claim is exempt from the usual notice requirements because the defendants affirmatively created the allegedly dangerous condition by their choice of the carpet as a playing surface. *HN21*[⬆] Under an affirmative act theory of negligence, if the plaintiff alleges "that the defendant's conduct created the unsafe condition [on the premises], [***28] proof of notice is not necessary. . . . That is because *HN22*[⬆] when a defendant itself has created a hazardous condition, it safely may be inferred that [the defendant] had knowledge thereof." (Internal quotation marks

---

[9] We note that the plaintiff's counsel conceded at oral argument before this court that a claim regarding an inherent defect in a product may appropriately lie against the product manufacturer.

306 Conn. 107, *122; 49 A.3d 951, **959; 2012 Conn. LEXIS 323, ***28

omitted.) *Id., 777.*[10] On the particular facts of this case, we disagree that the defendants' choice of the carpet was an affirmative act of negligence from which **[*123]** knowledge of the carpet's inherent dangerousness can be inferred.

*HN27*[⬆️] The affirmative act rule creates the inference of knowledge when defendants are responsible for creating the allegedly dangerous condition. The plaintiff argues that the mere assertion that the defendants were responsible for installing an allegedly defective carpet obviates the notice requirement. We disagree. Analysis

---

[10] In concluding that the plaintiff was not required to prove notice, the Appellate Court cited cases involving the mode of operation rule. See *DiPietro v. Farmington Sports Arena, LLC, supra, 123 Conn. App. 621.* We previously have noted the close relationship between the mode of operation and affirmative act rules: *HN23*[⬆️] "[T]here is no logical distinction between a situation in which the storeowner directly creates the condition or defect, and where the storeowner's method of operation creates a situation [in which] it is reasonably foreseeable that the expectable acts of third parties will create a dangerous condition or defect." (Internal quotation marks omitted.) *Kelly v. Stop & Shop, Inc., supra, 281 Conn. 784,* quoting *Meek v. Wal-Mart Stores, Inc., 72 Conn. App. 467, 478, 806 A.2d 546,* **[***29]** cert. denied, *262 Conn. 912, 810 A.2d 278 (2002). HN24*[⬆️] Affirmative act cases for injuries from negligently displayed merchandise differ from mode of operations cases chiefly in that the injury is not triggered by an intervening customer's act. See *Meek v. Wal-Mart Stores, Inc., supra, 474; Holody v. First National Supermarkets, Inc., 18 Conn. App. 553, 556, 559 A.2d 723 (1989). HN25*[⬆️] The mode of operation analysis is applicable "only to those accidents that result from particular hazards that occur regularly, or are inherently foreseeable, due to some specific method of operation employed on the premises." *Fisher v. Big Y Foods, Inc., 298 Conn. 414, 423, 3 A.3d 919 (2010).* Thus, *HN26*[⬆️] like the affirmative act rule, an action brought under the mode of operation rule includes an element of notice in its prima facie case.

of the affirmative act rule as it has been applied shows that *HN28*[⬆️] it **[***30]** permits the inference of actual notice only when the **[**960]** defendant or its employees created an obviously hazardous condition. For example, notice of the unsafe condition has been inferred in slip and fall cases when employees left water in an aisle after watering plants; *Tuite v. Stop & Shop Cos., 45 Conn. App. 305, 308, 696 A.2d 363 (1997);* or left pricing stickers on a floor; *Fuller v. First National Supermarkets, Inc., 38 Conn. App. 299, 301-303, 661 A.2d 110 (1995);* or when an employer allowed the unstable stacking of boxes of aluminum folding tables. *Meek v. Wal-Mart Stores, Inc., 72 Conn. App. 467, 474, 806 A.2d 546,* cert. denied, *262 Conn. 912, 810 A.2d 278 (2002).*

This reading of the affirmative act rule is consistent with decisions in other states. The Appellate Court's analysis in *Meek,* which we adopted in *Kelly v. Stop & Shop, Inc., supra, 281 Conn. 785-86,* cited three cases for the proposition that, *HN29*[⬆️] "when a defendant itself has created a hazardous condition, it safely may be inferred that it had knowledge thereof." *Meek v. Wal-Mart Stores, Inc., supra, 72 Conn. App. 474.* Upon closer examination, each of those cases involved factual scenarios in which the defendant was on notice **[***31]** of a dangerous condition, through constructive notice, actual notice, or a foreseeably hazardous mode of operation, **[*124]** respectively.[11] *HN30*[⬆️] Rather

---

[11] See *Wal-Mart Stores, Inc. v. Blaylock, 591 N.E.2d 624, 628 (Ind. App. 1992)* (actual knowledge of danger from employees' aisle display of stacked products); *Wal-Mart Stores, Inc. v. Sholl, 990 S.W.2d 412, 418 (Tex. App. 1999)* (evidence of "at least constructive knowledge of the hazardous condition" when there were paint cans stacked on high shelves); *Canfield v. Albertsons, Inc., 841 P.2d 1224, 1226 (Utah App. 1992)* (no need to show actual or constructive notice when defendant "chooses a method of operation where it is reasonably foreseeable that the expectable acts of third parties will create

306 Conn. 107, *124; 49 A.3d 951, **960; 2012 Conn. LEXIS 323, ***31

than acting as an alternative to notice, the affirmative act rule allows an inference of notice when circumstantial evidence shows that the defendant knew or should have known of the dangerous condition because it was a foreseeably hazardous one that the defendant itself created.

In sum, we conclude that the affirmative act rule is not applicable in the present case and the plaintiffs needed to provide [***32] an evidentiary foundation from which a reasonable jury could have found that the defendants or their employees had notice of the potential dangerousness of the carpet. In the present case, the defendants produced uncontroverted evidence that they were not on notice of the carpet's alleged dangerousness, and indeed, could not have foreseen that it was inherently defective in the absence of scientific testing. Furthermore, even when viewed in the light most favorable to the plaintiff, Nigg's expert testimony did not create a disputed fact on the issue of notice because it addressed only the cause of Michelle's injury. Thus, there was no evidence that the dangerous condition was or could have been foreseeable to the defendants without extensive scientific testing, or that the scope of the duties to maintain and inspect the indoor soccer facility in a reasonably safe manner extended to such testing. Because the plaintiff did not establish a disputed issue of fact on the element of notice, the defendants were entitled to summary judgment.

[*125] The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgments of the trial court.

In this [***33] opinion the other justices concurred.

_____

End of Document

_____

a dangerous condition"), cert. denied, *853 P.2d 897 (1993)*.

Ben Levites

 Caution

As of: March 17, 2022 2:37 AM Z

# *Fujitsu Ltd. v. Fed. Express Corp.*

United States Court of Appeals for the Second Circuit

November 8, 2000, Argued ; April 20, 2001, Decided

Docket No. 00-7343

**Reporter**

247 F.3d 423 *; 2001 U.S. App. LEXIS 7356 **

FUJITSU LIMITED, Plaintiff-Appellee, - v.- FEDERAL EXPRESS CORPORATION, Defendant-Appellant.

**Subsequent History:** Certiorari Denied October 1, 2001, Reported at *2001 U.S. LEXIS 6580*.

**Prior History: [**1]** Appeal from a judgment in the United States District Court for the Southern District of New York (Alvin K. Hellerstein, Judge), in favor of the Plaintiff, Fujitsu Limited, in the amount of $ 726,400 based on causes of action sounding in breach of contract and negligence.

**Disposition:** Affirmed.

## Core Terms

Convention, shipment, air waybill, treaty, carrier, wafers, damages, cargo, trial court, container, provisions, limited liability, international law, shipping, parties, consignee, abated, spoliation, consignor, customary, carriage, inspect, savings, argues, bags, international agreement, take place, destination, departure, tracking

## Case Summary

### Procedural Posture

Defendant appealed the judgment for plaintiff entered by the United States District Court for the Southern District of New York based in a breach of contract and negligence action pursuant to the Convention for the Unification of Certain Rules relating to International Transportation by Air, opened for signature Oct. 12, 1929, 49 Stat. 3000 (1934), 137 L.N.T.S. 11, reprinted in note following *49 U.S.C.S. § 40105* (Warsaw Convention).

### Overview

Defendant shipped goods from Japan to Austin via a completed airway bill (bill). The goods were rejected in Austin. Defendant shipped the goods back via Memphis. Defendant did not prepare a new bill for the trip from Austin to Memphis and used an incomplete bill for the leg to Japan. Upon the goods' return, plaintiff noted that the goods were covered with an oily substance. Plaintiff sued. The district court granted plaintiff's partial summary judgment motion and awarded damages. Defendant appealed. The appellate court agreed that defendant was not entitled to the protection of the Warsaw Convention because defendant had failed to fully complete a bill for the shipment as required. Further, defendant was not entitled to a protection under the Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw on 12 October 1929, Sept. 28, 1955, 478 U.N.T.S. 371 (Hague Protocol) as it did not supercede the Warsaw Convention. The issues of

247 F.3d 423, *423; 2001 U.S. App. LEXIS 7356, **1

damages and spoliation were appropriately decided below.

### Outcome

The judgment was affirmed as defendant was not entitled to limit its liability under the Warsaw Convention despite the later implementation of the Hague Protocol. Furthermore, the awarded damages were not clearly erroneous and there was no abuse of discretion regarding the issue of spoliation.

## LexisNexis® Headnotes

Admiralty & Maritime Law > Shipping > Regulations & Statutes > Limitations on Liability

Transportation Law > Air & Space Transportation > Warsaw Convention > Air Consignment Notes

Admiralty & Maritime Law > Shipping > General Overview

International Law > Dispute Resolution > Remedies > General Overview

Transportation Law > Air & Space Transportation > Warsaw Convention > General Overview

Transportation Law > Air & Space Transportation > Warsaw Convention > Limitations on Liability

*HN1*[⬇] Regulations & Statutes, Limitations on Liability

The Convention for the Unification of Certain Rules relating to International Transportation by Air, opened for signature Oct. 12, 1929, 49 Stat. 3000 (1934), 137

L.N.T.S. 11, reprinted in note following *49 U.S.C.S. § 40105*, sets forth uniform rules of liability for loss, damage, or delay of international shipments by air, and embodies a tradeoff between the interests of carriers and shippers. Among its provisions is the rule that cargo carriers are entitled to a limitation of liability based on the weight of the shipment, presently established by the government at $ 9.07 per pound.

International Law > Dispute Resolution > Remedies > General Overview

Transportation Law > Air & Space Transportation > Warsaw Convention > Air Consignment Notes

Transportation Law > Air & Space Transportation > Warsaw Convention > General Overview

Transportation Law > Air & Space Transportation > Warsaw Convention > Property Damages

*HN2*[⬇] Dispute Resolution, Remedies

The air waybill shall contain the following particulars: (a) the place and date of its execution; (b) the place of departure and of destination; (c) the agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity; (d) the name and address of the consignor; (e) the name and address of the first carrier; (f) the name and address of the consignee; (g) the nature of the goods; (h) the number of packages, the method of packing, and the particular marks or numbers upon them; (i) the weight, the quantity, the volume, or dimensions of the goods; (q) A statement that the transportation is subject to the rules relating to liability established by this convention. The Convention for the Unification of Certain Rules

relating to International Transportation by Air, opened for signature Oct. 12, 1929, art. 8(a)-8(q), 49 Stat. 3000 (1934), 137 L.N.T.S. 11, reprinted in note following _49 U.S.C.S. § 40105_.

Admiralty & Maritime Law > Shipping > Regulations & Statutes > Limitations on Liability

Transportation Law > Air & Space Transportation > Warsaw Convention > Air Consignment Notes

Admiralty & Maritime Law > Shipping > General Overview

International Law > Dispute Resolution > Remedies > General Overview

Transportation Law > Air & Space Transportation > Warsaw Convention > General Overview

Transportation Law > Air & Space Transportation > Warsaw Convention > Limitations on Liability

_HN3_⬇] Regulations & Statutes, Limitations on Liability

If the carrier accepts goods without an air waybill having been made out, or if the air waybill does not contain all the particulars set out in article 8(a) to (i) the carrier shall not be entitled to avail himself of the provisions which exclude or limit his liability. The Convention for the Unification of Certain Rules relating to International Transportation by Air, opened for signature Oct. 12, 1929, art. 9, 49 Stat. 3000 (1934), 137 L.N.T.S., reprinted in note following _49 U.S.C.S. § 40105_.

Admiralty & Maritime Law > Shipping > Regulations

& Statutes > Limitations on Liability

International Law > Dispute Resolution > Remedies > General Overview

Transportation Law > Air & Space Transportation > Warsaw Convention > Air Consignment Notes

Admiralty & Maritime Law > Shipping > General Overview

Transportation Law > Air & Space Transportation > Warsaw Convention > General Overview

_HN4_⬇] Regulations & Statutes, Limitations on Liability

As amended by the Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw on 12 October 1929, Sept. 28, 1955, 478 U.N.T.S. 371, article 9 deprives carriers of the limited liability protections of the Convention for the Unification of Certain Rules relating to International Transportation by Air, opened for signature Oct. 12, 1929, 49 Stat. 3000 (1934), 137 L.N.T.S. 11, reprinted in note following _49 U.S.C.S. § 40105_, only if cargo is loaded on board the aircraft without an air waybill having been made out or if the air waybill does not include the notice required by article 8(c).The Convention for the Unification of Certain Rules relating to International Transportation by Air, opened for signature Oct. 12, 1929, art. art. 9, 49 Stat. 3000 (1934), 137 L.N.T.S. 11, reprinted in note following _49 U.S.C.S. § 40105_.

Admiralty & Maritime Law > Shipping > General Overview

International Law > General Overview

Transportation Law > Carrier Duties & Liabilities > Damages

Admiralty & Maritime Law > Shipping > Regulations & Statutes > Limitations on Liability

International Law > Dispute Resolution > Remedies > General Overview

Transportation Law > Air & Space Transportation > Warsaw Convention > General Overview

Transportation Law > Air & Space Transportation > Warsaw Convention > Air Consignment Notes

## *HN5*[ ] Admiralty & Maritime Law, Shipping

The revised version of article 8(c) requires the carrier to give the consignor notice to the effect that, if the carriage involves an ultimate destination or stop in a country other than the country of departure, the Convention for the Unification of Certain Rules relating to International Transportation by Air, opened for signature Oct. 12, 1929, 49 Stat. 3000 (1934), 137 L.N.T.S. 11, reprinted in note following *49 U.S.C.S. § 40105* (Warsaw Convention), may be applicable and that the Warsaw Convention governs and in most cases limits the liability of carriers in respect of loss of or damage to cargo. Convention for the Unification of Certain Rules relating to International Transportation by Air, opened for signature Oct. 12, 1929, art. 8(c), 49 Stat. 3000 (1934), 137 L.N.T.S. 11, reprinted in note following *49 U.S.C.S. § 40105*.

Governments > Courts > Common Law

International Law > Dispute Resolution > Conflict of Law > General Overview

## *HN6*[ ] Courts, Common Law

Under common-law principles, all rights, liabilities, penalties, forfeitures and offences which are of purely statutory derivation and unknown to the common law are eliminated by the repeal of the statute which granted them, irrespective of the time of their accrual.

Governments > Legislation > Expiration, Repeal & Suspension

Governments > Legislation > General Overview

## *HN7*[ ] Legislation, Expiration, Repeal & Suspension

In order to avoid the potentially disruptive implications of the common law rule, the United States Congress has enacted a general savings statute, *1 U.S.C.S. § 109*, which provides that the repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

International Law > Dispute Resolution > General Overview

International Law > Sources of International Law

International Law > Treaty Interpretation > General Overview

## *HN8*[ ] International Law, Dispute Resolution

The issue of whether the provisions of a treaty have been abated or extinguished following the entry into force of a subsequent treaty is governed by neither the

common law doctrine of abatement nor the general savings statute codified at *1 U.S.C.S. § 109*. Rather, when resolving that question, courts apply the rules of customary international law enunciated in the Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331.

International Law > Treaty Formation > General Overview

International Law > General Overview

International Law > Sources of International Law

International Law > Treaty Interpretation > General Overview

*HN9*[↓]  International Law, Treaty Formation

Unlike the common law relating to statutes, customary international law contains no baseline presumption that the provisions of a new agreement automatically abate and extinguish any prior treaty relating to the same subject matter. To the contrary, customary international law governing the effect of treaties furnishes almost the opposite baseline norm, pacta sunt servanda, which provides that a treaty in force is binding upon the parties to it and must be performed by them in good faith unless the treaty has been affirmatively terminated or suspended. Vienna Convention on the Law of Treaties, May 23, 1969, art. 26, U.N.T.S. 331.

International Law > Treaty Formation > General Overview

Transportation Law > Air & Space Transportation > Warsaw Convention > Statutory Construction

International Law > General Overview

International Law > Treaty Interpretation > General Overview

*HN10*[↓]  International Law, Treaty Formation

Under Article 59 of the Vienna Convention, an international agreement is deemed to have been "terminated" by conclusion of a later treaty only if all of the parties to the first agreement conclude a later agreement relating to the same subject matter and either (a) it appears from the later treaty or is otherwise established that the parties intended that the matter should be governed by that treaty; or (b) the provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time. Vienna Convention on the Law of Treaties, May 23, 1969, art. 59, U.N.T.S. 331.

International Law > Treaty Interpretation > General Overview

Transportation Law > Air & Space Transportation > Warsaw Convention > Statutory Construction

*HN11*[↓]  International Law, Treaty Interpretation

To the fullest extent possible, treaty language is to be interpreted so as to avoid inconsistency.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

*HN12*[↓]  Standards of Review, Clearly Erroneous Review

*Fed R. Civ. P. 52(a)* states that a trial court's findings of

fact shall not be set aside unless they are clearly erroneous, and the appellate court must give due regard to the trial judge's opportunity to observe the witnesses as to their credibility.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Evidence > ... > Expert Witnesses > Credibility of Witnesses > General Overview

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

**HN13**[ ]  **Standards of Review, Clearly Erroneous Review**

Credibility determinations are the province of the trial judge, and should not be overruled on appeal unless clearly erroneous.

Civil Procedure > Discovery & Disclosure > Discovery > Relevance of Discoverable Information

**HN14**[ ]  **Discovery, Relevance of Discoverable Information**

The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

Evidence > Relevance > Preservation of Relevant Evidence > Spoliation

Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery

**HN15**[ ]  **Judges, Discretionary Powers**

Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence. The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis.

**Counsel:** WARREN DEAN, Federal Express Corp., Memphis, Tennessee (R. JEFFERY KELSEY on brief) and PATRICK J. KEATING, Kaplan, Begy & Von Ohlen, Chicago, Illinois (Nicholas E. Pantelopoulos, Biedermann, Hoenig, Massamillo & Ruff on brief), for Appellant.

WILLIAM R. CONNOR, III, Bingham, Englar, Jones & Houston, New York, N.Y. (John MacCrate III on brief), for Appellee.

**Judges:** BEFORE: STRAUB, SOTOMAYOR, Circuit Judges, and SPATT, District Judge. [1]

**Opinion by:** Arthur D. Spatt

# Opinion

 [*426] SPATT, District Judge:

This case primarily concerns interpretation of the Warsaw Convention treaty governing the liability of

---

[1] The Honorable Arthur D. Spatt of the United States District Court, Eastern District of New York, sitting by designation.

international cargo shippers for damage to returned goods while in their possession. We find that the shipment at issue was not a return as defined by Article 12 [**2] of the Warsaw Convention and that the carrier's shipment of the goods back to the departure destination at the consignee's direction involved a second acceptance under Article 9, requiring the carrier to create a complete and correct air waybill in order to avail itself of the Convention's limited liability provisions. Because the carrier failed to furnish a complete and correct air waybill upon acceptance of the goods, we affirm the district court's grant of partial summary judgment in favor of the Plaintiff on the carrier's defense of limited liability. We also reject the carrier's argument that the entry into force of the Hague Protocol, which amended the Warsaw Convention, during the pendency of this case (but after the events giving rise to this case) precludes the application of the unamended Warsaw Convention. We find that the district court correctly applied the unamended provisions of the Warsaw Convention. Finally, we affirm the district court's assessment of damages and determination that spoliation sanctions were not warranted.

## BACKGROUND

On May 30, 1996, Plaintiff-Appellee Fujitsu Limited ("Fujitsu") shipped a container of silicon wafers from Narita, Japan [**3] to Ross Technologies, Inc. ("Ross") in Austin, Texas, using Defendant-Appellant Federal Express ("FedEx") as the cargo carrier. Accompanying the container was an air waybill-- a document serving as a bill of lading for goods transported by air, BLACK'S LAW DICTIONARY 70 (6th ed. 1990)-- designated as "AWB3691," specifying the consignor and consignee, weight, contents, destination, and route of the container.

On May 31, 1996, the container arrived in Austin and was placed in a bonded cargo cage to await clearance

through customs by the Customs Agent for Ross. FedEx does not release goods to their consignees until the goods actually have cleared customs and all import and customs duties have been paid. In this case, Ross' Customs Agent faxed a notification to FedEx that Ross was rejecting the shipment. Pursuant to FedEx's procedures, it contacted Fujitsu and Ross to determine what should be done with the cargo. FedEx policy provided that cargo refused by the consignee would not be moved without *written* instructions and a guarantee of payment.

According to a June 3, 1996 comment in the FedEx computer tracking system concerning a telephone call, Fujitsu orally instructed FedEx to [**4] return the goods to Japan. However, a separate document in the record, on Ross letterhead and dated June 4, 1996, indicates that Ross issued written instructions to FedEx to return the goods to Fujitsu in Japan and informed FedEx that Ross would incur all shipping charges. On July 27, 1996, after the return shipment was completed, FedEx sent an invoice billing Ross $ 493.00 for the return of the shipment to Japan. The trial court found that "[Ross] decided not to accept the merchandise, and engaged [*427] Federal Express to return the merchandise to the consignor in Tokyo at the consignee's expense."

FedEx proceeded to prepare the goods for shipment back by re-labeling and moving the cargo from the customs cage to an outbound staging area. The goods were flown from Austin to the main FedEx hub in Memphis. No air waybill was created in Austin, but in Memphis, FedEx created a new air waybill, designated AWB 3010, listing Ross as the shipper and indicating that the goods were to be shipped from Austin to Narita. AWB 3010 was not completely filled out, but did specifically contain a legend stating "RETURN OF [AWB 3691]" typed across the middle right-hand side of the air waybill form. Fujitsu [**5] contends that this legend appeared only on one copy of AWB 3010, not all of

them. FedEx asserts that it issued a new air waybill only to accommodate the needs of its computerized package tracking system, not because a new shipping contract was created for the return shipment.

FedEx air waybill numbers also serve as package tracking numbers, which appear on the air waybills in both numerical and barcode form. That tracking number is scanned into the FedEx computer system at various points during transit, in order to track the status of particular shipments. However, when a shipment is returned by FedEx, the computer system requires that a new tracking number (and, therefore, a new air waybill number) be issued. The computer system does not permit the use of the original air waybill number to track the return of the cargo to the original shipper, and as a result of this technological requirement, FedEx's standard policies for return of international shipments require that new air waybills be issued.

The goods apparently left Austin in good condition, but sat in Memphis for a week before being shipped to Japan. On June 24, 1996, the shipment arrived in Japan. At that time, Fujitsu observed [**6] that the outer container was broken and covered with an oily substance which had permeated into some of the interior boxes. Fujitsu opened one of the interior boxes and discovered that the oily substance was also on the exterior of the sealed aluminum bags containing the wafers. Fujitsu did not open any of the bags to determine whether the oily substance had penetrated any of the bags.

Fujitsu reported the damage to FedEx immediately. FedEx eventually acknowledged that the damage occurred to the container while in its possession. At some point in July 1996, upon instructions from its insurance carrier, Fujitsu disposed of the container and wafers. FedEx had not requested an opportunity to inspect the wafers prior to that time.

Fujitsu then brought this action against FedEx grounded in breach of contract and negligence. FedEx raised the defense that, under the Warsaw Convention treaty governing international cargo shipments, it carried the cargo with a proper air waybill and was thus entitled to a limitation on its liability to $ 9.07 per pound, or a total of about $ 1,200 for the entire shipment. On November 30, 1999, Judge Hellerstein granted partial summary judgment to Fujitsu, [**7] finding that air waybill AWB3010 did not comply with the requirements of the treaty, and that the shipment from Austin to Japan could not be considered to be covered by AWB3691, the initial air waybill. A bench trial on damages was held on February 22 and 23, 2000, and at the close of the trial, Judge Hellerstein found FedEx liable to Fujitsu for damages in the amount of $ 726,640.

FedEx appeals, claiming (i) that the trial court erred in finding that the return shipment was not covered by the waybill of the originating shipment; (ii) that the court [*428] improperly found that an amendment to the Warsaw Convention known as the Hague Protocol was inapplicable; (iii) that the court's findings regarding damages were incorrect; and (iv) that the court erred in denying FedEx's request for a finding of spoliation relating to Fujitsu's destruction of the container and wafers.

## DISCUSSION

This Court reviews the District Court's grant of summary judgment *de novo*. While all factual ambiguities must be resolved in favor of the nonmoving party, "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)*. [**8] The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew

credibility assessments." *Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996)*. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*.

## A. The Warsaw Convention's limitation of liability

International transportation of persons, baggage, and goods by air are governed by the series of laws, treaties, and individual contracts collectively referred to as the Warsaw Convention "system," deriving that name from the international agreement commonly referred to as the "Warsaw Convention." Convention for the Unification of Certain Rules relating to International Transportation by Air, *opened for signature* Oct. 12, 1929, 49 Stat. 3000 (1934), 137 L.N.T.S. 11, *reprinted in note following* *49 U.S.C.A. § 40105* **[**9]** ("Original Warsaw Convention"); *see El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 160, 142 L. Ed. 2d 576, 119 S. Ct. 662 (1998)*; *Chubb & Son, Inc. v. Asiana Airlines, 214 F.3d 301, 306 (2d Cir. 2000)*, *petition for cert. filed,* 121 S. Ct. 1223, 149 L. Ed. 2d 134, 69 U.S.L.W. 3591 (2001). *HN1*[↑] The Warsaw Convention sets forth uniform rules of liability for loss, damage, or delay of international shipments by air, and embodies a tradeoff between the interests of carriers and shippers. Among its provisions is the rule that cargo carriers are entitled to a limitation of liability based on the weight of the shipment, presently established by the Government at $ 9.07 per pound. *See Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243, 255, 80 L. Ed. 2d 273, 104 S. Ct. 1776 (1984)*; Warsaw Convention art. 22.

The carrier's right to limited liability revolves around the document called an "air waybill," which contains details including the origin, itinerary, and destination of the cargo, and the weight, dimensions, and content of the containers. Specifically, Article 8 of the treaty states that

*HN2*[↑] The air waybill **[**10]** shall contain the following particulars:

   (a) the place and date of its execution;

   (b) the place of departure and of destination;

   (c) the agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity. . .;

   (d) the name and address of the consignor;

   (e) the name and address of the first carrier;

   (f) the name and address of the consignee . . .;

 **[*429]**

   (g) the nature of the goods;

   (h) the number of packages, the method of packing, and the particular marks or numbers upon them;

   (i) the weight, the quantity, the volume, or dimensions of the goods;

   . . .

   (q) A statement that the transportation is subject to the rules relating to liability established by this convention.

Warsaw Convention art. 8(a)-8(q). According to Article 9 of the treaty, "*HN3*[↑]] if the carrier accepts goods without an air waybill having been made out, or if the air waybill does not contain all the particulars set out in article 8(a) to (i) . . . the carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability."

Due to the significant benefit that **[**11]** limited liability confers upon cargo carriers, the courts have generally required carriers to comply strictly with the terms of Article 8, and the omission of any required item from the air waybill, with exceptions not applicable here, will

247 F.3d 423, *429; 2001 U.S. App. LEXIS 7356, **11

result in the loss of limited liability regardless of the commercial significance of the omission. *See Intercargo Ins. Co. v. China Airlines, Ltd., 208 F.3d 64, 67 (2d Cir. 2000)* (*citing Brink's Ltd. v. South African Airways, 93 F.3d 1022, 1033-34 (2d Cir.1996)*; *Tai Ping Ins. Co. v. Northwest Airlines, Inc., 94 F.3d 29, 31 (2d Cir. 1996)*.

It is undisputed that AWB 3691, the first waybill for the shipment from Tokyo to Austin, contained all of the information for that shipment required by Article 8. It is also undisputed that the goods were shipped from Austin to Memphis without the issuance of a new air waybill, and that the air waybill created in Memphis for the return flight to Tokyo did not include the "agreed stopping places" for that return shipment as required by Article 8(c).

FedEx argues that the shipment from Austin to Japan was a return shipment pursuant to Article 12 of the Warsaw **[**12]** Convention, rather than a shipment pursuant to a new contract of carriage. Thus, FedEx contends it was not required to issue an amended or second air waybill for the return, but rather, could rely on AWB 3691, the air waybill issued for the shipment from Japan to Austin. Article 12 grants the consignor of the shipment the right to "dispose of the goods by withdrawing them at the airport of departure or destination, or by stopping them in the course of the journey on any landing . . . or by requiring them to be returned to the airport of departure." Article 12, however, does not address whether the issuance of a second or amended waybill is required when a consignor orders the carrier to return the goods to the airport of departure. We need not resolve that question today, because, as discussed below, FedEx's shipment of the wafers from Austin to Japan was not a return of goods as defined by Article 12 but rather was a separate shipment based on a new contract of carriage.

Article 12 addresses the right of the consignor to have a

carrier return the goods. Article 12 is inapplicable here because it was the *consignee*, Ross, not the consignor, Fujitsu, who ordered FedEx to return **[**13]** the goods to the airport of departure. FedEx Service Agent Cherri Field testified in a deposition that once goods in its possession were rejected, FedEx would not move the goods anywhere without *written* instructions and a guarantee of payment for the return shipping costs. Although FedEx asserts that instructions to return the shipment came from Fujitsu, the record indicates that FedEx treated the return shipment as having originated from Ross. After reviewing FedEx's computer records, Field testified at her deposition **[*430]** that authorization to return the goods came from Ross, not Fujitsu. When FedEx created the second waybill, AWB 3010, it listed Ross, not Fujitsu, as "Shipper." An Air Cargo Manifest produced by FedEx dated June 18, 1996 also appears to list Ross as the shipper and Fujitsu as the consignee. Further, following the completion of the shipment to Japan, FedEx invoiced Ross, not Fujitsu, for payment of the return shipping charges and payment was made by Ross. Under these circumstances, we find that the trial court correctly determined that the instruction to return the goods to Japan was given by Ross, not Fujitsu.

Because it was Ross, not Fujitsu, that instructed FedEx **[**14]** to return the goods, we find that the shipment of the goods from Austin to Japan was not a return as defined by Article 12, but rather, was a shipment based on a new contract of carriage. Under the provisions of Articles 8 and 9, if FedEx wanted to avail itself of the Warsaw Convention's limited liability provisions for this second, separate shipment, it was required to prepare a complete air waybill when it accepted the goods for shipment from Austin to Japan. As previously discussed, FedEx did not create a second air waybill in Austin, and the air waybill it created en route was incomplete.

Our determination that FedEx was required to issue a

complete and correct air waybill in order to gain the Convention's liability limitation for the shipment from Austin to Japan is not affected by FedEx's contention that pursuant to Article 9, limited liability is either gained or lost by the carrier at the time it initially "accepts" the goods for shipment and that there was only one acceptance of the goods in this case. Specifically, FedEx argues that at the time it accepted the goods in Japan for shipment to Austin, it secured the valid waybill AWB 3691, and thus, obtained the protection **[**15]** of the Convention for limited liability with regard to the shipment at issue. FedEx claims that a second acceptance did not occur in Austin because the shipment never left FedEx's custody and control, and thus, could not have been accepted by it from Ross in Austin.

The Warsaw Convention does not define "accepts," and this Court has uncovered no cases interpreting that term in the context it is used in Article 9. While the notion of "acceptance" does appear to contemplate a receiving of an item by the person making the acceptance, BLACK'S LAW DICTIONARY 12 (6th ed. 1990), nothing in that definition warrants a conclusion that transfer must involve a physical delivery of the property. Here, FedEx entered into a new contract of carriage with Ross on or about June 4, 1996 to ship the goods from Austin back to Narita. In doing so, Ross implicitly assumed authority to direct and control the movement of the goods, and FedEx appears to have accepted the authority of Ross to do so. Under these circumstances, requiring Ross to physically receive and re-present the goods to FedEx to complete the transaction seems needlessly formalistic. By that logic, upon receiving notice that an inbound shipment **[**16]** was arriving, a consignee wishing to re-direct the shipment to a third-party would have to travel to the receiving airport to accept the shipment and physically re-tender it to the carrier before the carrier could "accept" it for shipment to the third-party.

Accordingly, we find that the record supports the determination by the trial court that a new contract of carriage was created in Austin and, by extension, a constructive acceptance took place there for purposes of Article 9. Because FedEx failed to obtain a proper air waybill in Austin for the return shipment by Ross, it **[*431]** is not entitled to the limited liability protection of the Warsaw Convention, and the decision of the trial court granting partial summary judgment to Fujitsu on FedEx's defense of limited liability is affirmed.

## B. The Hague Protocol

FedEx also contends that this case is not governed by the Original Warsaw Convention, but rather by the Warsaw Convention as modified by the international agreement referred to as the "Hague Protocol." *See* Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw on 12 October 1929, Sept. 28, 1955, 478 **[**17]** U.N.T.S. 371 ("Hague Protocol"). The Hague Protocol, which eliminates some of the formalities required under Articles 8 and 9 of the Original Warsaw Convention, was ratified by Japan on November 8, 1967, but did not enter into force for the United States until another international agreement, Montreal Protocol No. 4, was ratified by the Senate on September 28, 1998 and became effective on March 4, 1999. *See* Montreal Protocol No. 4 to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as amended by the Protocol done at the Hague on 28 September 1955, Sept. 25, 1975, Message Transmitting Two Related Protocols, *reprinted in* S. Exec. Rep. No. 105-20, art. XVII(2); *Chubb, 214 F.3d at 307 n. 4*.

*HN4*[↑] As amended by the Hague Protocol, Article 9 deprives carriers of the Convention's limited liability protections only if "cargo is loaded on board the aircraft

without an air waybill having been made out" or if "the air waybill does not include the notice required by Article 8, paragraph (c)." *HN5*[↑] The revised version of Article 8(c) requires the carrier to give the consignor notice

> to [**18] the effect that, if the carriage involves an ultimate destination or stop in a country other than the country of departure, the Warsaw Convention may be applicable and that the Convention governs and in most cases limits the liability of carriers in respect of loss of or damage to cargo.

Warsaw Convention, art. 8(c) (as amended by the Hague Protocol). FedEx argues that the adoption of the Hague Protocol prior to the decision of the trial court in this case effectively abated the operation of the provisions of the Original Warsaw Convention, or that, in the alternative, it would be able to avail itself of the liability limitations of the Convention under the terms as amended by the Hague Protocol.

In response, Fujitsu argues that applying the Hague Protocol to facts that took place almost two years before that agreement's entry into force for the United States would conflict with our recent conclusion in *Chubb* that the Hague Protocol not be given retroactive effect. *See Chubb, 214 F.3d at 307 n. 4* ("Because the actions giving rise to this suit occurred in 1995, Montreal Protocol No. 4 does not affect this case.") (*citing* 1 *RESTATEMENT (THIRD) OF FOREIGN* [**19] *RELATIONS LAW OF THE UNITED STATES § 322(1)* (1987)).

However, FedEx's principal argument is not that the Hague Protocol should be given *retroactive* effect, but rather that the Original Warsaw Convention cannot *prospectively* be enforced following the Hague Protocol's entry into force. This theory is advanced under the common law doctrine of abatement, in which a court is without power to enforce inchoate rights or imperfect obligations under statutes that have been

repealed or amended, but not explicitly saved or preserved at the time of repeal or amendment. *See Hertz v. Woodman, 218 U.S. 205, 217-18, 54 L. Ed. 1001, 30 S. Ct. 621 (1910); United States v.* [*432] *Mechem, 509 F.2d 1193, 1194-95 & n.3 (10th Cir. 1975); see also* 1A SUTHERLAND STAT. CONST. § 23.33, at 424-25 (Norman J. Singer ed., 5th ed. 1993) ("*HN6*[↑] Under common-law principles, all rights, liabilities, penalties, forfeitures and offences which are of purely statutory derivation and unknown to the common law are eliminated by the repeal of the statute which granted them, irrespective of the time of their accrual.").

*HN7*[↑] In order to avoid the potentially disruptive implications of this common [**20] law rule, Congress has enacted a general savings statute, *1 U.S.C. § 109*, which provides that

> the repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

*1 U.S.C. § 109*. This provision operates to preserve both civil and criminal statutory liabilities. *See Hertz, 218 U.S. at 217-18*. Whether the earlier statute has been amended or repealed outright is of no consequence; the general savings statute applies in either instance. *See Mechem, 509 F.2d at 1194-95* & n. 3. Therefore, if the Hague Protocol and Montreal Protocol No. 4 were statutes rather than treaties, the provisions of the Original Warsaw Convention would remain applicable under the general savings statute in *1 U.S.C. § 109* to conduct that took place prior to the Hague Protocol's entry into force [**21] for the United States in March 1999. This is so notwithstanding the fact that neither the

Hague Protocol nor Montreal Protocol No. 4 contains its own savings provision.

However, FedEx maintains that *treaties* do no fall within the ambit of *1 U.S.C. § 109*, arguing that as a statutory exception to a traditional common law rule, the general savings clause must be interpreted narrowly so as not to apply to "treaties" but only to "statutes." *See e.g.* *Rodgers v. United States, 158 F.2d 835, 836-37 (6th Cir. 1947)* (since predecessor to *1 U.S.C. § 109* "prescribes a rule differing from that of the common law," it cannot be interpreted to include repealed regulations, but "must be strictly construed and limited to repealed statutes"). FedEx argues that because courts cannot enforce any statutory or treaty remedy that is no longer in effect and has not been saved, the remedy under Article 9 of the Original Warsaw Convention, which provides for unlimited liability for clerical omissions in air waybills, was abated and extinguished upon entry into force of the Hague Protocol and Montreal Protocol No. 4 (and the concurrent repeal of **[**22]** the Original Warsaw Convention) on March 4, 1999.

While we resolved the retroactivity of the Hague Protocol in *Chubb*, this case presents a distinct issue of first impression: whether the rights and liabilities of the Original Warsaw Convention were abated and extinguished by entry into force of the Hague Protocol. As FedEx correctly argues, the answer to that question does not *logically* depend upon whether the Hague Protocol is to be given retroactive effect. Indeed, while FedEx does urge us to overrule our recent holding in *Chubb* and to give limited retroactive effect to the Hague Protocol to fill the gap it perceives to have been left by the repeal of the Original Warsaw Convention, it would be just as possible for us to fill that gap with a rule derived from the law that governed before the Warsaw Convention. *C.f.* *Ruston Gas Turbines, Inc. v. Pan American World Airways, 757 F.2d 29, 30* **[*433]** *(2d*

*Cir. 1985)* (holding that "deregulation of certain common carriers" following enactment of the Airline Deregulation Act of 1978, 92 Stat. 1705, "returns us to the common law"). Fujitsu's mere recitation of our non-retroactivity holding in *Chubb*, therefore, is not **[**23]** sufficient to refute FedEx's abatement argument.

However, FedEx's enticing argument suffers a crucial flaw: *HN8*[⬆] the issue of whether the provisions of a treaty have been abated or extinguished following the entry into force of a subsequent treaty is governed by neither the common law doctrine of abatement nor the general savings statute codified at *1 U.S.C. § 109*. Rather, when resolving that question, we apply the rules of customary international law enunciated in the Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 ("Vienna Convention"). As we did in *Chubb*, we rely upon the Vienna Convention here "as an authoritative guide to the customary international law of treaties." *Chubb, 214 F.3d at 309*. Because the United States "recognizes the Vienna Convention as a codification of customary international law," it "considers the Vienna Convention 'in dealing with day-to-day treaty problems'" and acknowledges the Vienna Convention as, in large part, "the authoritative guide to current treaty law and practice.'" *Id. at 308; see* 1 RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES, pt. III, intro. **[**24]** note, at 144-45 (discussing Vienna Convention's codification of the customary international law governing international agreements and the acceptance of the Convention by the United States).

The ongoing effect of treaties under customary international law is not governed by the same rule governing the ongoing effect of statutes under the common law. Rather, customary international law, as recited by the Vienna Convention in some detail, supplies its own distinct set of rules concerning the amendment, modification, suspension, and termination

247 F.3d 423, *433; 2001 U.S. App. LEXIS 7356, **24

of international agreements. *See* Vienna Convention arts. 39-41, 54-64. *HN9*[⬆] Unlike the common law relating to statutes, customary international law contains no baseline presumption that the provisions of a new agreement automatically abate and extinguish any prior treaty relating to the same subject matter. To the contrary, customary international law governing the effect of treaties furnishes almost the opposite baseline norm, *pacta sunt servanda*, which provides that a treaty in force is "binding upon the parties to it and must be performed by them in good faith" unless the treaty has been affirmatively terminated or suspended. Vienna Convention **[**25]** art. 26; *see* 1 RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 321 & *cmt. a*, at 190 (stating that the doctrine of *pacta sunt servanda*, though subject to international law rules concerning the validity and termination of agreements, "lies at the core of the law of international agreements and is perhaps the most important principle of international law"); *see also* Vienna Convention art. 27 ("A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty.").

This contrary presumption is particularly relevant with respect to multilateral treaties such as the Warsaw Convention, because such treaties frequently are modified- but not thereby terminated- by

amending agreements binding only those parties that were willing to accept the amendment while leaving the original or earlier amended agreement still in force to govern relations between the other parties, as well as between the other parties and the amending group. As a result, it has become fairly common for several versions of a multilateral **[*434]** treaty to exist simultaneously, with different sets of provisions operating between various groups of states. **[**26]**

Maria Frankowska, *The Vienna Convention on the Law of Treaties Before United States Courts*, 28 VA. J. INT'L L. 281, 361-62 (1988).

*HN10*[⬆] Under Article 59 of the Vienna Convention, an international agreement is deemed to have been "terminated" by conclusion of a later treaty only if all of the parties to the first agreement conclude a later agreement relating to the same subject matter *and* either

(a) it appears from the later treaty or is otherwise established that the parties intended that the matter should be governed by that treaty; *or*

(b) the provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time.

Vienna Convention art. 59. In this case, while the Hague Protocol and Original Warsaw Convention clearly relate to the same subject matter, it is equally clear that the Original Warsaw Convention was not terminated by enactment of the Hague Protocol. Not only were all of the parties to the Original Warsaw Convention not parties to the Hague Protocol, but we have already concluded that (a) the parties to the Hague Protocol did not intend **[**27]** for that treaty to govern conduct taking place before entry into force of that agreement, *see* Chubb, 214 F.3d at 307 n. 4; 1 RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 322(1); and (b) the two treaties are not "so far incompatible" that they "are not capable of being applied at the same time." Vienna Convention art. 59(1)(b). *HN11*[⬆] To the fullest extent possible, treaty language is to be interpreted so as to avoid inconsistency. *See* 1 RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 332 cmt. f, at 211. By giving effect to the

Original Warsaw Convention for conduct taking place before entry into force of the Hague Protocol and effect to the Hague Protocol for conduct taking place after entry into force of that agreement, we easily avoid any possible inconsistency between the two agreements.

It is therefore not necessary for us to consider whether FedEx still would be able to invoke the liability limitation under the terms of the Amended Warsaw Convention, for notwithstanding the entry into force of the Hague Protocol in March 1999, we retain the authority to enforce the terms of the Original Warsaw Convention for conduct taking [**28] place prior to that date. We do, however, note our view that FedEx would not prevail even under the terms of the Amended Warsaw Convention. Upon its acceptance of the goods for shipment in Austin, FedEx permitted those goods to be loaded onto the aircraft for shipment without a new air waybill, apparently in violation of the requirements of even the amended version of Article 9. It was only upon arrival of the goods for shipment in Memphis that a new air waybill was generated for the return shipment to Narita.

Accordingly, we find that the entry into effect of the Hague Protocol during the pendency of this case did not preclude the application of the Original Warsaw Convention to the facts at issue here.

## C. Damages

With regard to provable damages, FedEx argues that Fujitsu produced no evidence showing that the wafers, which had been sealed inside impermeable aluminum bags, had been damaged in any way. It further contends that the trial court incorrectly determined the market value of the wafers to be the equivalent of the invoice price, when the testimony established that there was no real market for the wafers. [*435] Finally, FedEx challenges the court's findings on the mitigation [**29]

of damages by Fujitsu.

HN12[↑] Fed R. Civ. P. 52(a) states that a trial court's findings of fact shall not be set aside unless they are clearly erroneous, and the appellate court must give due regard to the trial judge's opportunity to observe the witnesses as to their credibility.

While FedEx is correct that the record contains no evidence that the wafers themselves were damaged, there was sufficient evidence adduced to support a finding by the court that the shipment was a total loss because the residue on the outer packaging made it impossible to access the wafers. According to the testimony, the bags containing the wafers could only be opened in a specially designed and maintained "clean room" so as to prevent dust contamination. However, because the bags themselves were coated with the oily residue, they could not be brought into a clean room for inspection, as the residue itself would contaminate the clean room. Consequently, the trial court found that even if the wafers were undamaged, Fujitsu was unable to extract them from the bags in an operable condition. This Court can discern no difference between damage rendering the wafers inoperable and damage that prevents otherwise operable [**30] wafers from being used or salvaged.

While there was competing testimony on the issue of whether cleaning the residue from the bags in order to permit inspection and salvage of the wafers inside was economically reasonable, the trial court resolved this conflict by expressly choosing to credit the testimony of Fujitsu's expert. Specifically, the trial court held that "on issues of credibility and the importance of his testimony, I believe that Mr. Abend's [Fujitsu's expert] testimony is the more credible [than Mr. Chevrier, FedEx's expert] and it should be accepted." HN13[↑] Credibility determinations are the province of the trial judge, and should not be overruled on appeal unless clearly

erroneous. *Tenenbaum v. Williams, 193 F.3d 581, 606 (2d Cir. 1998); Donato v. Plainview-Old Bethpage Cent. Sch. Dist., 96 F.3d 623, 634 (2d Cir.1996)*. This factual determination by the trial court will stand.

In addition, with regard to mitigation, the trial court's factual finding that efforts to salvage the wafers would have been prohibitively expensive also suffices to reject FedEx's argument that Fujitsu failed to mitigate its damages.

Finally, the appropriate **[**31]** measure of damages to cargo is the difference between the market value of the shipment at its destination and the value of the shipment as damaged. *Gulf, C. & S.F. Ry. Co. v. Texas Packing Co., 244 U.S. 31, 37, 61 L. Ed. 970, 37 S. Ct. 487 (1917); Seguros Banvenez, S.A. v. S/S Oliver Drescher, 761 F.2d 855, 860-61 (2d Cir. 1985)*. Here, the trial court found that the market value of the wafers was $ 726,400, and the value of the damaged shipment was zero. While FedEx argues that the wafers, once rejected by Ross, had no value to any other potential buyer because they had been custom-made for Ross, this Court agrees with the trial court's calculation of damages. The record reflects that Ross placed an order for a similar shipment of wafers after the events at issue here. Accordingly, the trial court's assessment of damages is affirmed.

## D. Spoliation

FedEx sought a sanction against Fujitsu for spoliation based on the destruction of the wafers in July 1996. The record reveals that Fujitsu informed FedEx of the damage to the container immediately upon its arrival in Japan on June 24, 1996. According **[*436]** to the parties, on an undetermined date in July, **[**32]** after receiving instructions from its insurance company, Fujitsu destroyed the container and wafers. FedEx admits that it never contacted Fujitsu to seek an opportunity to inspect the container or otherwise request that the container or wafers should be retained.

*HN14*[↑] The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation. *See Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998).* *HN15*[↑] Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence. *See id. at 127.* The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, *see West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)*, and is assessed on a case-by-case basis. *See United States v. Grammatikos, 633 F.2d 1013, 1019-20 (2d Cir. 1980)*. We have recently observed that "[our] case-by-case **[**33]** approach to the failure to produce relevant evidence seems to be working." *Reilly v. Natwest Mkts. Group, Inc., 181 F.3d 253, 267 (2d Cir. 1999)*.

In this case, the trial court found that FedEx had failed to demonstrate that Fujitsu's action was an intentional attempt to destroy evidence. In *Thiele v. Oddy's Auto and Marine, Inc., 906 F. Supp. 158, 160 (W.D.N.Y. 1995)*, the court sanctioned the plaintiff for destroying an allegedly defective boat before the third-party defendant could inspect it, but denied a spoliation sanction requested by the main defendant who had been given the opportunity to inspect the boat prior to its destruction. *See also Indemnity Ins. Co. of N. Am. v. Liebert Corp., 1998 U.S. Dist. LEXIS 9475, 96 Civ. 6675 (DC), 1998 WL 363834 (S.D.N.Y. June 29, 1998)* (denying spoliation sanction where defendant had an opportunity to inspect evidence prior to its destruction). It is undisputed that FedEx did not request to inspect the damaged shipping container after Fujitsu notified it of

the damage, nor at any time other than prior to it making the summary judgment motion in August 1999. Accordingly, the trial court did not abuse its discretion **[\*\*34]** in finding that, under the particular facts of this case, no sanction for spoliation was required.

## CONCLUSION

We hold that (1) because the return shipment from Austin to Narita constituted a new shipment that was constructively accepted by FedEx without the tender of a valid waybill, FedEx is not entitled to avail itself of the limitation of liability contained in the Original Warsaw Convention; (2) the entry into effect of the Hague Protocol does not abate the effect of the Original Warsaw Convention on events occurring prior to March 4, 1999; (3) the trial court was not clearly erroneous in finding that Fujitsu suffered damages in the amount of $ 726,400; and (4) the trial court did not abuse its discretion in refusing to sanction Fujitsu for spoliation.

AFFIRMED.

End of Document

 Caution

As of: March 17, 2022 2:37 AM Z

## *Gomes v. United States*

United States District Court for the District of Connecticut

November 19, 2012, Decided; November 19, 2012, Filed

CIVIL ACTION NO. 3:11-CV-01825 (VLB)

**Reporter**

2012 U.S. Dist. LEXIS 164526 *; 2012 WL 5869801

ARTUR GOMES, PLAINTIFF, v. UNITED STATES OF AMERICA, DEFENDANT.

## Core Terms

leaves, post office, steps, notice, summary judgment, slipped, constructive notice, minutes, stairs, floor, mode of operation, length of time, no evidence, wet, quotation, marks, additional discovery, dangerous condition, actual notice, discovery, injuries, infer, self-service, allegations, foreseeable, ascending, contends, premises, postal, spill

**Counsel:** [*1] For Artur Gomes, Plaintiff: Jonathan Perkins, LEAD ATTORNEY, Perkins & Associates, Woodbridge, CT.

For United States Govt, Defendant: Alan M. Soloway, LEAD ATTORNEY, U.S. Attorney's Office-NH, New Haven, CT.

**Judges:** Hon. Vanessa L. Bryant, United States District Judge.

**Opinion by:** Vanessa L. Bryant

## Opinion

MEMORANDUM OF DECISION GRANTING

DEFENDANT'S' MOTION FOR SUMMARY JUDGMENT [Dkt. #19]

I. Introduction

The Plaintiff, Artur Gomes ("Gomes"), brings this negligence action grounded in premises liability for monetary relief against the Defendant United States of America ("United States") pursuant to the Federal Tort Claims Act ("FTCA"), *28 U.S.C. §1346(b)*, in recompense for injuries he sustained when he allegedly slipped and fell on wet leaves which had accumulated on a set of outdoor steps on the Defendant's premises. Currently pending before the Court is the Defendant's Motion for Summary Judgment. For the reasons that follow, the Defendant's Motion for Summary Judgment is GRANTED.

II. Factual Background

The following facts relevant to the Defendant's Motion for Summary Judgment are undisputed unless otherwise noted. The Defendant United States operates a post office located at 340 Main Street, Norwich, Connecticut (the [*2] "Norwich Post Office" or "Post Office"). [Dkt. 1, Compl. at ¶ 2; Dkt. 8, Answer at ¶ 2]. Gomes maintained a post office box on the premises of the Norwich Post Office beginning in 2006 through early 2012, where he was a regular customer and routinely checked his post office box four to five times per week. [Dkt. 19-8, D's R. 56 Stmt. at ¶¶ 2, 3; Dkt. 19-12, Gomes

2012 U.S. Dist. LEXIS 164526, *2

Dep. at p. 71]. Gomes admits that he had been up and down the outdoor stairs leading to the Post Office entrance several hundred times prior to the date of the incident at issue in this action, including when it was raining, sleeting, and snowing. [Dkt. 19-8, D's R. 56 Stmt. at ¶ 11; Dkt. 19-12, Gomes Dep. at p. 73].

Gomes contends that he entered the Norwich Post Office to check his post office box in the early afternoon on October 21, 2010, using the side steps closest to the loading dock. [Dkt. 19-8, D's R. 56 Stmt. at ¶¶ 9, 16; Dkt. 19-12, Gomes Dep. at pp. 74, 78]. Gomes recalls that it was raining at the time, and he was not carrying an umbrella. [Dkt. 19-8, D's R. 56 Stmt. at ¶¶ 14, 15; Dkt. 19-12, Gomes Dep. at pp. 90, 91]. When asked whether he noticed any leaves on this set of stairs while walking up and into the  [*3] Post Office, Gomes stated, "I didn't notice anything. It could be there, but I didn't notice it." [Dkt. 19-8, D's R. 56 Stmt. at ¶ 17; Dkt. 19-12, Gomes Dep. at p. 98]. Gomes also confirmed that there was nothing obstructing his view of the steps when he climbed them to enter the Post Office. [Dkt. 19-12, Gomes Dep. at p. 98]. Gomes contends that, had he noticed any danger on the steps, he would have notified postal authorities of the danger. [Dkt. 19-8, D's R. 56 Stmt. at ¶ 18; Dkt. 19-12, Gomes Dep. at p. 105]. Gomes remained in the Post Office for less than or about two minutes, after which he exited the same way he entered. [Dkt. 19-8, D's R. 56 Stmt. at ¶¶ 20, 21; Dkt. 19-12, Gomes Dep. at pp. 75, 77, 79]. He admits that he did not speak with any post office employee while inside the Post Office. [Dkt. 19-8, D's R. 56 Stmt. at ¶19; Dkt. 19-12, Gomes Dep. at p. 76].

Gomes alleges that, after exiting the Post Office, he slipped and fell on an accumulation of wet leaves that covered the same set of stairs by which he had entered approximately two minutes prior. [Dkt. 19-8, D's R. 56 Stmt. at ¶ 10, ¶21; Dkt. 19-12, Gomes Dep. at pp. 76-77, 90]. Gomes contends that he fell backwards

 [*4] from the second step from the top and his "palm hit the edge of the stairs and the whole back just flipped, like came forward. Like, it bent." [Dkt. 19-8, D's R. 56 Stmt. at ¶ 23; Dkt. 19-12, Gomes Dep. at p. 104]. He further testified during deposition that, "[a]fter I fell I notice leaves, a lot of leaves." [Dkt. 19-8, D's R. 56 Stmt. at ¶ 24; Dkt. 19-12, Gomes Dep. at p. 90]. In an affidavit submitted with his opposition to Defendant's motion, though, Gomes asserts that "[t]here were leaves on these stairs every time I went to the post office in mid to late October 2010" and "I had not noticed the leaves when I entered because they were always there at that time. If I hadn't fallen on the wet leaves I would not have noticed them on my way out, either." [Dkt. 23, P's Opp. to MSJ at Exh. 1, Gomes Aff. at ¶¶ 6, 8]. No witnesses saw the fall and Gomes did not report the accident to postal authorities that day or within a few days. [Dkt. 19-8, D's R. 56 Stmt. at ¶¶ 8, 27; Dkt. 19-12, Gomes Dep. at p. 120; Dkt. 19-9, P's Responses to D's Interrogs. at ¶ 8]. Instead, after falling, Gomes continued to his car and drove straight to the emergency room at the William W. Backus Hospital where  [*5] he received treatment for a left distal radius fracture. [Dkt. 19-8, D's R. 56 Stmt. at ¶¶ 28, 29; Dkt. 19-12, Gomes Dep. at p. 105, 106; Dkt. 19-9, P's Responses to D's Interrogs. at ¶ 1]. Gomes subsequently underwent orthopedic surgery to set the bone and affix a locking plate. [Dkt. 19-8, D's R. 56 Stmt. at ¶30].

Gomes submitted an administrative claim to the United States Postal Service ("USPS") on or around November 29, 2010 which was subsequently denied by the Postal Service on August 3, 2011 based on a finding of no USPS negligence. [Dkt. 1, Compl. at ¶ 8; Dkt. 8, Answer at ¶ 8; Dkt. 19-8, D's R. 56 Stmt. at ¶ 34]. The Defendant United States denies that Gomes' fractured wrist resulted from a fall on the steps at the Norwich Post Office on October 21, 2010. [Dkt. 19-8, D's R. 56 Stmt. at ¶¶ 10, 21].

III. Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir.2010)*. "In determining whether that burden **[*6]** has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986)*; *Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986))*. "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315-16 (2d Cir.2006)* (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp., No.3:03cv481, 2004 U.S. Dist. LEXIS 22112, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004)* **[*7]** (internal quotation marks and citations omitted); *Martinez v. State of Connecticut, No. 3:09cv1341 (VLB), 817 F. Supp. 2d 28, 2011 WL 4396704 at *6 (D. Conn. 2011)*. Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom

the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co., 604 F.3d 712 (2d Cir. 2010)*.

IV. Discussion

Gomes claims that the United States is liable for his personal injuries because it was negligent in maintaining safe conditions on the premises of the Norwich Post Office. According to Gomes, the Norwich Post Office knew or should have known of the presence of wet leaves on the exterior steps, and therefore had a duty to either remove the leaves or warn of the dangerous condition. He contends that genuine issues of material fact exist which would allow a fact finder to find that the leaves had been on the steps of the Norwich Post Office long enough so that a reasonable, proper and timely inspection would have disclosed them, giving the Defendant ample opportunity **[*8]** to have remedied the condition. Defendant alleges that Plaintiff has presented no evidence on which a trier of fact could find that the Post Office had actual or constructive notice of the allegedly dangerous condition. The Court finds that Plaintiff's claim lacks merit.

Gomes brings this negligence action pursuant to the FTCA, under which the federal government has waived its sovereign immunity where a government employee commits a tort "while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *28 U.S.C. § 1346(b)(1)*. "The applicable law to a claim against the Government under the FTCA is the law that the state where the tortious incident took place would apply in like circumstances involving a private defendant." *Silverman v. U.S., No. CV 04-5647, 2008 U.S. Dist. LEXIS 25041,*

*2008 WL 1827920, at *12 (2d Cir. Mar. 28, 2008)* (quoting *Caban v. U.S., 728 F.2d 68, 72 (2d Cir. 1984)*; *Davis v. U.S., 430 F. Supp. 2d 67, 73 (D. Conn. 2006)* ("Under the FTCA the government's liability is determined by the application of the law of the place where **[*9]** the act or omission occurred"). Here, because Connecticut law would apply if Gomes brought a negligence action against a private defendant in this case, Connecticut law applies.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *Baptiste v. Better Val-U Supermarket, Inc., 262 Conn. 135, 138, 811 A.2d 687 (Conn. 2002)* (internal quotation marks and citations omitted). In this case, the parties do not dispute that Gomes was a business invitee and therefore the Defendant owed him a duty to maintain its premises in a reasonably safe condition. See *Kelly v. Stop and Shop, Inc., 281 Conn. 768, 776, 918 A.2d 249 (Conn. 2007)*; *Martin v. Stop & Shop Supermarket Cos., Inc., 70 Conn. App. 250, 251, 796 A.2d 1277 (Conn. App. Ct. 2002)* ("the defendant owed the plaintiff [business invitee] the duty to maintain its premises in a reasonably safe condition"); *James v. Valley-Shore Y.M.C.A., Inc., 125 Conn. App. 174, 178, 6 A.3d 1199 (Conn. App. Ct. 2010)* (same). To hold the Defendant liable for his injuries, Gomes must prove "(1) the existence of a defect, (2) that the defendant knew or in the exercise of reasonable care should have known about the defect and (3) that **[*10]** such defect had existed for such a length of time that the defendant should, in the exercise of reasonable care, have discovered it in time to remedy it." *Martin, 70 Conn. App. at 251* (internal quotation marks and citations omitted); *Chaves v. Exxon Mobil Corp., 2008 U.S. Dist. LEXIS 105786 (D. Conn. Jan. 5, 2009)* (same); *Considine v. City of Waterbury, 279 Conn. 830, 870, 905 A.2d 70 (Conn. 2006)* ("in the context of a negligence action based on a defective condition on the defendant's premises, there could be no breach of the duty resting upon the defendants unless they knew of the defective condition or were chargeable with notice of it.") (internal quotation marks and citations omitted).

Typically, for a plaintiff to recover for the breach of a duty owed to him as a business invitee, it is incumbent upon him to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused his injury or constructive notice of it.... The notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it.... In the absence of allegations **[*11]** and proof of any facts that would give rise to an enhanced duty ... a defendant is held to the duty of protecting its business invitees from known, foreseeable dangers.

*Kelly, 281 Conn. at 776* (internal quotation and grammatical marks omitted); see also *Fisher v. Big Y Foods, Inc., 298 Conn. 414, 423-39, 3 A.3d 919 (Conn. 2010)* (quoting same); *James, 125 Conn. App. at 179* ("the plaintiff [is] required to prove that the defendant had had actual or constructive notice of the *specific defect* that caused the plaintiff's injuries.") (quoting *Riccio v. Harbour Village Condo. Ass'n., Inc., 281 Conn. 160, 164, 914 A.2d 529 (Conn. 2007)*; *Graham v. Kohl's Dept. Stores, Inc., No. 3:04CV949(MRK), 2005 U.S. Dist. LEXIS 20173, 2005 WL 2256603, at *1 (D. Conn. Sept. 8, 2005)* ("relevant case law in Connecticut places a heavy burden on a 'slip and fall' plaintiff to demonstrate that a defendant had actual or constructive notice of the specific defect that led to the accident and 'not merely of conditions naturally productive of that defect even though subsequently in fact producing it.'") (citing *LaFaive v. DiLoreto, 2 Conn. App. 58, 60, 476*

2012 U.S. Dist. LEXIS 164526, *11

A.2d 626 (Conn. App. Ct. 1984)).

The Court notes that both *Kelly* and *Fisher*, cited above, addressed the mode of operation theory **[\*12]** under Connecticut law. The mode of operation theory, which "allows a customer injured due to a condition inherent in the way [a] store is operated to recover without establishing that the proprietor had actual or constructive knowledge of the dangerous condition" and applies to "premises liability claims brought by business invitees seeking compensation for injuries arising out of a business owner's self-service method of operation," does not apply to the case at hand (and the parties have not alleged that it does). *Kelly, 281 Conn. at 777, 786* (internal citations and quotation marks omitted). The Connecticut Supreme Court recently held in *Fisher* that "the mode of operation rule, as adopted in Connecticut, does not apply generally to all accidents caused by transitory hazards in self-service retail establishments, but rather, only to those accidents that result from particular hazards that occur regularly, or are inherently foreseeable, due to some specific method of operation employed on the premises," and that this theory is "meant to be a narrow one." *298 Conn. at 424, 437*. As justification for application of this method, the Connecticut Supreme Court has stated that, "because self-service **[\*13]** businesses are likely to achieve savings by virtue of their method of operation, it is appropriate to hold them responsible for injuries to customers that are a foreseeable consequence of their use of that merchandising approach unless they take reasonable precautions to prevent such injuries." *Kelly, 281 Conn. at 786*.

The mode of operation theory applies primarily in cases in which plaintiffs have suffered harm resulting from a particular method in which a retailer has offered items for sale in a self-service area. Where evidence of a dangerous method of offering goods for sale is lacking, or where the harm caused was not reasonably

foreseeable in the self-service area in which it occurred, the mode of operation theory has been held to be inapplicable. For instance, in *Fisher*, the plaintiff filed an action in negligence under the mode of operation theory against Big Y Supermarkets after he slipped and fell on a puddle of clear liquid which he believed to be fruit cocktail syrup that had leaked from a product in the aisle in which he slipped. *298 Conn. at 416-17*. At trial, the jury returned a verdict for the plaintiff. The Connecticut Supreme Court, though, reversed and ordered that **[\*14]** the jury verdict be set aside in favor of judgment for the defendant supermarket, concluding that "because no evidence was presented to show that there was anything particularly dangerous about the defendant's method of offering packaged fruit products for sale, making their spillage inherently foreseeable or regularly occurring, the plaintiff failed to make out a prima facie case of negligence under the mode of operation rule." *Id. at 441*. The Court further concluded that "[w]hen a dangerous condition arises through means other than those reasonably anticipated from the mode of operation, the traditional burden of proving notice remains with the plaintiff." *Id. at 439* (internal citations and quotation marks omitted). Here, where there is no allegation that a particular method of operation within the self-service area of the Post Office created a regularly occurring hazardous condition (but rather an allegation that the Plaintiff's injury occurred outside the establishment, on the stairs), or that there was anything particularly dangerous about the Post Office's method of offering products or services for sale in that area, the mode of operation theory is inapplicable. See also *Martin v. Big Y Foods, Inc., No. CV106016107S, 2011 Conn. Super. LEXIS 2570, 2011 WL 5083977, at \*2 (Conn. Super. Ct. Oct. 5, 2011)* **[\*15]** (holding that, where "the accumulation of water on which the defendant fell is expressly claimed to have resulted from the work activities of a Store employee that had nothing to do with the store's self-

service operations, let alone a condition of danger frequently arising therefrom, the plaintiff's claim of injury . . . is not actionable in negligence under the mode of operation rule."); *Straub v. Stop & Shop Supermarket Co., LLC, No. FSTCV075003935S, 2009 Conn. Super. LEXIS 1496, 2009 WL 1814567, at \*4 (Conn. Super. Ct. May 29, 2009)* (holding that, where bake shop and produce area were on opposite sides of the store and the risk of injury from slipping on a grape in the bake shop was thus not foreseeable, mode of operation rule was not applicable); *Pereira v. Target Stores, Inc., No. 3:09-cv-1537 PCD), 2011 U.S. Dist. LEXIS 62110, 2011 WL 2413495, at \*4 (D. Conn. June 10, 2011)* (holding that mode of operation rule did not apply where plaintiff slipped on liquid on the floor, there was no evidence that plaintiff slipped in a "zone of risk," and there was nothing dangerous about defendant's "method of offering packaged items for sale that would **[\*16]** have made the existence of debris or spillage inherently foreseeable or regularly occurring.").

Actual Notice

The Defendant argues that Gomes has failed to present any evidence that the Defendant possessed actual notice of the allegedly unsafe condition on the steps leading to the Post Office. The Court agrees. Here, Gomes has admitted that he did not notice the presence of leaves on the stairs leading to the Post Office as he was ascending them. Upon entering the Post Office Gomes did not speak to any Post Office employee, although he contends that, had he noticed any danger on the steps, he would have notified postal authorities. Gomes remained in the Post Office for approximately two minutes, exited the same way he entered, and alleges that he promptly slipped and fell while descending the same steps he had just ascended. He has testified that he only noticed the presence of the leaves after he fell. No witnesses saw Gomes fall and

Gomes himself did not report the accident to postal authorities for weeks. Gomes presents no evidence that any employee of the Norwich Post Office had actual knowledge of a dangerous condition before, during, or after Gomes' short visit to the Post Office **[\*17]** on October 21, 2010. Likewise, there is no evidence that any other customer at the Norwich Post Office warned the Defendant about the alleged condition on that date. Absent evidence that the Norwich Post Office had actual notice of the wet leaves on the exterior steps, Plaintiff may not establish actual notice. [1] *See, e.g., Navarro v. Kohl's Dept. Stores, Inc., No. 3:05CV00843 (DJS), 2007 U.S. Dist. LEXIS 21179, 2007 WL 735787, at \*4 (D. Conn. Mar. 8, 2007)* (holding that, absent evidence that Defendant's employees actually knew of the defective condition - a spilled liquid on the store's floor - or that the employees themselves had created the condition by spilling the liquid on the floor, plaintiff could not establish actual notice); *Mason v. Wal-Mart Stores, Inc., No. HHDCV106013281S, 2012 Conn. Super. LEXIS 1175, 2012 WL 1959006, at \*1 (Conn. Super. Ct. May 1, 2012)* (where "[n]o evidence was presented that proves that the defendant knew of the unsafe condition prior to the plaintiff's fall," actual notice did not exist).

Constructive Notice

Because **[\*18]** Defendant did not have actual notice of the alleged defect, the remaining question before this Court is whether a genuine issue of material fact exists as to whether Defendant had constructive notice of the defect that Gomes claims caused his injury. Defendant argues that Plaintiff has presented no evidence of the length of time the wet leaves were on the steps and

_____

[1] The Court notes that the Plaintiff has not disputed in his Opposition to Defendant's motion for summary judgment Defendant's assertion that the Norwich Post Office did not have actual notice of the defect.

therefore cannot establish constructive notice. Plaintiff counters that there were leaves on the stairs every time he went to the post office in the one to two weeks prior to his fall, which occurred on a Thursday, and he had not noticed them on the day of the fall "because they were always there at that time." Thus, Plaintiff argues, a trier of fact could infer that the leaves were on the steps for a period of time long enough that a reasonable inspection would have made their presence known to the Defendant. The Court is not persuaded by Plaintiff's argument.

"The controlling question in deciding whether the defendant[] had constructive notice of the defective condition is whether the condition existed for such a length of time that the defendants should, in the exercise of reasonable care, have discovered it in time to **[*19]** remedy it. What constitutes a reasonable length of time is largely a question of fact to be determined in the light of the particular circumstances of a case." *Riccio, 281 Conn. at 163-64* (internal quotation marks and citations omitted); *see also Kelly, 281 Conn. at 777* (same); *James, 125 Conn. App. at 179* (same). "The nature of the business and the location of the foreign substance would be factors in this determination. . . To a considerable degree each case must be decided on its own circumstances. Evidence which goes no farther than to show the presence of a slippery foreign substance does not warrant an inference of constructive notice to the defendant." *Kelly, 281 Conn. at 777* (internal citations and quotation marks omitted). "To establish constructive notice, [the plaintiff] must adduce some evidence, either direct or circumstantial, that establishes the length of time the defect was present." *Navarro, 2007 U.S. Dist. LEXIS 21179, 2007 WL 735787, at *4*. Furthermore, "[a]n inference [of constructive notice] must have some definite basis in the facts . . . and the conclusion based on it must not be the result of speculation and conjecture." *Gulycz v. Stop*

*and Shop Cos., Inc., 29 Conn. App. 519, 522, 615 A.2d 1087 (Conn. App. Ct. 1992)*.

Here, **[*20]** Plaintiff has testified that he did not notice any leaves on the stairs while walking up and into the Post Office, but has also asserted that he did not notice these leaves because the continuous presence of leaves on the steps in the weeks prior to his fall led to his not taking note of them while ascending the stairs on October 21, 2010. Even examining these facts in the light most favorable to Gomes, the Court finds that Gomes has failed to establish constructive notice because he has not presented any evidence to prove how long the leaves were present on the steps. Gomes essentially argues that, because he noticed leaves on the Post Office steps for one to two weeks prior to his fall, those leaves must have been present on these steps continuously for that particular one to two week period of time. However, Plaintiff has failed to present even a scintilla of evidence that the leaves on which he claims to have slipped on October 21, 2010 were the same leaves that he claims to have noticed on any day prior to the date of his fall, which occurred during the annual foliage season on an autumn day in New England. Additionally, Plaintiff has failed to present any evidence that the leaves **[*21]** on which he slipped while descending the stairs were present on the stairs while he was ascending them two minutes before. Indeed, the only evidence that the wet leaves on which Plaintiff fell existed *prior* to his fall is Plaintiff's assertion that he fell and noticed the leaves upon falling. Moreover, Plaintiff testified that he remained in the Post Office for approximately two minutes before exiting and descending the exterior steps, and that it was raining on October 21, 2010. Plaintiff has presented no evidence that these leaves did not fall to the steps in the two minutes in which Plaintiff was checking his post office box inside. Plaintiff's own testimony that he failed to notice any leaves on the steps while he was walking into

the Post Office is telling; if Plaintiff did not notice any leaves on the steps while ascending them, but did notice leaves on the steps after having fallen approximately two minutes later, the Court may infer that the leaves made their way on to the steps in the intervening two minutes.

Connecticut courts have held that, where a Plaintiff cannot establish by some direct or circumstantial evidence how long a dangerous condition was present, summary judgment **[*22]** may be appropriate. For instance, in *Navarro v. Kohl's Dept. Stores, Inc.*, the court granted summary judgment for the defendant where the plaintiff, who had slipped on a wet patch on the floor of the department store, did not present evidence that would support a reasonable inference as to the length of time the spill was in place. *2007 U.S. Dist. LEXIS 21179, 2007 WL 735787*. The court concluded that "the only evidence that the defect existed prior to [plaintiff's] fall is that she fell. Neither [plaintiff] nor any of the deposed store employees testified to seeing the spill or having notice of it prior to the accident. Without at least some evidence, direct or circumstantial, . . . , as to how long the spill existed prior to [plaintiff's] fall, it would be too speculative for a jury to infer the length of time the spill was in place so as to establish constructive notice." *2007 U.S. Dist. LEXIS 21179, 2007 WL 735787, at *5*. The court further concluded that "[s]peculation as to the probability or improbability of the timing of an occurrence is not . . . evidence of when the occurrence took place," and the evidence was insufficient for a jury to reasonably infer that the liquid was on the floor for any time longer than seconds. *Id.*

Similarly, **[*23]** in *Colombo v. Stop And Shop Supermarket Co., Inc.*, the appellate court affirmed summary judgment where the plaintiff, who alleged that she slipped on milk in the defendant's store, presented insufficient evidence as to how the milk was spilled or

how long it had been on the floor. *67 Conn. App. 62, 64, 787 A.2d 5 (Conn. App. Ct. 2001)*. The only evidence proffered by plaintiff was that the milk was dirty, leading the plaintiff to assume it had been on the floor for some time. The court held that "[t]he plaintiff [did not satisfy] the burden of proffering some evidence, either direct or circumstantial, from which the jury could infer that the defect she allegedly encountered existed for a length of time sufficient to put the defendant on actual or constructive notice of its existence." *Id. at 64*. Likewise, in a case whose details are similar to those at issue here, the court in *Budd v. U.S.* granted summary judgment for the defendant where plaintiff alleged injuries incurred from a fall on several drops of water on a post office floor. *No. 3:08CV131(MRK), 2009 U.S. Dist. LEXIS 98777, 2009 WL 3538648 (D. Conn. Oct. 23, 2009)*. The district court concluded that summary judgment was appropriate where plaintiff offered no evidence **[*24]** regarding how long the drops had been on the floor, how they got there, or how often the lobby of the post office was inspected or cleaned. The court further noted that "the drops could have arrived on the floor a minute and one-half before [plaintiff] slipped. Thus, the record contains absolutely no evidence from which a jury could infer constructive notice—that is, the wet 'condition existed for a length of time sufficient for the defendant's employees, in the exercise of due care, to discover the defect in time to have remedied it.'" *2009 U.S. Dist. LEXIS 98777, [WL] at *2* (internal citations omitted). Here, as in *Budd*, where Gomes cannot offer evidence that the leaves were on the steps for longer than mere minutes, he likewise cannot prove that the alleged dangerous condition on the steps "existed for a length of time sufficient for the defendant's employees, in the exercise of due care, to discover the defect in time to have remedied it."

Thus, where Gomes has presented no evidence as to how long the leaves on which he slipped were present

on the exterior steps, the Court may not infer that the leaves were present for any longer than minutes or even seconds. Therefore, Plaintiff has failed to sufficiently allege [*25] that the Defendant had constructive notice of any dangerous condition in time to remedy it. *See, e.g., Gulycz, 29 Conn. App. 519, 615 A.2d 1087* (affirming trial court's dismissal where plaintiff failed to offer evidence suggesting how long the defect - a protruding hinge and screw on a shelf at the end of a check-out aisle - had existed); *Mason, 2012 Conn. Super. LEXIS 1175, 2012 WL 1959006, at *2* (granting summary judgment where the plaintiff could not show that the water on which he slipped and fell existed long enough for the defendant to take corrective action, and holding that "it would be unreasonable for this court to find that the defendant had constructive notice of a hazardous condition that had been in existence for but one minute"); *Shaw v. Kmart Corp., No. CV065000627S, 2007 Conn. Super. LEXIS 1841, 2007 WL 2242710, at *3 (Conn. Super. Ct. July 13, 2007)* (holding that summary judgment was appropriate where "[t]he plaintiff fail[ed] . . . to offer any evidence, direct or circumstantial, to show that the wet spot [on which plaintiff slipped and fell] had existed for any period of time" and only argued that "because it had stopped snowing the day before, the defendant's employees had a sufficient length of time to anticipate, observe and clean up [*26] any wet spots that were likely to accumulate on the floor;" further concluding that plaintiff's argument had no merit because it did not "demonstrate that the specific wet spot that caused the plaintiff's injury had existed for any length of time and it merely suggests that general conditions naturally productive of wet spots existed."); *Deptula v. New Britain Trust Co., 19 Conn. Supp. 434, 436-437, 116 A.2d 773 (Conn. C. P. 1955)* (entering judgment for defendants where the source of the water on the floor on which plaintiff slipped was known, but there was no evidence as to how long the wetness was present;

therefore, without at least some evidence of how long the condition existed, it would be too speculative to infer that the water was on the floor for any more than "minutes or even seconds"); *Chaves v. Exxon Mobil Corp., No. 306CV1589(JCH), 2008 U.S. Dist. LEXIS 105786, 2009 WL 57119 (D. Conn. Jan. 5, 2009)* (dismissing case where plaintiff failed to produce any evidence of where the liquid on which he slipped came from or when it had appeared).

Moreover, even if the Post Office had notice of leaves on the steps, the Defendant may have a valid affirmative defense of contributory negligence based on Gomes' own admissions. Gomes [*27] has admitted that he was inattentive while ascending and descending the steps and has thus failed to meet his burden of exercising due or reasonable care to assure his own safety. Gomes admitted that he did not notice any leaves while climbing the steps to the Post Office, and also confirmed both that there was nothing obstructing his view of the steps when he climbed them and that he was familiar with the Post Office and the steps leading up to it. Instead, Gomes contends that "[t]here were leaves on these stairs every time I went to the post office in mid to late October 2010." Even given his allegation that the leaves had been present on the steps for approximately two weeks before his fall, Gomes claims to have noticed "a lot of leaves" only after he fell. Moreover, he posits that he would not have noticed the leaves had he not fallen. *If,* as Gomes contends, there were "a lot of leaves" on the steps and leaves had been present every time Gomes had visited the Post Office in October before his fall, and given that Gomes admittedly failed to notice these leaves while ascending the steps, then a reasonable juror would conclude that Gomes failed to exercise due care for his own safety [*28] while he was descending the Post Office steps.

Consequently, for the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.

Plaintiff's Request for Additional Discovery

Plaintiff requests additional time to pursue discovery pursuant to *Fed. R. Civ. P. 56(d)* because the attorney who was handling his case left the firm without having conducted a deposition or depositions of the person or persons employed by Defendant to inspect and maintain the Norwich Post Office. Plaintiff does not specify how this additional discovery might uncover "facts essential to justify its opposition" to Defendant's motion for summary judgment and gives no further explanation as to why discovery was not adequately conducted during the allotted time period. *Fed. R. Civ. P. 56(d)*. "In a summary judgment context, an opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of [a summary judgment] motion." *Paddington Partners v. Bouchard, 34 F.3d 1132, 1138, (2d Cir. 1994)* (internal quotation and citation omitted). "Requests for discovery in the face of motions for summary judgment put forth by parties who were dilatory in **[*29]** pursuing discovery are disfavored." *Id, at 1139*.

In this case, the deadline for conducting discovery was August 31, 2012, some nine months after Plaintiff filed this simple negligence case. Additionally, Gomes filed an administrative claim around November 29, 2010 with the United States Postal Service seeking redress for injuries from the fall which is the subject of this suit prior to the commencement of this action on November 25, 2011. Thus, the Plaintiff had the reason and opportunity to have discovered facts relevant to his claim for more than a year and a half before the close of discovery. Consequently, the time has passed for such depositions to be taken. Furthermore, the Plaintiff has failed to show how the additional discovery request would create a genuine issue of material fact or is essential to his opposition to Defendant's motion. Therefore, the Court DENIES Plaintiff's request for additional discovery. See

*Latimore v. NBC Universal Television Studio, No. 11-1202-cv, 480 Fed. Appx. 649, 2012 U.S. App. LEXIS 10347, 2012 WL 1863787, at *1 (2d Cir. May 23, 2012)* (affirming district court's denial of additional discovery where plaintiff had "more than enough time to conduct discovery, and she did not demonstrate that further **[*30]** discovery would likely uncover any evidence of [copyright violations]."); *Cornell v. Kapral, No. 11- 530-cv, 483 Fed. Appx. 590, 2012 U.S. App. LEXIS 8801, 2012 WL 1506049, at *1 (2d Cir. May 1, 2012)* (affirming district court's denial of additional discovery where six months elapsed without either party noticing a deposition, and where plaintiff failed to file an affidavit sufficiently explaining the need for additional discovery as required by *Rule 56(d)*).

V. Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's request for additional discovery is DENIED. The Clerk is directed to close the case.

IT IS SO ORDERED.

/s/ Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: November 19, 2012

---

End of Document

 Positive

As of: March 17, 2022 2:37 AM Z

## *Gulycz v. Stop & Shop Cos.*

Appellate Court of Connecticut

October 5, 1992, Argued ; November 17, 1992, Decided

No. 10948

**Reporter**

29 Conn. App. 519 *; 615 A.2d 1087 **; 1992 Conn. App. LEXIS 410 ***

Eugene Gulycz v. Stop and Shop Companies, Inc.

**Prior History: [***1]**   Action to recover damages for personal injuries sustained by the plaintiff as a result of the defendant's alleged negligence, brought to the Superior Court in the judicial district of Hartford-New Britain at New Britain and tried to the court, Hammer, J.; judgment dismissing the action, from which the plaintiff appealed to this court.

**Disposition:** Affirmed.

## Core Terms

trial court, constructive notice, motion to dismiss, length of time, no evidence, light most favorable, plaintiff's claim, prima facie case, burden of proof, sufficient length of time, circumstantial evidence, judgment of dismissal, reasonable inference, recover damages, medical report, trier of fact, protruding, injuries, aisle, hinge, infer, screw

## Case Summary

### Procedural Posture

Plaintiff customer appealed from a judgment of the Superior Court in the judicial district of Hartford-New Britain at New Britain (Connecticut), which dismissed the customer personal injury suit against defendant property owner.

### Overview

The customer was injured when his trousers became caught in a hinge protruding from a checkout aisle at the property owner's store. Subsequent to the dismissal of the customer's personal injury suit, he argued that there was sufficient evidence to support his claim and that the trial court applied an improper standard in determining the property owner's motion to dismiss. On review, the court affirmed the dismissal. In reaching its conclusion, the court held that the individual had provided neither direct nor circumstantial evidence to support his claim that the property owner had constructive notice of the protruding hinge. The court also held that the trial court applied the proper standard in considering the property owner's motion and that, even when viewing the evidence in the light most favorable to the customer, elements essential to support the customer's claim were missing, thus warranting dismissal.

### Outcome

The court affirmed the order dismissing the suit against the property owner.

## LexisNexis® Headnotes

Case 3:20-cv-01657-OAW    Document 53    Filed 03/17/22    Page 172 of 253

Page 2 of 5

29 Conn. App. 519, *519; 615 A.2d 1087, **1087; 1992 Conn. App. LEXIS 410, ***1

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Torts > ... > Duty On Premises > Invitees > Business Invitees

Torts > Premises & Property Liability > General Premises Liability > General Overview

Torts > ... > Duty On Premises > Invitees > General Overview

### *HN1*[ ] Jury Trials, Province of Court & Jury

A property owner owes a duty to a business invitee to keep its premises in a reasonably safe condition. If that duty was breached, and if the property owner had actual or constructive notice of the defect within a reasonable time to remedy it, the invitee is entitled to recover damages for injuries. Whether a property owner has constructive notice of a defect turns on whether the condition existed for a length of time sufficient for the property owner or agents, in the exercise of due care, to discover the defect in time to have remedied it.While an abundance of evidence is not necessary to show a sufficient length of time existed for discovery of the condition, some evidence is required. Where some evidence has been submitted, what constitutes a reasonable length of time becomes a question of fact to be determined on the basis of the circumstances of the case.

Evidence > Admissibility > Circumstantial & Direct Evidence

Torts > Premises & Property Liability > General Premises Liability > General Overview

Evidence > Inferences & Presumptions > General Overview

Evidence > Inferences & Presumptions > Inferences

### *HN2*[ ] Admissibility, Circumstantial & Direct Evidence

In a case against a property owner for negligence, circumstantial evidence can establish constructive notice and inferences can be made. However, an inference must have some definite basis in the facts and the conclusion based on it must not be the result of speculation and conjecture.

Evidence > Burdens of Proof > Allocation

Evidence > Inferences & Presumptions > General Overview

Evidence > Burdens of Proof > General Overview

### *HN3*[ ] Burdens of Proof, Allocation

While a plaintiff is entitled to every favorable inference that may be legitimately drawn from the evidence, and has the same right to submit a weak case as a strong one, the plaintiff must still sustain the burden of proof on the contested issues in the complaint and the defendant need not present any evidence to contradict it. The general burden of proof in civil actions is on the plaintiff, who must prove all the essential allegations of the complaint.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

### *HN4*[ ] Defenses, Demurrers & Objections, Motions to Dismiss

When ruling on a motion to dismiss, the trial court is

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 173 of 253

Page 3 of 5

29 Conn. App. 519, *519; 615 A.2d 1087, **1087; 1992 Conn. App. LEXIS 410, ***1

required to view the evidence in the light most favorable to the plaintiff and to draw every reasonable inference in his favor. Whether a prima facie case has been made out is a question of law for the court. If, after reviewing the evidence in the light most favorable to the plaintiff, the court cannot reasonably find the essential issues on the complaint in his favor, a judgment of dismissal is appropriate.

**Counsel:** John R. Williams, for the appellant (plaintiff).

Barbara B. Sacks, with whom, on the brief, was Laura N. Ondrush, for the appellee (defendant).

**Judges:** Foti, Lavery and Freedman, Js.

**Opinion by:** FOTI

# Opinion

 **[*520]**    **[**1088]** The plaintiff appeals from the judgment of dismissal rendered during a trial to the court for failure of the plaintiff to make out a prima facie case. [1] The plaintiff brought the underlying action to recover damages for leg injuries he sustained on January 30, 1989, when his trousers were caught on a protruding hinge and screw on a shelf at the end of a check-out aisle at the defendant's store in New Britain.  Following the plaintiff's testimony and the introduction of medical reports pursuant to *General Statutes § 52-174*, the

---

[1] Practice Book § 302 provides: "If, on the trial of any issue of fact in a civil action tried to the court, the plaintiff has produced his evidence and rested his cause, the defendant may move for judgment of dismissal, and the court may grant such motion, if in its opinion the plaintiff has failed to make out a prima facie case. The defendant may offer evidence in the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made."

plaintiff rested. The defendant then moved to dismiss the action on **[***2]** the ground that the plaintiff had failed to make out a prima facie case by failing to prove that the defendant had either actual or constructive notice of the condition that the plaintiff claimed in his complaint to have existed in the defendant's store.  The court granted the defendant's motion.

On appeal, the plaintiff claims that the trial court improperly granted the motion to dismiss because the  **[*521]** defect was structural in nature and the trier of fact could reasonably have inferred that the condition **[***3]** had existed long enough for it to have come to the defendant's attention.  He also claims that the trial court did not apply the proper standard in granting the motion to dismiss. We affirm the judgment of the trial court.

It is not disputed that the plaintiff was *HN1*[⬆] a business invitee, and that the defendant owed him a duty to keep its premises in a reasonably safe condition. *Cruz v. Drezek, 175 Conn. 230, 234, 397 A.2d 1335 (1978)*. Also undisputed is that, if that duty was breached, and if the defendant had actual or constructive notice of the defect within a reasonable time to remedy it, the plaintiff would be entitled to recover damages for his injuries. *Morris v. King Cole Stores, Inc., 132 Conn. 489, 492, 45 A.2d 710 (1946)*. The plaintiff produced no evidence to establish that the defendant had actual notice of the alleged defect. Whether the defendant had constructive notice of this condition turns on whether the condition existed for a length of time sufficient for the defendant's employees, in the exercise of due care, to discover the defect in time to have remedied it. *McCrory v. Heilpern, 170 Conn. 220, 221, 365 A.2d 1057 (1976)*.

While an **[***4]** abundance of evidence is not necessary to show a sufficient length of time existed for discovery of the condition; see *Kapilotis v. Shop Rite*

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 174 of 253

Page 4 of 5

29 Conn. App. 519, *521; 615 A.2d 1087, **1088; 1992 Conn. App. LEXIS 410, ***4

*Supermarket, Inc., 14 Conn. App. 250, 251, 540 A.2d 376 [**1089] (1988)*; some evidence is required. *Schwartz v. Waterbury Public Market, Inc., 6 Conn. App. 429, 432-33, 505 A.2d 1272 (1986)*. Where some evidence has been submitted, what constituted a reasonable length of time becomes a question of fact to be determined on the basis of the circumstances of the case. Id.

The plaintiff claims that the defect was structural in nature and therefore must have existed for a sufficient **[*522]** length of time so as to enable an inference of constructive notice. The record is devoid of such evidence. The only evidence that the plaintiff put before the trial court, other than medical reports, was his own testimony that he saw the protruding hinge and screw on which he struck his knee. He further testified that after the accident he asked others, including two people who brought in the carriages, the head cashier, the aisle supervisor and the stock clerk, "if they saw it." There was no evidence, however, whether they "saw it" **[***5]** before or after the injury. No witness was called to establish whether any employee had observed the defect at any time prior to the plaintiff's injury. If there had been some evidence that the defect existed prior to the injury, the trier of fact would have had a basis to determine whether the length of time was sufficient to permit a reasonable inference of constructive notice.

*HN2*⬆] Although circumstantial evidence can establish constructive notice; *Sokolowski v. Medi Mart, Inc., 24 Conn. App. 276, 287, 587 A.2d 1056 (1991)*; no such circumstantial evidence exists here. The plaintiff offered no evidence, direct or circumstantial, to show that the defect had existed for any period of time so as to enable the court to exercise its function as factfinder. Nor was the court able to infer that the defect had existed for any length of time, since there was no evidence to establish a basis for such an inference. "An inference must have some definite basis in the facts"; *Boehm v. Kish, 201*

*Conn. 385, 389, 517 A.2d 624 (1986)*; and the conclusion based on it must not be the result of speculation and conjecture. *Palmieri v. Macero, 146 Conn. 705, 708, 155 A.2d 750 [***6] (1959)*.

Finally, the plaintiff claims that the motion to dismiss should not have been granted since the trial court failed to view the evidence in the light most favorable to him. He argues that there probably would not have been an appeal if the court had denied the motion, **[*523]** allowed the defendant to complete its case and rest, and then rendered judgment for the defendant because the plaintiff had not sustained his burden of proof.

*HN3*⬆] While a plaintiff is entitled to every favorable inference that may be legitimately drawn from the evidence, and has the same right to submit a weak case as a strong one, the plaintiff must still sustain the burden of proof on the contested issues in the complaint and the defendant need not present any evidence to contradict it. *Lukas v. New Haven, 184 Conn. 205, 211, 439 A.2d 949 (1981)*. The general burden of proof in civil actions is on the plaintiff, who must prove all the essential allegations of the complaint. Id.

*HN4*⬆] When ruling on a motion to dismiss, the trial court is required to view the evidence in the light most favorable to the plaintiff and to draw every reasonable inference in his favor. *Pagni v. Corneal, 13 [***7] Conn. App. 468, 470, 537 A.2d 520*, cert. denied, *207 Conn. 810, 541 A.2d 1239 (1988)*. Whether a prima facie case has been made out is a question of law for the court. *Falker v. Samperi, 190 Conn. 412, 419, 461 A.2d 681 (1983)*. If, after reviewing the evidence in the light most favorable to the plaintiff, the court cannot reasonably find the essential issues on the complaint in his favor, a judgment of dismissal is appropriate. *Hinchliffe v. American Motors Corporation, 184 Conn. 607, 609, 440 A.2d 810 (1981)*.

29 Conn. App. 519, *523; 615 A.2d 1087, **1089; 1992 Conn. App. LEXIS 410, ***7

We conclude that the trial court applied the correct standard and properly rendered a judgment of dismissal in this case.

The judgment is affirmed.

In this opinion the other judges concurred.

End of Document

 Caution

As of: March 17, 2022 2:37 AM Z

## *Hellamns v. Yale-New Haven Hosp., Inc.*

Appellate Court of Connecticut

September 25, 2013, Argued; December 31, 2013, Officially Released

AC 34904

**Reporter**

147 Conn. App. 405 *; 82 A.3d 677 **; 2013 Conn. App. LEXIS 591 ***; 2013 WL 6818146

CLORISSA HELLAMNS v. YALE-NEW HAVEN HOSPITAL, INC.

**Prior History: [***1]** Action to recover damages for personal injuries sustained as a result of the defendant's alleged negligence, brought to the Superior Court in the judicial district of New Haven, and tried to the court, Hon. Robert I. Berdon, judge trial referee; judgment for the plaintiff, from which the defendant appealed to this court.

*Hellamns v. Yale New Haven Hosp., Inc., 2012 Conn. Super. LEXIS 1811 (Conn. Super. Ct., July 16, 2012)*

**Disposition:** Reversed; judgment directed.

## Core Terms

hallway, janitor, constructive notice, length of time, notice, strict liability, puddle, defective condition, standard of care, pregnant, premises liability, business invitee, walked

## Case Summary

### Overview

HOLDINGS: [1]-The duty of care imposed by the trial court was improper for a premises liability action because, by holding the hospital liable regardless of whether it was aware of any defects (water on the floor), solely because of the population that the hallway served (pregnant women), the trial court converted the hospital into an insurer of the safety of the pregnant women who were given access to the hallway; [2]-Any application of strict liability was improper because the hospital was not strictly liable for injuries sustained by pregnant business invitees; [3]-The conclusion of the trial court that the hospital had notice of the puddle of water by virtue of a passing janitor was without evidential basis and could only have been the result of speculation, which was clearly erroneous.

### Outcome

The judgment is reversed and the case is remanded with direction to render judgment for the defendant.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of Review > De Novo Review

Torts > ... > Standards of Care > Appropriate Standard > General Overview

*HN1*[⬇] **Standards of Review, De Novo Review**

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 177 of 253

Page 2 of 8

147 Conn. App. 405, *405; 82 A.3d 677, **677; 2013 Conn. App. LEXIS 591, ***1

Whether the court applied the correct standard of care in a negligence action is a question of law, and therefore appellate review is plenary.

Torts > ... > Proof > Evidence > Burdens of Proof

Torts > ... > Standards of Care > Reasonable Care > Recognition of Risk

Torts > ... > General Premises Liability > Dangerous Conditions > General Overview

Torts > ... > General Premises Liability > Defenses > General Overview

Torts > ... > Duty On Premises > Invitees > Business Invitees

*HN2*[⬇] Evidence, Burdens of Proof

The general principles of premises liability provide that the owner owes a business invitee a duty to keep the premises in a reasonably safe condition. Nevertheless, for a plaintiff to recover for the breach of a duty owed to her as a business invitee, it is incumbent upon her to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused her injury or constructive notice of it. In the absence of allegations and proof of any facts that would give rise to an enhanced duty, a defendant is held to the duty of protecting its business invitees from known, foreseeable dangers. Accordingly, business owners do not breach their duty to invitees by failing to remedy a danger unless they had actual or constructive notice of that danger.

Torts > ... > General Premises Liability > Dangerous Conditions > General Overview

Torts > ... > Standards of Care > Reasonable Care > Recognition of Risk

*HN3*[⬇] General Premises Liability, Dangerous Conditions

The controlling question in deciding whether a business/premises owner had constructive notice of a defective condition is whether the condition had existed for such a length of time that the employees should, in the exercise of due care, have, discovered it in time to have remedied it. What constitutes a reasonable length of time within which the owner should have learned of the defect, how that knowledge should have been acquired, and the time within which, thereafter, the defect should have been remedied are matters to be determined in light of the particular circumstances of each case. The nature of the business and the location of the defective condition would be factors in this determination. To a considerable degree each case must be decided on its own circumstances.

Torts > ... > Proof > Evidence > Burdens of Proof

Torts > ... > Standards of Care > Reasonable Care > Recognition of Risk

Torts > ... > General Premises Liability > Dangerous Conditions > General Overview

*HN4*[⬇] Evidence, Burdens of Proof

A duty on a premises owner to ensure that a defect does not exist for "any length of time" is incompatible with the plaintiff's well established duty in a premises liability action to prove that a defect existed for "a reasonable length of time," that is, a period of time such that the defendant could have both learned of and remedied the defect. Further, to establish the presence of a defect for "any length of time," the plaintiff need

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 178 of 253

Page 3 of 8

147 Conn. App. 405, *405; 82 A.3d 677, **677; 2013 Conn. App. LEXIS 591, ***1

only establish a causal link between the defect and the premises owner. Such is the burden borne by a plaintiff in a strict liability action and not in a premises liability action.

Torts > ... > Duty On
Premises > Invitees > Business Invitees

*HN5*[ ] Invitees, Business Invitees

In Connecticut, a premises owner is not strictly liable for injuries sustained by pregnant business invitees.

Torts > ... > Proof > Evidence > Burdens of Proof

*HN6*[ ] Evidence, Burdens of Proof

Strict liability is available only where the legislature has provided for it or where common law has imposed it and the legislature has not changed it.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

*HN7*[ ] Standards of Review, Clearly Erroneous Review

A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made.

Torts > ... > Proof > Evidence > Burdens of Proof

Torts > ... > Standards of Care > Reasonable Care > Recognition of Risk

Torts > ... > General Premises Liability > Dangerous Conditions > General Overview

*HN8*[ ] Evidence, Burdens of Proof

A plaintiff can demonstrate that a defendant had actual notice of an unsafe condition by, for example, demonstrating that the condition was created by the defendant's employee or by presenting evidence that an employee, operating within the scope of his authority, observed the dangerous condition and either was charged with maintaining the area or was charged with a duty to report the unsafe condition. To establish constructive notice, the controlling question is whether the condition existed for such a length of time that the defendants should, in the exercise of reasonable care, have discovered it in time to remedy it. What constitutes a reasonable length of time is largely a question of fact to be determined in light of the particular circumstances of the case.

Torts > ... > General Premises Liability > Dangerous Conditions > General Overview

Torts > ... > Standards of Care > Reasonable Care > Recognition of Risk

*HN9*[ ] General Premises Liability, Dangerous Conditions

Evidence establishing that the defective condition existed a few seconds before the accident is insufficient to establish that the defendant had constructive notice of that defect.

Evidence > Inferences & Presumptions > Inferences

Torts > Negligence > Proof > General Overview

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 179 of 253

Page 4 of 8

147 Conn. App. 405, *405; 82 A.3d 677, **677; 2013 Conn. App. LEXIS 591, ***1

*HN10*[↓]  **Inferences & Presumptions, Inferences**

In premises liability cases, inferences to be drawn from the facts proved must be reasonable and logical, and the conclusions based on them must not be the result of speculation and conjecture.

## Syllabus

The plaintiff sought to recover damages from the defendant hospital for personal injuries she sustained when she slipped and fell on a puddle of water in a hallway of a building owned by the defendant. The plaintiff was at the building seeking treatment related to her pregnancy at the time of her fall. The trial court rendered judgment for the plaintiff, from which the defendant appealed to this court. *Held*:

1. The trial court applied a standard of care that was contrary to law when it held that extra care was required by the defendant with respect to the maintenance of the hallway and that care included not to allow hazardous material to remain on the floors of the hallway for "any length of time": although the defendant owed the plaintiff, a business invitee, a duty to keep the premises in a reasonably safe condition, the plaintiff had to **[***2]** prove that the defendant had actual or constructive notice of the presence of the unsafe condition that caused her injury, and, thus, the duty imposed by the court on a premises owner to ensure that a defect not exist for any length of time was akin to a strict liability standard and was improper for a premises liability action; moreover, the trial court, by holding the defendant liable regardless of whether it was aware of any defects, solely because of its knowledge that pregnant women used the hallway, converted the defendant into an insurer of safety of the pregnant women who were given access to the hallway, which was incompatible with a principle of premises liability

that a property owner is not an insurer of the safety of its invitees.

2. The trial court's finding that the defendant had notice of the puddle of water because, just prior to the plaintiff's fall, a janitor had walked by the spot and could have alerted the plaintiff to the danger, was not supported by the record and was clearly erroneous: the sole evidence provided at trial as to the issue of notice was the plaintiff's own testimony that a janitor had walked past the puddle of water just before she fell, and the **[***3]** testimony of an employee of the defendant who had observed the puddle of water but did not know its source or how long it had been there, which was insufficient to support the court's finding that an employee of the defendant noticed the defect and had an opportunity to remedy it; furthermore, the plaintiff failed to establish that notice could be imputed to the defendant, as she failed to present any evidence to establish that cleaning the specific hallway where the accident occurred was within the janitor's scope of employment.

**Counsel:** Miles N. Esty, for the appellant (defendant).

William B. Wynne, with whom, on the brief, was Lawrence H. Adler, for the appellee (plaintiff).

**Judges:** Robinson, Alvord and Lavery, Js.

**Opinion by:** LAVERY

## Opinion

**[**679]  [*406]** LAVERY, J. The defendant, Yale-New Haven Hospital, Inc., appeals from the judgment rendered after a trial to the court awarding the plaintiff, Clorissa Hellamns, damages for injuries sustained in a fall on the defendant's property. The defendant claims that the court applied a standard of care contrary to law.

Case 3:20-cv-01657-OAW    Document 53    Filed 03/17/22    Page 180 of 253

Page 5 of 8

147 Conn. App. 405, *406; 82 A.3d 677, **679; 2013 Conn. App. LEXIS 591, ***3

The defendant also claims that the plaintiff failed to establish that **[\*407]** the defendant had notice of the defect. We reverse the judgment of the court.

The court found the following **[\*\*\*4]** facts. On September 15, 2009, the plaintiff sought treatment related to her pregnancy at the Dana Clinic Building located at 789 Howard Avenue, New Haven. The Dana Clinic **[\*\*680]** Building is owned by the defendant. While walking in a hallway, the plaintiff slipped on a puddle of water on the floor and fell. A janitor, pushing a cart with cleaning material and a warning sign, walked past the spot where the water had accumulated just prior to the plaintiff falling. The hallway primarily served patients, many of whom were pregnant, and the hallway was not open to the public, in that the patients needed permission to enter from the waiting room. As a result of the fall, the plaintiff received strains and injuries to her lumbar spine, groin area, right knee, the bottom of her stomach, and other contiguous muscles. Her unborn child was not injured.

The plaintiff brought this action against the defendant to recover damages for the injuries sustained as a result of her fall. The matter was tried to the court on April 13, 2012. On July 16, 2012, in a written decision, the court found the defendant negligent. The court awarded the plaintiff $61,914 in damages. This appeal followed.

I

The defendant first **[\*\*\*5]** claims that the court applied a standard of care contrary to law. Specifically, the defendant claims that the court applied a standard akin to strict liability. The court held that "extra care was required by the defendant with respect to the maintenance of the hallway and that care included not to allow hazardous material to remain on the floors of the hallway for any length of time," and the court found the defendant liable because it "allow[ed] the puddle of water to remain . . . for any length of time." We agree

with the defendant.

*HN1*[↑] **[\*408]** Whether the court applied the correct standard of care is a question of law, and therefore our review is plenary. *Location Realty, Inc. v. Colaccino, 287 Conn. 706, 717, 949 A.2d 1189 (2008)*; *Deroy v. Baron, 136 Conn. App. 123, 127, 43 A.3d 759 (2012)*.

The general principles of premises liability guide our analysis. It is undisputed that the plaintiff was a business invitee, and therefore, that *HN2*[↑] the defendant owed the plaintiff a duty to keep the premises in a reasonably safe condition. See *Gulycz v. Stop & Shop Cos., 29 Conn. App. 519, 521, 615 A.2d 1087*, cert. denied, *224 Conn. 923, 618 A.2d 527 (1992)*; see also *DiPietro v. Farmington Sports Arena, LLC, 306 Conn. 107, 116-17, 49 A.3d 951 (2012)*. **[\*\*\*6]** "Nevertheless, [f]or [a] plaintiff to recover for the breach of a duty owed to [her] as [a business] invitee, it [is] incumbent upon [her] to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused [her injury] or constructive notice of it. . . . In the absence of allegations and proof of any facts that would give rise to an enhanced duty . . . [a] defendant is held to the duty of protecting its business invitees from known, foreseeable dangers. . . . Accordingly, business owners do not breach their duty to invitees by failing to remedy a danger unless they had actual or constructive notice of that danger." (Citation omitted; internal quotation marks omitted.) *DiPietro v. Farmington Sports Arena, LLC, supra, 116-17*.

*HN3*[↑] "The controlling question in deciding whether the defendant had constructive notice of the defective condition is whether the condition had existed for such a length of time that the defendants' employees should, in the exercise of due care, have discovered it in time to have remedied it. . . . What constitutes a reasonable length of time within which the defendant should have

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 181 of 253

Page 6 of 8

147 Conn. App. 405, *408; 82 A.3d 677, **680; 2013 Conn. App. LEXIS 591, ***6

learned of the defect, how [***7] that knowledge should [*409] have been acquired, and the time within which, [**681] thereafter, the defect should have been remedied are matters to be determined in light of the particular circumstances of each case. The nature of the business and the location of the defective condition would be factors in this determination. To a considerable degree each case must be decided on its own circumstances." (Citation omitted.) *Pollack v. Gampel, 163 Conn. 462, 469-70, 313 A.2d 73 (1972);* see also *Riccio v. Harbour Village Condominium Ass'n., Inc., 281 Conn. 160, 163-64, 914 A.2d 529 (2007); Morris v. King Cole Stores, Inc., 132 Conn. 489, 494, 45 A.2d 710 (1946).*

The court found that "[i]n view of the plaintiff's physical condition at the time of the fall (that is, she was six months pregnant), and that the defendant had knowledge that pregnant women used the hallway of the hospital where the fall took place . . . to allow the puddle of water to remain which caused the fall for any length of time constituted negligence on the part of the defendant." On appeal, the defendant asserts that this standard of care is improper because it is akin to strict liability, in that a plaintiff need only prove the presence [***8] of a defect to establish liability. Further, the defendant argues that any application of strict liability to this case was improper because Connecticut does not recognize strict liability as the standard of care owed by a premises owner to pregnant business invitees, and because the plaintiff did not plead strict liability.

We agree with the defendant that the standard of care used by the court is contrary to law. *HN4*[⬆] A duty on a premises owner to ensure that a defect does not exist for "any length of time" is incompatible with the plaintiff's well established duty in a premises liability action to prove that a defect existed for "a reasonable length of time," that is, a period of time such that the defendant could have both learned of and remedied the defect.

[*410] See, e.g., *Colombo v. Stop & Shop Supermarket Co., Inc., 67 Conn. App. 62, 63-65, 787 A.2d 5 (2001)* (evidence that plaintiff fell on dirty milk insufficient basis for inference to be drawn that milk was on floor for sufficient period of time to establish actual or constructive notice), cert. denied, *259 Conn. 912, 789 A.2d 993 (2002).* Further, to establish the presence of a defect for "any length of time," the plaintiff need only [***9] establish a causal link between the defect and the premises owner. Such is the burden borne by a plaintiff in a strict liability action; see *Caporale v. C. W. Blakeslee & Sons, Inc., 149 Conn. 79, 85, 175 A.2d 561 (1961);* and not in a premises liability action. The duty of care imposed by the court in the present case was improper for a premises liability action.

The plaintiff asserts that the court did not apply strict liability, but "rather, it found that given the combination of total control of the hallway, the population it served and a janitor with the means of curing or warning of the defect, the defendant knew or should have known that the defect existed." We are not persuaded. By holding the defendant liable regardless of whether it was aware of any defects, solely because of the population that the hallway served, the court converted the defendant into an insurer of the safety of the pregnant women who are given access to the hallway. This finding is incompatible with a principle of premises liability that a property owner is not an insurer of the safety of its invitees. *Drible v. Village Improvement Co., 123 Conn. 20, 23-24, 192 A. 308 (1937)* ("[u]nder familiar principles [***10] of law, the defendant, as a property owner, is not an insurer of the safety of persons using . . . the premises against the possibility of injury by reason of [a defective condition] thereon. . . . Mere proof of the [**682] presence of some [defective condition] does not necessarily show a breach of [a] defendant's duty. . . . [T]he burden rests upon the plaintiff . . . to offer evidence . . . [*411] from which the jury could

Case 3:20-cv-01657-OAW    Document 53    Filed 03/17/22    Page 182 of 253

Page 7 of 8

147 Conn. App. 405, *411; 82 A.3d 677, **682; 2013 Conn. App. LEXIS 591, ***10

reasonably conclude that the defendant had notice of this condition and failed to take reasonable steps to remedy it after such notice"); see also *Morris v. King Cole Stores, Inc., supra, 132 Conn. 494* ("[e]vidence which goes no farther than to show the presence of a slippery foreign substance does not warrant any inference of constructive notice to the defendant").

We also agree with the defendant that any application of strict liability to this case was improper. *HN5*[↑] In Connecticut, a premises owner is not strictly liable for injuries sustained by pregnant business invitees. See *Torres v. Department of Correction, 50 Conn. Supp. 72, 78 n.8, 912 A.2d 1132 (2006)* (*HN6*[↑] strict liability is available only where legislature has provided for it or where common law has imposed it and legislature [***11] has not changed it). The standard of care applied by the court was incorrect.[1]

II

The defendant also claims that the plaintiff failed to establish that the defendant had notice of the defect. We agree.

The court found that "[j]ust prior to the plaintiff falling, a janitor walked by the spot where the water had accumulated that caused the plaintiff to fall. The janitor had a cart with cleaning material and a warning sign. The water could have been dried or the warning sign could have been displayed which would have alerted the plaintiff to the danger that caused her fall."

"To the extent that the defendant challenges the trial court's factual findings, we review such claims under [*412] our clearly erroneous standard of review. . . . *HN7*[↑] A court's determination is clearly erroneous only in cases in which the record contains no evidence to [***12] support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Citation omitted; internal quotation marks omitted.) *Considine v. Waterbury, 279 Conn. 830, 858, 905 A.2d 70 (2006).*

*HN8*[↑] A plaintiff can demonstrate that a defendant had actual notice of an unsafe condition by, for example, demonstrating that the condition was created by the defendant's employee; see *Zarembski v. Three Lakes Park, Inc., 177 Conn. 603, 607, 419 A.2d 339 (1979)*; or by presenting evidence that an employee, operating within the scope of his authority, observed the dangerous condition and either was charged with maintaining the area or was charged with a duty to report the unsafe condition. See *Derby v. Connecticut Light & Power Co., 167 Conn. 136, 141-42, 355 A.2d 244 (1974)*, cert. denied, *421 U.S. 931, 95 S. Ct. 1659, 44 L. Ed. 2d 88 (1975)*. To establish constructive notice, "[t]he controlling question . . . is whether the condition existed for such a length of time that the defendants should, in the exercise of reasonable care, have discovered it in time to remedy it. . . . What constitutes a reasonable length of time is [***13] largely a question of fact to be determined in light of the particular circumstances of the case." (Citation omitted; internal quotation marks omitted.) *Considine v. Waterbury, supra, [**683] 279 Conn. 870*, *Sauro v. Arena Co., 171 Conn. 168, 171, 368 A.2d 58 (1976)*.

At trial, the plaintiff provided only her own testimony and her medical records to establish her case. The sole evidence provided at trial as to the issue of notice was the plaintiff's own testimony that a janitor walked past the puddle of water just before she fell. The only other

---

[1] The defendant also argues that the standard of care applied by the court was contrary to law because it removed the plaintiff's burden to prove notice. Because we agree with the defendant that the standard of care applied by the court was improper because it was akin to strict liability, it is unnecessary to address any additional aspects of the defendant's claim.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 183 of 253

Page 8 of 8

147 Conn. App. 405, *412; 82 A.3d 677, **683; 2013 Conn. App. LEXIS 591, ***13

evidence before the court was the testimony of an employee of the defendant. This employee testified that, **[\*413]** upon entering the hallway after the plaintiff fell, the employee observed the puddle of water, but was unable to determine the source of the water, did not see any cups or other litter on the ground, and was unable to determine how long the water had been there. The employee also testified that she never observed a janitor

This evidence is insufficient to support the court's finding that an employee of the defendant noticed the defect and had the opportunity to remedy the defect. First, the plaintiff did not present the janitor, or any other employee **[\*\*\*14]** of the defendant, to establish for the court that the janitor actually saw the puddle of water before the accident. While circumstantial evidence can establish constructive notice, a plaintiff's assertion that an employee walked past the defect, absent evidence that the employee actually did see the defect, is insufficient. See *Gulycz v. Stop & Shop Cos., supra, 29 Conn. App. 522* (evidence insufficient to establish constructive notice when evidence established that plaintiff saw defect but failed to establish that defendant's employees saw defect prior to plaintiff's injury). Second, the plaintiff's testimony established that a janitor passed the puddle of water only seconds before the plaintiff fell. **HN9**[⬆] Evidence establishing that the defective condition existed a few seconds before the accident is insufficient to establish that the defendant had constructive notice of that defect. See *White v. E & F Construction Co., 151 Conn. 110, 113-14, 193 A.2d 716 (1963)* (evidence that established that defective condition existed for only two minutes prior to accident was insufficient to charge defendant with constructive notice of defect); see also *Gulycz v. Stop & Shop Cos., supra, 521-22.*

Third, **[\*\*\*15]** the plaintiff failed to establish that notice

could be imputed to the defendant because the plaintiff did not present any evidence to establish that cleaning the specific hallway where the accident occurred was within the janitor's scope of employment. See **[\*414]** *Derby v. Connecticut Light & Power Co., supra, 167 Conn. 142* ("[w]hile it is true that matters coming to the knowledge of an agent of a corporation within the scope of his authority are conclusively presumed to have been reported to his principal . . . there is nothing in the evidence of the present case to indicate that the condition of the [property] was a matter within the scope of the authority of the repairman who may have seen it, or any other agent who may have entered onto the property" [citations omitted]). *HN10*[⬆] "Inferences to be drawn from the facts proved must be reasonable and logical, and the conclusions based on them must not be the result of speculation and conjecture." *Palmieri v. Macero, 146 Conn. 705, 708, 155 A.2d 750 (1959)*; see also *Gulycz v. Stop & Shop Cos., supra, 29 Conn. App. 522*. The conclusion of the court that the defendant had notice of the puddle of water by virtue of a passing janitor was without evidential **[\*\*\*16]** basis and could only have been the result of speculation. *Palmieri v. Macero, supra, 708*. Such a finding is clearly erroneous.

**[\*\*684]** The judgment is reversed and the case is remanded with direction to render judgment for the defendant.

In this opinion the other judges concurred.

---

End of Document

 Caution

As of: March 17, 2022 2:37 AM Z

## *James v. Valley-Shore Y.M.C.A., Inc.*

Appellate Court of Connecticut

September 21, 2010, Argued; November 23, 2010, Officially Released

AC 31571

**Reporter**

125 Conn. App. 174 *; 6 A.3d 1199 **; 2010 Conn. App. LEXIS 527 ***

JENNIFER JAMES v. THE VALLEY-SHORE Y.M.C.A., INC.

**Subsequent History:** Appeal denied by *James v. Valley-Shore Y.M.C.A., Inc., 300 Conn. 916, 13 A.3d 1103, 2011 Conn. LEXIS 78 (2011)*

**Prior History: [***1]** Action to recover damages for personal injuries sustained as a result of the defendant's alleged negligence, brought to the Superior Court in the judicial district of Middlesex, where the court, Bear, J., granted the defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed to this court.

*James v. Valley Shore Y.M.C.A., Inc., 2009 Conn. Super. LEXIS 2612 (Conn. Super. Ct., Sept. 25, 2009)*

**Disposition:** Affirmed.

## Core Terms

pool, slipped, residue, ladder, constructive notice, conditions, slippery, notice, steps, summary judgment, genuine issue of material fact, deposition testimony, unsafe condition, quotation, marks, chemical, foot

## Case Summary

**Procedural Posture**

Plaintiff patron filed a premises liability action against defendant fitness center, alleging she slipped and fell on a slippery substance on the steps of the center's swimming pool ladder. The Superior Court in the judicial district of Middlesex (Connecticut) found the patron did not show the center had constructive notice of the alleged unsafe condition and granted the center's motion for summary judgment. The patron appealed.

**Overview**

On appeal, the patron claimed she submitted evidence indicating the center had constructive notice of the alleged defect. Specifically, the patron relied on her husband's statement in his affidavit that he "felt a slimy, slippery, algae-like build-up" on the steps and on the deposition testimony of the center's facilities director. However, the proof submitted by the patron was bereft of evidence that she ever came into contact with the residue discovered by her husband. The attestation of the patron's husband that he felt a slippery residue in the area where the patron fell pertained to the general conditions of the area, which was insufficient to establish constructive notice on the part of the center. Likewise, the director's deposition testimony as to the consequences of terminating chemical treatment in the pool related to knowledge of conditions naturally productive of a defect, rather than knowledge of the

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 185 of 253

Page 2 of 9

125 Conn. App. 174, *174; 6 A.3d 1199, **1199; 2010 Conn. App. LEXIS 527, ***1

specific defect in question. Furthermore, there was no evidence the allegedly defective condition existed for such a length of time that the center's employees should, in the exercise of due care, have discovered it in time to have remedied it.

### Outcome

The judgment was affirmed.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN1*[⬇] Summary Judgment, Entitlement as Matter of Law

Summary judgment is appropriate when the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Conn. Gen. Prac. Book, R. Super. Ct. § 17-49.*

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

*HN2*[⬇] Entitlement as Matter of Law, Materiality of Facts

For purposes of summary judgment, a material fact is a fact that will make a difference in the result of the case.

The burden of showing the nonexistence of any material fact is on the party seeking summary judgment.

Civil Procedure > ... > Summary Judgment > Opposing Materials > Accompanying Documentation

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

*HN3*[⬇] Opposing Materials, Accompanying Documentation

For purposes of summary judgment, it is not enough for the moving party merely to assert the absence of any disputed factual issue; the moving party is required to bring forward evidentiary facts, or substantial evidence outside the pleadings to show the absence of any material dispute. Once met, the burden shifts to the party opposing such a motion to provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Need for Trial

125 Conn. App. 174, *174; 6 A.3d 1199, **1199; 2010 Conn. App. LEXIS 527, ***1

HN4[⬇] **Entitlement as Matter of Law, Appropriateness**

A motion for summary judgment is properly granted if it raises at least one legally sufficient defense that would bar a plaintiff's claim and involves no triable issue of fact.

> Civil Procedure > Appeals > Standards of Review > De Novo Review

> Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

> Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

HN5[⬇] **Standards of Review, De Novo Review**

Because a trial court's decision on a motion for summary judgment is a legal determination, an appellate court's review is plenary.

> Torts > ... > Duty On Premises > Invitees > Business Invitees

> Torts > ... > Activities & Conditions > Slip & Fall Injuries > Elements

> Torts > ... > General Premises Liability > Dangerous Conditions > Duty to Maintain

> Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

> Torts > ... > Duties of Care > Duty On Premises > Reasonable Care

HN6[⬇] **Invitees, Business Invitees**

A defendant owes a business invitee a duty to keep its premises in a reasonably safe condition. Typically, under traditional premises liability doctrine, for a plaintiff to recover for the breach of a duty owed to her as a business invitee, it is incumbent upon her to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused her injury or constructive notice of it. The notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it. To recover under Connecticut's current law, the plaintiff is required to prove that the defendant had had actual or constructive notice of the specific defect that caused the plaintiff's injuries.

> Torts > ... > General Premises Liability > Dangerous Conditions > Duty to Inspect

> Torts > ... > Proof > Evidence > Inferences & Presumptions

> Torts > ... > Proof > Evidence > Province of Court & Jury

> Torts > ... > Activities & Conditions > Slip & Fall Injuries > General Overview

> Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

HN7[⬇] **Dangerous Conditions, Duty to Inspect**

The question as to whether a defendant had constructive notice of the defect of which a business invitee complained entails an inquiry into whether the condition had existed for such a length of time that the defendant's employees should, in the exercise of due care, have discovered it in time to have remedied it. What constitutes a reasonable length of time is largely a question of fact to be determined in the light of the

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 187 of 253

Page 4 of 9

125 Conn. App. 174, *174; 6 A.3d 1199, **1199; 2010 Conn. App. LEXIS 527, ***1

particular circumstances of a case. The nature of the business and the location of the foreign substance would be factors in this determination. To a considerable degree each case must be decided on its own circumstances. Evidence which goes no farther than to show the presence of a slippery foreign substance does not warrant an inference of constructive notice to the defendant.

Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

*HN8*[⬇] Dangerous Conditions, Known Dangers

On a question of notice for purposes of premises liability, the trier's consideration must be confined to a defendant's knowledge and realization of the specific condition causing the injury, and such knowledge and realization cannot be found to exist from a knowledge of the general or overall conditions obtaining on the premises.

Civil Procedure > Appeals > Appellate Briefs

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > General Overview

*HN9*[⬇] Appeals, Appellate Briefs

It is well established that claims are unreviewable when raised for the first time in a reply brief. One rationale for that maxim is the fact that arguments first presented in a reply brief impair the opposing party's opportunity to reply in writing.

Governments > Courts > Judicial Precedent

*HN10*[⬇] Courts, Judicial Precedent

It is axiomatic that the Appellate Court of Connecticut, as an intermediate body, is bound by the decisions of the Connecticut Supreme Court. Accordingly, the Appellate Court is not at liberty to overrule or discard the decisions of the Supreme Court but are bound by them. It is not within the Appellate Court's province to reevaluate or replace those decisions.

**Counsel:** William F. Gallagher, with whom, on the brief, were Michael L. Oh and Mark A. Balaban, for the appellant (plaintiff).

Ralph W. Johnson III, for the appellee (defendant).

**Judges:** Gruendel, Beach and Sullivan, Js. GRUENDEL, J. In this opinion the other judges concurred.

**Opinion by:** GRUENDEL

## Opinion

 [**1201]   [*175] GRUENDEL, J. The plaintiff, Jennifer James, appeals from the summary judgment rendered by the trial court in favor of the defendant, The Valley-Shore Y.M.C.A.,  [*176] Inc. She claims that the court improperly concluded that no genuine issue of material fact existed as to the notice element of this premises liability action. [1] We affirm the judgment of the trial court.

The record, viewed in the light most favorable to the plaintiff; see *Martinelli v. Fusi, 290 Conn. 347, 350, 963 A.2d 640 (2009)*; reveals the following facts. On June

_____

[1] In light of our conclusion that summary judgment was appropriate on that ground, we do not address the court's alternate basis for rendering summary judgment or the plaintiff's challenge thereto. See *Valentine v. LaBow, 95 Conn. App. 436, 448 n.11, 897 A.2d 624*,  [***2] cert. denied, *280 Conn. 933, 909 A.2d 963 (2006)*.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 188 of 253

Page 5 of 9

125 Conn. App. 174, *176; 6 A.3d 1199, **1201; 2010 Conn. App. LEXIS 527, ***2

26, 2007, the plaintiff and her husband, Alan James, swam in a pool on the defendant's premises without incident. The plaintiff entered and exited the pool via a ladder with metal steps and encountered no difficulty in so doing. Neither the plaintiff nor her husband noticed any slippery conditions on the ladder at that time. When they returned to the defendant's facility the following day, the plaintiff approached the same ladder to enter the pool. As she entered the pool via the ladder, she slipped and fell, resulting in physical injury to her shoulder and knee. Her husband already had entered the pool and did not witness her fall, but came to her aid soon thereafter. With the plaintiff standing in the pool beside him, he ran his hand over a step that was underwater and felt "a slimy, slippery, algae-like buildup . . . ." Nevertheless, the plaintiff and her husband at that time did not notify the defendant or its employees of the incident or the allegedly unsafe condition **[***3]** that they had discovered. Rather, the plaintiff first reported her accident to the defendant seven weeks later. At that time, she stated that she had "slipped on the steps" and did not mention any slippery substance or residue thereon.

The plaintiff thereafter commenced this negligence action against the defendant grounded in premises liability. Her one count complaint alleged, inter alia, that **[*177]** the negligence of the defendant in failing to maintain the ladder properly "caused [her] to fall on a slippery substance on [its] steps" and that "[t]he defendant knew, or had it exercised due care and proper diligence, should have known of the aforesaid conditions." On April 15, 2009, the defendant filed a motion for summary judgment, alleging that there was no genuine issue of material fact and that it was entitled to judgment as a matter of law. Specifically, the defendant averred that there was no evidence before the **[**1202]** court that it had actual or constructive notice of the allegedly unsafe condition or that the

condition caused the plaintiff's injuries. In support of the motion, the defendant submitted (1) certain deposition testimony of the plaintiff, (2) the affidavit of Heather Husted, the **[***4]** defendant's aquatic director at all relevant times, (3) the affidavit of Joan Camire, the defendant's executive director at the time of the incident, and (4) the affidavit of Maureen Paul, the defendant's membership director at the time of the incident, to whom the plaintiff on August 17, 2007, reported her fall. [2] In objecting to the motion, the plaintiff submitted the affidavit of her husband and certain deposition testimony of John Looney, the defendant's facilities director. In its September 25, 2009 memorandum of decision, the court concluded that the plaintiff had not raised genuine issues of material fact "concerning the lack of proximate cause between the alleged accident and the alleged unsafe condition [or] concerning the defendant's lack of actual or constructive notice of the alleged unsafe condition." Accordingly, the court rendered summary judgment in favor of the defendant, and this appeal followed.

*HN1* ] Summary judgment is appropriate when "the pleadings, affidavits and any other proof submitted show that **[*178]** there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Practice Book § 17-49*; *Miller v. United Technologies Corp., 233 Conn. 732, 744-45, 660 A.2d 810 (1995)*. *HN2* ] "A material fact is a fact that will make a difference in the result of the case. . . . [T]he burden of showing the nonexistence of any material fact is on the party seeking summary judgment . . . . *HN3* ] It is not enough for the moving party merely to assert

---

[2] In their respective affidavits, Husted, Camire and Paul all averred that "[n]o **[***5]** one has ever complained about any slippery substance or residue being present on the pool steps where this accident is alleged to have occurred before [the plaintiff] claims she fell in June, 2007."

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 189 of 253

Page 6 of 9

125 Conn. App. 174, *178; 6 A.3d 1199, **1202; 2010 Conn. App. LEXIS 527, ***5

the absence of any disputed factual issue; the moving party is required to bring forward . . . evidentiary facts, or substantial evidence outside the pleadings to show the absence of any material dispute." (Citation omitted; internal quotation marks omitted.) *Barasso v. Rear Still Hill Road, LLC, 81 Conn. App. 798, 803, 842 A.2d 1134 (2004)*.

Once met, the burden shifts to "the party opposing such a motion [to] provide **[***6]** an evidentiary foundation to demonstrate the existence of a genuine issue of material fact." (Internal quotation marks omitted.) *Bednarz v. Eye Physicians of Central Connecticut, P.C., 287 Conn. 158, 169, 947 A.2d 291 (2008)*. *HN4*[⬆] "A motion for summary judgment is properly granted if it raises at least one legally sufficient defense that would bar the plaintiff's claim and involves no triable issue of fact." (Internal quotation marks omitted.) *Lunn v. Cummings & Lockwood, 56 Conn. App. 363, 370, 743 A.2d 653 (2000)*. *HN5*[⬆] Because the court's decision on a motion for summary judgment is a legal determination, our review on appeal is plenary. *Boone v. William W. Backus Hospital, 272 Conn. 551, 559, 864 A.2d 1 (2005)*.

It is undisputed that the plaintiff was a business invitee of the defendant. *HN6*[⬆] The defendant thus owed the plaintiff a duty to keep its premises in a reasonably safe condition. *Baptiste v. Better Val-U Supermarket, Inc., 262 Conn. 135, 140, 811 A.2d 687 (2002)*. "Typically, under traditional premises liability doctrine, [f]or [a] plaintiff to recover for the breach of a duty owed to **[*179]** [her] as [a business] invitee, it [is] incumbent upon [her] to allege and **[**1203]** prove that the defendant either **[***7]** had actual notice of the presence of the specific unsafe condition which caused [her injury] or constructive notice of it. . . . [T]he notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely

of conditions naturally productive of that defect even though subsequently in fact producing it." (Internal quotation marks omitted.) *Fisher v. Big Y Foods, Inc., 298 Conn. 414, 418 n.9, 3 A.3d 919 (2010)*; see also 2 *Restatement (Second), Torts § 343*, pp. 215-16 (1965). As our Supreme Court observed, "to recover under our current law, the plaintiff [is] required to prove that the defendant had had actual or constructive notice of the *specific defect* that caused the plaintiff's injuries." (Emphasis added.) *Riccio v. Harbour Village Condominium Assn., Inc., 281 Conn. 160, 164, 914 A.2d 529 (2007)*.

The plaintiff does not allege that the defendant possessed actual notice of the allegedly unsafe condition at issue. As a result, the question before us is whether a genuine issue of material fact exists as to whether the defendant had constructive notice of the defect of which the plaintiff complains. *HN7*[⬆] That question entails an inquiry into "whether **[***8]** the condition had existed for such a length of time that the [defendant's] employees should, in the exercise of due care, have discovered it in time to have remedied it. . . . What constitutes a reasonable length of time is largely a question of fact to be determined in the light of the particular circumstances of a case. The nature of the business and the location of the foreign substance would be factors in this determination . . . . To a considerable degree each case must be decided on its own circumstances. Evidence which goes no farther than to show the presence of a slippery foreign substance does not warrant an inference of constructive notice to the defendant." **[*180]** (Citations omitted; internal quotation marks omitted.) *Kelly v. Stop & Shop, Inc., 281 Conn. 768, 777, 918 A.2d 249 (2007)*.

In her deposition testimony, the plaintiff averred that she watched her step as she entered the pool via the ladder. She testified that she was able to see clearly where she was stepping and observed no substance or residue on

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 190 of 253

Page 7 of 9

125 Conn. App. 174, *180; 6 A.3d 1199, **1203; 2010 Conn. App. LEXIS 527, ***8

the step at that time. When asked to describe her fall, the plaintiff stated that "I put my foot down, and it happened so fast I just went in." In response to the question **[***9]** of whether her left or right foot had stepped into the pool water before she slipped, the plaintiff stated: "I don't remember, it happened so fast." She further testified that she "couldn't say which step" she had slipped on or whether that step was under water. The following colloquy transpired on that point:

"[The Defendant's Counsel]: . . . So, you don't know if you fell after walking into the water; is that correct?

"[The Plaintiff]: Walking into the water, I wasn't in the water.

"[The Defendant's Counsel]: So you fell--you're--

"[The Plaintiff]: I slipped on a step.

"[The Defendant's Counsel]: So, you slipped on a step that was outside the water, above the water, correct? Is that what you're telling me?

"[The Plaintiff]: I don't know.

"[The Defendant's Counsel]: Okay. . . . I mean, your right foot, was it in the pool water or was it outside the pool when you slipped?

"[The Plaintiff]: When I slipped [it] must have been there, and I don't know if that [step] was covered with **[*181]** water or not. Whatever step I stepped on, I don't **[**1204]** know if it was covered with water, but I slipped."

The plaintiff also recounted how her husband discovered a residue on one of the ladder's steps immediately after her **[***10]** fall. She testified that the step from which he had scraped the residue was under water. She further confirmed that she did not know if the step from which he had scraped the residue was the same step on which she slipped. In addition, the plaintiff

stated that she did not know if the residue that her husband discovered was present on the step on which she slipped. The plaintiff also stated that she did not **[**1205]** know if she slipped because of a misstep with her right foot.

On appeal, the plaintiff contends that she submitted evidence indicating that the defendant had constructive notice of the alleged defect. Specifically, she relies on her husband's statement in his affidavit that he "felt a slimy, slippery, algae-like build-up" on the steps and on Looney's deposition testimony. In that testimony, Looney was asked about the conditions under which a "slipperiness or sliminess" could appear in the pool. Looney stated that if one stopped applying chemicals, including chlorine to the pool, "within maybe four or five days you would see the pool start to turn a tinge of green. And then you would start to see this precipitate out onto other things. . . . [I]t would take a long time. And it wouldn't **[***11]** happen in one hour, in two hours. It would take days." Looney further stated that he monitored the pool and maintained proper chemical levels on a daily basis. The plaintiff argues that Looney's testimony and her husband's affidavit together establish a genuine issue of material fact regarding whether an unsafe condition had existed for such a length of time that the defendant's employees should, in the exercise of due care, have discovered it in time to have remedied it. We disagree.

**[*182]** It is well established that _HN6_⬆ "[o]n a question of notice, the trier's consideration must be confined to the defendant's knowledge and realization of the specific condition causing the injury, and such knowledge and realization cannot be found to exist from a knowledge of the general or overall conditions obtaining on the premises." _Monahan v. Montgomery, 153 Conn. 386, 390, 216 A.2d 824 (1966)_; see also _Fisher v. Big Y Foods, Inc., supra, 298 Conn. 418 n.9_; _Kirby v. Zlotnick, 160 Conn. 341, 344-45, 278 A.2d 822_

Case 3:20-cv-01657-OAW    Document 53    Filed 03/17/22    Page 191 of 253

Page 8 of 9

125 Conn. App. 174, *182; 6 A.3d 1199, **1205; 2010 Conn. App. LEXIS 527, ***11

*(1971)*; *Boretti v. Panacea Co., 67 Conn. App. 223, 228, 786 A.2d 1164 (2001)*, cert. denied, *259 Conn. 918, 791 A.2d 565 (2002)*; *Kurti v. Becker, 54 Conn. App. 335, 343-44, 733 A.2d 916*, cert. denied, **[***12]** 251 Conn. 909, 739 A.2d 1248 (1999)* (*Landau, J., dissenting*); *Fuller v. First National Supermarkets, Inc., 38 Conn. App. 299, 301, 661 A.2d 110 (1995)*; *LaFaive v. DiLoreto, 2 Conn. App. 58, 60, 476 A.2d 626*, cert. denied, *194 Conn. 801, 477 A.2d 1021 (1984).* The plaintiff's contention confounds that principle, as the proof submitted is bereft of evidence that she ever came into contact with the residue discovered by her husband. In moving for summary judgment, the defendant submitted the aforementioned deposition testimony of the plaintiff, in which she testified, inter alia, that (1) she encountered no residue on the ladder on June 26, 2007, (2) she did not see any residue on the ladder as she stepped down on June 27, 2007, (3) her husband had felt a residue on an underwater step, (4) she did not know if the step she slipped on was under water, (5) she did not know if the step she slipped on was the one from which the residue was discovered, (6) she did not know if the residue that her husband discovered was present on the step on which she slipped and (7) she did not know if she slipped because of a misstep with her right foot. Put simply, the attestation of the plaintiff's husband **[***13]** that he felt a slippery residue in the area where the plaintiff fell pertains to the general **[*183]** conditions of the area, which is insufficient to establish constructive notice on the part of the defendant. Likewise, Looney's deposition testimony as to the consequences of terminating chemical treatment in the pool relates to knowledge of conditions naturally productive of a defect, rather than knowledge of the specific defect in question. *Kirby v. Zlotnick, supra, 344.*

Furthermore, there is no evidence before us that the allegedly defective condition existed for such a length of time that the defendant's employees should, in the exercise of due care, have discovered it in time to have remedied it. See *Kelly v. Stop & Shop, Inc., supra, 281 Conn. 777.* Although Looney in his deposition stated that a residue could appear days after cessation of chemical treatment to the pool, he also testified that he had maintained proper chemical levels in the pool on a daily basis at all relevant times. In addition, the plaintiff in her deposition testimony acknowledged that she and her husband had traversed the ladder in question on the day before her fall. She testified that they did not observe any residue **[***14]** thereon or encounter any slippery conditions when they entered and exited the pool via the ladder at that time. In light of the foregoing, we concur with the conclusion of the court that no genuine issue of material fact existed as to whether the defendant had constructive notice of the specific condition causing the plaintiff's injuries.

In her reply brief, the plaintiff for the first time claims that this court should modify the law of premises liability in Connecticut with regard to the notice of a defect that a plaintiff must demonstrate. In particular, she asks us to eliminate the specific defect requirement, insisting that knowledge of the general conditions in the area provides sufficient notice to a defendant of the condition of the premises. For two reasons, her invitation is ill-advised. First, *HN9*[↑] "[i]t is well established . . . that [c]laims . . . are unreviewable when raised for the **[*184]** first time in a reply brief." *SS-II, LLC v. Bridge Street Associates, 293 Conn. 287, 293, 977 A.2d 189 (2009).* One rationale for that maxim is the fact that "[a]rguments first presented in a reply brief impair the opposing party's opportunity to reply in writing." *State v. Rosario, 113 Conn. App. 79, 93, 966 A.2d 249*, **[***15]** cert. denied, *291 Conn. 912, 969 A.2d 176 (2009).* Such is the case here.

Second, we are mindful that our Supreme Court recently declined to consider the precise claim advanced by the plaintiff. See *Riccio v. Harbour Village Condominium*

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 192 of 253

Page 9 of 9

125 Conn. App. 174, *184; 6 A.3d 1199, **1205; 2010 Conn. App. LEXIS 527, ***15

*Assn., Inc., supra, 281 Conn. at 165*. In that decision, the court reaffirmed that "to recover under our current law, the plaintiff was required to prove that the defendant had had actual or constructive notice of the specific defect that caused the plaintiff's injuries." *Id., 164*. **HN10**[⬆] It is axiomatic that this court, as an intermediate body, is bound by the decisions of our Supreme Court. See *Fennelly v. Norton, 103 Conn. App. 125, 133 n.5, 931 A.2d 269*, cert. denied, *284 Conn. 918, 931 A.2d 936 (2007)*. Accordingly, "[w]e are not at liberty to overrule or discard the decisions of our Supreme Court but are bound by them. . . . [I]t is not within our province to reevaluate or replace those decisions." (Internal quotation marks omitted.) *State v. Smith, 107 Conn. App. 666, 684-85, 946 A.2d 319*, cert. denied, *288 Conn. 902, 952 A.2d 811 (2008)*; see also, e.g., *State v. Brown, 73 Conn. App. 751, 756, 809 A.2d [**1206] 546 (2002)* ("Our Supreme Court is the ultimate arbiter **[***16]** of the law in this state. We, as an intermediate appellate court, cannot reconsider the decisions of our highest court."). Proper regard for this court's role as an intermediate appellate tribunal mandates that we decline the plaintiff's invitation.

The judgment is affirmed.

In this opinion the other judges concurred.

---

End of Document

 Neutral

As of: March 17, 2022 2:37 AM Z

# *Knox v. United States*

United States District Court for the District of Connecticut

September 9, 2016, Decided; September 9, 2016, Filed

Civ. No. 3:12CV01741(SALM)

**Reporter**

2016 U.S. Dist. LEXIS 121905 *; 2016 WL 4724558

ANITRA KNOX v. UNITED STATES

**Prior History:** *Knox v. United States, 2016 U.S. Dist. LEXIS 41808 (D. Conn., Mar. 30, 2016)*

## Core Terms

floor, waxed, constructive notice, slipped, alleged defect, actual notice, length of time, no evidence, defective condition, slip and fall, preponderance, surveillance, notice, business invitee, cause of action, alterations, video, rug, wet

**Counsel:** **[*1]** For Anitra Knox, Plaintiff: Anthony Lasala, LEAD ATTORNEY, Lasala Walsh Wicklow & Velardi, New Haven, CT; William B. Wynne, Adler Law Group LLC, East Hartford, CT.

For USA, Defendant: Brenda M. Green, LEAD ATTORNEY, U.S. Attorney's Office-BPT, Bridgeport, CT; Alan M. Soloway, U.S. Attorney's Office-NH, New Haven, CT.

**Judges:** HON. SARAH A. L. MERRIAM, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** SARAH A. L. MERRIAM

## Opinion

### MEMORANDUM OF DECISION

Pro se plaintiff Anitra Knox ("plaintiff") brings this single-count personal injury action against defendant United States ("defendant") pursuant to the *Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§1346(b), 2671, et seq.* Plaintiff alleges that she slipped and fell at the West Haven Veteran's Administration Hospital ("WHVA"), and as a result, sustained personal injuries. Plaintiff seeks monetary damages. A bench trial was held on September 1, 2016.

At the close of plaintiff's evidence, defendant made an oral motion to dismiss. The Court construed this motion as one for judgment on partial findings under *Federal Rule of Civil Procedure 52(c)*[1], "which allows the court to enter judgment as a matter of law in the moving party's favor at any point in the proceedings when the non-moving party has been fully heard on an issue during a non-jury trial and **[*2]** the court finds against the party." *Fabricated Wall Sys., Inc. v. Herman Miller, Inc., No. 3:08CV01313(SRU), 2011 U.S. Dist. LEXIS 128963, 2011 WL 5374130, at *1 (D. Conn. Nov. 8, 2011)* (citing *Fed. R. Civ. P. 52(c)*; *AmBase Corp. v.*

---

[1] Counsel for defendant represented to the Court at the final pretrial conference that he might bring a motion pursuant to *Rule 52* at the close of plaintiff's evidence.

2016 U.S. Dist. LEXIS 121905, *2

*SDG Inc., No. 3:00CV1694(DJS), 2005 U.S. Dist. LEXIS 16164, 2005 WL 1860260, at \*2 (D. Conn. Aug. 3, 2005)).* "A *Rule 52(c)* motion made by a defendant may be granted where the plaintiff has failed to make out a prima facie case or where the plaintiff has made out a prima facie case but the court determines that a preponderance of the evidence goes against the plaintiff's claim." *Fabricated Wall Sys., 2011 U.S. Dist. LEXIS 128963, 2011 WL 5374130, at \*1* (citation and internal quotations omitted).

"The court's task on such a motion is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies ... *Rule 52(c)* implies the same inquiry the court makes to resolve all of the legal and factual matters under *Rule 52(a).*" *Id.* (citation omitted); *see also LaMarca v. United States,* 31 F. Supp. 2d 110, 123-24 (E.D.N.Y. 1998) (On a *Rule 52(c)* motion: "The court does not evaluate the evidence under the standards governing a directed verdict. It does not draw any special inferences in the non-movant's favor, or consider the evidence in the light most favorable to the non-moving party. Instead the court acts as both judge and jury, weighing **[\*3]** the evidence, resolving any conflicts, and deciding where the preponderance lies." (citation omitted)).

Plaintiff presented only her testimony. The entirety of defendants' exhibits, marked 12 through 28, were entered into evidence by agreement of the parties. [Doc. ##154, 155]. Plaintiff's Exhibit 10, the deposition of her treating doctor, Dr. Jonathan Grauer, was also entered into evidence by agreement of the parties. [Doc. #154]. After considering plaintiff's testimony, as well as the documentary evidence, the Court granted defendant's oral motion for judgment on partial findings [Doc. ##152, 153], finding that plaintiff had failed to prove all elements of her claim; specifically that she failed to provide any evidence that defendant had notice of an alleged defect which resulted in her slip and fall. In support of this

Ruling, the following constitutes the Court's findings of fact and conclusions of law pursuant to *Rules 52(a)* and *(c) of the Federal Rules of Civil Procedure.*

## FINDINGS OF FACT

Based on the entire record developed during trial, including the credible testimony and the admitted exhibits, the Court finds the following facts established.

At approximately 9:00PM on February 1, 2012, plaintiff, who was on her way to visit her **[\*4]** father in the hospital, slipped and fell in the hallway of the WHVA. See Def. Ex. 24; see also Doc. #139 at 11 (stipulation of fact).[2] Although plaintiff offered no testimony on this point, her complaint alleges that she slipped and fell as a result of a highly waxed floor. See Doc. #1, Complaint at ¶8 ("The area upon which the plaintiff, ANITRA KNOX, fell was in a dangerous and defective condition likely to cause harm to persons lawfully walking thereupon, such as the plaintiff, as it was highly waxed hallway floor that was a slick and slippery surface and that was inherently dangerous and slippery that had been present for some time." (sic)). The documentary evidence also suggests that plaintiff contends that she slipped as the result of a highly waxed floor. See Def. Ex. 21 (Standard Form ("SF") 95 alleging plaintiff fell due to "heavily waxed floors"); Def. Ex. 13 at 13-03 (medical record dated February 2, 2012, stating plaintiff: "suffered a fall at the VA Hospital in West Haven last night. She notes that the floors were especially waxed and this is what caused her to fall.").

---

[2] Although the controlling version of the Trial Memorandum was filed by defendant, plaintiff later indicated **[\*5]** that she had no objection to this version. See Doc. #144 at 2. Accordingly, the Court deemed the Trial Memorandum filed by defendant at docket entry 139 as a Joint Trial Memorandum for purposes of the bench trial. See id.

2016 U.S. Dist. LEXIS 121905, *5

Surveillance video of the slip and fall shows plaintiff falling forward and landing on her right knee and forearm. See Def. Exs. 23, 23B; see also Def. Ex. 12 at 12-01; Def. Ex. 15 at 15-01. Plaintiff can then be seen on her hands and knees trying to gather herself, before sitting on the ground and rubbing her right knee. See Def. Ex. 23. WHVA security officers are then seen responding to the fall and offering plaintiff a wheelchair, which plaintiff refused. See id.; see also Def. Ex. 24 at 24-01. The video next shows plaintiff ambulating on her own, eventually travelling out of the surveillance camera's view. See Def. Ex. 23.

Plaintiff initially refused medical treatment after her fall. See Def. Ex. 24 at 24-02. However, later that evening, plaintiff presented to the WHVA emergency department with complaints of right arm, knee and lower back pain. See id.; see also Def. Ex. 12. Plaintiff was discharged in stable condition "with minor soft tissue trauma." Def. Ex. 12 **[*6]** at 12-02. An x-ray taken that night, the results of which became available the next day, revealed that plaintiff suffered an elbow injury, specifically, an impacted right radial head fracture. See id. at 12-04.

Plaintiff focused her testimony on the treatment she received for her injuries, which is largely supported by the documentary evidence. She also testified about her activities of daily living both before and after the fall, generally stating that she is no longer able to perform many of her prior activities since the fall. Plaintiff testified that she continues to suffer pain and other symptoms as a result of the February 1, 2012, slip and fall.

**CONCLUSIONS OF LAW**

**I. Federal Tort Claims Act**

Plaintiff brings this negligence action pursuant to the

FTCA. See Doc. #1, Complaint. Under certain circumstances, the FTCA provides for a limited waiver of the government's sovereign immunity where a government employee commits a tort "within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *28 U.S.C. §1346(b)(1)*. "Thus, for liability to arise under the FTCA, a plaintiff's **[*7]** cause of action must be 'comparable' to a 'cause of action against a private citizen' recognized in the jurisdiction where the tort occurred, ... and his allegations, taken as true, must satisfy the necessary elements of that comparable state cause of action[.]" *Chen v. United States, 854 F.2d 622, 626 (2d Cir. 1988)* (internal citation omitted); see also *Davis v. United States, 430 F. Supp. 2d 67, 73 (D. Conn. 2006)* ("Under the FTCA the government's liability is determined by the application of the law of the place where the act or omission occurred." (citing *28 U.S.C. §1346(b)*). Here, because plaintiff's accident occurred in Connecticut, and as stipulated to by the parties, Connecticut premises liability law applies to the merits of this case. See Doc. #139 at 11.

In a civil case such as this, "the plaintiff bears the burden of proving the elements of [her] claim by a preponderance of the evidence[,]" meaning "the fact is more likely true than not true." *Watson v. United States, No. 14CV6459, 179 F. Supp. 3d 251, 2016 U.S. Dist. LEXIS 23250, 2016 WL 748489, at *13 (E.D.N.Y. Feb. 25, 2016)* (citation omitted).

**II. Negligence and Premises Liability under Connecticut Law**

**A. Elements, Generally**

2016 U.S. Dist. LEXIS 121905, *7

Plaintiff's premises liability claim sounds in negligence. See *Maffucci v. Royal Park Ltd. P'ship, 243 Conn. 552, 707 A.2d 15, 20-21 (Conn. 1998)*. Under Connecticut law, "[t]he essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *Id. at 24* (quoting *RK Constructors, Inc. v. Fusco Corp., 231 Conn. 381, 650 A.2d 153, 155 (Conn. 1994))*. "The existence of a duty is a [*8] question of law. ... Only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand." *Gordon v. Bridgeport Hous. Auth., 208 Conn. 161, 544 A.2d 1185, 1191 (Conn. 1988)* (collecting cases) (internal citations omitted).

"In general, there is an ascending degree of duty owed by the possessor of land to persons on the land based on their entrant status, i.e., trespasser, licensee or invitee." *Considine v. City of Waterbury, 279 Conn. 830, 905 A.2d 70, 89 (Conn. 2006)* (quoting *Morin v. Bell Court Condo. Ass'n, Inc., 223 Conn. 323, 612 A.2d 1197, 1199 (Conn. 1992))*. Here, it is undisputed that plaintiff, as a visitor of the WHVA, was a business invitee. See *Diaz v. Manchester Mem'l Hosp., 161 Conn. App. 787, 130 A.3d 868, 871 (Conn. App. Ct. 2015)* ("It is undisputed that the plaintiff [a hospital visitor] was a business invitee[.]" (citation omitted) (alteration added)); see also *Hellamns v. Yale-New Haven Hosp., Inc., 147 Conn. App. 405, 82 A.3d 677, 680 (Conn. App. Ct. 2013)*(finding that "[i]t is undisputed that plaintiff [a hospital patient], was a business invitee[]" of the hospital (alteration added)).

"A possessor of land has a duty to an invitee to reasonably inspect and maintain the premises in order to render them reasonably safe. ... In addition, the possessor of land must warn an invitee of dangers that the invitee could not reasonably be expected to discover." *Considine, 905 A.2d at 89* (quoting *Morin,*

*612 A.2d at 1199*). Accordingly, for defendant to be found liable for plaintiff's injuries, "plaintiff must prove (1) the existence of a defect, (2) that the defendant [*9] knew or in the exercise of reasonable care should have known about the defect and (3) that such defect 'existed for such a length of time that the [defendant] should, in the exercise of reasonable care, have discovered it in time to remedy it.'" *Martin v. Stop & Shop Supermarket Cos., Inc., 70 Conn. App. 250, 796 A.2d 1277, 1278 (Conn. App. Ct. 2002)* (quoting *Cruz v. Drezek, 175 Conn. 230, 397 A.2d 1335, 1339 (Conn. 1978))*.

## B. Existence of a Defect

The Court turns first to whether plaintiff has proved the existence of a defect. In response to defendant's *Rule 52* motion, plaintiff argued that the presence of a wet rug contributed to her fall. She did not, however, present any testimony on this theory. Nevertheless, in support of this argument, plaintiff relies on Defendant's Exhibit 23, which is the surveillance video of her accident. The surveillance video, however, does not show the presence of a rug. Additionally, the weight of the evidence does not support plaintiff's argument that the presence of a wet rug contributed to her fall. See Def. Ex. 21 (SF 95 alleging she fell due to "heavily waxed floors"); Def. Ex. 13 at 13-03 (medical record dated February 2, 2012, stating plaintiff: "suffered a fall at the VA Hospital in West Haven last night. She notes that the floors were especially waxed and this is what caused her to fall"). Additionally, statements [*10] taken from plaintiff at the time of the incident make no reference to a wet rug, but rather state that she "slipped on a scuff-mark on the floor." See Def. Ex. 24 at 24-02. Photographs and surveillance footage reveal that the scuff mark was caused by plaintiff's high heel as she fell. See Def. Exs. 23, 23A, 23B. WHVA police who responded to plaintiff's fall observed that the area on

which plaintiff slipped was "dry." Def. Ex. 24 at 24-02. Accordingly, the Court finds that the preponderance of the evidence does not support plaintiff's argument that she slipped as a result of stepping off of a wet rug onto an allegedly highly waxed floor.

As to whether the presence of a highly waxed floor constitutes a per se defective condition, an argument could be made that the fact that plaintiff slipped supports an inference of an inherently defective or dangerous condition. See, e.g., Gray v. Fitzgerald & Platt, Inc., 144 Conn. 57, 127 A.2d 76, 78 (Conn. 1956) ("Upon the evidence that the floor was so slippery that the plaintiff's son could slide upon it, the jury were entitled to infer that the defendant had failed to use reasonable care to keep its premises reasonably safe for its business visitors."). However, under the circumstances now under consideration, it is not [*11] clear whether the presence of a highly waxed floor alone necessarily implies a defect. For example, the Connecticut Supreme Court has held: "An owner in treating a floor may use wax or oil or other substance in the customary manner without incurring liability to one who slips and falls thereon, unless the owner is negligent in the materials he uses or in the manner of applying them." Smith v. Union & New Haven Trust Co., 121 Conn. 369, 185 A. 81, 82 (Conn. 1936) (sic) (collecting cases); see also Jordan v. Realogy Franchise Grp., LLC, No. CV116008264, 2013 Conn. Super. LEXIS 974, 2013 WL 2278755, at *4 (Conn. Super. Ct. Apr. 25, 2013) (same); Nussbaum v. Metro-N. Commuter R.R., 603 F. App'x 10, 11-12 (2d Cir. 2015) ("When a plaintiff seeks to establish a defendant's slip-and-fall liability by showing that the defendant created a dangerous condition, the application of wax, polish, or paint to a floor in a nonnegligent manner will not, standing alone, support a negligence cause of action for making the floor slippery." (applying New York law) (citation and internal quotation marks omitted)).

Plaintiff has presented no evidence that defendant was negligent in the materials used on the floor, or in the manner in which they were applied. Nevertheless, the Court need not reach the issue of whether the allegedly highly waxed floor at the WHVA constituted a defective condition, in light of the complete absence of any evidence [*12] that defendant had notice of this alleged defect.

## C. Notice

"[R]elevant case law in Connecticut places a heavy burden on a 'slip and fall' plaintiff to demonstrate that a defendant had actual or constructive notice of the specific defect that led to the accident and 'not merely of conditions naturally productive of that defect even though subsequently in fact producing it.'" Graham v. Kohl's Dep't Stores, Inc., No. 3:04CV949(MRK), 2005 U.S. Dist. LEXIS 20173, 2005 WL 2256603, at *1 (D. Conn. Sept. 8, 2005) (quoting LaFaive v. DiLoreto, 2 Conn. App. 58, 476 A.2d 626, 629 (Conn. App. Ct. 1984)); see also Kelly v. Stop & Shop, Inc., 281 Conn. 768, 918 A.2d 249, 255 (Conn. 2007) ("Typically, [f]or [a] plaintiff to recover for the breach of a duty owed to [him] as [a business] invitee, it [is] incumbent upon [him] to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused [his injury] or constructive notice of it. ... [T]he notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it[.]" (quoting Baptiste v. Better Val—U Supermarket, Inc., 262 Conn. 135, 811 A.2d 687 (Conn. 2002))). "Thus, for [plaintiff] to recover for the breach of a duty owed to her as a business invitee, she must prove that [defendant] had either actual or constructive notice of the particular defect that caused her [*13] injuries." Navarro v. Kohl's Dep't Stores, Inc., No. 3:05CV00843(DJS), 2007 U.S.

*Dist. LEXIS 21179, 2007 WL 735787, at *3 (D. Conn. Mar. 8, 2007)* (alterations added).

### i. Actual notice

"A plaintiff can demonstrate that a defendant had actual notice of an unsafe condition by, for example, demonstrating that the condition was created by the defendant's employee[.]" *Hellamns, 82 A.3d at 682* (citing *Zarembski v. Three Lakes Park, Inc., 177 Conn. 603, 419 A.2d 339, 341 (Conn. 1979)).* Even assuming there was a defective condition, plaintiff presented absolutely no evidence at trial that defendant had actual notice of the alleged highly waxed floor. Plaintiff provided no specifics of her accident during her testimony. Plaintiff presented no testimony of any WHVA employee, nor does the record contain any maintenance reports or other evidence that could support a finding that one of defendant's employees created the allegedly defective condition. There was also no evidence presented that another visitor to, or patient of, the WHVA warned defendant about the alleged condition on February 1, 2012. Surveillance video of the area where plaintiff slipped also shows other persons walking in that area without issue. See Def. Ex. 23.

Alternatively, a plaintiff can prove actual notice "by presenting evidence that an employee, operating within the scope of his authority, observed the dangerous **[*14]** condition and either was charged with maintaining the area or was charged with a duty to report the unsafe condition." *Hellamns, 82 A.3d at 682* (citing *Derby v. Conn. Light & Power Co., 167 Conn. 136, 355 A.2d 244, 246-47 (Conn. 1974)).* As detailed above, plaintiff presented no evidence that would satisfy this theory of actual notice.

Therefore, the Court finds that plaintiff failed to sustain

her burden of proof that defendant had actual notice of the alleged defect -- a highly waxed floor -- given the complete absence of evidence "that [defendant's] employees actually knew of the [defect], or that [defendant's] employees themselves [created the defect.]" *Navarro, 2007 U.S. Dist. LEXIS 21179, 2007 WL 735787, at *4* (alterations added); see also *Gomes v. United States, No. 3:11CV01825(VLB), 2012 U.S. Dist. LEXIS 164526, 2012 WL 5869801, at *6 (D. Conn. Nov. 19, 2012)* ("Absent evidence that the Norwich Post Office had actual notice of the wet leaves on the exterior steps, Plaintiff may not establish actual notice." (collecting cases) (footnote omitted)).

Accordingly, the Court next turns to whether plaintiff has shown, by a preponderance of the evidence, that defendant had constructive notice of the alleged defective condition.

### ii. Constructive Notice

"The controlling question in deciding whether the defendant[] had constructive notice of the defective condition is whether the condition existed for such a length of time that the defendant[] **[*15]** should, in the exercise of reasonable care, have discovered it in time to remedy it." *Considine, 905 A.2d at 95-96* (quoting *Cruz, 397 A.2d at 1335*) (alterations added).

> What constitutes a reasonable length of time within which the defendant should have learned of the defect, how that knowledge should have been acquired, and the time within which, thereafter, the defect should have been remedied are matters to be determined in light of the particular circumstances of each case. The nature of the business and the location of the defective condition would be factors in this determination.

*Pollack v. Gampel, 163 Conn. 462, 313 A.2d 73, 78*

2016 U.S. Dist. LEXIS 121905, *15

*(Conn. 1972)*. "Constructive notice is triggered by a general duty of inspection or, when the dangerous condition is not apparent to the human eye, some other factor that would alert a reasonable person to the hazard." *Olsen v. Norwalk Hosp. Ass'n, No. FSTCV136019793S, 2016 Conn. Super. LEXIS 1515, 2016 WL 3536524, at *3 (Conn. Super. Ct. June 3, 2016)* (quoting *DiPietro v. Farmington Sports Arena, LLC, 306 Conn. 107, 49 A.3d 951, 957 (Conn. 2012))*.

"To establish constructive notice, plaintiff must adduce some evidence, either direct or circumstantial, that establishes the length of time the defect was present. The finder of fact is then left to determine whether the length of time is sufficient enough so as to expect that the defendant should have encountered it." *Navarro, 2007 U.S. Dist. LEXIS 21179, 2007 WL 735787, at *4* (citing *Gulycz v. Stop and Shop Cos., Inc., 29 Conn. App. 519, 615 A.2d 1087, 1088 (Conn. App. Ct. 1992))*.

There is no evidence that establishes the length of time the **[*16]** alleged defect was present. The only evidence, if any, that a defect existed prior to plaintiff's fall, was that she in fact slipped and fell. See *Navarro, 2007 U.S. Dist. LEXIS 21179, 2007 WL 735787, at *5*. This, however, is far too tenuous to support a finding of constructive notice without any other evidence as to how long the alleged defective condition existed prior to plaintiff's fall. See id. Indeed,

> [a]lthough circumstantial evidence can establish constructive notice; *Sokolowski v. Medi Mart, Inc., 24 Conn. App. 276, 287, 587 A.2d 1056 (1991)*; no such circumstantial evidence exists here. The plaintiff offered no evidence, direct or circumstantial, to show that the defect had existed for any period of time so as to enable the court to exercise its function as factfinder. Nor was the court able to infer that the defect had existed for any length of time, since there was no evidence to

establish a basis for such an inference. "An inference must have some definite basis in the facts"; *Boehm v. Kish, 201 Conn. 385, 389, 517 A.2d 624 (1986)*; and the conclusion based on it must not be the result of speculation and conjecture. *Palmieri v. Macero, 146 Conn. 705, 708, 155 A.2d 750 (1959)*.

*Gulycz, 615 A.2d at 1089*. Therefore, the Court finds that plaintiff failed to sustain her burden of proof that defendant had constructive notice of the alleged defect -- a highly waxed floor -- which resulted in her slip and fall on February 1, 2012.[3]

## CONCLUSION

Accordingly, because plaintiff has failed to prove an essential element of her FTCA claim, namely that defendant had notice of the alleged defective condition resulting in her fall, the Court finds in favor of defendant. Therefore, the Clerk of the Court is directed to enter judgment in favor of defendant.

This is not a Recommended Ruling. The parties

---

[3] Following argument on defendant's **[*17]** motion for judgment on partial findings, the Court took a thirty minute recess to provide plaintiff with an opportunity to review the evidence admitted during trial to locate any exhibits which would satisfy the elements of defect and notice. Following this break, plaintiff proffered a document, which was not in evidence, as proof of defendant's constructive notice of the defect. The Court explained to plaintiff that because this document was not in evidence, and indeed had never been listed as an exhibit or otherwise disclosed to defendant, it could not consider the document in ruling on the defendant's motion. Following this discussion, held on the record, plaintiff proceeded with her response to the defendant's argument, and conceded that the evidence at trial did not establish the element of notice.

2016 U.S. Dist. LEXIS 121905, *17

consented to proceed before **[\*18]** a United States Magistrate Judge on January 15, 2016 [Doc. #50], with any appeal to be made directly to the Court of Appeals. See *Fed. R. C. P. 73(b)-(c)*.

SO ORDERED at New Haven, Connecticut, this 9th day of September, 2016.

/s/ HON. SARAH A. L. MERRIAM

UNITED STATES MAGISTRATE JUDGE

_____

End of Document

 Neutral

As of: March 17, 2022 2:37 AM Z

# *Krause v. Almor Homes, Inc.*

Supreme Court of Errors of Connecticut

June 8, 1962, Argued ; July 12, 1962, Decided

No Number in Original

**Reporter**

149 Conn. 614 *; 183 A.2d 273 **; 1962 Conn. LEXIS 223 ***

Richard Krause et al. v. Almor Homes, Inc., et al.

**Prior History: [***1]** Action to recover damages for personal injuries, alleged to have been caused by the negligence of the defendants, brought to the Court of Common Pleas in Hartford County and tried to the jury before *Doherty, J.;* verdict and judgment for the plaintiffs against the named defendant and appeal by it.

**Disposition:** *Error; new trial.*

## Core Terms

ditch, contractors, defendant's knowledge, general condition, trespassing child, charging, realized, tipped, negligence claim, unnecessary risk, conditions, principles, assigning, insecure, premises, walking, bridge, plank

## Case Summary

### Procedural Posture

Defendant owner sought review of a judgment from the Court of Common Pleas in Hartford County (Connecticut), which awarded damages to plaintiff parents for injuries to their minor son, who was trespassing on the owner's property and was injured when he fell from a board lying across a ditch. The jury found that defendant contractor was not liable.

### Overview

The boy was playing with friends at the construction site and was injured when he fell into a ditch from a board bridging the ditch. The complaint alleged that the board tipped over when it fell from the foundation wall. The trial court instructed the jury that if the owner knew the general conditions existing at the site, the fact that the owner didn't know the precise plank was in the precise location would not avail the because the owner would have known of the general conditions. In reversing the judgment, the court held that the instruction was error. The court explained that the question for the jury was not whether a construction practice was in general dangerous to children nor whether it was an unnecessary risk, but was rather whether the condition complained of was one which the owner knew and realized, or should have known and realized, involved an unreasonable risk of death or serious bodily harm to trespassing children. The court found that the jury's consideration should have been confined to the owner's knowledge and realization of the specific condition alleged to have caused the injury.

### Outcome

The court reversed the judgment in favor of the parents and remanded for a new trial.

**Counsel:** *Robert C. Danaher,* for the appellant (named defendant).

149 Conn. 614, *614; 183 A.2d 273, **273; 1962 Conn. LEXIS 223, ***1

*S. William Bromson,* with whom, on the brief, were *Charles N. Rodens, A. Ronald Burke, Solomon T. Burke* and *Irving Reiner,* for the appellees (plaintiffs).

**Judges:** Baldwin, C. J., King, Murphy, Shea and Alcorn, Js.

**Opinion by:** ALCORN

# Opinion

 [*615] [**273]  The plaintiffs brought this action against the named defendant, the owner of a tract of land in East Hartford, and three contractors engaged in construction and development work on the property. The action was later withdrawn as to two of the contractors and went to trial before a jury as against the named defendant and the contractor who constructed the cellar walls for two houses on the property. The jury found for the plaintiffs against the named defendant only. The named defendant, hereafter referred to as the defendant, **[***2]** appealed, assigning error in the denial of a **[**274]** motion to set aside the verdict, in the finding and in the charge. Only the attack on the charge is pursued in the briefs. The defendant assigns error in the court's refusal to charge as requested and in its charging as it did in several respects. All of the assignments center upon the correctness of the charge concerning the liability of a property owner to a trespassing child. We have so recently discussed the principles applicable to that relationship that reiteration is unnecessary here.  *Louche v. Silvestri, 149 Conn. 373, 376, 179 A.2d 835; Hale v. Crestline Realty, Inc., 148 Conn. 643, 646, 173 A.2d 500; Greene v. DiFazio, 148 Conn. 419, 422, 171 A.2d 411.*

The plaintiffs, a boy and his mother, sought recovery for the injuries sustained by the boy, **[*616]** Richard, eleven years old, when he fell into a ditch from a board bridging the ditch. The board tipped and caused him to fall. The complaint, in part, substantially alleged the elements essential to establish the defendant's liability under the rule of the Restatement, 2 Torts § 339, adopted by us in *Wolfe v. Rehbein, 123 Conn.* **[***3]** *110, 113, 193 A. 608.* The defendant denied the allegations of the complaint and pleaded a special defense of contributory negligence.

The complaint, having been drawn to state a cause of action not only against the defendant but also against its contractors, included, in addition to the allegations previously mentioned, a paragraph setting forth seven claims of negligence made against all defendants. In a written request to charge, the defendant sought to have the jury instructed to disregard this paragraph as inapplicable to any liability of the defendant. It also requested a charge applying the principles laid down in *Wolfe v. Rehbein, supra*, to the determination of its liability. The complaint alleged that Richard "was playing with other boys, on . . . [the] premises walking on a board, back and forth across a ditch to a cement foundation, on the defendant's, Almor Homes, Incorporated property, which ditch and foundation was created and maintained by the defendants, when the board which was negligently and carelessly placed and left thereon by . . . [the] defendants, on which . . . [the] plaintiff was walking, tipped over and caused him to be thrown into . . . **[***4]** [the] ditch." The plaintiffs produced evidence from which they claimed to have proved this allegation. There was no dispute that the boy was a trespasser.

The court, instead of charging as requested, discussed the quoted allegation as it related to the **[*617]** general claims of negligence made against both the defendant and its contractor. The court then charged on the liability of a possessor of land to trespassing children substantially in accord with the rule of *Wolfe v. Rehbein,*

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 203 of 253

Page 3 of 3

149 Conn. 614, *617; 183 A.2d 273, **274; 1962 Conn. LEXIS 223, ***4

*supra.* In the course of its discussion of this rule, the court said: "[I]f you believe that the Almor Homes Corporation knew of the general conditions and methods of operation here, that they were using these forms first on one side of the wall and then on the other to cross over . . . and that practice in itself was dangerous, and you so find, the fact that Almor Homes didn't know that this particular planking was over on that side of the building would be immaterial if the practice in general was dangerous to children and it was an unnecessary risk under the circumstances. If they knew the general conditions existing in that way, the fact that they didn't know the precise plank was **[***5]** in the precise location would not avail the Almor Company because Almor would have known of the general conditions." In so charging the jury, the court committed material error.   The question for the jury was not whether a construction practice was "in general . . . dangerous to children" nor whether it was an "unnecessary risk." The question, rather, was whether the condition complained of was one which the defendant knew and realized, or should have known and realized, involved an unreasonable risk of **[**275]** death or serious bodily harm to trespassing children.

The plaintiffs claimed to be entitled to recover because Richard's fall was caused by a board insecurely placed across a ditch. The parties agreed in argument before us that the issue of the defendant's negligence was limited to the condition arising from the existence of the described board placed **[*618]** to bridge the ditch. The jury's consideration should have been confined to the defendant's knowledge and realization of the specific condition alleged to have caused the injury.   Beyond that, the language used by the court would lead the jury to believe that the defendant's knowledge of the existence of the defect **[***6]** complained of could be found to exist from a general knowledge of the work being done and the overall conditions obtaining on the premises.  This was an incorrect guide for the jury. *New Britain Trust Co. v. New York, N.H. & H.R. Co., 145 Conn. 390, 393, 143 A.2d 438*; *Long v. Savin Rock Amusement Co., 141 Conn. 150, 152, 104 A.2d 221*. Since the plaintiffs claimed in the complaint that the board "tipped over," and in their claims of proof that it "fell from the foundation wall," it is obvious that the danger in the condition complained of arose from the improper or insecure placing of this particular board. The defendant's knowledge of any general practice of placing this or any other board at other times or locations in the course of the construction work could have no bearing on its knowledge of how this unit was placed.

The court thus failed to give the jury an accurate statement of the law applicable to the conditions of the case or one adapted to lead the jury to a legal and logical conclusion.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.

---

End of Document

 Positive

As of: March 17, 2022 2:37 AM Z

# *LaFaive v. DiLoreto*

Appellate Court of Connecticut

February 28, 1984, Argued ; May 29, 1984, Decided

No. 2428

## Reporter

2 Conn. App. 58 *; 476 A.2d 626 **; 1984 Conn. App. LEXIS 615 ***

Elsie LaFaive v. Mario DiLoreto et al.

**Prior History: [***1]** Action to recover for injuries sustained in a fall allegedly caused by the negligence of the defendants, brought to the Superior Court in the judicial district of Hartford-New Britain at Hartford and tried to the jury before *Satter, J*.; verdict and judgment for the plaintiff, from which the defendants appealed.

**Disposition:** *No error.*

## Core Terms

mat, defendants', trial court, variance, records, notice, stairway, recess, stairs, juror, heel

## Case Summary

### Procedural Posture

Defendant landlords appealed from the judgment of the Superior Court in the Judicial District of Hartford-New Britain at Hartford (Connecticut), which denied the landlords' motion to set aside a verdict in favor of plaintiff tenant in the tenant's negligence action to recover for injuries sustained in a fall allegedly caused by the landlords' negligence.

### Overview

The tenant's negligence action alleged that the landlords failed to secure the back edge of the rubber mat onto a stairway, to properly inspect the stairway, to provide a handrail, and to take reasonable steps to cure the defect. The jury returned a verdict in favor of the tenant and the trial court denied the landlords' motion to set aside the verdict. On appeal the court affirmed, holding that: (1) the trial court did not abuse its discretion in refusing to set aside the verdict because there was ample evidence from which the jury could reasonably have concluded that the claimed defect had existed for such a sufficient length of time that the landlords should have known of it or should have discovered it in the exercise of a reasonable supervision of the premises and (2) the variance between the proof and the pleadings did not invalidate the judgment because the variance was immaterial; and (3) the trial court did not err in admitting the tenant's personnel records into evidence because the records were prepared contemporaneously with the events recorded therein and were admissible as business records under *Conn. Gen. Stat. § 52-180*.

### Outcome

The court found no error in the trial court's denial of the landlords' motion to set aside the verdict in favor of the tenant.

2 Conn. App. 58, *58; 476 A.2d 626, **626; 1984 Conn. App. LEXIS 615, ***1

# LexisNexis® Headnotes

Civil Procedure > Appeals > Standards of
Review > General Overview

Civil Procedure > Judgments > Relief From
Judgments > General Overview

## HN1[↧]  Appeals, Standards of Review

An appellate court's review of a trial court's refusal to set aside a verdict is limited. If on the evidence the jury could reasonably have decided as it did, the appellate court will not find error in the trial court's acceptance of the verdict. Upon review, the appellate court must give the evidence the construction most favorable to support the verdict. The conclusion of a trial judge is significant for he had an opportunity to weigh the evidence presented and to determine the credibility and effect to be given the evidence.

Civil Procedure > ... > Jury
Trials > Verdicts > General Verdicts

Civil Procedure > Trials > Jury Trials > Province of
Court & Jury

Civil Procedure > ... > Jury
Trials > Verdicts > General Overview

## HN2[↧]  Verdicts, General Verdicts

Whether a jury's general verdict for a plaintiff was premised on either actual or constructive notice, it is sustainable if either type of notice is supported by the evidence.

Torts > Premises & Property Liability > General
Premises Liability > General Overview

## HN3[↧]  Premises & Property Liability, General Premises Liability

For a plaintiff to recover for the breach of a duty owed to her as an invitee, she must allege and prove that the defendants had actual or constructive notice of the presence of the specific unsafe condition which caused her fall. Either type of notice must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it. On a question of notice, the trier's consideration must be confined to the defendant's knowledge and realization of the specific condition causing the injury, and such knowledge and realization cannot be found to exist from a knowledge of the general or overall conditions on the premises.

Civil Procedure > Judgments > Relief From
Judgments > General Overview

Evidence > Burdens of Proof > Variances Between
Pleadings & Proof

## HN4[↧]  Judgments, Relief From Judgments

To set aside a verdict on the basis of a variance between the pleadings and the proof, the variance must be material in a way which is essential to the cause of action claimed. Not every variance, however, is material. If the variance is immaterial, it is disregarded. Conn. Gen. Prac. Book, R. Super. Ct. § 178. An immaterial variance is one in which the difference between the allegations and the proof is so slight and unimportant that the adverse party is not misled as to the charge he is required to meet or prejudiced in maintaining his defense on the merits of the case. Thus,

2 Conn. App. 58, *58; 476 A.2d 626, **626; 1984 Conn. App. LEXIS 615, ***1

an otherwise valid judgment will not be invalidated if a variance does not change the theory of the cause of action and if the party complaining of the variance was, at all times, in a position to know the true state of the facts.

Evidence > ... > Documentary
Evidence > Writings > General Overview

Evidence > ... > Exceptions > Business
Records > General Overview

Evidence > Relevance > Relevant Evidence

_HN5_[⬇] ] **Documentary Evidence, Writings**

Three statutory criteria for the admission of business records are set forth in _Conn. Gen. Stat. § 52-180_. They are: (1) that the record was made in the regular course of business; (2) that it was the regular course of the business to make the writing; and (3) that the writing was made at the time of the transaction or occurrence or within a reasonable time thereafter. _Conn. Gen. Stat. § 52-180_. Once these criteria have been met by the party seeking to introduce the record, however, it does not necessarily follow that the record itself is generally admissible, nor does it mean that everything in it is required to be admitted into evidence. Additionally, the information contained in the record must be relevant to the issues being tried, and the information contained in the report must be based on the entrant's own observation or on information of others whose business duty it was to transmit it to the entrant.

Evidence > ... > Exceptions > Business
Records > General Overview

Governments > State & Territorial
Governments > Employees & Officials

Civil Procedure > Judicial
Officers > Judges > Discretionary Powers

Governments > Legislation > Interpretation

_HN6_[⬇] ] **Exceptions, Business Records**

A trial court is given the discretion under _Conn. Gen. Stat. § 52-180_ to determine whether the criteria of the statute have been satisfied. In reviewing the decision of the trial court, the appellate court must construe the statute liberally.

Civil Procedure > Appeals > Reviewability of Lower
Court Decisions > Preservation for Review

_HN7_[⬇] ] **Reviewability of Lower Court Decisions, Preservation for Review**

An appellate court will not review a claim, except in exceptional circumstances, where the claim raised on appeal is different from the objection raised in the trial court.

Evidence > Privileges > Attorney-Client
Privilege > General Overview

_HN8_[⬇] ] **Privileges, Attorney-Client Privilege**

Under the common law rule of privileged communications, where legal advice of any kind is sought from a professional legal adviser in his capacity as such, the communications relating to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal adviser, except if the protection is waived.

Evidence > Privileges > Attorney-Client

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 207 of 253

Page 4 of 9

2 Conn. App. 58, *58; 476 A.2d 626, **626; 1984 Conn. App. LEXIS 615, ***1

Privilege > Elements

Evidence > Privileges > Attorney-Client Privilege > General Overview

### HN9[↓] Attorney-Client Privilege, Elements

One of the essential elements of the claim of privilege between attorney and client is that the communication be confidential.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

Criminal Law & Procedure > Juries & Jurors > Disqualification & Removal of Jurors > Bias

Governments > Courts > Judges

Civil Procedure > Judicial Officers > Judges > General Overview

Civil Procedure > ... > Jurors > Selection > General Overview

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

### HN10[↓] Judges, Discretionary Powers

The right of a presiding judge to excuse a prospective juror is controlled by *Conn. Gen. Stat. § 51-240(b)*, which states that if the judge before whom the examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel as the judge determines. The trial court is vested with wide discretion in conducting an examination of prospective jurors. There is no reversible error in its exercise of that discretion unless it has been clearly abused or one of

the parties has been prejudiced by it.

**Counsel:** *Snow Gene Munford*, for the appellants (defendants).

*L. Paul Sullivan*, for the appellee (plaintiff).

**Judges:** Dannehy, C.P.J., Testo and Hull, Js.

**Opinion by:** TESTO

## Opinion

 **[*58]** **[**628]** The plaintiff was the tenant in an apartment house owned by the defendants, Mario and Rosa **[*59]** DiLoreto. On January 11, 1972, in the early morning, while the plaintiff was descending the interior stairway of the building from her third floor apartment, she fell, head first, down from the second to the first floor. She alleged that, as she was descending, her heel caught on the edge of the rubber mat on the third tread down from the second floor landing and that the mat was raised above the tread surface. The plaintiff commenced a negligence action against the defendants claiming that they had failed to secure the back edge of the rubber mat onto **[***2]** the stairway, to properly inspect the stairway, to provide a handrail and to take reasonable steps to cure the defect, the raised mat. The jury returned a verdict in favor of the plaintiff in the amount of $ 46,000. The defendants then filed a motion to set aside the verdict which was denied by the trial court. The defendants appeal [1] from the judgment denying their motion to set aside the verdict. In their appeal, the defendants **[**629]** claim that the court

---

[1] This appeal, originally filed in the Supreme Court, was transferred to this court. Public Acts, Spec. Sess., June, 1983, No. 83-29, § 2 (c).

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 208 of 253

Page 5 of 9

2 Conn. App. 58, *59; 476 A.2d 626, **629; 1984 Conn. App. LEXIS 615, ***2

erred (1) in refusing to set aside the verdict because there was no credible evidence of actual or constructive notice to the defendants of the alleged defect in the rubber mat on the stairs; (2) in refusing to set aside the verdict because the proof did not conform to the pleadings; (3) in admitting the plaintiff's personnel records as business records; (4) in curtailing the defendants' cross-examination of the plaintiff regarding her conversation with her attorney during a recess; and (5) in excusing for cause two prospective jurors who were engineers.

 **[\*\*\*3]** I

*HN1* ] Our review of a trial court's refusal to set aside a verdict is limited. If on the evidence the jury could reasonably have decided as it did, we will not find error in the trial court's acceptance of the verdict. *Kalleher*  *[\*60] v. Orr, 183 Conn. 125, 126, 438 A.2d 843 (1981)*. Upon review in this court, we must give the evidence construction most favorable to support the verdict. *Id., 126-27*. The conclusion of the judge who presided at the trial and denied the defendants' motion to set aside the verdict is significant for he had an opportunity superior to ours to weigh the evidence presented and to determine the credibility and effect to be given the evidence. *Swift & Co.* v. *Rexton, Inc., 187 Conn. 540, 543, 447 A.2d 9 (1982)*; cf. *Rood v. Russo, 161 Conn. 1, 5, 283 A.2d 220 (1971)*.

*HN2* ] Whether the jury's general verdict for the plaintiff was premised on either actual or constructive notice, it is sustainable if either type of notice is supported by the evidence. *HN3* ] For the plaintiff to recover for the breach of a duty owed to her as an invitee, [2] she had to allege and prove that the

defendants had actual or constructive notice of the presence of **[\*\*\*4]** the specific unsafe condition which caused her fall. See *Monahan v. Montgomery, 153 Conn. 386, 390, 216 A.2d 824 (1966)*. Either type of notice must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it. Id.; *White v. E & F Construction Co., 151 Conn. 110, 113, 193 A.2d 716 (1963)*. "On a question of notice, the trier's consideration must be confined to the defendant's knowledge and realization of the specific condition causing the injury, and such knowledge and realization cannot be found to exist from a knowledge of the general or overall conditions . . . on the premises." *Monahan v. Montgomery, supra*; *Krause v. Almor Homes, Inc., 149 Conn. 614, 618, 183 A.2d 273 (1962)*.

The named defendant testified that he saw and percieved the raised **[\*\*\*5]** condition of the mat prior to the accident,  **[\*61]** but that he did not pay any attention to it because he perceived that physical condition as normal. There was also evidence presented by a qualified expert in the field of safety engineering, who examined the stairway four weeks after the accident. [3] He testified that the waving or elevated condition of the mat would have occurred during the warm weather, and would have come to an end and remained stable throughout the colder weather months so that a person inspecting [4] the stairs would have seen the raised condition of the mat for a period of at least two months before the accident occurred. This was a reasonable

---

[2] The plaintiff's status as a business invitee was alleged in the complaint and admitted by the defendants in their amended answer.

[3] The plaintiff testified that there was no change in the condition of the stairs or the rubber mat between the time she examined the mat on the day of the fall and the day that the expert witness examined it, February 10, 1972.

[4] The named defendant testified that he went up the stairs approximately once every two weeks.

Ben Levites

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 209 of 253

Page 6 of 9

2 Conn. App. 58, *61; 476 A.2d 626, **629; 1984 Conn. App. LEXIS 615, ***5

length of time in which the defendants in the exercise of due care should have discovered the defective condition in time to have it remedied. See *Long v. Savin Rock Amusement Co., 141 Conn. 150, 153, 104 A.2d 221 (1954)*. Under these circumstances, there was ample evidence from which the jury could reasonably **[**630]** have concluded that the claimed specific defect had existed for such a sufficient length of time that the defendants should have known of it or should have discovered it in the exercise of **[***6]** a reasonable supervision of the premises. We, therefore, cannot say that the trial court abused its discretion in refusing to set aside the verdict.

II

*HN4* ] To set aside a verdict on the basis of a variance between the pleadings and the proof, the variance must be material in a way which is essential to the cause of action claimed. *Schaller v. Roadside Inn, Inc., 154 Conn. 61, 65, 221 A.2d 263 (1966)*; *Francis v. Hollauer, 1 Conn. App. 693, 695, 475 A.2d 326 (1984)*; S.H.V.C., **[*62]** Inc. v. *Roy, 37 Conn. Sup. 579, 580-81, 428 A.2d 806 (1981)*. Not every variance, however, is material. If the variance is immaterial, it is disregarded. Practice Book § 178. An **[***7]** immaterial variance is one in which the difference between the allegations and the proof is so slight and unimportant that the adverse party is not misled as to the charge he is required to meet or prejudiced in maintaining his defense on the merits of the case. *Strimiska v. Yates, 158 Conn. 179, 184, 257 A.2d 814 (1969)*. Thus, an otherwise valid judgment will not be invalidated if a variance does not change the theory of the cause of action and if the party complaining of the variance was, at all times, in a position to know the true state of the facts. Id.

The allegations in the complaint state that "when [the plaintiff] arrived at the third tread down from the second floor landing she was caused to trip and fall down the

stairway by reason of a . . . defective condition of the stairway at said location. . . ." The defendants posit that at trial evidence was presented that the plaintiff's left heel became caught on the rubber mat and that the accident was not the result of her tripping on the mat. Any variance between the mechanics of the fall as presented during the trial and the definition of the word "trip" is a difference in semantics and does not change the theory **[***8]** of the cause of actions. We must, therefore, conclude that the variance is immaterial and will not invalidate the judgment.

III

*HN5* ] Three statutory criteria for the admission of business records are set forth in *General Statutes § 52-180*. They are (1) that the record was made in the regular course of business; (2) that it was the regular course of the business to make the writing; and (3) that the writing was made at the time of the transaction or occurrence or within a reasonable time thereafter. *General Statutes* **[*63]** *§ 52-180*; *Emhart Industries, Inc.* v. *Amalgamated Local Union 376, U.A.W., 190 Conn. 371, 383-84, 461 A.2d 422 (1983)*. Once these criteria have been met by the party seeking to introduce the record, however, it does not necessarily follow that the record itself is generally admissible, nor does it mean that everything in it is required to be admitted into evidence. *Emhart Industries, Inc.* v. *Amalgamated Local Union 376, U.A.W., supra, 384*; *Hutchinson v. Plante, 175 Conn. 1, 4, 392 A.2d 488 (1978)*; *Mucci v. LeMonte, 157 Conn. 566, 569, 254 A.2d 879 (1969)*; *Maggi v. Mendillo, 147 Conn. 663, 667, 165 A.2d 603 (1960)*. Additionally, **[***9]** the information contained in the record must be relevant to the issues being tried; see *Maggi v. Mendillo, supra*; and the information contained in the report must be based on the entrant's own observation or on information of others whose business duty it was to transmit it to the entrant. *Mucci v. LeMonte, supra*.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 210 of 253

Page 7 of 9

2 Conn. App. 58, *63; 476 A.2d 626, **630; 1984 Conn. App. LEXIS 615, ***9

The plaintiff's personnel records were introduced through the president of the company where she was employed. The defendants claim that the trial court erred in admitting these records into evidence as full exhibits over their objections. The specific grounds were that the "business entry qualifications haven't been met with." On appeal the defendants' objections to their admissibility are twofold: (1) as to all three exhibits, they claim that there was no evidence **[**631]** that these were made by or entered as a result of the witnesses' own personal knowledge or on the personal knowledge of the entrant or upon information of others with personal knowledge of the same, who are or were under a business duty to transmit such information to the entrants; and (2) as to two of the exhibits, the defendants claim there was no evidence or testimony presented **[***10]** that the information was recorded at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

**[*64]** *HN6*[⬆] The trial court is given the discretion under the statute to determine whether the criteria of the statute have been satisfied. In reviewing the decision of the trial court, we must construe the statute liberally. *Shuchman v. State Employees Retirement Commission, 1 Conn. App. 454, 458-59, 472 A.2d 1290 (1984)*. The problem with the defendants' first claim, that the job evaluation reports were not based on the personal observation of the witness, is that they failed to raise this specific objection in the trial court. *HN7*[⬆] We will not review a claim, except in exceptional circumstances where the claim raised on appeal is different from the objection raised in the trial court. *Emhart Industries, Inc.* v. *Amalgamated Local Union 376, U.A.W., supra, 388*. There are no exceptional circumstances here. The defendants' second objection, however, goes to the statutory criteria of *§ 52-180* and is similar enough to the objection raised at the trial level to merit our review of it. See *Shuchman v. State Employees Retirement*

*Commission [***11]  , supra, 457-58 n.6*. The evidence presented was that the exhibits were prepared contemporaneously with the events recorded therein. On the basis of such evidence, we must reject the defendants' claim.

IV

The defendants' next claim of error concerns certain conversations the plaintiff had with her attorney during a recess while she was still testifying. During cross-examination, the plaintiff had testified to the location of her heel when her left foot became caught on the mat and that when her right heel let go, it had been against the back of the stair riser. After a recess, upon redirect examination, the plaintiff's counsel asked her "[d]o you recall exactly what the position of the toe of your foot was when it came onto that step?" The plaintiff replied, "my feet land on the stairs when I walk down the stairs." Her counsel asked a further question, **[*65]** "[c]an you tell us precisely where, exactly where, your heel was in reference to the back part of the step which is called the riser?" To which she responded, "[n]o." On recross-examination the defendants' counsel noted first that her testimony before the recess as to the location of her heel differed from her testimony **[***12]** after the recess. The defendants' counsel proceeded to inquire whether she had spoken to anyone during the recess. Upon learning that the plaintiff had spoken with her attorney, he asked, "[w]ell what did you talk about?" She replied, "I recall he was talking about the stairs and the mat." The defendants' counsel continued, "[w]as he telling you to correct or change your answer?" she replied, "[n]o." The plaintiff's counsel objected to this line of questioning and the court ruled that the subject matter of the conversation between the plaintiff and her attorney was a privileged communication.

*HN8*[⬆] ] "The common law rule of privileged communications has been stated as follows: 'Where

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 211 of 253

Page 8 of 9

2 Conn. App. 58, *65; 476 A.2d 626, **631; 1984 Conn. App. LEXIS 615, ***12

legal advice of any kind is sought from a professional legal adviser in his capacity as such, the communications relating to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal adviser, except the protection be waived.' 8 Wigmore, Evidence § 2292, p. 554 (McNaughton Rev. 1961)." *Rienzo v. Santangelo, 160 Conn. 391, 395, 279 A.2d 565 (1971)*. HN9[↑] One of the essential elements of the claim of privilege between attorney [***13] and client is that the communication be confidential. *Rienzo v. [**632] Santangelo, supra*; *State v. Hanna, 150 Conn. 457, 466, 191 A.2d 124 (1963)*. The purpose and effect of the line of questioning by the defendants' counsel during the recross-examination was to have a direct communication between the plaintiff and her counsel revealed. The resort to these questions went beyond the scope of proper recross and was an invasion of the [*66] attorney client privilege. The trial court properly prevented the defendants' counsel from pursuing this line of questioning.

V

HN10[↑] The right of a presiding judge to excuse a prospective juror is controlled by *General Statutes § 51-240 (b)* which states: "If the judge before whom the examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel . . . as the judge determines." The trial court is vested with wide discretion in conducting an examination of prospective jurors. *Childs v. Blesso, 158 Conn. 389, 394, 260 A.2d 582 (1969)*; see also *State v. Roberson, 173 [***14] Conn. 102, 103-104, 376 A.2d 1087 (1977)*. There is no reversible error in its exercise of that discretion unless it has been clearly abused or one of the parties has been prejudiced by it. Id.

The two jurors who were called and subsequently excused by the judge were both civil engineers who stated [5] [***15] that [**633] it would be difficult for

_____

[5] As pertains to the first juror the following questioning took place:

"Q: Yes. We are going to have in this case the testimony of civil engineers. And as may often times be the case, there may be differences of opinion, differences of conclusion by these civil engineers. And you may, in fact, have your own opinion of a particular set of circumstances having viewed the evidence. Do you feel that your own judgment as a civil engineer would enter into your judgment of the engineering questions that would have to be decided in this case?

"A: Yes.

* * *

"Q: And, also, posing a hypothetical, if you did run into a situation where all of the engineering testimony agreed on a particular conclusion or a particular fact, and you as an engineer on the basis of your engineering ability and knowledge disagreed with those things that the other engineers seem to be in agreement with, would you have difficulty with that particular situation?

* * *

"Q: You would have difficulty?

"A: I would have difficulty, yes.

"Q: And be serious difficulty as far as your own conscience is concerned?

"A: I don't know if it would be a serious problem; but I have my own opinions on engineer approach and on facts, and I would -- if I was in disagreement with them, I would find it difficult to -- to judge the case solely on -- on their evidence.

"Q: You feel under those circumstances that you would be more comfortable not sitting on this particular case?

"A: Yes.

* * *

"The Court: . . . [I]t is very clear to me that this gentleman has -

2 Conn. App. 58, *66; 476 A.2d 626, **633; 1984 Conn. App. LEXIS 615, ***15

- has indicated -- has indicated an intention that if -- even if the engineering opinions are contrary to his notion of what the engineering situation is that he would substitute his own judgment.   And in that regard he is as biased and as prejudiced as if he had some objection to the color of one of the party's eyes.  As far as I see it, he has completely lost his -- his objectivity, and indicated a prejudice that as a matter of law requires that he be excused from the Jury.  So, I grant the motion to excuse him for cause."

As to the second juror the following questions took place: "Q: Okay.  Now, in the case that we are about to try, which is a claim of a fall down a stairs, there will be engineers testifying.  And my question is this.  That we may encounter a situation where the engineers are at issue or differ as to either factual or theoretical opinions concerning a particular point of the case.  Do you feel that with your background as an engineer that that would have an influence upon your judgment in trying to evaluate the testimony of the engineers?

"A: If there were disagreement between the two engineers?

"Q: Yes, sir.  Yes.

"A: Yes, I would.

"Q: All right.   And if, in fact, you encountered a situation wherein both the engineers did agree, but you in your background and experience as an engineer felt that they were both inaccurate, then would that affect your judgment?

* * *

"A: Yes, it would.

"Q: Okay.  I don't think I have any further questions.

"The Court: How would it affect your judgment?

"[The Juror]: Well, if -- if, in fact, I disagreed with their engineering conclusion, I would -- I would think that they weren't proficient in whatever they were doing.  Making their judgment.  In other words, if it was just a basic engineering concept that was very simple or they misinterpreted or whatever, then I would disagree with their finding.

"The Court: And you would act on your disagreement rather than on what they said?

"[The Juror]: Yes, I would.

them to separate **[*67]** their own extrinsic knowledge from those issues which pertained to their particular area of expertise.   Under **[*68]** these circumstances, the trial court did not abuse its discretion in excusing them. [6]

There is no error.

End of Document

"The Court: Is that what you're saying?

"[The Juror]: Yes.

* * *

"The Court: . . . I think this Juror should be excused for cause.  So ruled."

[6] The defendants' have made no claim of having been prejudiced by the trial court's exercise of its discretion.

No *Shepard's* Signal™

As of: March 17, 2022 2:37 AM Z

# *Langston v. United States*

United States District Court for the District of Connecticut

September 30, 2021, Decided; September 30, 2021, Filed

No. 3:19-cv-2020 (MPS)

**Reporter**

2021 U.S. Dist. LEXIS 189002 *; 2021 WL 4477328

ALLASIA LANGSTON, Plaintiff, v. UNITED STATES OF AMERICA, Defendant.

## Core Terms

post office, lobby, floor, constructive notice, snow, inspection, slipped, summary judgment, deposition, hazard, notice, no evidence, minutes, video, present evidence, entrance, mail, weather, puddle, infer, grant summary judgment, surveillance video, remember, caution, Street, path, reasonable factfinder, dangerous condition, conditions, recordings

**Counsel:** **[*1]** For Allasia Langston, Plaintiff: Kevin D Scully, LEAD ATTORNEY, Kernan, Scully & McDonald, LLP, Waterbury, CT.

For USA, Defendant: Michelle Lynn McConaghy, LEAD ATTORNEY, U.S. Attorney's Office-NH, New Haven, CT.

**Judges:** Michael P. Shea, United States District Judge.

**Opinion by:** Michael P. Shea

## Opinion

RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Allasia Langston filed suit against the United States of America under the *Federal Tort Claims Act, 28 U.S.C. §§ 1346* and *2671, et seq.* ("FTCA"). Langston's complaint alleges one count of negligence based on her allegation that she slipped and fell at the Bridgeport Post Office on January 13, 2018. The Government moves for summary judgment on this claim. For the reasons set forth below, the Government's motion for summary judgment is DENIED without prejudice.

### I. Factual Background

The United States Postal Service operates a full-service post office located at 120 Middle Street, Bridgeport, CT ("Post Office"). ECF No. 31-2 at ¶ 1; ECF No. 32-1 at Section I, ¶ 1. The Post Office is located in an historic building and has terrazzo floors in the lobby area. ECF No. 31-2 at ¶ 2; ECF No. 32-1 at Section I, ¶ 2.

#### A. Langston's Fall

On Saturday, January 13, 2018, Langston left her house around 12:00 p.m., or at some point "in the 12 o'clock **[*2]** hour," and drove to the Post Office to mail something. ECF No. 31-2 at ¶ 40; ECF No. 32-1 at Section I, ¶ 40. She was wearing Ugg all-weather boots. ECF No. 32-1 at Section II, ¶ 3. According to Langston, it took her seven to ten minutes to drive from her home to the Post Office. ECF No. 32-1 at Section II, ¶ 5.

Langston testified at her deposition that she parked on a side street. ECF No. 32-3 at 9[1] . According to Langston, there were "hills of snow ... pushed over from shoveling and that" on the ground that day. *Id.* at 7. According to Langston, she had to help her daughter out of the car upon arrival at the Post Office due to the hills of snow, and she and her daughter had to step on snow in order to get out of the car. ECF No. 32-1 at Section II, ¶ 8; ECF No. 32-3 at 16. At her deposition, Langston initially testified that "a walkway ... was cleared" and that "[y]ou didn't have to step on any snow" to enter the Post Office, but she then stated that she could not recall whether she had to "walk across hills of snow" to enter the Post Office. ECF No. 34-1 at 16-17. She also testified that she could not recall if there was snow on the stairs leading into the Post Office. ECF No. 32-3 [*3] at 17. Langston submitted a weather report for January 13, 2018 that indicates that while there was rain in the early morning hours, there was no precipitation after 3:39 a.m. ECF No. 32-13 at 4. That report also indicates that temperatures were above freezing in the early morning hours but had dropped to 32 degrees by 9:52 a.m. and continued to drop throughout the day. *Id.*

Langston entered the Post Office through the north entrance, which is also known as the Golden Hill Street entrance. ECF No. 31-2 at ¶ 42; ECF No. 32-1 at Section I, ¶ 42. That entrance has stairs leading up from the sidewalk to the outside doors of the Post Office. ECF No. 31-2 at ¶ 6; ECF No. 32-1 at Section I, ¶ 6. There are marble pillars located on either side of the stairs. *Id.* The Government has presented evidence that there were yellow caution signs affixed to the pillars stating "CAUTION SLIPPERY WHEN WET" on January 13, 2018. ECF No. 31-2 at ¶¶ 7-8. Langston testified at her deposition that she did not remember whether the signs were there when she entered the Post Office that

day. ECF No. 31-4 at 12.

Upon moving through the outside doors at the Golden Hill Street entrance, Post Office customers enter a [*4] vestibule area, which leads to another set of doors to the Post Office lobby. ECF No. 31-2 at ¶ 9; ECF No. 32-1 at Section I, ¶ 9. The Government has presented evidence that blue rugs are located in the vestibule area all year long, and that additional runners are placed there during the winter months. ECF No. 31-2 at ¶¶ 10-12. Langston does not recall whether she saw rugs in the vestibule area on January 13, 2018. ECF No. 32-1 at ¶¶ 10-12. Langston also does not remember if she saw water or debris on the floor of the vestibule area, and she does not remember slipping in that area. ECF No. 31-2 at ¶ 48; ECF No. 32-1 at Section I, ¶ 48.

Upon passing through the second set of doors into the lobby, Langston proceeded to her right towards the Post Office's full-service counter to mail a package. ECF No. 31-2 at ¶ 54; ECF No. 32-1 at Section I, ¶ 54. According to Langston, the Post Office is very busy on the weekends, and there were about twenty to twenty-five people there. ECF No. 32-1 at Section II, ¶ 10. At some point after passing through the doors but before reaching the full-service counter, Langston asserts that she slipped and fell. ECF No. 31-2 at ¶ 55; ECF No. 32-1 at Section I, [*5] ¶ 55 and Section II, ¶ 11. Langston does not remember whether she saw any water on the floor before she slipped and fell. ECF No. 31-2 at ¶ 56; ECF No. 32-1 at Section I, ¶ 56. She testified at her deposition that she did not "remember what the floor was looking like," ECF No. 31-2 at ¶ 49; ECF No. 32-1 at Section I, ¶ 49, but that she did recall that there was no caution sign in the area where her fall occurred. ECF No. 32-1 at Section I, ¶ 49. She claims that, after she fell, she observed a pizza-sized puddle of water on the lobby floor. ECF No. 31-2 at ¶ 57; ECF No. 32-1 at Section I, ¶ 57. Langston does not know how the water got onto the lobby floor, nor how long the water was on

---

[1] This ruling cites ECF page numbers throughout.

the floor prior to her fall. ECF No. 31-2 at ¶¶ 58-59; ECF No. 32-1 at Section I, ¶¶ 58-59.

The Government presented evidence that there are rugs on the floor of the lobby directly in front of each doorway, and that additional runners are placed in the lobby "[w]hen the weather gets bad." ECF No. 31-2 at ¶¶ 14-15. The Government also presented evidence that the Post Office keeps two caution cones at the lobby entrances year-round and that the Post Office adds additional caution signs, as well as floor [*6] fans intended to keep the floor dry, during the winter months. ECF No. 31-2 at ¶¶ 18-20. Langston does not recall seeing any rugs, caution signs, or floor fans in the lobby. ECF No. 32-1 at Section I, ¶¶ 14-15 18-20.

The parties dispute how frequently and thoroughly Post Office employees inspected the lobby on January 13, 2018. While Jonathan Duberry, the custodian working the morning of January 13, testified at his deposition that he checks the lobby somewhere between every fifteen minutes and every forty-five minutes, depending on the weather, ECF No. 32-6 at 14, he also provided a written statement indicating that he checks the lobby "every 30 to 45 minutes for wet spots" during inclement weather. ECF No. 32-7 at 2. According to Langston, this discrepancy between his testimony and his written statement creates uncertainty regarding how frequently Duberry actually checked the lobby.

The parties also dispute whether Duberry conducted an inspection of the lobby shortly before Langston fell. Duberry testified that he was scheduled to work until 12:30 p.m. on Saturdays in January of 2018, although he would work past 12:30 if he found he needed to clean something near the end of his shift. [*7] ECF No. 32-6 at 17-18. Duberry also testified that he conducted a final check of the lobby floor before leaving, and that he did so "[p]robably around 12:15, 12:20 ... [s]omewhere in there." *Id.* at 17. As noted above, Langston left her

house around 12:00 p.m., or at some point "in the 12 o'clock hour," to drive to the Post Office, ECF No. 31-2 at ¶ 40; ECF No. 32-1 at Section I, ¶ 40, and (according to Langston) it took seven to ten minutes to drive to the Post Office from her home, ECF No. 32-1 at Section II, ¶ 5. Given the uncertainty regarding what time Duberry conducted his final check of the lobby and what time Langston arrived at the Post Office, it is not clear whether Duberry checked the lobby before or after Langston's fall.

The parties also dispute whether the Post Office has a clear policy for what specifically should happen if an employee sees something on the ground. Langston points out that Orlando Giddiens, the Post Office's Supervisor of Operations, testified at his deposition that an employee should report any liquid on the ground to a supervisor, manager, or custodian—"whoever they can find first." ECF No. 32-5 at 12-13. Duberry testified at his deposition that an [*8] employee who sees something on the ground should call a custodian to clean it up. ECF No. 32-6 at 12. Giddiens also testified that he was "not sure" if the Post Office had a policy requiring employees to report a fall if they witness one, but he indicated that the employee should report it to a supervisor or manager. ECF No. 32-5 at 20. The Government contends that this testimony does not indicate a lack of clear procedure, as both Giddiens and Duberry were clear that spills should be reported. ECF No. 34-1 at 7.

B. Events Following Langston's Fall

According to Langston, a Post Office employee who was behind a counter observed Langston on the ground immediately after her fall and peeked over to ask if she was all right. ECF No. 32-1 at Section II, ¶ 19. According to Langston, this employee was Hispanic, was in her thirties, and had brown, shoulder-length hair. *Id.* at Section II, ¶ 20. Langston also asserts that after her fall,

another female employee brought a cone to the spot where the fall had occurred but did not speak to Langston. *Id.* at Section II, ¶ 21. According to Langston, this employee was around 50 years old, "had shoulder-length hair, was white, about five foot three inches **[*9]** and was thin." *Id.* at Section II, ¶ 23. According to Langston, a third employee—who was female, of medium build, and wearing a uniform—spoke to the employee who brought the cone over. *Id.* at Section II, ¶¶ 24-25. According to Langston, this third employee did not speak to her. *Id.* at Section II, ¶ 26.[2]

After getting up from her fall, Langston proceeded to the full-service counter to mail her package. ECF No. 31-2 at ¶ 68; ECF No. 32-1 at Section I, ¶ 68. She did not tell anyone at the counter—or any other Post Office employee—that there was water on the floor or that she had fallen. ECF No. 31-2 at ¶¶ 69-70; ECF No. 32-1 at Section I, ¶¶ 69-70. She did not ask anyone for assistance or medical care. ECF No. 31-2 at ¶ 71; ECF No. 32-1 at Section I, ¶ 71. She did not fill out an incident report on January 13, 2018, and she never returned to the Post Office to complete an incident report. ECF No. 31-2 at ¶ 72; ECF No. 32-1 at Section I, ¶ 72. A search of all records at the Post Office indicates that no complaints were made at any time on January 13, 2018 regarding a fall in the lobby. ECF No 31-2 at ¶ 38; ECF No. 32-1 at Section I, ¶ 38.

On June 24, 2019, Langston's attorney filed an administrative **[*10]** claim with the United States Postal Service District Tort Claims Coordinator on Langston's behalf. ECF No. 31-2 at ¶ 77; ECF No. 32-1 at Section I, ¶ 77. On January 13, 2020, the Post Office denied Langston's claim. ECF No. 31-2 at ¶ 78; ECF No. 32-1

at Section I, ¶ 78.

C. Surveillance Video

The Post Office has video surveillance cameras that capture footage of the Post Office lobby and the entrances to it. ECF No. 32-1 at Section II, ¶¶ 56-57. The Post Office preserves video recordings captured by these cameras for 30 days; after 30 days, the recordings are deleted. *Id.* at ¶¶ 58-60. Giddiens is responsible for the video camera system used to record video of activity in the customer access area of the Bridgeport Post Office. ECF No. 31-2 at ¶ 96; EF No. 32-1 at Section I, ¶ 96. The video for January 13, 2018 was automatically deleted on February 12, 2018, in accordance with the Post Office's normal operating procedures. ECF No. 31-2 at ¶ 99; EF No. 32-1 at Section I, ¶ 99. Giddiens stated in a declaration that he was unaware of Langston's allegation that she had fallen on January 13 when the video was deleted. *Id.*

The week that Langston fell, she hired the law firm of Kernan, Scully, **[*11]** & McDonald to represent her. ECF No. 32-1 at Section II, ¶ 46. Attorney David Scully, of that firm, states in a sworn affidavit that upon opening a new file involving premises liability, he sends a letter of representation to the property owner, person or entity against whom a claim will be brought. *Id.* at Section II, ¶ 47. According to her sworn affidavit, Shanequa Camp, Attorney Scully's paralegal, will type the letter and place it in his Attorney Scully's bin with an envelope, and he will sign the letter and return it to Camp. *Id.* at Section II, ¶ 48. Camp will then stamp the letter and place it in a bin within the office containing mail to be mailed that day. *Id.* at Section II, ¶ 49. According to Camp's affidavit, in January of 2018, a firm staff member would then bring all the stamped envelopes in the bin to the Post Office box on Grand Street in Waterbury at 11:00 a.m., 3:00 p.m., and 5:00 p.m. each day. *Id.* at Section II, ¶ 50.

---

[2] The Government contends that no Post Office employees saw Langston fall or were aware that she fell on January 13, 2018. *See* ECF No. 31-2 at ¶¶ 62-66, 101.

2021 U.S. Dist. LEXIS 189002, *11

Attorney Scully signed a letter addressed to the "Manager" of Post Office and dated January 26, 2018, requesting that any surveillance, security, incident report or other evidence related to the January 13 incident be preserved. *Id.* at Section II, ¶ 51; **[*12]** ECF No. 32-11 at 2. The metadata for the word document containing this letter confirms that it was last edited on January 26, 2018 at 11:57 a.m. ECF No. 32-1 at Section II, ¶ 52. Although Attorney Scully does not specifically recall signing this letter, he confirms in his sworn affidavit that the signature on the letter is his, and that there is no reason that the letter would have been typed, printed, signed, and copied, but then not mailed. *Id.* at Section II, ¶ 53. Camp also confirms in her sworn affidavit that if a letter is typed, printed, and signed, and the firm has a copy of it in its file, there is no reason that letter would not have been mailed. *Id.* at Section II, ¶ 54.

The Government asserts that Post Office never received the letter. It presents evidence that Postmaster Gary Thompson, the lead manager for the Bridgeport Post Office at the relevant time, would have received any correspondence addressed to the "Manager" of the Post Office. ECF No. 31-2 at ¶¶ 88-89; ECF No. 32-1 at Section I, ¶¶ 88-89. It also presents evidence that it is standard procedure that any correspondence received by the Postmaster's Office regarding maintenance issues, video recordings made at the **[*13]** Post Office, incidents that occurred in the lobby area of the Post Office, and matters related to custodial staff is forwarded to Giddiens "for attention and appropriate action." ECF No. 31-2 at ¶ 90; ECF No. 32-1 at Section I, ¶ 90. Postmaster Thompson stated in a declaration that he did not receive a copy of Attorney Scully's January 26 letter. ECF No. 31-2 at ¶ 91; ECF No. 32-1 at Section I, ¶ 91. Giddiens also states in a declaration that he did not receive the letter and that, if he had, he would have ensured that video recordings from January 13 were downloaded and preserved. ECF No. 31-2 at

¶¶ 95, 100; EF No. 32-1 at Section I, ¶¶ 95, 100. In January 2018, Giddiens reported to Lawrence McLean, Acting Manager of Customer Service Support at the Post Office. ECF No. 31-2 at ¶¶ 92-93; ECF No. 32-1 at Section I, ¶¶ 92-93. McLeain stated in a declaration that he did not receive a copy of the letter. ECF No. 31-2 at ¶ 94; ECF No. 32-1 at Section I, ¶ 94. According to the Government, the Post Office did not become aware of Langston's fall until August 20, 2018, when its Torts Claim Section received a different letter from Attorney Scully. ECF No. 31-2 at ¶ 75.

## II. Legal Standard

"Summary **[*14]** judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton, 572 U.S. 650, 656-57, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)* (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc., 715 F.3d 417, 427 (2d Cir. 2013)*. "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013)*. The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011)* (citing *Anderson v. Liberty*

*Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*).

### III. Discussion

Langston claims that the Government is liable for her personal injuries because it was negligent in maintaining safe conditions at the Post Office, leading to her fall. In its motion for summary judgment, the Government argues that the plaintiff **[\*15]** has failed to present any evidence from which a reasonable factfinder could infer that it had notice of the defect or hazard that caused the plaintiff to slip and fall. I conclude that the Government is not entitled to summary judgment due to the parties' dispute regarding the non-preservation of surveillance video of the Post Office lobby from the day of Langston's fall.

### A. Applicable Law

Langston brings her negligence action pursuant to the FTCA. "The applicable law to a claim against the Government under the FTCA is the law that the state where the tortious incident took place would apply 'in like circumstances involving a private defendant.'" *Silverman v. United States, No. CV 04-5647 (ETB), 2008 U.S. Dist. LEXIS 25041, 2008 WL 1827920, at \*12 (E.D.N.Y. Mar. 28, 2008)* (quoting *Caban v. U.S., 728 F.2d 68, 72 (2d Cir.1984)*); *Davis v. United States, 430 F. Supp. 2d 67, 73 (D. Conn. 2006)* ("Under the FTCA the government's liability is determined by the application of the law of the place where the act or omission occurred."). Connecticut law would apply if Langston brought a negligence action against a private defendant, so Connecticut law applies to this action.

Under Connecticut law, "[t]he essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *Baptiste v. Better Val-U Supermarket, Inc., 262 Conn.*

*135, 811 A.2d 687, 690 (Conn. 2002)*. In this case, the Government does not dispute that Langston was a business invitee and that **[\*16]** the Government therefore owed her a duty to maintain its premises in a reasonably safe condition. ECF No. 31-1 at 9; s*ee also Kelly v. Stop and Shop, Inc., 281 Conn. 768, 918 A.2d 249, 255 (Conn. 2007)*. To hold the Government liable for her injuries, Langston must prove that the Government had notice of the hazard that caused them. Specifically, Langston must show that the Government "had actual notice of the presence of the specific unsafe condition which caused [her injury] or constructive notice of it." *Kelly, 918 A.2d at 255* (quoting *Baptiste, 811 A.2d at 691*). "The notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely conditions naturally productive of that defect even though subsequently in fact producing it." *Id.* (alteration omitted).

Here, Langston does not contend that the Government had actual notice of the puddle of water that she asserts caused her to slip and fall. *See* ECF No. 32-1 at Section I, ¶ 60 (admitting that Langston has no evidence indicating that any Post Office employee knew there was water on the lobby floor prior to her fall). Thus, the question is whether the Government had constructive notice of the puddle. "To establish constructive notice, [Langston] must adduce some evidence, either direct or circumstantial, that **[\*17]** establishes the length of time the defect was present." *Navarro v. Kohl's Dept. Stores, Inc., No. 5-CV-843 (DJS), 2007 U.S. Dist. LEXIS 21179, 2007 WL 735787, at \*4 (D. Conn. Mar. 8, 2007)*; *see also Gulycz v. Stop & Shop Companies, Inc., 29 Conn. App. 519, 615 A.2d 1087, 1088 (Conn. App. 1992)* ("Whether the defendant had constructive notice of [the alleged defect] turns on whether the [defect] existed for a length of time sufficient for the defendant's employees, in the exercise of due care, to discover the defect in

time to have remedied it.")

B. Application to Facts of This Case

The Government argues that Langston has presented no evidence from which a trier of fact could infer that the Government had constructive notice of the presence of the water on which she slipped. Langston has presented no evidence indicating where the water came from or how long it was on the floor before she fell; rather, Langston testified at her deposition that she observed the water after she fell. But the presence of the water on the floor at the point in time when Langston fell cannot support an inference of constructive notice because "without at least some evidence of how long [the water was on the floor], it would be too speculative to infer that the water was on the floor for any more than 'minutes or even seconds.'" *Navarro, 2007 U.S. Dist. LEXIS 21179, 2007 WL 735787, at *5* (quoting *Deptula v. New Britain Trust Co., 19 Conn. Supp. 434, 46-37, 116 A.2d 773 (1955)*). Courts within this district, applying Connecticut negligence law in slip and fall cases, have **[*18]** repeatedly granted summary judgment against plaintiffs who were unable to present evidence regarding how long a hazard existed before they fell. *See Camera v. Target Corp., No. 18-CV-95 (KAD), 2020 U.S. Dist. LEXIS 99873, 2020 WL 3051751, at *7 (D. Conn. June 8, 2020)* (granting summary judgment to the defendant because the plaintiff failed to present any evidence of constructive notice, where "the evidence 'goes no farther than to show the presence of a slippery foreign substance'") (quoting *Kelly, 918 A.2d at 256*); *Gomes v. United States, No. 11-CV-1825 (VLB), 2012 U.S. Dist. LEXIS 164526, 2012 WL 5869801, at *7 (D. Conn. Nov. 19, 2012)* (granting summary judgment to the defendant because the plaintiff failed to present any evidence of constructive notice, where "the only evidence that the wet leaves on which Plaintiff fell existed *prior* to his fall is Plaintiff's assertion that he fell and noticed the leaves upon falling") (emphasis in original); *Navarro, 2007 U.S.*

*Dist. LEXIS 21179, 2007 WL 735787, at *5* (granting summary judgment to the defendant because the plaintiff failed to present any evidence of constructive notice, where "the only evidence that the defect existed prior to [the plaintiff]'s fall is that she fell"). Thus, Langston's evidence that the water was present on the lobby floor at the time that she fell is insufficient to support an inference that the Post Office had constructive notice.

1. Reasonableness of Lobby Inspections

Langston argues that a factfinder may infer constructive notice **[*19]** from the Post Office's allegedly inadequate inspections of its lobby. *See* ECF No. 32-2 at 10-12. However, the authority Langston cites does not support this argument. For example, Langston quotes the Connecticut Superior Court's statement in *Lunney v. Taubman Co., LLC*, that "when a possessor of land fails to make or to have made a *reasonable inspection* which would have disclosed the dangerous condition, his negligent ignorance is, in the eyes of the law, equivalent to actual knowledge." *No. FSTCV 166029324S, 2018 Conn. Super. LEXIS 450, 2018 WL 1659485, at *7 (Conn. Super. Ct. Mar. 5, 2018)* (quoting *Hall v. Burns, 213 Conn. 446, 479, 569 A.2d 10 (1990)*) (emphasis in original). But this quotation merely explains what constructive notice is, and as it highlights, the "reasonable inspection" referenced would need to have "disclosed the dangerous condition" in order for the defendant to have constructive notice. Indeed, the quoted language follows a sentence that reflects the importance of the duration of the dangerous condition in determining whether the property owner's inspection was reasonable: "A possessor of land is charged with constructive notice of the dangerous condition when it is of such a nature and *duration* that a *reasonable inspection* would have disclosed the risk." *Id.* (quoting *Hall, 213 Conn. at 479*) (first emphasis added). All of this language **[*20]** is consistent with the case law

above requiring a plaintiff to submit some evidence of the duration of the dangerous condition. As I explained above, Langston has offered no evidence that a reasonable inspection would have disclosed the presence of the water on which she slipped because she has presented no evidence indicating where the water came from or how long it was on the lobby floor prior to her fall. Thus, even if the Post Office thoroughly inspected its lobby as frequently as every few minutes, there is no evidence that such inspections would have disclosed the presence of the water. As a result, even a determination that Post Office employees inspected the lobby on an unreasonably infrequent basis or in an inadequately thorough manner would not support the inference that the Post Office had constructive knowledge of the presence of the puddle of water.

Langston also cites *Dominguez v. United States* as support for her unreasonable inspection argument. In that case, the plaintiff brought a negligence action alleging that she slipped and fell on a snowy and icy path. *963 F. Supp. 2d 107, 110 (D. Conn. 2013)*. The court, in determining that the defendant had at least constructive notice that the path was icy based on **[*21]** the plaintiff's evidence that "everyone was talking about the fact that" the path had been slippery for days due to accumulated snow and ice, also noted that the defendant's employees had inspected the path about one hour and fifteen minutes before the plaintiff's fall. *Id. at 122*. The court did not indicate that a gap of one hour and fifteen minutes between the inspection and the fall somehow supported the conclusion that the defendant had constructive notice. Thus, *Dominguez* also does not support Langston's argument that summary judgment may not be granted due to disputes about the timing and extent of the Post Office's inspections of its lobby.

2. Presence of Snow Outside

Langston also argues that the presence of snow on the

ground on the day of her fall supports an inference that the Post Office had constructive notice of the puddle of water on the lobby floor. ECF No. 32-2 at 13-15. This argument also fails. As I noted above, the Connecticut Supreme Court has emphasized that the defendant must have notice "of the very defect which occasioned the injury and not merely conditions naturally productive of that defect even though subsequently in fact producing it." *Kelly., 918 A.2d at 255* (quoting *Baptiste, 811 A.2d at 691*) (alteration omitted). **[*22]** Here, the defect that occasioned Langston's injury is the puddle of water on the lobby floor. The hills of snow are at most "conditions naturally productive of that defect." *Id.* Thus, a reasonable factfinder could not infer from Langston's evidence regarding the hills of snow that the Post Office had constructive notice of the defect that caused her to fall.

The authority Langston cites does not compel a different result. She points to the *Dominguez* case, but in that case, the hazard at issue was the snowy and icy path on which the plaintiff claimed to have slipped. *963 F. Supp. 2d at 110*. There, the plaintiff's evidence that "everyone" knew that the path was slippery on the morning of her fall due to ice and snow that had not been cleared, together with her evidence that the temperatures on the days leading up to and the day of her fall had "fluctuated below and above the freezing point such [that] the snow and ice existing on the ground could have melted and refrozen," indicated that the hazard had existed for a period of time before the plaintiff slipped. *Id. at 122*. That evidence could, the court concluded, support an inference that the hazard had existed for long enough that the defendant, in the exercise of **[*23]** reasonable care, should have discovered it (and that the defendant, therefore, had constructive knowledge of the hazard). *Id.* Here, Langston does not claim that she slipped on hills of snow outside the Post Office. Rather, she asserts that

she slipped on water inside the Post Office lobby. Thus, unlike in *Dominguez*, evidence regarding the presence of snow and the weather on the day of the fall is not probative of how long the hazard (here, the puddle of water) existed.

Langston also points to two unpublished Connecticut Superior Court decisions that indicate that in certain circumstances, evidence regarding weather conditions outside may be probative of whether a defendant had constructive knowledge of a hazard inside. In *Fragoso v. Stop & Shop Companies, Inc.*, the plaintiff slipped on water on the floor near the entrance of a grocery store. *No. 099317, 1991 Conn. Super. LEXIS 2511, 1991 WL 231567, at * 1 (Conn. Super. Ct. Oct. 31, 1991)*. The court indicated that "continuous rain with pedestrian traffic coming into the store was sufficient to put the defendant on notice that water would be tracked in and deposited on the floor." *Id.* In *Lunney*, the plaintiff slipped on a wet painted line just inside a parking garage. *2018 Conn. Super. LEXIS 450, 2018 WL 1659485, at *7*. The court, citing *Fragoso*'s observation that the **[*24]** combination of continuous rain and pedestrian traffic put the defendant in that case on notice of the hazard, stated that "[t]he same would seem to be true for the area of a parking garage near the entrance, at the bottom of a sloped ramp, with cars driving into the garage with water dripping from the cars as would/should be expected (in addition to the possible direct flow of rain down the ramp)." *Id.*

Assuming that *Fragoso* and *Lunney* accurately apply Connecticut's law regarding constructive notice, I nevertheless conclude that these cases do not support Langston's argument that her testimony regarding the hills of snow can support an inference of constructive notice. Unlike the plaintiffs in those cases, Langston presented no evidence that it was continuously raining at the time that she entered the building in question (here, the Post Office) and slipped. Langston's claim

that it was "above freezing for several hours prior to [her fall], and there was light rain, demonstrating that snow would be melting onto the walkways and being stepped on by customers and tracked into the Post Office," ECF No. 32-2 at 14-15, is not supported by the weather report she herself submitted. That report **[*25]** shows that there was no precipitation after 3:39 a.m. on the day of Langston's fall, and that temperatures were at or below freezing from 9:52 a.m. onwards. ECF No. 32-13 at 4. Langston has presented no other evidence indicating that there was melted snow on the walkways leading into the Post Office, and she indicated at her deposition that she could not remember whether there was snow on the walkway or steps leading into the Post Office. ECF No. 34-1 at 16-17; ECF No. 32-3 at 17. Langston's evidence that she and her daughter had to step on "hills of snow ... pushed over from shoveling and all that" in order to get out of their car, which was parked on the street, ECF No. 32-3 at 7, 9, 16; ECF No. 32-1 at Section II, ¶ 8, cannot support an inference by a reasonable factfinder that Post Office customers were on January 13, 2018 tracking in snow and water in such a manner that the Post Office would have had constructive notice of the presence of water on the lobby floor.

3. Failure to Preserve Surveillance Video

Despite the fact that there is no evidence of constructive notice in the existing record, I cannot grant summary judgment to the Government due to the parties' dispute in a pending **[*26]** motion for sanctions (ECF No. 33) regarding the Government's failure to preserve the surveillance video from the day that Langston claims she fell. There appears to be a factual dispute about whether the Government received a January 26, 2018 letter from Langston's counsel requesting preservation of the surveillance video. But because the briefs supporting and opposing the motion for sanctions do not address the legal implications of the evidence presented

2021 U.S. Dist. LEXIS 189002, *26

regarding the mailing and non-receipt of the January 26, 2018 letter, I cannot resolve that motion without supplemental briefing, which I have ordered. And because this issue remains undecided, there remains the possibility that I will decide to impose measures under *Fed. R. Civ. P. 37(e)(1)*, which could include permitting the factfinder in this case (the Court) to consider the fact that the surveillance video was not preserved. If I imposed such a measure, then a reasonable factfinder could infer from the Government's non-preservation that the video contained evidence adverse to the Government. In that circumstance, summary judgment would be inappropriate, although whether such an adverse inference should be drawn and whether it would be enough to prove **[*27]** Langston's claim that the Government had constructive notice of the water on the lobby floor are questions I would then need to decide, after a trial, as the factfinder. At this point, then, I cannot conclude as a matter of law that there is no evidence from which a reasonable factfinder could infer that the Government had constructive notice of the alleged defect, and so I cannot grant summary judgment to the Government. If, after supplemental briefing on the motion for sanctions, the Government is able to show from the existing evidence its non-receipt of the letter as a matter of law, I will permit the Government to renew its motion for summary judgment on the existing record and briefs.

## IV. Conclusion

The Defendant's motion for summary judgment (ECF No. 31) is DENIED without prejudice.

IT IS SO ORDERED.

/s/ Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut

September 30, 2021

---

End of Document

 Positive

As of: March 17, 2022 2:37 AM Z

## *Martin v. Stop & Shop Supermarket Cos.*

Appellate Court of Connecticut

March 18, 2002, Argued ; June 4, 2002, Officially Released

(AC 21287)

### Reporter

70 Conn. App. 250 *; 796 A.2d 1277 **; 2002 Conn. App. LEXIS 301 ***

MICHELE MARTIN v. STOP & SHOP SUPERMARKET COMPANIES, INC.

**Prior History: [***1]** (Appeal from Superior Court, judicial district of New Haven, Pittman, J.) Action to recover damages for personal injuries sustained by the plaintiff as a result of the defendant's alleged negligence, and for other relief, brought to the Superior Court in the judicial district of New Haven and tried to the court, Pittman, J.; judgment for the defendant, from which the plaintiff appealed to this court.

*Martin v. Stop & Shop Supermarket Co., 2000 Conn. Super. LEXIS 2522 (Conn. Super. Ct. Sept. 22, 2000).*

**Disposition:** Affirmed.

## Core Terms

mat, interrogatory, curl

## Case Summary

### Procedural Posture

Plaintiff injured party appealed the judgment of the Superior Court, New Haven (Connecticut), finding in favor of defendant supermarket in a premises liability case.

### Overview

The injured party fell and sustained injuries while exiting one of the supermarket's stores. She tripped on a mat located just inside the exit door. The injured party alleged that the supermarket failed to correct the defective condition created by the unsecured mat even though the supermarket knew or should have known of the condition. On appeal, the injured party challenged the trial court's finding that common sense dictated that mere use of movable floor mats in highly trafficked areas was not an unreasonably dangerous condition. The injured party offered very few details as to whether the mat on which she fell was properly attached to the floor or if it had come loose. Although there was evidence of prior incidents involving the mats, there was no evidence that the mat the injured party tripped on was the same one involved in prior incidents. Therefore, the trial court's finding that there was no defect was not clearly erroneous. The supermarket's response to an interrogatory admitting that there had been prior complaints about the alleged defect in the mats did not constitute an admission that the mat was defective.

### Outcome

The judgment was affirmed.

## LexisNexis® Headnotes

Case 3:20-cv-01657-OAW    Document 53    Filed 03/17/22    Page 224 of 253

Page 2 of 5

70 Conn. App. 250, *250; 796 A.2d 1277, **1277; 2002 Conn. App. LEXIS 301, ***1

Torts > ... > Duty On Premises > Invitees > Business Invitees

Torts > Premises & Property Liability > General Premises Liability > General Overview

*HN1*[ ] **Invitees, Business Invitees**

Where a plaintiff is a business invitee a defendant owes the plaintiff the duty to maintain its premises in a reasonably safe condition. To hold the defendant liable for a business invitee's personal injuries, the business invitee must prove (1) the existence of a defect, (2) that the defendant knew or in the exercise of reasonable care should have known about the defect, and (3) that such defect had existed for such a length of time that the defendant should, in the exercise of reasonable care, have discovered it in time to remedy it. It is within the province of the trier of fact to determine whether a defective condition existed.

Civil Procedure > Appeals > Record on Appeal

*HN2*[ ] **Appeals, Record on Appeal**

An appellant bears the burden of furnishing an appellate court with an adequate record on which to review the trial court's factual and legal determinations. Conn. Gen. Prac. Book, R. App. P. *§ 61-10.* It is, therefore, the responsibility of an appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision or to clarify the legal basis of a ruling.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

*HN3*[ ] **Standards of Review, Clearly Erroneous Review**

An appellate court's standard of review of a trial court's factual findings is well established. The trial court's findings are binding upon an appellate court unless they are clearly erroneous in light of the evidence. An appellate court cannot retry the facts or pass on the credibility of the witnesses. A finding of fact is clearly erroneous when there is no evidence in the record to support it or when although there is evidence in the record to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

Civil Procedure > ... > Standards of Review > Plain Error > General Overview

Criminal Law & Procedure > ... > Standards of Review > Plain Error > Definition of Plain Error

*HN4*[ ] **Standards of Review, Plain Error**

It is well established that plain error review is proper in only limited circumstances. Plain error review is properly reserved for those extraordinary situations where the error is so obvious that the fairness and integrity of and public confidence in the judicial process would be impaired were an appellate court to fail to address an issue that was not raised or preserved at trial.

**Counsel:** Edward L. Walsh, for the appellant (plaintiff).

Bryan L. LeClerc, for the appellee (defendant).

**Judges:** Schaller, Mihalakos and Flynn, Js. In this opinion the other judges concurred.

70 Conn. App. 250, *250; 796 A.2d 1277, **1277; 2002 Conn. App. LEXIS 301, ***1

Opinion by: FLYNN

# Opinion

[*250]  [**1278]  FLYNN, J. In this premises liability action, the plaintiff, Michele Martin, appeals from the judgment of the trial court rendered in favor of the defendant, Stop & Shop Supermarket Companies, Inc. On appeal, the plaintiff claims that the trial court improperly (1) concluded [*251] that she failed to prove that a defect existed and (2) failed to give proper weight to the defendant's answers to interrogatories. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to our disposition of this appeal. On July 7, 1997, the plaintiff fell and [***2] sustained injuries while exiting one of the defendant's stores in Hamden. She tripped on a mat located just inside the exit door. The plaintiff commenced this negligence action against the defendant seeking damages for her injuries. In her complaint, she alleged that the defendant failed to correct the defective condition created by the unsecured mat even though the defendant knew or should have known of the condition. Following a trial to the court, the court rendered judgment in favor of the defendant. This appeal followed.

The plaintiff was _HN1_[⬆] a business invitee and, therefore, the defendant owed the plaintiff the duty to maintain its premises in a reasonably safe condition. _Gulycz v. Stop & Shop Cos., 29 Conn. App. 519, 521, 615 A.2d 1087_, cert. denied, _224 Conn. 923, 618 A.2d 527 (1992)_. To hold the defendant liable for her personal injuries, the plaintiff must prove (1) the existence of a defect, (2) that the defendant knew or in the exercise of reasonable care should have known about the defect and (3) that such defect had "existed for such a length of time that the [defendant] should, in

the exercise of reasonable care, have discovered it in [***3] time to remedy it." _Cruz v. Drezek, 175 Conn. 230, 238-39, 397 A.2d 1335 (1978)_. It is within the province of the trier of fact to determine whether a defective condition existed. See _id., at 235_.

There was evidence from both the defendant's manager and the plaintiff that the mat in question had a curl in it. The court found that this curl was not a defect. That finding as to the curl is not before us on appeal [*252] because the plaintiff conceded in her brief and reply brief that she does not challenge that finding and, thus, we do not address it. However, the plaintiff does challenge the court's finding that "common sense dictates that mere use of movable floor mats in highly trafficked areas is not an unreasonably dangerous condition, and the court does not find it to have been so in this instance."

We first observe that the court, other than stating that common sense dictated this finding, did not cite to any of the evidence, including the interrogatory answers that disclosed prior falls. Moreover, the plaintiff did not request an articulation [**1279] of the court's decision and we cannot speculate on what predicate facts the court found to make its conclusion. [***4] [1]

_HN3_[⬆] Our standard of review of a trial court's factual findings is well established. "The trial court's findings are binding upon this court unless they are clearly

---

[1] _HN2_[⬆] The appellant bears the burden of furnishing this court with an adequate record on which to review the trial court's factual and legal determinations. **Practice Book § 61-10.** "It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . [or] to clarify the legal basis of a ruling . . . ." (Internal quotation marks omitted.) _Maloney v. PCRE, LLC, 68 Conn. App. 727, 743-44, 793 A.2d 1118 (2002)_; see **Practice Book § 66-5.**

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 226 of 253

Page 4 of 5

70 Conn. App. 250, *252; 796 A.2d 1277, **1279; 2002 Conn. App. LEXIS 301, ***4

erroneous in light of the evidence. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence in the record to support it, the reviewing [***5] court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Premier Capital, Inc. v. Grossman, 68 Conn. App. 51, 59, 789 A.2d 565 (2002)*.

There was evidence that the plaintiff shopped in the same market before at a rate of two to three times [*253] per week. She testified that she had exited from the pharmacy side of the store. She further testified that her foot was caught under the curl of the mat, but no evidence was presented that the curl occurred because of lack of tacking and she did not know how long the curl was there. She also could not recall the dimensions of the mat in length or width, the position of the mat when she fell or whether it was at an angle.

The court had before it all of the evidence, including the plaintiff's testimony and the incident reports from the defendant. Although evidence of prior incidents was admitted through the reports, the court, as the trier of fact, was free to determine the weight to be afforded to that evidence. There was no evidence that the mat that the plaintiff tripped on was the same mat involved in the prior incidents. Furthermore, [***6] there was no evidence that the mat was in the same position and state of wear as in the prior incidents. Ultimately, the court found that no defect existed. After thoroughly reviewing the record, we conclude that the court's finding was not clearly erroneous and it could have reasonably found as it did.

The crux of the plaintiff's second argument is that the defendant's answer to one of her interrogatories, which was admitted into evidence as a full exhibit, was a judicial admission that the rug was defective, which was binding on the court, and the court improperly treated it as an evidentiary admission by which it was not bound. The plaintiff claims that the defendant admitted in its answer to one of the interrogatories that the particular defect at issue existed and that it had notice of that defect. Question nine of the plaintiff's interrogatories, which mirrors the standard interrogatory form, provides: "State whether you received, at any time six months before the incident described by the plaintiff, complaints from anyone about the defect or condition that the plaintiff *claims* caused the plaintiff's [*254] injury." (Emphasis added.) The defendant's answer to this question was [***7] "Yes." The plaintiff's interrogatory number nine asks the defendant to disclose prior similar complaints about what *the plaintiff claims* was the defect or condition causing the injury. An affirmative answer to that question does not admit the existence of a defect. [**1280] It merely supplies requested information about other claims in which the complainants asserted that the same mat was defective. It does not concede or admit that the mat in issue was defective at the time of the plaintiff's fall. While under the present definition of an admission under *§ 8-3 (1) of the Connecticut Code of Evidence*, the interrogatory answer might be categorized as an admission in that it came into evidence as "[a] statement that is being offered against a party and is (A) the party's own statement, in . . . an individual . . . capacity," it does not appear to admit or concede the fact at issue about whether the mat was defective. [2]

[***8] We next observe that this issue is unpreserved.

─────────────────────

[2] Because we conclude that the plaintiff failed to prove that a defect existed or that the defendant admitted the existence of a defect, we do not need to reach the issue of whether the defendant's interrogatory answer was an admission as to notice of the claimed defect.

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 227 of 253

Page 5 of 5
70 Conn. App. 250, *254; 796 A.2d 1277, **1280; 2002 Conn. App. LEXIS 301, ***8

The plaintiff did not claim before the trial judge that the defendant's interrogatory answers were a binding judicial admission conceding that the mat was defective. She concedes in her brief that this issue was not distinctly raised at trial and, therefore, requests plain error review.

*HN4*[↑] It is well established that plain error review is proper in only limited circumstances. "Plain error [review] is properly reserved for those extraordinary situations where the error is so obvious that the fairness and integrity of and public confidence in the judicial process would be impaired were we to fail to address an issue that was not raised or preserved at trial." (Internal quotation **[*255]** marks omitted.) *State v. Jones, 67 Conn. App. 25, 27, 787 A.2d 43 (2001)*.

On the basis of our thorough review of the record and briefs, we conclude that this situation does not point us to any such obvious error nor invoke any exceptional circumstances warranting plain error review.

The judgment is affirmed.

In this opinion the other judges concurred. **[***9]**

---

End of Document

 Caution

As of: March 17, 2022 2:37 AM Z

## *Monahan v. Montgomery*

Supreme Court of Connecticut

December 8, 1965, Argued ; January 25, 1966, Decided

No Number in Original

### Reporter

153 Conn. 386 *; 216 A.2d 824 **; 1966 Conn. LEXIS 536 ***

Hazel L. Monahan, Administratrix (Estate of John Monahan) v. William Montgomery, Conservator (Estate of Lucie Heitmann)

**Prior History: [***1]**  Action to recover damages for the death of the plaintiff's decedent, alleged to have been caused by the negligence of the defendant, brought to the Superior Court in New Haven County and tried to the jury before *Loiselle, J.;* verdict and judgment for the plaintiff and appeal by the defendant.

The appellee filed a motion for reargument which was denied.

**Disposition:** *Error; judgment directed.*

## Core Terms

premises, driveway, garage, notice, rake, defense motion, circumstances, licensee, leaves, front, stall

## Case Summary

### Procedural Posture

Defendant conservator of property owner's estate appealed an order of the Superior Court of New Haven County (Connecticut), which granted judgment to plaintiff administratrix on her suit to recover damages for her decedent's death that was allegedly the result of a fall on the property owner's premises. The conservator argued that the trial court erred in denying his motion for a directed verdict and for judgment notwithstanding the verdict.

### Overview

The decedent and the property owner were neighbors, and decedent rented part of the property owner's garage. The decedent was raking leaves out of the garage driveway when he tripped over a branch and fell and struck his head. The decedent died, and the administratrix subsequently filed suit against the conservator to recover damages for the decedent's death. The administratrix argued that the death was caused by the negligence of the property owner in failing to keep her premises in a reasonably safe condition in that, in the area of the garage, the premises was endangered by tree branches. The jury found for the administratrix, and the trial court denied the conservator's motions for a directed verdict, judgment notwithstanding the verdict, and to set aside the verdict. The conservator appealed. The court held that the administratrix did not prove that the property owner had actual or constructive notice of the defect on her property and that such defect in fact caused the decedent's injuries. Proof merely of the existence of tree branches in the area of the garage was not sufficient. There was no evidence as to how the branch was a causative factor in decedent's fall.

153 Conn. 386, *386; 216 A.2d 824, **824; 1966 Conn. LEXIS 536, ***1

## Outcome

The order of the trial court granting judgment to the administratrix on her suit to recover damages for her decedent's death from a fall on the property owner's property was reversed with directions that judgment be entered in favor of the conservator.

# LexisNexis® Headnotes

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN1*[⬇]  **Trials, Judgment as Matter of Law**

An assignment of error that is not briefed is treated as abandoned.

Torts > Premises & Property Liability > General Premises Liability > General Overview

*HN2*[⬇]  **Premises & Property Liability, General Premises Liability**

For plaintiff to recover for the breach of a duty owed to her as an invitee, it is incumbent upon her to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused the accident or constructive notice of it.

Torts > Premises & Property Liability > General Premises Liability > General Overview

*HN3*[⬇]  **Premises & Property Liability, General**

## Premises Liability

Notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it. On a question of notice, the trier's consideration must be confined to the defendant's knowledge and realization of the specific condition causing the injury, and such knowledge and realization cannot be found to exist from a knowledge of the general or overall conditions obtaining on the premises.

Torts > Premises & Property Liability > General Premises Liability > General Overview

*HN4*[⬇]  **Premises & Property Liability, General Premises Liability**

For a plaintiff to recover damages for injuries sustained from a defect in property, it is necessary for her to allege and prove that the defendant had actual or constructive notice of the existence of the specific defect and that that defect in fact caused the decedent's injuries. It is incumbent upon the plaintiff to remove these issues from the realm of surmise, guess, conjecture and speculation.

Torts > Premises & Property Liability > General Premises Liability > General Overview

*HN5*[⬇]  **Premises & Property Liability, General Premises Liability**

Proof of the existence of a general condition is not sufficient.

**Counsel:** *Thomas F. Keyes, Jr.,* with whom, on the brief, was *Walter A. Mulvihill,* for the appellant (defendant).

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 230 of 253

Page 3 of 5

153 Conn. 386, *386; 216 A.2d 824, **824; 1966 Conn. LEXIS 536, ***1

*Alfonse C. Fasano,* for the appellee (plaintiff).

**Judges:** King, C. J., Murphy, Alcorn, Shannon and House, Js.

**Opinion by:** HOUSE

# Opinion

 **[*387] [**825]**   The plaintiff is the administratrix of the estate of her husband, whom, in the interest of brevity, we will hereinafter call the decedent. William Montgomery is the conservator of the estate of Lucie Heitmann, whom, for the same reason, we will call the defendant.

There is no dispute about the general circumstances giving rise to the suit.  The decedent and the defendant were neighbors. On the defendant's property there was a two-car garage with a single driveway leading to it. The decedent rented one stall of the garage **[***2]**  for the plaintiff's car while the  **[*388]** defendant retained the use of the other.  The decedent in 1957 had suffered a coronary thrombosis but had made a very good recovery and was in good health.  In March, 1962, the plaintiff asked the decedent to go over and rake up the garage driveway, where there was an accumulation of leaves and branches.  Trees overhung both sides of the driveway and had dead branches on them.   The premises were located close to the shore of Long Island Sound, where it was windy, and as a result leaves and branches were blown around.  The decedent first raked up a pile in front of the stall he rented and then started to rake up in front of the defendant's side of the garage. There were no witnesses to his fall.  The plaintiff looked over from their house and saw the decedent lying in the driveway, stretched out at a right angle to the garage with his head nearest to the garage and about one foot

away from the apron of the garage. His head was opposite the middle of the defendant's stall. He had a rake in his hand and stated to the plaintiff and to a neighbor that he tripped over a branch and fell.  He never pointed out or identified any particular branch.  **[***3]**  An ambulance was called, and he was taken to a hospital, where he died two days later.

In the complaint it is alleged that the death was caused by the negligence of the defendant in failing to keep her premises in a reasonably safe condition in that, in the area of the garage, the premises "were endangered by twigs, branches from bushes and trees" and that the driveway "with the broken branches and twigs from the trees and bushes, strung along the ground, had a tendency to inflict harm upon a user of said driveway." An allegation that "said premises **[**826]** including said driveway were under the control of the defendant" was admitted.

 **[*389]**  The jury returned a verdict for the plaintiff, and the defendant has appealed, assigning error in the denial of the defendant's motions for a directed verdict, for judgment notwithstanding the verdict and to set the verdict aside.   *HN1*[⬆]  ] The assignment of error concerning the court's refusal to find certain facts has not been briefed and is therefore treated as abandoned. *Krejpcio v. Zoning Board of Appeals, 152 Conn. 657, 659, 211 A.2d 687*. The remaining assignments of error relate to the charge.   They reassert the basic contentions **[***4]**  of the defendant's motions that there was no evidence that the defendant had notice of the presence of the branch over which the decedent fell, that he was, under the circumstances, a licensee, and that the evidence did not disclose any breach of duty on the part of the defendant to him as a licensee.

So far as the status of the decedent as an invitee or a licensee is concerned, the jury were fully and properly instructed as to the difference between them and the

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 231 of 253

Page 4 of 5

153 Conn. 386, *389; 216 A.2d 824, **826; 1966 Conn. LEXIS 536, ***4

tests to be applied in the determination as to which of the two categories the decedent belonged under the circumstances as the jury might find them. Although the court did not use the technical term "licensee," it did correctly charge on the law which was applicable if the decedent had that status. The court, in its charge, correctly following the rule as laid down in such cases as *Hennessey v. Hennessey, 145 Conn. 211, 213, 140 A.2d 473*, and *Sokoloski v. Pugliese, 149 Conn. 299, 301, 179 A.2d 603*, instructed the jury that, if, under the circumstances, they found that the decedent fell in an area which was beyond that which the defendant might reasonably have contemplated would be used by her tenant in [***5] the use and enjoyment of the leased premises, there could be no recovery by the plaintiff [*390] and their verdict must be for the defendant. The verdict for the plaintiff, therefore, established that the decedent was not a licensee and that the duty owed to him by the defendant was the duty owed by the owner of premises to an invitee.

HN2[↑] For the plaintiff to recover for the breach of a duty owed to the decedent as an invitee, it was incumbent upon her to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused the decedent's fall or constructive notice of it. *White v. E & F Construction Co., 151 Conn. 110, 113, 193 A.2d 716*; *Morris v. King Cole Stores, Inc., 132 Conn. 489, 492, 45 A.2d 710*. The plaintiff made no claim of any actual notice but relied on a claim of constructive notice, that is, that the situation had existed for such a length of time that, had the defendant exercised reasonable supervision of her premises, she would have known of its existence. We have repeatedly stated that the HN3[↑] notice, whether actual or constructive, must be notice of the very defect which occasioned the injury [***6] and not merely of conditions naturally productive of that defect even though subsequently in

fact producing it. *White v. E & F Construction Co., supra, 114*; *New Britain Trust Co. v. New York, N.H. & H.R. Co., 145 Conn. 390, 393, 143 A.2d 438*; *Drible v. Village Improvement Co., 123 Conn. 20, 23, 192 A. 308*. On a question of notice, the trier's consideration must be confined to the defendant's knowledge and realization of the specific condition causing the injury, and such knowledge and realization cannot be found to exist from a knowledge of the general or overall conditions obtaining on the premises. *Krause v. Almor Homes, Inc., 149 Conn. 614, 618, 183 A.2d 273*.

We recognize the problems of proof which faced [*391] both parties to this action. There were no eyewitnesses to the fall, and the only testimony as to the cause was the statement of the decedent at the scene that he fell over a branch. His subsequent death foreclosed any opportunity of obtaining further information from him. The aged defendant was, at the time of trial, confined to the Connecticut Valley Hospital with no [**827] memory and was unable to talk or answer questions. [***7] Nevertheless, HN4[↑] for the plaintiff to recover it was necessary for her to allege and prove that the defendant had actual or constructive notice of the existence of the specific defect and that that defect in fact caused the decedent's injuries. It was incumbent upon the plaintiff to remove these issues from the realm of surmise, guess, conjecture and speculation. *Lombardi v. J. A. Bergren Dairy Farms, Inc., 153 Conn. 19, 25, 213 A.2d 449*; *Gothreau v. New York, N.H. & H.R. Co., 148 Conn. 65, 67, 167 A.2d 244*; *Gillette v. Plante Properties, Inc., 349 Mass. 760, 207 N.E.2d 304*.

In reviewing the rulings of the court in denying the defendant's motions, we consider the evidence in the light most favorable to the plaintiff. *Santor v. Balnis, 151 Conn. 434, 435, 199 A.2d 2*; *Bambus v. Bridgeport Gas Co., 148 Conn. 167, 168, 169 A.2d 265*. There was evidence as to the general condition of the premises, the existence thereon of dead leaves, brush, branches

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 232 of 253

Page 5 of 5

153 Conn. 386, *391; 216 A.2d 824, **827; 1966 Conn. LEXIS 536, ***7

and debris and the existence in a windy location of overhanging trees with dead branches. There was an abundance of evidence as to the existence of a general condition naturally productive of the existence [***8] on the driveway of a branch over which a person raking the area could fall and sustain injury. As we have noted, however, *HN5*[⬆] ] proof merely of the existence of such a general condition is not sufficient. The plaintiff's claim of proof [*392] is that the decedent raked up a pile of branches and leaves in front of one stall and then started to rake up a pile in front of the other stall and that "[w]hile in the driveway he tripped over a broken branch" and fell. No particular branch was ever identified. Whether it was a specific isolated branch or a component part of an accumulation of debris is not disclosed. There was no evidence whatsoever as to how long it had been in the position it was in when the decedent fell over it, its size, whether it had just fallen or been blown there, whether it was a portion of branches, leaves and bushes which had collected over a period of time, or, in any circumstance, whether it had been in the location for some time or had just been placed there or moved into that position by the decedent himself since he was on the premises for the express purpose, and was actually engaged in the process, of moving the branches and general debris. For all [***9] that appears the branch may have been a part of the debris which the decedent himself had just collected and gathered into a pile in front of the garage. Nor is there any evidence at all as to how and to what extent the branch was a causative factor in the decedent's fall.

In short, whatever the conditions on the defendant's premises may have been before the decedent himself undertook to change them, it is undisputed that he did himself intentionally and materially change them and in fact was in the process of changing them when he in some undisclosed manner tripped over a branch and fell.

Under the circumstances, there was no evidence from which the jury could reasonably conclude that the claimed specific defect had existed for such a sufficient length of time that the defendant should [*393] have discovered it in the exercise of a reasonable supervision of her premises or to what extent it was a material factor in causing the injuries which the decedent sustained. Accordingly, the court should have granted the defendant's motion for a directed verdict or, pursuant to Practice Book § 255, granted the defendant's motion for judgment notwithstanding the verdict.

There is [***10] error, the judgment is set aside and the case is remanded with direction to render judgment for the defendant.

In this opinion the other judges concurred.

---

End of Document

 Positive

As of: March 17, 2022 2:37 AM Z

## *Navarro v. Kohl's Dep't Stores, Inc.*

United States District Court for the District of Connecticut

March 8, 2007, Decided

No. 3:05CV00843 (DJS)

**Reporter**

2007 U.S. Dist. LEXIS 21179 *; 2007 WL 735787

ADALIA NAVARRO, Plaintiff, v. KOHL'S DEPARTMENT STORES, INC., Defendant.

## Core Terms

spill, liquid, floor, constructive notice, length of time, notice, actual notice, picture frame, milk, employees, cleaned, defective condition, summary judgment, encountered, registers, genuine, walking, feet, reasonable inference, material fact, matter of law, no evidence, premises, invitee, minutes, aisle

**Counsel:** **[*1]** For Adalia Navarro, Plaintiff: Andrew R. Sherriff, LEAD ATTORNEY, Sherriff & Sherriff, Westport, CT.

For Kohl's Dept Stores, Inc, Defendant: Barry P. Beletsky, LEAD ATTORNEY, Riccio & Beletsky, East Haven, CT.

**Judges:** DOMINIC J. SQUATRITO, UNITED STATES DISTRICT JUDGE.

**Opinion by:** DOMINIC J. SQUATRITO

## Opinion

## MEMORANDUM OF DECISION AND ORDER

On April 29, 2005, the plaintiff, Adalia Navarro ("Navarro") initiated this action for damages against the defendant, Kohl's Department Stores, Inc. ("Kohl's"), in the Connecticut Superior Court for the Judicial District of Stamford/Norwalk at Stamford claiming that the negligence of Kohl's in maintaining its premises caused her to receive personal injuries. On May 26, 2005 this case was removed to this court pursuant to *28 U.S.C. § 1441(a)*. Now pending is Kohl's motion for summary judgment (dkt. # 15) pursuant to *Rule 56 of the Federal Rules of Civil Procedure*. For the reasons stated herein, Kohl's motion **(dkt. # 15)** is **GRANTED.** [1]

_____

[1] The court points out that Navarro's Local Rule 56(a)(2) Statement did not specifically admit or deny the paragraphs set out in Kohl's Local Rule 56(a)(1) statement. Likewise, Navarro's Local Rule 56(a)(2) Statement did not list each issue of material fact as to which she contends there is a genuine issue to be tried. A party opposing a motion for summary judgment who fails to submit a proper Local Rule 56(a)(2) Statement is deemed to have admitted the moving party's Local Rule 56(a)(1) Statement. See, e.g., *Shoaf v. Matteo, 100 F. Supp. 2d 114, 117 (D. Conn. 2000)* (holding that the facts set forth in the defendant's statement were properly deemed admitted because the plaintiff's submission, which "[did] not cite any evidence, [did] not create genuine issues of material fact."). Failure to provide an adequate Local Rule 56(a)(2) Statement is grounds alone for granting the motion. *Booze v. Shawmut Bank, Conn., 62 F. Supp. 2d 593, 595 (D. Conn.*

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 234 of 253

Page 2 of 7
2007 U.S. Dist. LEXIS 21179, *1

[*2] I. FACTS

On August 23, 2003 at approximately 9:00 p.m., Navarro was shopping at a Kohl's store located at 500 Connecticut Avenue, Norwalk, Connecticut. When Navarro had finished shopping, she went to the cash registers to buy the merchandise she had selected for purchase. While at a cash register, she disputed the price of a picture frame. A store clerk, Zakaria Zakaria ("Zakaria"), was summoned to the registers to accompany Navarro to the picture frame section of the store to check the advertised price. Zakaria led Navarro down the approximately ten-foot-wide main aisle to the picture frame section. Navarro quickly located the frame in question and showed it, with its advertised price, to Zakaria. Navarro testified that the pair spent "probably less" than one minute in the picture frame section. Navarro then began to walk back to the front registers, with Zakaria following her from behind. As Navarro was returning to the front registers, she slipped and fell on some clear liquid that was located on the floor approximately ten to fifteen feet from the picture frame area. Navarro injured both knees and the tops of her toes as a result of the fall. The spot of liquid, located [*3] in a generally highly traveled area of the store, was between one and three feet around. The floor was speckled white in color. Neither Navarro nor Zakaria claims to have seen the spill when passing through the area previously.

Zakaria helped Navarro to her feet and escorted her to the customer service area. The store manager, Henry Williams ("Williams") encountered Navarro on her way to the customer service area. At the time of Navarro's

fall, Williams was in his office, which is next to the customer service area. As soon as he was notified, Williams went to investigate the incident. Williams testified that five minutes before Navarro's slip and fall, he had walked through and "inspected" the area where the incident occurred. According to Williams, there had not been any previous reports of liquid on the floor. After checking on Navarro's condition, Williams went to the area of the incident. Williams testified that the liquid was present at that time, but he was unable to determine from where the liquid had come. Williams then had the liquid cleaned up. Williams returned to the customer service area and completed an accident report with Navarro. Navarro subsequently pointed out the [*4] area of the incident to Williams as she later left the building, but the spill had already been cleaned up and caution/wet cone put in place.

Zakaria testified in his deposition that it is the practice of the store and all store employees to clean spills within two or three minutes of encountering them. Additionally, Zakaria stated that cleaning up any spill or incident of breakage takes precedence over whatever else an employee may be involved in. Zakaria does not, however, have any specific recollection of this incident with Navarro. There is no security surveillance footage from that evening.

II. DISCUSSION

Navarro brings this negligence claim against Kohl's pursuant to Connecticut's common law. Specifically, Navarro claims that Kohl's owed a duty of care to Navarro as a business invitee and was negligent by: (1) allowing the floor of its store to remain in a dangerous condition for an unreasonable length of time; (2) failing to warn its patrons of the dangerous condition; (3) failing to inspect the aisles and walkways of its store so as to discover the unsafe condition; (4) failing to isolate

_1999)._ Because the outcome of Navarro's case would be the same under a Local Rule 56(a) analysis and under a discussion of the merits, the court shall, in the interest of judicial fairness, reach the merits of Navarro's claim.

Ben Levites

and/or fix the defective condition. Additionally, Navarro claims that Kohl's **[*5]** created the dangerous and unsafe condition. Navarro asserts that because of Kohl's negligence she (1) has suffered severe injuries to both her knees, legs, and left foot; (2) has suffered pain and discomfort about her entire body, and will suffer permanent pain and disability; (3) has been restricted from pursuing activities she enjoyed prior to the accident and her ability to enjoy life's offerings will be permanently impaired; (4) has incurred medical, surgical and hospital treatment expenses and will be obliged to expend additional sums for such purposes in the future; and (5) has lost time and compensation from gainful employment and may be required to lose further compensation in the future. Kohl's denies liability and has moved for summary judgment, claiming that judgment should be entered in its favor as a matter of law.

## A. STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)* **[*6]** .

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981)* (quoting *Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975))*.

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))*. The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See *Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991)*. "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper. **[*7]** " Id.

## B. PREMISES LIABILITY

In Connecticut, the essential prima facie elements of a cause of action in negligence are: duty; breach of that duty; causation; and actual injury. *Baptiste v. Better Val-U Supermarket, Inc., 262 Conn. 135, 138, 811 A.2d 687 (2002)*. Navarro must prove each of these elements to recover on her claim.

Navarro claims that Kohl's owed a duty of care to her based on her status as a business invitee. As the Connecticut Supreme Court has long held, "The standard of duty required by the law to be exercised by the owner of premises toward an invitee thereon is that of reasonable care." *Stratton v. J.J. Newberry Co., 117 Conn. 522, 525, 169 A. 56 (1933)*. Kohl's does not dispute that Navarro was a business invitee and that this duty existed. In addition, Kohl's does not dispute that Navarro's was injured by her fall. For the purposes of this summary judgment motion, the only contested issue is whether Kohl's breached the duty owed to Navarro by being on notice of, but not remedying, the defect.

"[I]n the context of a negligence action based on a defective condition on the defendant's premises, '[t]here could be no breach of the duty resting **[*8]** upon the defendant[] unless [it] knew of the defective condition or [was] chargeable with notice of it . . . .'" *Considine v.*

*City of Waterbury, 279 Conn. 830, 870, 905 A.2d 70 (2006)* (quoting *Cruz v. Drezek, 175 Conn. 230, 235, 397 A.2d 1335 (1978)*; see *Morris v. King Cole Stores, Inc., 132 Conn. 489, 492, 45 A.2d 710 (1946)*. Thus, for Navarro to recover for the breach of a duty owed to her as a business invitee, she must prove that Kohl's had either actual or constructive notice of the particular defect that caused her injuries. If Navarro fails to establish a breach of duty, which is an essential prima facie element in a negligence action, any issues of causation and injury would be rendered moot, and her negligence claim must fail.

1. Actual Notice

Navarro first alleges that Kohl's had actual notice of the liquid on the floor. Specifically, Navarro asserts that Zakaria should have warned her of the danger the first time they passed the area of the fall, and that Williams should have taken steps to clean up the spill when he was in the area five minutes before the incident. Kohl's responds that there is no proof Kohl's had actual notice of the defective condition.

 [*9]  Navarro has failed to present any evidence supporting her assertion that either Williams or Zakaria had actual knowledge of the spilled liquid. Both Zakaria and Williams testified that they did not see a spill when they were in the area around the time of the incident. Williams also testified there was no notice given to any store personnel of any spilled liquid. Navarro does not dispute this testimony, and has presented no additional evidence demonstrating that either Williams or Zakaria knew of the spill before Navarro was injured.

Navarro also maintains that when she and Zakaria were walking from the registers to the picture frame section, Zakaria "should" have noticed the spill, a spill which Navarro admits she herself did not notice. Yet, Navarro has presented no evidence that the spill already existed when she and Zakaria were walking into the picture frame section. In addition, a statement that Zakaria "should" have noticed the spill does not demonstrate that Zakaria was on actual notice of the spill. Furthermore, Navarro's naked assertion that Zakaria "should" have noticed the spill (which may not have existed when Navarro and Zakaria were walking into the picture frame area)  [*10]  is wholly insufficient to create a genuine issue of material fact. Therefore, Navarro's assertions that Williams did not have the spill cleaned and that Zakaria did not warn Navarro about the spill fail, by themselves, to establish actual notice of the defective condition.

Navarro could have established that Kohl's had notice of the defect if she had presented evidence that Kohl's employees had created the defective condition. In Connecticut, a plaintiff does not have to prove that a defendant had actual or constructive notice of a dangerous condition when the plaintiff demonstrates that the defendant's employees created the condition. See *Tuite v. Stop and Shop Cos., Inc., 45 Conn. App. 305, 308, 696 A.2d 363 (1997)*. "In these types of cases, the defendant is deemed to have actual notice of the dangerous condition that its employees created." *Id. at 309*. For example, in Tuite there was evidence that store employees were watering plants a few feet from the place of the fall, that the plants being watered were placed directly on the floor, and that there were no measures taken to insure the water would not spill out of the pots. Id. Under this theory of  [*11]  notice, Navarro would not have to rely upon Williams's or Zakaria's actual notice of the spill. In the instant case, however, Navarro, although claiming that Kohl's created the dangerous and unsafe condition, has presented no evidence that Kohl's or its agents created the defect. Without such evidence, Navarro cannot demonstrate that Kohl's was on the type of notice as described in *Tuite*.

2007 U.S. Dist. LEXIS 21179, *11

Absent any evidence that Kohl's employees actually knew of the spilled liquid, or that Kohl's employees themselves spilled the liquid, Navarro cannot establish actual notice. As noted above, Navarro's bald assertion that there is a genuine issue of material fact is insufficient to create an actual genuine issue of material fact. Consequentially, the court finds that, as a matter of law, Navarro cannot prevail insofar as her claim is based on Kohl's actual notice of the defect.

2. Constructive Notice

Navarro next alleges that even if Kohl's did not have actual notice of the spill, it had constructive notice. Specifically, she argues that the she and Zakaria were in the frame department for such a short time that the liquid had to have already been on the floor for a much longer period of time. **[*12]** Kohl's responds that this circumstantial evidence is too speculative to reasonably infer constructive notice.

Constructive notice may be found if it can be proven that the specific defect was in place for a sufficient length of time that the defendant, in the exercise of reasonable care, should have encountered it in time to remedy it. _Cruz, 175 Conn. at 238-39_. To establish constructive notice, Navarro must adduce some evidence, either direct or circumstantial, that establishes the length of time the defect was present. _Gulycz v. Stop and Shop Cos., Inc., 29 Conn. App. 519, 521, 615 A.2d 1087 (1992)_. The finder of fact is then left to determine whether the length of time is sufficient enough so as to expect that the defendant should have encountered it. Id. For example, in _Gulycz_, the plaintiff's only proof that he was injured by a hinge protruding out of the end of a check-out aisle was his testimony that he had seen it. _Id. at 522_. There was no evidence that anyone else, including the head cashier, the aisle supervisor, and a stork clerk, had seen the hinge either before or after the incident. Id. The court observed, "if there had **[*13]**

been some evidence that the defect existed prior to the injury, the trier of fact would have had a basis to determine whether the length of time was sufficient to permit a reasonable inference of constructive notice." Id.

In the present case, the only evidence that the defect existed prior to Navarro's fall is that she fell. Neither Navarro nor any of the deposed store employees testified to seeing the spill or having notice of it prior to the accident. Without at least some evidence, direct or circumstantial, see id., as to how long the spill existed prior to Navarro's fall, it would be too speculative for a jury to infer the length of time the spill was in place so as to establish constructive notice.

Navarro also asserts that the length of time she and Zakaria spent in the picture frame area (i.e., the time between first passing by the location of the fall and the actual fall) was too short for the spill to have occurred in that time. Speculation as to the probability or improbability of the timing of an occurrence is not, however, evidence of when the occurrence took place. See _Deptula v. New Britain Trust Co., 19 Conn. Supp. 434, 436-37, 116 A.2d 773 (1955)_. In **[*14]** _Deptula,_ the source of the water on the floor was known, but there was no evidence as to how long the wetness was present. _Id. at 436-37_. Thus, the court held that without at least some evidence of how long the condition existed, it would be too speculative to infer that the water was on the floor for any more than "minutes or even seconds." _Id. at 437_. In the present case, Navarro has presented no evidence as to the source of the liquid or how long the spill was in place. Although it is permissible to infer that the liquid was on the floor for an instant before Navarro slipped and fell, Navarro has submitted insufficient evidence for a jury to reasonably infer that the liquid was on the floor for any time longer than that.

Additionally, the court in _Deptula_ held that constructive

notice of the existence of a condition could not be drawn from the form of the condition itself absent any evidence relating to length of time the condition was present. Id. In Deptula, the plaintiff slipped on a wet marble floor while walking in between two lobby counters. Id. at 435. The floor was wet because the bank patrons had tracked [*15] in snow from the sidewalks. Id. That the floor was in a wet condition was, by itself, insufficient to prove that the floor was wet for a sufficient length of time that the defendant should have encountered it and cleaned it up. Id. at 437. Thus, in the present case, the mere existence of a one to three foot puddle of liquid is not, by itself, a viable foundation for the inference that the liquid was on the floor long enough that Kohl's should have encountered it.

The appearance of the spill in this case also does not support a reasonable inference as to the length of time the spill was in place. Connecticut courts have held that the appearance of a spill or defective condition may be indicative of the length of time the defect existed. See Schwarz v. Waterbury Pub. Mkt., Inc., 6 Conn. App. 429, 432-33, 505 A.2d 1272 (1986); see also Colombo v. Stop and Shop Supermarket Co., Inc., 67 Conn. App. 62, 64, 787 A.2d 5 (2001). The court in Schwarz held that testimony about the condition of spilled milk was sufficient for a jury to reasonably have concluded that the condition had existed for a certain length of time, and that a reasonable inspection by the [*16] defendant would have discovered the existence of the spilled milk on the defendant's premises. Schwarz, 6 Conn. App. at 433. In Schwarz, there were statements by several witnesses that milk had spilled on the defendant's premises, and that the spilled milk in question appeared dirty. Id. at 432. Additionally, there was testimony "that there was a trail of milk, covering six aisles in the defendant's supermarket, at the time of the plaintiff's fall, and . . . that milk had leaked frequently from milk containers housed in the defendant's store." Id. at 432-

33. In contrast to Schwarz, however, the court in Colombo found that "dirty" spilled milk, presented as the sole proof of the length of time the spill was in place, was insufficient to establish constructive notice. Colombo, 67 Conn. App. at 64. Absent any other evidence, either direct or circumstantial, the court in Colombo held that a "jury could not reasonably have concluded that the defendant breached a duty to the plaintiff . . . ." Id. at 65.

In the present case, Navarro contends that the size and shape of the spill is [*17] sufficient to establish that it was in place long enough to be encountered. The court disagrees with Navarro. Unlike in Schwarz, where there was testimony regarding the expansiveness of the spill to buttress an inference of time based on the dirty appearance of the spilled milk, the testimony here describes the defect as simply a clean, clear spot of liquid approximately one to three feet in diameter. Indeed, Navarro has not even presented evidence that the liquid was "dirty," which, as Colombo demonstrates, would be insufficient by itself to establish constructive notice. The sole fact that the liquid was in a puddle approximately one to three feet in diameter fails, as a matter of law, to demonstrate that the spill was in place for a length of time sufficient to put Kohl's on constructive notice of the spill. In sum, Navarro has not presented the court with any evidence establishing that Kohl's was on constructive notice of the spilled liquid in question.

Navarro has failed to demonstrate that Kohl's had actual notice of the defect in question. In addition, there is an insufficient evidentiary foundation to support a reasonable inference that the defect was in place for [*18] a sufficient length of time so as to impute constructive notice upon Kohl's. Thus, by failing to present evidence of either type of notice, Navarro cannot demonstrate that Kohl's breached the duty owed to Navarro, which is necessary to establish a prima facie

2007 U.S. Dist. LEXIS 21179, *18

negligence claim. Consequently, Kohl's is entitled to judgment as a matter of law, and its motion for summary judgement is **GRANTED.**

## III. CONCLUSION

For the foregoing reasons, Kohl's motion for summary judgment (**dkt. # 15**) is **GRANTED.** Judgment in favor of the defendant shall enter. The Clerk of the Court shall close this file.

**SO ORDERED** this <u>8th</u> day of March, 2007.

**/s/** DOMINIC J. SQUATRITO

**UNITED STATES DISTRICT JUDGE**

---

End of Document

 Cited

As of: March 17, 2022 2:37 AM Z

## *Shaw v. Kmart Corp.*

Superior Court of Connecticut, Judicial District of Ansonia-Milford At Derby

July 11, 2007, Decided; July 13, 2007, Filed

CV065000627S

### Reporter

2007 Conn. Super. LEXIS 1841 *; 2007 WL 2242710

Barbara Shaw v. Kmart Corporation

**Notice:** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

## Core Terms

spot, wet, summary judgment, constructive notice, material fact, floor, deposition, quotation, genuine, marks, length of time, duct, argues, notice

## Case Summary

### Procedural Posture

Plaintiff invitee filed suit against defendant store, seeking to recover for injuries she sustained when she slipped and fell on a wet spot on the floor. The store filed a motion for summary judgment, alleging that the invitee failed to establish that the store had actual or constructive notice of the defective condition.

### Overview

In her complaint, the invitee alleged that the spot on which she slipped was dirty and discolored. In granting the store's motion for summary judgment, the court found that the invitee could not show that the store had either actual or constructive notice of the wet spot. The store manager's statement made immediately after the invitee's injury that she could not clean up every spot in the store was insufficient for the court to conclude that the store had been notified of the defective condition on the floor that caused the invitee's injury as the manager's affidavit established that, by her statement, she meant that the store could not be expected to wipe up instantly every drop of water in the store as it fell from a customer's boot or cart. Moreover, the invitee offered no evidence to show that the wet spot had existed for any period of time. While the customer alleged that the water came from a rusty heating duct in the ceiling directly above the wet spot, she also admitted that she saw no water leaking from the duct and that she did not know how long the water was on the floor.

### Outcome

The court granted the store's motion for summary judgment.

## LexisNexis® Headnotes

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN1*[⬇] Summary Judgment, Evidentiary Considerations

*Conn. Gen. Prac. Book, R. Super. Ct. § 17-49* provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. The "genuine issue" aspect of summary judgment requires the parties to bring forward before trial evidentiary facts, or substantial evidence outside the pleadings, from which the material facts alleged in the pleadings can warrantably be inferred. A material fact has been defined adequately and simply as a fact which will make a difference in the result of the case.

Civil Procedure > ... > Summary Judgment > Supporting Materials > Affidavits

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

*HN2*[⬇] Supporting Materials, Affidavits

Although the moving party on a motion for summary judgment has the burden of presenting evidence that shows the absence of any genuine issue of material fact, the opposing party must substantiate its adverse claim with evidence disclosing the existence of such an issue. Mere assertions of fact are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under *Conn. Gen. Prac. Book § 17-45*. Such assertions are insufficient regardless of whether they are contained in a complaint or a brief. When a party moves for summary judgment and there are no contradictory affidavits, the court properly decides the motion by looking only to the sufficiency of the movant's affidavits and other proof.

Civil Procedure > ... > Summary Judgment > Supporting Materials > Discovery Materials

Evidence > Types of Evidence > Judicial Admissions > General Overview

*HN3*[⬇] Supporting Materials, Discovery Materials

While a plaintiff's deposition testimony is not conclusive as a judicial admission, *Conn. Gen. Stat. § 52-200*, it is sufficient to support of entry of summary judgment in the absence of contradictory competent affidavits that establish a genuine issue as to a material fact.

Torts > ... > Duty On Premises > Invitees > Business Invitees

Torts > ... > General Premises Liability > Dangerous

Conditions > Known Dangers

*HN4*[⬇] **Invitees, Business Invitees**

For a plaintiff to recover for the breach of a duty owed to him as a business invitee, it is incumbent upon him to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused his injury or constructive notice. The notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it.

> Torts > ... > Activities & Conditions > Slip & Fall Injuries > Elements

> Torts > ... > General Premises Liability > Dangerous Conditions > Known Dangers

*HN5*[⬇] **Slip & Fall Injuries, Elements**

The controlling question in deciding whether defendants had constructive notice of a defective condition is whether the condition existed for such a length of time that the defendants should, in the exercise of reasonable care, have discovered it in time to remedy it. What constitutes a reasonable length of time is largely a question of fact to be determined in the light of the particular circumstances of a case. Evidence which goes no farther than to show the presence of a slippery foreign substance does not warrant an inference of constructive notice to the defendant. While an abundance of evidence is not necessary to show a sufficient length of time existed for discovery of the condition, some evidence is required.

**Judges:** [*1] Gerard F. Esposito, J.

**Opinion by:** Gerard F. Esposito

# Opinion

MEMORANDUM OF DECISION RE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT-- # 108

*ISSUE*

The issue before the court is whether the court should grant the defendant's motion for summary judgment. The defendant's motion argues that because there is no genuine issue of material fact as to whether the defendant had actual or constructive notice of the defective condition on the floor, the defendant is entitled to judgment as a matter of law.

*FACTS*

On March 14, 2006, the plaintiff, Barbara Shaw, filed a one-count complaint against defendant, Kmart Corporation, alleging negligence. This action arises out of the injuries and damages the plaintiff allegedly sustained as a result of a slip and fall in the defendant's store. In the complaint, the plaintiff alleges that, while she was walking on the first floor of the defendant's store as an invitee, she slipped on a wet spot and fell backwards onto the floor, which caused her serious physical injuries. She further alleges that the wet spot on which she slipped was dirty and discolored and a heating duct located in the ceiling directly above the spot was discolored with rust as well.

On January 17, 2007, the defendant [*2] filed a motion for summary judgment on the ground that the plaintiff failed to establish that the defendant had actual or constructive notice of the defective condition. In support of its motion, the defendant has submitted a memorandum of law and a copy of the transcript of the plaintiff's deposition. On April 26, 2007, the plaintiff filed

a memorandum of law in opposition to the motion. On June 8, 2007, the defendant filed a reply memorandum of law, accompanied by a copy of an affidavit of Christine Donicz, Kmart's store manager.

## DISCUSSION

HN1[↑] ] "*Practice Book [§ 17-49*] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Internal quotation marks omitted.) *Deming v. Nationwide Mutual Ins. Co., 279 Conn. 745, 756-57, 905 A.2d 623 (2006)*. "[T]he 'genuine issue' aspect of summary judgment requires the parties to bring forward before trial evidentiary facts, or **[*3]** substantial evidence outside the pleadings, from which the material facts alleged in the pleadings can warrantably be inferred . . . A material fact has been defined adequately and simply as a fact which will make a difference in the result of the case." (Citation omitted; internal quotation marks omitted.) *Buell Industries, Inc. v. Greater New York Mutual Ins. Co., 259 Conn. 527, 556, 791 A.2d 489 (2002)*.

HN2[↑] ] "Although the moving party has the burden of presenting evidence that shows the absence of any genuine issue of material fact, the opposing party must substantiate its adverse claim with evidence disclosing the existence of such an issue." (Internal quotation marks omitted.) *Beers v. Bayliner Marine Corp., 236 Conn. 769, 771 n.4, 675 A.2d 829 (1996)*. "Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court under *Practice Book § [17-45]*." (Internal quotation marks omitted.)

*Allstate Ins. Co. v. Barron, 269 Conn. 394, 406, 848 A.2d 1165 (2004)*. "Such assertions are insufficient regardless of whether they are contained in a complaint or a brief." *New Milford Savings Bank v. Roina, 38 Conn.App. 240, 245, 659 A.2d 1226*, **[*4]** cert. denied, *235 Conn. 915, 665 A.2d 609 (1995)*. When a party moves for summary judgment "and there [are] no contradictory affidavits, the court properly [decides] the motion by looking only to the sufficiency of the [movant's] affidavits and other proof." *Heyman Assocs. No. 1 v. Ins. Co. of Pa., 231 Conn. 756, 795, 653 A.2d 122 (1995)*.

"In interpreting [the] decision in *Esposito v. Wethered, 4 Conn.App. 641, 496 A.2d 222 (1985)*, the Superior Court has been split as to whether deposition testimony, either uncertified or certified, may be considered for the purposes of a motion for summary judgment . . . Since [the] decision in *Esposito,* [the Appellate Court] has not determined it to be improper for a trial court to consider deposition testimony in ruling on a motion for summary judgment." *Schratwieser v. Hartford Casualty Ins. Co., 44 Conn.App. 754, 756 n.1, 692 A.2d 1283*, cert. denied, *241 Conn. 915, 696 A.2d 340 (1997)*, and cases cited therein. HN3[↑] ] "While the plaintiff's deposition testimony is not conclusive as a judicial admission; *General Statutes § 52-200*; it is sufficient to support of entry of summary judgment in the absence of contradictory competent affidavits **[*5]** that establish a genuine issue as to a material fact." *Collum v. Chapin, 40 Conn.App. 449, 450 n.2, 671 A.2d 1329 (1996)*.

The defendant moves for summary judgment on the ground that the plaintiff failed to show that the defendant had actual or constructive notice of the presence of the specific wet spot that caused the plaintiff's injury. In response, the plaintiff argues that there is a genuine issue of material fact as to whether the defendant had actual or constructive notice of the wet spot and there is sufficient evidence that shows that the defendant had

actual and constructive notice of the wet spot prior to the plaintiff's slip and fall.

*HN4*[↑] ] "[F]or [a] plaintiff to recover for the breach of a duty owed to [him] as [a business] invitee, it [is] incumbent upon [him] to allege and prove that the defendant either had actual notice of the presence of the specific unsafe condition which caused [his injury] or constructive notice . . . [T]he notice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it." (Internal quotation marks omitted.)  [*6] *Kelly v. Stop & Shop, Inc., 281 Conn. 768, 776, 918 A.2d 249 (2007)*.

*HN5*[↑] ] "The controlling question in deciding whether the defendants had constructive notice of the defective condition is whether the condition existed for such a length of time that the defendants should, in the exercise of reasonable care, have discovered it in time to remedy it." (Internal quotation marks omitted.) *Considine v. Waterbury, 279 Conn. 830, 870, 905 A.2d 70 (2006)*. "What constitutes a reasonable length of time is largely a question of fact to be determined in the light of the particular circumstances of a case . . . Evidence which goes no farther than to show the presence of a slippery foreign substance does not warrant an inference of constructive notice to the defendant." (Citation omitted; internal quotation marks omitted.) *Kelly v. Stop & Shop, Inc., supra, 281 Conn. 777*. "While an abundance of evidence is not necessary to show a sufficient length of time existed for discovery of the condition . . . some evidence is required." (Citation omitted.) *Gulycz v. Stop & Shop Cos., 29 Conn.App. 519, 521, 615 A.2d 1087 (1992)*.

In the present case, the plaintiff claims that the defendant had actual notice of the  [*7] wet spot that caused the plaintiff's injury. The plaintiff fails, however,

to present sufficient evidence to support its claim. The plaintiff argues that the court can reasonably conclude that Donicz had actual notice of the wet spot, in light of her statement made immediately after the plaintiff's injury: "I can't clean up every spot in the store." The plaintiff states, however, in her deposition that she understood Donicz's statement to mean that the wet spots were throughout the store due to the weather. Moreover, Donicz's affidavit attests that she meant by that statement that "Kmart could not be expected to wipe up instantaneously every drop of water in the store as it fell from a customer's boot or cart." Thus, Donicz's statement alone is insufficient for the court to conclude that the defendant had been notified of the defective condition on the floor that caused the plaintiff's injury.

The plaintiff also claims that the evidence demonstrates that the defendant had constructive notice of the existence of the wet spot. The plaintiff fails, however, to offer any evidence, direct or circumstantial, to show that the wet spot had existed for any period of time. Instead, the plaintiff  [*8] argues that, because it had stopped snowing the day before, the defendant's employees had a sufficient length of time to anticipate, observe and clean up any wet spots that were likely to accumulate on the floor. This argument has no merit because it does not demonstrate that the specific wet spot that caused the plaintiff's injury had existed for any length of time and it merely suggests that general conditions naturally productive of wet spots existed.

In addition, the plaintiff argues that her allegation that the duct located in the ceiling directly above the wet spot was discolored and her statement in her deposition that "the vents in Kmart are all rusted," also suggest that the defendant had constructive notice of the wet spot because the rusty condition of the duct indicates that water may have been leaking for a considerable period of time. This argument is also without merit. The plaintiff fails to provide any evidentiary basis for the court to

2007 Conn. Super. LEXIS 1841, *8

infer that the specific wet spot had existed for any length of time since she offers no evidence to demonstrate when the water accumulated on that specific spot. Furthermore, the plaintiff states in her deposition that she did not know  **[\*9]** what caused the water to be on the floor; that she did not see any water leaking from the duct, but she assumed the water came from the duct in light of the amount of the water on the floor, the weather at that time and the fact that the ducts were rusty; and that she did not know how long the water was on the wet spot and found nothing to indicate how long the water was on the floor. Accordingly, based on the evidence adduced by the parties, the court finds that the defendant has met its burden of showing that there is no genuine issue of material fact as to whether the defendant had actual or constructive notice of the wet spot and the plaintiff failed to substantiate its adverse claim with evidence disclosing the existence of such an issue. Therefore, the defendant is entitled to judgment as a matter of law, and the court grants the defendant's motion for summary judgment.

Gerard F. Esposito

End of Document

 Positive

As of: March 17, 2022 2:37 AM Z

## *Tucker v. United States*

United States District Court for the District of Connecticut

February 3, 2017, Decided; February 3, 2017, Filed

Civil Case Number 3:14-cv-01621 (VLB)

**Reporter**

2017 U.S. Dist. LEXIS 15265 *; 2017 WL 469729

BLANCHE TUCKER, Plaintiff, v. UNITED STATES OF AMERICA, Defendant.

**Subsequent History:** Affirmed by *Tucker v. United States, 2017 U.S. App. LEXIS 26522 (2d Cir. Conn., Dec. 22, 2017)*

## Core Terms

bug, spray, summary judgment, notice, floor, constructive notice, liquid, business invitee

**Counsel:** **[*1]** For Blanche Tucker, Plaintiff: Dennis W. Gillooly, LEAD ATTORNEY, D'Elia Gillooly DePalma LLC, New Haven, CT.

For USA, Defendant: Alan M. Soloway, U.S. Attorney's Office-NH, New Haven, CT.

**Judges:** Vanessa L. Bryant, United States District Judge.

**Opinion by:** Vanessa L. Bryant

## Opinion

MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 30]

INTRODUCTION

Plaintiff, Blanche Tucker ("Plaintiff" or "Tucker"), brings this negligence suit against the United States under the Federal Tort Claims Act ("FTCA"), *28 U.S.C. §§ 1346(b), 2671, et seq.*, for a slip-and-fall that occurred in a United States Post Office in West Haven, Connecticut. Before the Court is Defendant's Motion for Summary Judgment. For the reasons that follow, Defendant's Motion for Summary Judgment is GRANTED.

BACKGROUND

On August 23, 2013, Tucker took the day off from work and went to the Allingtown Post Office in West Haven, Connecticut to buy stamps or get a money order. [Dkt. 30-1 (Def.'s Mot. Summ. J. *Local Rule 56(a)(1)* Statement), ¶¶ 1-2; Dkt. 33-2 (Pl.'s Opp'n Mot. Summ. J. *Local Rule 56(a)(2)* Statement), ¶¶ 1-2; Dkt. 30-2 (Pl.'s Dep.) at 25:21-22]. When she entered the premises, she spotted her friend from church, Delores McQueen ("McQueen"), who worked at the Post Office as a Postal Clerk. [Dkt. 30-1, **[*2]** ¶ 3; Dkt. 33-2, ¶ 3]. The people in the Post Office were abuzz with excitement over a "huge" bug that was annoying the customers. [*See* Dkt. 30-3 (McQueen Dep.), at 22:11-25 ("It looked like a bee as big as our heads. It was huge."); Dkt. 30-1, ¶ 4; Dkt. 33-2, ¶ 4]. Tucker alleges that McQueen asked her to

2017 U.S. Dist. LEXIS 15265, *2

spray the bug, although McQueen does not recall doing so. [*See* Dkt. 30-1, ¶ 5; Dkt. 33-2, ¶ 5; Dkt. 33-5 (McQueen Dep.), at 23:21-22]. Tucker obtained a spray bottle containing unknown liquid, sprayed the bug, and attempted to step on the bug when it came closer to the ground. [Dkt. 30-1, ¶¶ 5-10; Dkt. 33-2, ¶¶ 5-10]. In the process of stepping on the bug, Tucker slipped and fell on the ground. [Dkt. 30-1, ¶ 11; Dkt. 33-2, ¶ 11].

Tucker did not notice any wet spots on the floor prior to stepping on the bug. [Dkt. 30-1, ¶ 12; Dkt. 33-2, ¶ 12]. Tucker testified that the area of the floor with which she came into contact when stomping on the bug was in fact dry. [Dkt. 30-1, ¶ 13; Dkt. 33-2, ¶ 13]. After getting up, Tucker did not notice any other wet spots. [Dkt. 30-1, ¶ 16; Dkt. 33-2, ¶ 16]. McQueen had not asked Tucker to step on the bug. [Dkt. 30-1, ¶ 17; Dkt. 33-2, ¶ 17]. Kevin Love ("Love"), the custodian, **[*3]** indicated there was a "liquidy" spot about "[t]he size of a soccer ball" that he was to mop during the time when Tucker was present, but it is unclear when the substance on the floor came to exist. [*See* Dkt. 30-4 (Love Dep.) at 38:1-16]. Three days later, Tucker received an x-ray and treatment to her leg. [*See* Dkt. 30-2, at 41:2-25].

On May 7, 2014, Tucker filed a claim for administrative settlement with the United States Postal Services in the amount of $450,000, which the United States Postal Service Tort Claims Examiner/Adjudicator denied on September 18, 2014. [Dkt. 18-1 (Standard Form 95 Claim for Damage, Injury, or Death); Dkt. 18-2 (Administrative Letter)]. As required under *28 U.S.C. § 2401(b)*, Tucker has filed an administrative claim with the appropriate federal agency within two years of the time the claim accrued and filed this action within six months of the date mailing of the notice of final denial of her claim, thereby conferring jurisdiction upon this Court.

ANALYSIS

I. Legal Standard

Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The moving party bears the burden of proving that no genuine factual disputes **[*4]** exist. *See Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010)*. "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986))*. Where, as here, "a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law." *Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 242 (2d Cir. 2004)*. "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then 'summary judgment must be denied even if no opposing evidentiary matter is presented.'" *Id. at 244* (emphasis omitted) (quoting *Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001))*.

"In order to defeat a summary judgment motion that is properly supported by affidavits, depositions, and documents as envisioned by *Fed. R. Civ. P. 56(e)*, the opposing party is required to come forward with materials envisioned by the Rule, setting forth specific facts showing that there is a genuine issue of material fact to be tried." *Gottlieb v. Cty of Orange, 84 F.3d 511, 518 (2d Cir. 1996)* (internal citation omitted). A plaintiff may not rely solely on "the allegations of the pleadings, or on conclusory statements, or on mere assertions that

affidavits supporting the motion **[\*5]** for summary judgment are not credible. *Id.* (internal citations omitted). "At the summary judgment stage of the proceeding, [a plaintiff is] required to present admissible evidence in support of her allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch—Rubin v. Sandals Corp., No. 3:03CV481 (MRK), 2004 U.S. Dist. LEXIS 22112, 2004 WL 2472280, at \*1 (D. Conn. Oct. 20, 2004)* (citing *Gottlieb, 84 F.3d at 518*); *see Martinez v. Conn. State Library, 817 F. Supp. 2d 28, 37 (D. Conn. 2011)*.

II. FTCA Negligence Claim

Under *28 U.S.C. § 1346(b)*, the United States is liable for its employee's torts "in accordance with the law of the place where the act or omission occurred." *28 U.S.C. § 1346(b)(1)*; *see Caban v. United States, 728 F.2d 68, 72 (2d Cir. 1984)*; *Davis v. United States, 430 F. Supp. 2d 67, 73 (D. Conn. 2006)* ("The Supreme Court has, on numerous occasions, read the FTCA to mean that the United State's [sic] liability is determined by state substantive tort law."). Connecticut law applies to Tucker's claims because it would have applied if Tucker had brought a negligence action against a private defendant.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *Baptiste v. Better Val-U Supermarket, Inc., 262 Conn. 135, 138, 811 A.2d 687 (Conn. 2002)* (internal quotation marks and citations omitted). The existence of a duty is a question of law. *Gordon v. Bridgeport Hous. Auth., 208 Conn. 161, 171, 544 A.2d 1185 (Conn. 1988)*; *Dubuis v. U.S., 3:06CV01443(DJS), 2008 U.S. Dist. LEXIS 10053, 2008 WL 410429, at \*4 (D. Conn. Feb. 12, 2008)*. "Only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that **[\*6]** duty in the particular situation at hand." *Gordon, 208 Conn. at 171*. The status of a person entering onto a possessor's land determines the duty owed by the possessor to such person: thus, an ascending degree of duty is owed to a trespasser, a licensee, and an invitee. *Considine v. City of Waterbury, 279 Conn. 830, 859, 905 A.2d 70 (Conn. 2006)*. Tucker, who was a regular patron of the Allingtown Post Office, was a business invitee on that day because she went to buy stamps or get a money order, both of which were offered for sale at the Post Office at the time of her visit. [Dkt. 30-2, at 25:21-22]; *see Corcoran v. Jacovino, 161 Conn. 462, 465, 290 A.2d 225 (Conn. 1971)* ("A business invitee 'is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land.'") (quoting *Restatement (Second) of Torts § 332* (Am. Law Inst. 1965)); *Gomes v. United States, No. 3:11-CV-01825, 2012 U.S. Dist. LEXIS 164526, 2012 WL 5869801, at \*4 (D. Conn. Nov. 19, 2012)* (where the parties did not dispute plaintiff was a "business invitee" of the United States Post Office because he maintained a post office box and was a regular customer of the Norwich Post Office). As a business invitee, Defendant owed Plaintiff a "duty to maintain its premises in a reasonably safe condition." *Gomes, 2012 U.S. Dist. LEXIS 164526, 2012 WL 5868901, at \*4*; *Martin v. Stop & Shop Cos., Inc., 70 Conn. App. 250, 251, 796 A.2d 1277 (Conn. Appt. Ct. 2002)*.

A defendant has breached the duty to a business invitee if "the defendant either had actual notice of the presence **[\*7]** of the specific unsafe condition which caused [his injury] or constructive notice. . . ." *Kelly v. Stop and Shop, Inc., 281 Conn. 768, 776, 918 A.2d 249 (Conn. 2007)*. Whether actual or constructive, the notice "must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it. . . ." *Id.*; *James v. Valley-Shore Y.M.C.A.,*

2017 U.S. Dist. LEXIS 15265, *7

*Inc.*, 125 Conn. App. 174, 179, 6 A.3d 1199 (Conn. App. Ct. 2010)* ("the plaintiff [is] required to prove that the defendant had had actual or constructive notice of the *specific defect* that caused the plaintiff's injuries.") (quoting *Riccio v. Harbour Village Condo. Ass'n., Inc., 281 Conn. 160, 164, 914 A.2d 529 (Conn. 2007)*; *Graham v. Kohl's Dep't Stores, Inc., No. 3:04CV949(MRK), 2005 U.S. Dist. LEXIS 20173, 2005 WL 2256603, at *1 (D. Conn. Sept. 8, 2005)* ("[R]elevant case law in Connecticut places a heavy burden on a 'slip and fall' plaintiff to demonstrate that a defendant had actual or constructive notice of the specific defect that led to the accident and 'not merely of conditions naturally productive of that defect even though subsequently in fact producing it.'") (citing *LaFaive v. DiLoreto, 2 Conn. App. 58, 60, 476 A.2d 626 (Conn. App. Ct. 1984))*. Proof of notice is not necessary if "the defendant's conduct created the unsafe condition" because "it safely may be inferred that it had knowledge thereof." *Kelly, 281 Conn. at 777*.

Plaintiff does not argue that Defendant had actual or constructive notice, but if she had done so these arguments would be unavailing. No evidence has been submitted to indicate **[*8]** that anyone was aware of a puddle existing prior to Plaintiff's fall, and therefore Defendant did not have actual notice of an unsafe condition.[1] With respect to constructive notice, "[t]he controlling question in deciding whether the defendant[ ] had constructive notice of the defective condition is whether the condition existed for such a length of time that the defendants should, in the exercise of

reasonable care, have discovered it in time to remedy it." *Kelly, 281 Conn. at 777*; *Gomes, 2012 U.S. Dist. LEXIS 164526, 2012 WL 5869801, at *7* (same). Such a determination is based on the particular circumstances of the case. *Kelly, 281 Conn. at 777*. Here, the evidence is that there was no puddle at all. Tucker herself testifies that she did not notice any liquid substance on the ground before or after she fell. [Dkt. 30-2, at 33:12-14, 73:5-9]. Neither McQueen, who was on the other side of the service counter, nor any other affiant has offered evidence that there was liquid on the floor immediately prior to Tucker's fall. In fact, when asked what Tucker slipped on, she testified, "I don't know," and she admitted that the ground was dry where her foot came into contact. [*Id.* at 33:6-20]. The record indicates that Plaintiff's slip and fall is not attributable to the liquid on the floor, but even **[*9]** it were the case, the liquid certainly could not have existed on the floor for a time long enough for a Postal Service employee exercising reasonable care to clean it up.

While foregoing the notice argument, Plaintiff instead posits that Defendant created the unsafe condition when the employee asked Plaintiff to spray the liquid at the bug without telling the Plaintiff that "the contents of the spray bottle . . . would likely cause the floor to become slippery." [Dkt. 33-1 (Pl.'s Opp'n Mot. Summ. J.), at 7]. Tucker testified that she was affirmatively asked by McQueen to spray the bug, although McQueen could not corroborate this allegation. [Dkt. 30-2, at 31:7-9; Dkt. 30-1, ¶ 3; Dkt. 33-2, ¶ 3; Dkt. 33-5, at 23:21-22]. Assuming McQueen had asked Tucker to spray the bug and assuming such a request is a breach of duty, such an action alone does not make Tucker's injuries reasonably foreseeable. Connecticut law requires that after proving a defendant is in breach of duty the plaintiff then must establish (a) "the injury would not have occurred but for the actor's conduct," and (b) "the defendant's conduct [was] a substantial factor in

---

[1] Love refers to something "liquidy" that was "the size of a soccer ball," but it is unclear at what point this substance came to exist on the floor. [Dkt. 30-4, at 38:1-14]. It is entirely possible that this liquid appeared after Plaintiff's fall, as the Court can imagine a situation in which Plaintiff fell, dropped the bottle, and the liquid poured out as a result.

2017 U.S. Dist. LEXIS 15265, *9

bringing about the plaintiff's injuries and that there **[\*10]** was an unbroken sequence of events that tied [the plaintiff's] injuries to the [defendant's conduct]." *Rawls v. Progressive N. Ins. Co., 310 Conn. 768, 776-77, 83 A.3d 576 (Conn. 2014)*. Simply stating that McQueen breached a duty by asking Tucker to spray the bug is not enough. No defendant could reasonably foresee that by virtue of possessing a spray bottle Tucker would either (a) spray so much of the contents onto the floor to create a slip-worthy puddle, or (b) attempt to step on a bug that is actively flying through the air to squash and kill it. The Court finds as a matter of law that no reasonable jury could determine that McQueen's alleged request to spray a bug was a substantial factor in causing Tucker to slip, fall, and sustain an actual injury. *See, e.g., Demers v. Rosa, 102 Conn. App. 497, 506, 925 A.2d 1165 (Conn. App. Ct. 2007)* (finding that the defendant's negligent act in allowing the dog to roam free on the day in question did not proximately cause plaintiff to slip and fall, as the dog had already been put in the car and plaintiff slipped on ice and snow in the driveway); *Ellison v. St. Raphael Dialysis Ctr. P'ship, No. NNHCV146049509, 2015 Conn. Super. LEXIS 1554, 2015 WL 4098173, at \*2 (Conn. Super. Ct. June 3, 2015)* (granting summary judgment because defendant's failure to warn of a wet floor proximately caused plaintiff's fall but did not proximately cause an actual injury). Therefore, the Court **[\*11]** finds that Defendant did not breach its duty of care to maintain its premises in a reasonably safe condition.

III. Conclusion

The Court GRANTS Defendant's Motion for Summary Judgment and enters judgment in Defendant's favor. The Clerk is directed to close this case. IT IS SO ORDERED.

/s/ Vanessa L. Bryant

Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: February 3, 2017

---

End of Document

 Caution

As of: March 17, 2022 2:37 AM Z

## *White v. E & F Constr. Co.*

Supreme Court of Errors of Connecticut

May 8, 1963, Argued ; June 25, 1963, Decided

No Number in Original

**Reporter**

151 Conn. 110 *; 193 A.2d 716 **; 1963 Conn. LEXIS 315 ***

Georgia White v. The E and F Construction Company

**Prior History: [***1]** Action to recover damages for personal injuries, alleged to have been caused by the negligence of the defendant and by a nuisance maintained by it, brought to the Superior Court in Fairfield County and tried to the jury before *Barber, J.;* the court directed a verdict for the defendant, and from the judgment thereon the plaintiff appealed.

The appellant filed a motion for reargument which was denied.

**Disposition:** *No error.*

## Core Terms

landing, door, notice, stairway, minutes, apartment house, basement, doorway, wet, constructive notice, length of time, rear entrance, injuries, tenants, coming, rainy, rear

## Case Summary

**Procedural Posture**

Plaintiff invitee, who was injured in a fall on a basement stairway in an apartment house owned by defendant property owner, complained of a judgment of the Superior Court in Fairfield County (Connecticut), which was rendered on a directed verdict in favor of the property owner on the invitee's personal injury action for negligence and nuisance, assigning as error the denial of her motion to set aside the verdict.

**Overview**

The invitee intended to hang the laundry in the cellar to dry and fell to the basement floor. She noticed that the landing was wet, that the door to the rear entry was propped open at the time, and that rain was coming through the doorway. The trial court directed a verdict on the ground that there was no evidence to show that the property owner had notice of the condition that caused the invitee's fall. The court held that the jury could not have found that the property owner was liable for the invitee's injuries because there was nothing to show that the property owner knew of the unsafe condition or was chargeable with notice of it because, had it exercised a reasonable inspection of the premises, it would have known of the condition. The evidence did not support a finding that the condition had existed for a sufficient length of time to charge the property owner with constructive notice. Constructive notice would have required notice of the presence of the water itself and not merely of conditions naturally productive of it. The evidence was insufficient to support a verdict for the invitee, and the court did not err in directing the verdict.

151 Conn. 110, *110; 193 A.2d 716, **716; 1963 Conn. LEXIS 315, ***1

## Outcome

The court held that there was no error.

## LexisNexis® Headnotes

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

*HN1*[↓] Trials, Judgment as Matter of Law

The direction of a verdict is justified if upon the evidence the jury could not reasonably and legally reach any other conclusion than that embodied in the verdict as rendered.

Torts > Premises & Property Liability > General Premises Liability > General Overview

*HN2*[↓] Premises & Property Liability, General Premises Liability

To charge a defendant with constructive notice in a general premises liability suit, the notice would have to be of the presence of the hazard itself and not merely of conditions naturally productive of the hazard.

**Counsel:** *Irwin E. Friedman,* with whom were *Albert J. Kleban* and, on the brief, *Arthur Levy, Jr.,* for the appellant (plaintiff).

*Ivan A. Hirsch,* with whom, on the brief, was *Edgar W. Krentzman,* for the appellee (defendant).

**Judges:** Baldwin, C. J., King, Murphy, Shea and Alcorn, Js.

**Opinion by:** SHEA

## Opinion

[*111] [**717]    The plaintiff, an invitee, sustained injuries as a result of a fall on a basement stairway. At the close of the evidence, the trial court directed a verdict for the defendant. The plaintiff has appealed, assigning as error the denial of her motion to set aside the verdict.

From the evidence most favorable to the plaintiff, the jury could reasonably have found the following facts: In May, 1958, the plaintiff was employed as [***2] a domestic by one of the tenants in an apartment house owned by the defendant in Bridgeport. The rear entrance to the building, the basement stairway and the landing above the stairway were used in common by the various tenants and were under the control of the defendant. The landing and the stairway were made of concrete and had been recently painted, so that they had a shiny or glossy finish. There is one step leading from the [*112] backyard to the landing. On May 7, about 2:30 p.m., the plaintiff left the apartment house by the front door and went into the yard to remove some laundry from the clothesline. It was raining at the time. The clothes were wet, and the plaintiff intended to hang them in the cellar to dry. She put them into a basket and entered the house through the back door. As she started to step from the landing to go down the stairs, her feet slipped from under her and she fell to the basement floor. After her fall, she noticed that the landing was wet. The door to the rear entry was propped open at the time, and rain was coming through the doorway. The plaintiff's employer had occupied an apartment in the defendant's building for more than a month, [***3] and during that time the door to the rear entrance was open most of the time. There was a rainy spell from May 3 through May 7, and rain had fallen during some part of each one of those days. About two

Case 3:20-cv-01657-OAW   Document 53   Filed 03/17/22   Page 253 of 253

Page 3 of 3

151 Conn. 110, *112; 193 A.2d 716, **717; 1963 Conn. LEXIS 315, ***3

minutes before the plaintiff fell, her employer had noticed that the steps were wet by reason of rain which was coming through the open doorway.

From the memorandum of decision denying the motion to set aside the verdict, it appears that the court directed the verdict on the ground that there was no evidence to show that the defendant had notice of the condition which caused the plaintiff's fall.  *HN1*[↑] The direction of a verdict is justified if upon the evidence the jury could not reasonably and legally reach any other conclusion than that embodied in the verdict as rendered.  *Lurier v. Danbury Bus [**718] Corporation, 144 Conn. 544, 547, 135 A.2d 597*. The jury could have found that the plaintiff's fall was caused by the wet condition of the landing. However, before the jury could find that the defendant was liable for the plaintiff's injuries, it was **[*113]** necessary to show that the defendant knew of the unsafe condition, or was chargeable with notice of it because, **[***4]** had it exercised a reasonable inspection of the premises, it would have known of the condition.  *Laflin v. Lomas & Nettleton Co., 127 Conn. 61, 64, 13 A.2d 760; Smeriglio v. Connecticut Savings Bank, 129 Conn. 461, 462, 29 A.2d 443; Morris v. King Cole Stores, Inc., 132 Conn. 489, 492, 45 A.2d 710*. There is nothing to indicate that the defendant had actual notice of the presence of the water on the landing. Therefore, the crucial question is whether the water had been there for such a length of time that the defendant should, in the exercise of due care, have discovered it in time to have removed it.  *Morris v. King Cole Stores, Inc., supra.*

Although there was evidence that rain was falling on the landing through the open doorway at the time the plaintiff fell, there is nothing to establish how long this condition had prevailed.  There was evidence also that the door had been open most of the time between April 1 and May 7, but there was nothing to show that the

door was open on rainy days or that it had been open for any appreciable length of time before the plaintiff fell.  Four families lived in the apartment house. The rear door was used by all **[***5]** of them, and it would be pure speculation to indulge in an attempt to determine when or by whom the door had been opened.  The plaintiff's employer had observed the water on the landing only about two minutes before the accident.  It is impossible to ascertain whether the water had been on the landing for a period of minutes, hours or days.  The evidence reveals no more than that the condition which caused the plaintiff to fall had been present for about two minutes before the time she entered the building. This evidence would not  **[*114]** support a finding that the condition had existed for a sufficient length of time to charge the defendant with constructive notice of it.  *Smeriglio v. Connecticut Savings Bank, supra; Laflin v. Lomas & Nettleton Co., supra, 63.  HN2*[↑] To charge the defendant with constructive notice, the notice would have had to be of the presence of the water itself and not merely of conditions naturally productive of it.  *New Britain Trust Co. v. New York, N.H. & H.R. Co., 145 Conn. 390, 393, 143 A.2d 438; Drible v. Village Improvement Co., 123 Conn. 20, 23, 192 A. 308.*

The evidence was insufficient to support a verdict for the plaintiff,  **[***6]** and the court did not err in directing the jury to return a defendant's verdict.  *Bambus v. Bridgeport Gas Co., 148 Conn. 167, 171, 169 A.2d 265.*

There is no error.

In this opinion the other judges concurred.

_____